**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, *et al.*,

        *Plaintiffs*,

    - against -

DEUTSCHE TELEKOM AG, *et al.*,

        *Defendants*.

19 Civ. 5434 (VM) (RWL)

**REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION OF NON-PARTIES
COMCAST CORPORATION, CHARTER COMMUNICATIONS, INC., AND ALTICE
USA, INC. TO MODIFY THE STIPULATED INTERIM PROTECTIVE ORDER**

ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 508-4600

1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000

*Attorneys for Non-Party*
*Charter Communications, Inc.*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Attorneys for Non-Party*
*Comcast Corporation*

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300

1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

*Attorneys for Non-Party*
*Altice USA, Inc.*

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ......................................................................................... ii

ARGUMENT ..............................................................................................................1

I.     The Stipulated Order Should Be Modified so that Defendants'
       In-House Counsel Do Not Have Access to Non-Party Confidential Information ...............1

       A.     Defendants' Proposed Amendment Does Not Address the
              Risk of Inadvertent Misuse or Disclosure of Confidential Information ..................2

       B.     Defendants Have Not Shown that They Would Be Prejudiced if
              Confidential Information is Restricted to Outside Counsel Only ...........................4

       C.     The Court Should Adopt the Cable MVNOs' Proposed Order,
              Which Follows Typical Protections in Litigated Merger Cases .............................5

II.    Defendants' Declarations Confirm that their Employees
       Should Not Have Access to Non-Party Confidential Information .....................................6

       A.     Sprint ...........................................................................................................6

       B.     T-Mobile .....................................................................................................8

       C.     Deutsche Telekom .......................................................................................9

CONCLUSION ..........................................................................................................10

**TABLE OF AUTHORITIES**

CASES

PAGE(S)

*Brown Bag Software v. Symantec Corp.*,
   960 F.2d 1465 (9th Cir. 1992) ...................................................................................1, 2, 4

*In re Dental Supplies Antitrust Litig.*,
   2017 WL 1154995 (E.D.N.Y. Mar. 27, 2017) ...........................................................4

*F.T.C. v. Advocate Health Care Network*,
   162 F. Supp. 3d 666 (N.D. Ill. 2016) .................................................................3, 4, 6

*F.T.C. v. Sysco Corp.*,
   83 F. Supp. 3d 1 (D.D.C. 2015) ...............................................................................6

*F.T.C. v. Whole Foods Mkt., Inc.*,
   2007 WL 2059741 (D.D.C. July 6, 2007) ................................................................6

*Intel Corp. v. VIA Techs., Inc.*,
   198 F.R.D. 525 (N.D. Cal. 2000) ............................................................................5

*New York v. Microsoft Corp.*,
   2002 WL 31628220 (D.D.C. Nov. 18, 2002) ..........................................................5

*Sullivan Mktg., Inc. v. Valassis Commc'ns, Inc.*,
   1994 WL 177795 (S.D.N.Y. May 5, 1994) ..........................................................4, 9

*United States v. AB Electrolux*,
   139 F. Supp. 3d 390 (D.D.C. 2015) .........................................................................6

*United States v. Aetna Inc.*,
   2016 WL 8738420 (D.D.C. Sept. 5, 2016) ......................................................4, 6, 7, 9

*United States v. Deere & Co.*,
   No. 1:16-cv-08515 (N.D. Ill. Apr. 26, 2017) ...........................................................6

*United States v. Dentsply Int'l, Inc.*,
   187 F.R.D. 152 (D. Del. 1999) ........................................................................1, 5, 7

*United States v. Sungard Data Sys., Inc.*,
   173 F. Supp. 2d 20 (D.D.C. 2001) ..........................................................................6

*U.S. Steel Corp. v. United States*,
   730 F.2d 1465 (Fed. Cir. 1984) ...............................................................................3

**ARGUMENT**

Defendants' letter response effectively concedes that the Stipulated Order inadequately

protects non-parties' confidential information and requires modification.[1]  Yet Defendants'

proposed amendment fails to remedy the deficiencies in the Stipulated Order or to provide

adequate assurance concerning the roles of employees who would access non-party Confidential

Information.  In particular, Defendants propose an improperly narrow definition of "competitive

decision-making" that is inconsistent with case law and with the FCC protective order, and still

permits *sixteen* of Defendants' in-house lawyers to access ***everything*** that non-parties produce—

without any showing of necessity.  Moreover, the declarations ***affirmatively reveal*** that it would

be inappropriate to permit in-house counsel to access the Cable MVNOs' Confidential

Information.  For these reasons, and as shown below, the Court should enter the Cable MVNOs'

proposed order and preclude in-house counsel from access to Confidential Information.[2]

**I.      The Stipulated Order Should Be Modified so that Defendants'
         In-House Counsel Do Not Have Access to Non-Party Confidential Information**

Defendants' employees should be barred from accessing non-party Confidential

Information because the risk of inadvertent disclosure of such competitively sensitive

information outweighs any conceivable prejudice.  *See, e.g.*, *Brown Bag Software v. Symantec

Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992); *United States v. Dentsply Int'l, Inc.*, 187 F.R.D. 152,

158 (D. Del. 1999).  Defendants incorrectly state that the Cable MVNOs "offer no evidence that

they would be harmed" from disclosure of their Confidential Information to Defendants'

---

[1] Capitalized terms not otherwise defined have the same meaning as in the moving brief ("Mem."). Exhibits are attached to the moving (Exs. 1 to 10) and reply (Exs. 11 to 21) declarations of Arthur J. Burke.

[2] Contrary to Defendants' assertion, this motion was not procedurally "noncompliant."  Defendants never explain the basis for this claim, but may be intimating that the Cable MVNOs should have sought a pre-motion conference pursuant to Magistrate Judge Lehrburger's Individual Practices.  But Paragraph B(2) of the Stipulated Order expressly required a *motion* to be filed by July 8, 2019—*not* a request for a pre-motion conference.  If the Cable MVNOs had not moved then, they would have risked irreparable injury from disclosure of their Confidential Information to Defendants' in-house counsel.  Defendants' assertion is also misplaced because this motion was not referred to Judge Lehrburger until July 16, when a general pretrial order of reference was entered.  ECF 120.

employees.  During the pre-suit merger review, the Cable MVNOs disclosed wide-ranging

information related to their mobile wireless and broadband businesses, their negotiations with

MNOs, their strategic plans, and other highly sensitive issues, as shown in the moving brief.

Mem. 5-6.  The risk of misuse or disclosure of such information, even inadvertently, is plain.[3]

### A.    Defendants' Proposed Amendment Does Not Address the Risk of Inadvertent Misuse or Disclosure of Confidential Information

In their opposition, Defendants propose an amendment that would modify the role

restriction applicable to their in-house lawyers with access to Confidential Information.  This

amendment effectively concedes that the role restriction in the current Stipulated Order is

facially insufficient because it does not preclude such employees from involvement in

"competitive decision-making," which has been called a "crucial factor" in assessing the risk that

information will be (even inadvertently) misused.  *Brown Bag*, 960 F.2d at 1470.

Defendants' proposed amendment, however, does not go nearly far enough.  In particular,

it defines "competitive decision-making" as "participat[ing] in making decisions or advis[ing]

the company regarding formulating or implementing business strategies to compete with the

company's competitors."  ECF 112-1, ¶ E(1)(i).  This unduly narrow definition fails to reflect the

case law and commercial realities.

Notably, Defendants' submission—and their narrow proposed definition of competitive

decision-making—focuses only on competition between the Cable MVNOs and the Defendants

and completely ignores the actual or potential ***customer/supplier relationships*** between the

Cable MVNOs and Defendants.  The Cable MVNOs—nascent wireless players—are Defendants'

wholesale customers or potential customers.  As explained in the moving brief, the complaint

contains allegations about Sprint's wholesale MVNO agreement with Altice and MVNO

---

[3] Defendants fail to justify why each Defendant could possibly need to provide Confidential Information to *four* in-house lawyers when each Defendant is advised by highly skilled counsel.  The sheer number of employees with access magnifies the risk of misuse or disclosure of such information.

negotiations that Sprint conducted with Comcast and Charter. Mem. 5; *see* Am. Compl. (ECF 65) ¶¶ 86-88. Already, during the merger review, the Cable MVNOs have disclosed highly sensitive information related to these topics and to their internal views of MVNO negotiations.

Now, however, Defendants have proposed a "competitive decision-making" standard that focuses entirely on claimed competition and not on relevant customer/supplier arrangements. Under Defendants' proposal, their in-house counsel who access the Cable MVNOs' highly sensitive information can simultaneously advise their clients on strategy concerning wholesale relationships—even after reviewing the Cable MVNOs' key strategic documents regarding wholesale strategies—among other issues where this information would give Defendants an advantage. In sum, Defendants' amendment provides no assurance that Defendants' employees will not use or disclose Confidential Information to the Cable MVNOs' disadvantage.

The relevant legal precedent confirms that the proposed amendment is legally deficient. Courts use the phrase "competitive decision-making" as a "convenient shorthand" for an "inevitably complex inquiry." *F.T.C. v. Advocate Health Care Network*, 162 F. Supp. 3d 666, 669 (N.D. Ill. 2016). Even in the case on which Defendants principally rely, *U.S. Steel Corp. v. United States*, the court explained that competitive decision-making is simply "shorthand" for "counsel's *activities, association, and relationship with a client* that are such as to involve counsel's advice and participation in *any or all of the client's decisions* . . . made in light of similar or corresponding information about a competitor." 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984) (emphasis added). The FCC protective order in this very merger defines "Competitive Decision-Making" far more broadly as "a person's activities, association, or relationship with any of his or her clients involving advice about or participation in the relevant business decisions or the analysis underlying the relevant business decisions of the client in competition with or in a

3

business relationship with the Submitting Party or with a Third-Party Interest Holder."[4]  Ex. 8

¶ 2.  Defendants' unreasonably narrow definition of competitive decision-making falls far short

of this applicable standard and should be rejected.

The declarations submitted by three Defendants' in-house counsel, as explained in Point

II below, confirm the acute risk of misuse or disclosure of Confidential Information.  Their

canned disclaimers of responsibility for "potentially competitively sensitive issues," Buckland

Decl. (ECF 112-2) ¶¶ 6-7; Fell Decl. (ECF 112-3) ¶¶ 5-6; Stapper Decl. (ECF 112-4) ¶ 4, neither

address the full range of sensitive matters nor permit "careful and sensitive assessment of the

entire setting in which in-house counsel functions."  *Advocate Health*, 162 F. Supp. 3d at 669.

## B. Defendants Have Not Shown that They Would Be Prejudiced if Confidential Information is Restricted to Outside Counsel Only

The risk of misuse or disclosure of Confidential Information must be balanced against the

prejudice, if any, that Defendants would suffer if their in-house counsel were not able to access

such information.  *Brown Bag*, 960 F.2d at 1470; *Sullivan Mktg., Inc. v. Valassis Commc'ns, Inc.*,

1994 WL 177795, at *2 (S.D.N.Y. May 5, 1994).  Defendants fail to show that their outside

counsel would be "hamstrung in their trial preparations" absent input from in-house counsel on

Confidential Information or that it is "essential" that in-house counsel pore over the Cable

MVNOs' highly sensitive information.  *Advocate Health*, 162 F. Supp. 3d at 672, 674; *see, e.g.*,

*In re Dental Supplies Antitrust Litig.*, 2017 WL 1154995, at *4 (E.D.N.Y. Mar. 27, 2017);

*United States v. Aetna Inc.*, 2016 WL 8738420, at *9 (D.D.C. Sept. 5, 2016).

---

[4] Defendants' discussion of the FCC protective order is misleading.  That order broadly defines "Highly Confidential Information" to include information that the submitting party "claims constitutes some of its most sensitive business data which, if released to competitors or those with whom the Submitting Party . . . does business, would allow those persons to gain a significant advantage in the marketplace or in negotiations."  Ex. 8 ¶ 2.  Under the FCC order, no such information can be shared with *any* in-house counsel or even *any outside counsel* who are involved in competitive decision-making.  *Id.* ¶ 7.  In contrast, Paragraph E(8) of the Stipulated Order provides heightened protection only for the limited category of "NRUF/LNP" data.

The declarations of Defendants' in-house counsel do not demonstrate otherwise.  None

provide particularized reasons why it is essential or even particularly important for them to

access non-party Confidential Information.  Instead, they contain generic statements to the effect

that they have "significant experience and knowledge regarding where relevant information can

be found to respond to the allegations and arguments by Plaintiffs based in part on Confidential

Information."  Buckland Decl. ¶ 10; *see also* Fell Decl. ¶ 8; Stapper Decl. ¶ 6.  It is unexplained

why in-house counsel require access to *non-parties'* Confidential Information to find relevant

information within their own companies.  The declarations' rote claims that these employees

"cannot provide fully informed legal advice" absent access to Confidential Information,

Buckland Decl. ¶ 11; Fell Decl. ¶ 9; Stapper Decl. ¶ 7, lack particularity and do not disprove

Defendants' ability to prepare for trial without in-house access to Confidential Information.[5]

### C.       The Court Should Adopt the Cable MVNOs' Proposed Order, Which Follows Typical Protections in Litigated Merger Cases

The Court should enter the Cable MVNOs' proposed order, which presumptively

prohibits disclosure of Confidential Information to any in-house counsel.  Contrary to

Defendants' suggestion, protective orders in other merger cases of similar scope and complexity

provide appropriate models.  They reflect the burden that the law puts on parties to demonstrate

why their in-house counsel should be permitted access to highly sensitive information of others.

*See, e.g.*, *Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525, 528 (N.D. Cal. 2000) (the party seeking

"disclosure of information that would otherwise be confidential" bears the burden of establishing

"sufficient need for the information" which outweighs the risk of inadvertent disclosure);

*Dentsply*, 187 F.R.D. at 162 (defendant seeking to disclose confidential information to in-house

---

[5] Defendants' arguments that "fairness" requires in-house counsel to have access to Confidential
Information and that a ruling to the contrary would "deprive" Defendants of their "counsel of choice" are
misguided.  "[F]airness" does not require in-house counsel to have access to highly confidential third-party
documents. *New York v. Microsoft Corp.*, 2002 WL 31628220, at *2 (D.D.C. Nov. 18, 2002).  And an order barring
in-house counsel from accessing certain information will not keep those counsel from representing Defendants.

counsel had to detail "the circumstances warranting disclosure" and explain "why reliance on the

representations and opinions of outside counsel would not be adequate").  Indeed, in similar

merger cases, courts frequently deny defendants' applications to allow in-house counsel to

access such information.  *See, e.g.*, *United States v. Deere & Co.*, No. 1:16-cv-08515 (N.D. Ill.

Apr. 26, 2017) (Ex. 11); *Aetna*, 2016 WL 8738420.  The Stipulated Order turns the law on its

head by *presuming* it is appropriate for in-house counsel to access non-party Confidential

Information, rather than requiring Defendants to *demonstrate* need that outweighs harm.[6]

## II.     Defendants' Declarations Confirm that their Employees Should Not Have Access to Non-Party Confidential Information

The declarations from three Defendants confirm why this Court should bar disclosure of

non-party Confidential Information to Defendants' employees.  As shown above, they are replete

with insufficient boilerplate language, which is no basis for access to Confidential Information.

*Advocate Health*, 162 F. Supp. 3d at 669 ("[M]erely insisting that one is not 'involved in

competitive decision-making' cannot pretermit inquiry into the underlying facts or serve as a

shibboleth the mere invocation of which permits access to Highly Confidential Information.").

Indeed, they confirm that presumptive disclosure by in-house counsel threatens to inflict

significant harm on the Cable MNVOs, and thus support the Cable MVNOs' proposed order.[7]

### A.      Sprint

Disclosure of Confidential Information to Sprint's designated in-house counsel poses

significant risks.  Declarant Mary Jean Fell has responsibilities for "management/supervision of

---

[6] The cases relied upon by Defendants involved inquiries into particular, clearly identified in-house counsel. *See F.T.C. v. Sysco Corp.*, 83 F. Supp. 3d 1 (D.D.C. 2015); *United States v. AB Electrolux*, 139 F. Supp. 3d 390 (D.D.C. 2015); *F.T.C. v. Whole Foods Mkt., Inc.*, 2007 WL 2059741, at *1 (D.D.C. July 6, 2007); *United States v. Sungard Data Sys., Inc.*, 173 F. Supp. 2d 20, 21 (D.D.C. 2001).  Thus, they are consistent with the position that Defendants have the burden to show that any particular employee should access non-party Confidential Information.

[7] The Cable MVNOs reserve their right to bring more particularized challenges to each disclosed individual under processes approved by the Court, if necessary following resolution of this motion.  Defendants have not yet responded to the Cable MVNO's request to meet and confer on many of these employees, and have identified employees not mentioned in the declarations in a piecemeal fashion, including three SoftBank employees today.

litigation and government investigations," including antitrust matters.  Fell Decl. ¶ 4.  Fell's

LinkedIn page elaborates that she "manage[s] regulatory approvals associated with mergers and

other transactions."  Ex. 12.  Providing Fell with access to the Cable MVNOs' Confidential

Information would place her in the highly inappropriate position of advising on strategic

transactions that could harm the Cable MVNOs while knowing detailed information about their

businesses.  Courts have repeatedly recognized that in-house counsel in similar positions present

a risk of inadvertent disclosure.  *See, e.g.*, *Aetna*, 2016 WL 8738420, at *7 (in-house antitrust

lawyer with access to "direct competitors' information" might "inadvertently disclose such

information when advising management regarding future mergers with or against competitors

whose information has been disclosed to him"); *Dentsply*, 187 F.R.D. at 161-62 (in-house

counsel was involved in competitive decision-making where he participated in acquisitions).

Fell's colleagues pose even greater risks.  Vonya McCann, Senior Vice President for

Government Affairs, and Charles McKee, Vice President of Government Affairs, are responsible

for "oversight of Sprint's government affairs efforts at the federal and state levels."  Fell Decl.

¶ 4.  McCann develops "Sprint's regulatory, legislative and public policy positions and advocacy

at the state, federal and international levels."  Ex. 13.  These responsibilities include advocacy

against competitors.  For example, in 2011, McCann appeared on C-SPAN to discuss the

proposed merger of AT&T and T-Mobile, calling it "illegal" and describing the reasons why it

would harm competition.[8]  Likewise, McKee is responsible "for all non-spectrum related

regulatory matters before the [FCC]" and "all State Public Service Commission proceedings

including . . . merger reviews."  Ex. 14.  Their roles inevitably require them to advocate before

regulators, frequently against the interests of the Cable MVNOs.  Sprint entirely fails to justify

allowing government affairs professionals to access to non-party Confidential Information.

---

[8] *Communicators with Vonya McCann and Larry Cohen*, C-SPAN (Sept. 14, 2011), https://www.c-span.org/video/?301503-1/communicators-vonya-mccann-larry-cohen.

**B.**     **T-Mobile**

T-Mobile's declaration also illustrates the harm the Cable MVNOs likely will suffer from the Stipulated Order.  Laura Buckland, T-Mobile's Senior Vice President for Litigation and IP, "[a]dvises CEO and executive committee leaders on managing legal and business risks."  Ex. 9.  This direct line of communication to T-Mobile's leaders creates a danger that Buckland's advice—which may be influenced by her knowledge of Confidential Information—will come at the detriment of the Cable MVNOs.  Furthermore, as T-Mobile's chief litigation counsel, Buckland is very likely to become involved in litigation against the Cable MVNOs sometime in the future.[9]  Allowing Buckland to access highly sensitive business information about entities she may later oppose in court could seriously disadvantage the Cable MVNOs.

Similarly, disclosure to Melissa Scanlan, Ellen Blanchard, and Bradley Meisser, each of whom reports to Buckland, similarly threatens harm to the Cable MVNOs.  Buckland's declaration contains only conclusory statements regarding their lack of participation in competitive decision-making.  T-Mobile has not shown a particularized need for their access to confidential information.  Furthermore, based on publicly available information about Scanlan and Blanchard, both pose a risk of inadvertent disclosure of Cable MVNOs' Confidential Information.  Scanlan, as Vice President of IP and Antitrust, "advise[s] executive team and business owners regarding risk mitigation with an emphasis on intellectual property, antitrust, contractual, and network-related issues."  Ex. 15.  Likewise, her responsibilities include "advocacy before federal and state antitrust agencies related to corporate deals."  *Id.*  Through her involvement in contractual and network issues, among others, Scanlan is likely to be involved in business decisions relating to the Cable MVNOs, which have an actual or potential

---

[9] For example, Buckland was involved in litigation between T-Mobile and AT&T.  In particular, Buckland verified the complaint in *T-Mobile USA, Inc. v. AT&T Mobility LLC*, Case No. 8377-VCG (Del. Ch. Mar. 4, 2013), an action to confirm an arbitration award that T-Mobile won against AT&T.  Sprint currently is in IP litigation against Charter, and Buckland likely would become involved in that matter.  *Sprint Commc'ns Co. L.P. v. Charter Commc'ns, Inc.*, No. 1:17-cv-1734 (D. Del.).

MVNO arrangement with Sprint or T-Mobile.  Blanchard, T-Mobile's Managing Corporate Counsel for eDiscovery, "work[s] with a variety of business segments at T-Mobile in connection with Government inquiries and litigation."  Ex. 16.  "Government inquiries" include FCC matters and other matters involving strategic or competitive decision-making that may be adverse to the interests of the Cable MVNOs.  Further, the Cable MVNOs may have litigations unrelated to this Action against T-Mobile or Sprint.  It threatens irreparable harm to the Cable MVNOs for Blanchard to access Confidential Information in this matter and potentially have that information influence her activities in other matters.

C.      **Deutsche Telekom**

Deutsche Telekom's ("DT") declarations similarly demonstrate why the Court should revise the Stipulated Order presumptively to bar disclosure.  For example, Volker Stapper, DT's Vice President of International Competition Policy and Projects, plainly should not have access to the Cable MVNOs' Confidential Information.  Stapper "advises [DT] on international competition policy," ensuring that competition issues "are appropriately framed and advanced." Ex. 17 at 2-3.  As discussed above, in-house counsel involved in competition counseling pose a significant risk of inadvertent disclosure of Confidential Information to the detriment of competitors.  *See, e.g.*, *Aetna*, 2016 WL 8738420, at *7; *Sullivan Mktg.*, 1994 WL 177795, at *3 ("[W]here advice on a seemingly legal issue such as an antitrust question is sought, counsel's intimate knowledge of a competitor's [strategies and policies] could surely influence the nature of the advice given.").  **Even Sprint itself** objected to the disclosure of confidential information to Stapper in a prior FCC proceeding, because "framing and advancing competition policy" constitute "the very core of Competitive Decision-Making."  Ex. 18 at 5.  Based on Stapper's position, seniority, and implicit access to high-level decision makers at DT, there is a high risk that Stapper's future advice on competition issues, such as regulatory risks associated with future

9

transactions in the mobile wireless industry, may be unintentionally influenced by the

competitively sensitive information contained in the Cable MVNOs' Confidential Information.

As for Stapper's colleagues, DT provides no information on their roles. But publicly

available information confirms that Roman Reuter, Wolfgang Kopf, and Thomas Anderson are

involved in competitive decision-making. Reuter, DT's Senior Counsel for International

Competition Affairs, presents the same issues as Stapper as he advises DT "on all antitrust

related matters" and is "[r]esponsible for antitrust compliance." Ex. 19. Kopf, DT's Senior Vice

President for Public and Regulatory Affairs, is responsible for, among other matters

"Competition and Media Policy" and "Spectrum Strategy." Ex. 20. Kopf's work has included

"market entry in the US and building up the Antitrust and International Regulatory departments

at DT." *Id.* Kopf's responsibilities for competition, spectrum strategy, and market entry place

him at the forefront of competitive decision-making and should disqualify him from viewing the

Confidential Information of the Cable MVNOs, who would be competitively disadvantaged if

Kopf's future decisions and advice were influenced by their sensitive information. Finally,

Anderson is DT's Associate General Counsel and Regulatory Counsel. His duties include

serving as "secretary for various DT group entities." Ex. 21. His implicit access to high-level

decision-makers whom he may advise on legal issues necessarily creates a significant risk of

inadvertent use or disclosure of Confidential Information.

## CONCLUSION

For the foregoing reasons, Defendants' proposed amendment should be rejected, and the

Court should enter Cable MVNOs' Proposed Order.

Dated: July 19, 2019                    Respectfully submitted,

                                        DAVIS POLK & WARDWELL LLP

                                        By:      /s/ Arthur J. Burke

                                        Arthur J. Burke
                                        Christopher Lynch
                                        450 Lexington Avenue
                                        New York, New York  10017
                                        (212) 450-4000

                                        *Attorneys for Non-Party Comcast
                                        Corporation*

                                        ROPES & GRAY LLP

                                        By:      /s/ Mark S. Popofsky

                                        Mark S. Popofsky (*pro hac vice*)
                                        2099 Pennsylvania Avenue, NW
                                        Washington, DC 20006
                                        (202) 508-4600

                                        Alexander B. Simkin
                                        1211 Avenue of the Americas
                                        New York, NY 10036
                                        (212) 596-9000

                                        *Attorneys for Non-Party Charter
                                        Communications, Inc.*

                                        PAUL, WEISS, RIFKIND, WHARTON
                                        & GARRISON LLP

                                        By:      /s/ Jonathan S. Kanter

                                        Jonathan S. Kanter (*pro hac vice*)
                                        2001 K Street, NW
                                        Washington, DC 20006
                                        (202) 223-7300

                                        Jay Cohen
                                        1285 Avenue of the Americas
                                        New York, NY 10019
                                        (212) 373-3000

                                        *Attorneys for Non-Party Altice USA, Inc.*