**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK,
STATE OF CALIFORNIA,
STATE OF COLORADO,
STATE OF CONNECTICUT,
DISTRICT OF COLUMBIA,
STATE OF HAWAII,
STATE OF ILLINOIS,
STATE OF MARYLAND,
COMMONWEALTH OF MASSACHUSETTS,
STATE OF MICHIGAN,
STATE OF MINNESOTA,
STATE OF MISSISSIPPI,
STATE OF NEVADA,
STATE OF OREGON,
COMMONWEALTH OF PENNSYLVANIA,
STATE OF TEXAS,
COMMONWEALTH OF VIRGINIA, *and*
STATE OF WISCONSIN,

                    *Plaintiffs*,

            v.

DEUTSCHE TELEKOM AG,
T-MOBILE US, INC.,
SPRINT CORPORATION, *and*
SOFTBANK GROUP CORP.,

                    *Defendants*.

Case No. 1:19-cv-5434-VM-RWL

**REDACTED THIRD AMENDED COMPLAINT**

The States of New York, California, Colorado, Connecticut, Hawaii, Illinois, Maryland,

Michigan, Minnesota, Mississippi, Nevada, Oregon, Texas, and Wisconsin, the Commonwealths

of Massachusetts, Pennsylvania, and Virginia, and the District of Columbia ("Plaintiff States"),

acting by and through their respective Offices of their Attorneys General, bring this civil antitrust

suit to enjoin the proposed acquisition of Sprint Corporation ("Sprint") by T-Mobile US, Inc.

("T-Mobile"), and to obtain equitable and other relief as appropriate.  Plaintiff States allege as follows:

I.       NATURE OF THE ACTION

1.       Throughout the United States, people from every background rely on mobile wireless telecommunications services for essential daily activities, including, staying in touch with family and friends, transacting business, accessing email and the Internet, learning the news, making emergency 911 calls, listening to music, watching videos, and using services like ridesharing and mobile banking.  Many, particularly those with lower incomes who cannot pass a credit check and must purchase mobile wireless telecommunications service on a prepaid basis, rely on mobile wireless telecommunications services as their primary form of communications and do not have traditional wireline phone or broadband connections.

2.       Competition has enabled mobile wireless telecommunications services to become vital to the everyday lives of all people by driving dramatic improvements in quality and reductions in prices.  The U.S. Federal Communications Commission ("FCC") noted in its *Communications Marketplace Report* that average revenue per user for mobile wireless telecommunications services – a reflection of price paid for service – has steadily declined and Consumer Price Index data from the Bureau of Labor Statistics shows that it "fell sharply during 2017."[1]  The FCC also reported that the cost per megabyte of data declined by between 72% and 83% from 2013 to the end of 2017.  As average revenue per user and cost per megabyte of data declined, quality of service, as measured by coverage, speed, and reliability, improved.

---

[1] Federal Communications Commission, *Communications Marketplace Report*, FCC 18-181 (adopted Dec. 12, 2018 and released Dec. 26, 2018) at ¶¶ 19-20.

Preserving vigorous competition for mobile wireless telecommunications services is essential to ensure continued innovation and low prices for American consumers.

3.       In the United States, mobile wireless telecommunications services are dominated by four companies:  Verizon Communications, Inc. ("Verizon"), AT&T Inc. ("AT&T"), T-Mobile, and Sprint.  Those four companies are the only four mobile network operators ("MNOs") in the United States with networks that serve at least 90% of the U.S. population. T-Mobile and Sprint are the third and fourth largest MNOs in the United States and serve approximately 80 million and 55 million customers, respectively.

4.       For many years, T-Mobile's controlling shareholder, Deutsche Telekom AG, has believed that it would be in its economic interest to reduce the number of MNOs in the United States from four to three.  Deutsche Telekom AG expects that such a shift would result in a more "██████" market by reducing competition and enabling it to earn a greater return on its investment.  A 2015 Deutsche Telekom AG document states that the "████████████████ ████████████████████████████████████ and it recognizes that consolidation will lead to less competition and better returns for network operators.  Internal documents reveal that for several years, Deutsche Telekom AG and T-Mobile have believed that moving from four national carriers to three would be "██████████████████████," and facilitate a "████ ████████████████████████."  Consistent with Deutsche Telekom AG's views, T-Mobile previously attempted to merge with AT&T, but abandoned the transaction after it was challenged in court for being anticompetitive.  Sprint and T-Mobile also previously contemplated a merger in 2014.  It was widely reported that those discussions were abandoned due to antitrust concerns.

5.    On April 29, 2018, T-Mobile and Sprint agreed to combine, a decision supported by their respective controlling shareholders, Deutsche Telekom AG, Deutsche Telekom Holding B.V., and Softbank Group Corp.  The proposed transaction would eliminate Sprint as a competitor and reduce the number of MNOs with nationwide networks in the United States from four to three.  The combined company would have a retail market share larger than the two largest MNOs today, Verizon and AT&T.  In some areas, including in the New York City metropolitan area, the combined company's share of subscribers would exceed 50%.  The combined market share of Sprint and T-Mobile would result in an increase in market concentration that significantly exceeds the thresholds at which mergers are presumed to violate the antitrust laws.  This increased market concentration will result in diminished competition, higher prices, and reduced quality and innovation.

6.    This increase in market concentration does not reflect fully the harm to competition that would result from the proposed transaction.  Sprint and T-Mobile are close competitors.  Direct competition between Sprint and T-Mobile has led to lower prices, higher quality service, and more features for consumers.  If consummated, the merger will eliminate the competition between Sprint and T-Mobile and will increase the ability of the three remaining MNOs to coordinate on pricing.  The new combined company will also have reduced incentives to engage in innovative strategies to attract and retain customers compared to Sprint and T-Mobile today because, as T-Mobile's CEO, John Legere, has explained, companies with the anticipated size and market share of the new combined company can "███████████████████████ ████████████."  The cumulative effect of this merger, therefore, will be to decrease competition in the retail mobile wireless telecommunications services market and increase prices that consumers pay for mobile wireless telecommunications services.  Preliminary estimates

based on the submissions made by economists for Sprint and T-Mobile show that the merger could cost Sprint and T-Mobile subscribers at least $4.5 billion annually and the harm to all retail mobile wireless telecommunications subscribers could be even larger.  The merger will also negatively impact the entire ecosystem of businesses and significant segments of the American economy that depend on mobile wireless telecommunications services.

7.      The merger will negatively impact all retail mobile wireless telecommunications service subscribers but will be particularly harmful to prepaid subscribers.  Many low-income subscribers cannot pass a credit check and, thus, can purchase mobile wireless telecommunications services only on a prepaid basis.  The harms faced by low-income subscribers using prepaid service will be particularly pronounced because many low-income subscribers use their mobile handsets as their primary – or even only – means of connecting to the Internet, and the fees paid for mobile wireless telecommunications services are among the highest monthly expenses in many low-income households.

8.      Because the merger contemplates the transfer of radio licenses from Sprint to T-Mobile, it requires approval from the FCC.  In reviewing a merger, the FCC employs a broad standard and is free to consider issues beyond the merger's impact on competition.  On May 20, 2019, Sprint and T-Mobile made certain commitments to the FCC.  Based on those commitments, some FCC commissioners have publicly announced support for the merger.  To date, the FCC has not issued any order to approve the merger, which is a requirement before any closing can take place.  The proposed commitments Sprint and T-Mobile made to the FCC do not resolve the harms to competition that will result if the merger proceeds.

9.      On July 26, 2019, the United States Department of Justice ("USDOJ") filed a complaint in the United States District Court for the District of Columbia alleging that the

merger between T-Mobile and Sprint "would substantially lessen competition for retail mobile wireless service."  Complaint at ¶ 6, Dkt. No. 1, *United States et al. v. Deutsche Telekom AG et al.*, No. 1:19-cv-02234-TJK (D.D.C. July 26, 2019).  USDOJ simultaneously filed a stipulation and proposed final judgment laying out the terms of a proposed settlement that would allow the merger to proceed, so long as Defendants divested certain assets and made several additional commitments to DISH Network Corporation ("DISH"), a satellite television provider.[2]  The terms of this proposed settlement (the "Proposed DISH Settlement") do not resolve the harms to competition that will result if the merger proceeds.

10.     Because "the effect of" T-Mobile's merger with Sprint "may be substantially to lessen competition," 15 U.S.C. § 18, the Court should permanently enjoin the merger.

## II.     JURISDICTION AND VENUE

11.     Plaintiff States file this Amended Complaint under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.  Plaintiff States, by and through their respective Offices of their Attorneys General, bring this action as *parens patriae* on behalf of and to protect the health and welfare of their residents and the general economy of each of their states.

12.     Defendants are engaged in interstate commerce and in activities substantially affecting interstate commerce.

13.     The Court has subject-matter jurisdiction over this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337.

---

[2] Stipulation and Order, Dkt. No. 2-1, & Proposed Final Judgment, Dkt. No. 2-2, *United States et al. v. Deutsche Telekom AG et al.*, 1:19-cv-02232-TJK (D.D.C. July 26, 2019).  As so filed, the proposed settlement is subject to public comment and court review under the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, commonly referred to as the Tunney Act.

14.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)(1), (c).

15.     The Court has personal jurisdiction over each Defendant under Section 12 of the Clayton Act, 15 U.S.C. § 22, and Federal Rule of Civil Procedure 4.  Defendants transact business and are found within the Southern District of New York.  Defendants negotiated the merger in the United States and agreed that any closing of the merger will take place in the Southern District of New York.  In agreements executed in connection with the proposed transaction, each of T-Mobile, Deutsche Telekom AG, Sprint, and Softbank Group Corp. consented to the exclusive jurisdiction of specific courts within the United States for actions arising out of those agreements.

16.     If the merger is consummated, it will cause substantial harm to consumers in the Southern District of New York and across the United States.

### III.     THE PARTIES

17.     T-Mobile is a corporation organized and existing under the laws of the State of Delaware with its headquarters in Bellevue, Washington.  T-Mobile is one of the world's largest providers of communications services, and the third-largest mobile wireless telecommunications services provider in the United States, as measured by subscribers.  Since 2010, T-Mobile has more than doubled its total subscriber base, growing from approximately 33 million subscribers in 2010 to nearly 80 million subscribers at the end of 2018.  T-Mobile provides mobile wireless telecommunications services in all 50 states, the District of Columbia, and Puerto Rico. T-Mobile provides wireless telecommunications services under the T-Mobile and Metro by T-Mobile (formerly MetroPCS) brand names.  T-Mobile transacts business in New York and has corporate offices in New York.  In 2018, T-Mobile's revenues were $43.3 billion.

18.     Deutsche Telekom AG is a German corporation headquartered in Bonn, Germany. It is the largest telecommunications operator in Europe with wireline and wireless interests in more than 50 countries around the world and total annual revenues in 2018 of €75.7 billion (approximately $86 billion).  Deutsche Telekom AG controls T-Mobile and indirectly holds approximately 63% of T-Mobile's stock.

19.     Sprint is a corporation organized and existing under the laws of the State of Delaware with its headquarters in Overland Park, Kansas.  Sprint is the fourth-largest wireless carrier in the United States, serving approximately 55 million customers at the end of 2018, and is an interexchange long-distance wireline carrier and a Tier 1 Internet backbone provider. Sprint offers a range of wireless and wireline voice and data products and services, as well as devices and accessories, to residential and business customers in the United States, Puerto Rico, and the U.S. Virgin Islands under the Sprint, Boost Mobile, Virgin Mobile, and Assurance Wireless brands.  Sprint transacts business in New York.  Sprint's 2018 revenues from wireless services were approximately $23 billion.

20.     In May 2019, Sprint announced, based on its most recent filing for fiscal year 2018, that it had increased the number of postpaid subscribers with "710,000 postpaid net additions for the year, an improvement of 286,000 year-over-year,"[3] which was the fourth consecutive year of postpaid net additions.  Sprint further announced that it had made progress on executing its "Next-Gen Network plan."  Sprint CEO Michel Combes explained that Sprint continued to improve the quality of its network, stating:  "we increased our network CapEx spend by 50% year-over-year and our network continued to improve, as we have more LTE

---

[3] Press Release:  Sprint Reports Fiscal Year 2018 Fourth Quarter and Full Year Results (May 7, 2019).

coverage and faster download speeds year-over-year."[4]  Mr. Combes confirmed to the public that Sprint remained on track to launch standards-based 5G service in nine cities beginning in the next few weeks and stated that "Sprint delivered on its plan for fiscal 2018, as [Sprint] met all of [its] financial guidance for the year."[5]  On May 30, 2019, Sprint announced that it had launched "True Mobile 5G in Atlanta, Dallas-Fort Worth, Houston and Kansas City" and that Sprint's "on-the-go customers are among the first in the world to experience the power and performance of true mobile 5G with the largest initial 5G coverage footprint in the U.S."[6]

21.    SoftBank Group Corp. ("SoftBank") is a multinational holding conglomerate headquartered in Tokyo, Japan.  SoftBank is led by its founder, Masayoshi Son.  SoftBank had revenues of ¥9.2 trillion ($85 billion) in fiscal year 2018.  SoftBank controls Sprint and indirectly holds approximately 85% of Sprint's stock.

## IV.    THE MERGER

22.    Pursuant to their Business Combination Agreement, Sprint and T-Mobile will merge in an all-stock transaction (the "Merger").  Based on closing share prices on the last day of trading before the Merger was announced, the deal represented a total implied enterprise value of $59 billion for Sprint and approximately $146 billion for the combination of Sprint and T-Mobile ("New T-Mobile").  If the Merger were completed, Sprint would cease to exist as a separate brand.  T-Mobile's CEO, John Legere, would serve as CEO of New T-Mobile.  T-Mobile's

---

[4] Sprint Corp. Q4 2018 Earnings Call Transcript at 3 (May 7, 2019).

[5] Press Release:  Sprint Reports Fiscal Year 2018 Fourth Quarter and Full Year Results (May 7, 2019).

[6] Press Release:  Sprint Lights Up True Mobile 5G in Atlanta, Dallas-Fort Worth, Houston and Kansas City (May 30, 2019).

President and Chief Operating Officer, Mike Sievert, would serve as President and Chief Operating Officer of New T-Mobile.

23.     To facilitate the Merger, T-Mobile secured a financing commitment from the offices of six banks in New York, New York.  That commitment, set forth in a Commitment Letter, dated April 29, 2018, is governed by New York law.  Sprint and T-Mobile consented to personal jurisdiction in New York County and irrevocably and unconditionally submitted to the exclusive jurisdiction of the courts in New York County for any action directly or indirectly arising out of, relating to, based upon or as a result of the Commitment Letter or other documents related to the financing for the Merger.

24.     If the Merger were consummated, New T-Mobile would have approximately ▮ million retail subscribers, with over $▮ billion in annual mobile wireless telecommunications services revenues in 2019.  The Merger would reduce the number of MNOs with nationwide networks in the United States from four to three.  Deutsche Telekom AG would be the controlling shareholder of New T-Mobile, owning 42% of its shares, while SoftBank would own 27% of outstanding shares.  Deutsche Telekom AG would control nine of the fourteen seats on New T-Mobile's board of directors.

25.     New T-Mobile would be the largest provider of prepaid mobile wireless telecommunications services in the United States both directly and indirectly through arrangements with mobile virtual network operators that resell capacity on the New T-Mobile network.

26.     New T-Mobile plans to decommission more than ▮ cell sites that Sprint currently operates and to close retail store locations if the Merger is consummated.  New

T-Mobile has not provided plans to build any new cell sites for the purpose of expanding coverage into new areas that are not already served by either Sprint or T-Mobile.

27.     In connection with the Business Combination Agreement, Sprint and T-Mobile entered into the Domestic LTE Roaming Data Services Agreement (the "Roaming Agreement"), pursuant to which Sprint users can utilize the T-Mobile network, according to the terms and conditions set forth therein.  The Roaming Agreement is currently in effect and will continue even if the Merger is not consummated and Sprint and T-Mobile remain separate entities.

## V.     TRADE AND COMMERCE

### A.     Relevant Product Market

28.     Retail mobile wireless telecommunications services is a line of commerce or product market under Section 7 of the Clayton Act, 15 U.S.C. § 18.

29.     Mobile wireless telecommunications services allow customers to make traditional voice calls and send and receive data without being confined to a small area.  The transfer of data can be used for everything from messaging to video chatting, Internet browsing, and exchanging location information.  Mobile wireless telecommunications services utilize a radio network to carry voice calls and data, which is designed so that customers can maintain their voice calls and data sessions while traveling.

30.     Mobility is highly valued by customers and access to mobile wireless telecommunications services is essential in modern society.  In the United States at the end of 2017, there were nearly 285 million retail mobile wireless telecommunication connections. Revenue from the sale of retail mobile wireless telecommunications services in the United States was over $155 billion in 2018.  Mobile wireless telecommunications services support an ecosystem of apps and programs estimated to have had an economic impact of more than $500 billion for the United States economy in 2018.

31.     There are no reasonable alternatives to retail mobile wireless telecommunications services.  Because traditional wireline services (*e.g.*, cable or fiber connectivity provided to a home or office) are not mobile, they are not regarded by consumers of mobile wireless telecommunications services as reasonable substitutes.  In the face of a small but significant price increase imposed by a hypothetical monopolist, it is unlikely that a sufficient number of customers would switch some or all of their usage from retail mobile wireless telecommunications services to a non-mobile option such that the price increase or reduction in quality or innovation would be unprofitable.

32.     Business customers, sometimes known as enterprises, and government customers often select and contract for mobile wireless telecommunications services for use by their employees in their professional and/or personal capacities.  The terms of those agreements are set through individualized negotiations and result in rate plans and service offerings that are generally not available to retail consumers.  Accordingly, enterprise and government customers constitute a distinct set of customers for mobile wireless telecommunications services and are not included in the market for retail mobile wireless telecommunications services.

33.     Mobile wireless telecommunications services are sold in the United States to retail customers on a prepaid or postpaid basis.  There are differences between prepaid and postpaid service, the most notable being that individuals who cannot pass a credit check and/or who do not have a history of bill payment with a MNO may not be eligible for postpaid service.  Accordingly, it is informative to look at prepaid mobile wireless telecommunications services as a separate segment of the market for mobile wireless telecommunications services.

B.      **Wireless Carriers in the United States**

34.     In the United States, the only companies with nationwide networks that can provide mobile wireless telecommunications services to more than 90% of the population are AT&T, Sprint, T-Mobile, and Verizon (the "Big Four MNOs").

35.     There are a small number of companies that operate regional networks with limited coverage for mobile wireless telecommunications in certain states or regions.  However, because customers demand nationwide coverage, each such regional carrier has a roaming agreement with one or more of the Big Four MNOs.  Those agreements are essential so that the customers of regional carriers have connectivity when traveling outside the area served by the regional carrier's network.  Because regional networks do not operate nationwide and depend on roaming agreements with one or more of the Big Four MNOs, they are not a significant competitive constraint on the Big Four MNOs.

36.     Companies can offer service to retail customers without building or operating any network infrastructure of their own by buying access from a MNO and reselling it to consumers. Those entities do not own or operate any network infrastructure of their own and, as such, they are referred to as Mobile Virtual Network Operators ("MVNOs").  MVNOs have no choice but to purchase access from a MNO.  Because MVNOs must purchase access from a MNO, MVNOs depend on the MNOs for network quality.  The prices a MVNO can charge are indirectly controlled by the prices MNOs set for network access to the MVNO.  As such, MNOs have power to adjust terms and prices charged to MVNOs in a way that prevents MVNOs from creating significant new competition.  Accordingly, MVNOs are not a significant competitive constraint on MNOs.  Rather, MVNOs are considered as more of a marketing channel through which MNOs can reach additional consumers.

13

37.     There are significant barriers to entering the market and providing mobile wireless telecommunications services.  To replace the loss of competition from a nationwide MNO, a new entrant would need to, among other things, acquire spectrum licenses at a national level, design and construct a nationwide network, and market services nationally.  Those required activities are difficult, time consuming, and expensive.  No company has announced plans to build a nationwide network and enter the national market for retail mobile wireless telecommunications services.

38.     The Big Four MNOs are all competing to deploy mobile wireless telecommunications service using the newest cellular communications standard, 5G, as quickly as possible.  Sprint has stated that, even if the Merger is not approved, Sprint "████████████ ████████████████████."  Sprint's 5G service is currently active in Atlanta, Dallas-Fort Worth, Houston and Kansas City.  "In the coming weeks, Sprint also expects to launch service in areas of Chicago, Los Angeles, New York City, Phoenix and Washington, D.C., covering approximately 2,180 square miles and 11.5 million people total across all 9 market areas."[7] T-Mobile is already deploying equipment to support 5G service and plans to launch 5G service in select markets in 2019 with nationwide 5G coverage by 2020.  Verizon and AT&T also are rolling out 5G service in the United States.  Verizon has announced plans to launch 5G service in 20 U.S. cities in 2019 and AT&T claims to have already deployed 5G service in parts of 19 cities.

---

[7] Press Release:  Sprint Lights Up True Mobile 5G in Atlanta, Dallas-Fort Worth, Houston and Kansas City (May 30, 2019).

C.      **Relevant Geographic Markets**

39.      Retail mobile wireless telecommunications services are marketed and sold nationwide through national advertisements.  The Big Four MNOs market plans that allow for use throughout the United States without additional charges.  The effects of the Merger will occur nationwide and it is therefore appropriate to identify the United States as a geographic area within which the Merger likely would substantially lessen competition for retail mobile wireless telecommunications services under Section 7 of the Clayton Act, 15 U.S.C. § 18.

40.      Sprint and T-Mobile (as well as AT&T and Verizon) utilize networks that cover the vast majority of the U.S. population, advertise nationally, have nationally recognized brands, and offer pricing, plans, and devices that are generally available nationwide.  This allows the carriers to take advantage of nationwide marketing and technology deployment.

41.      The effect of the proposed Merger can also be evaluated in local geographic markets, in addition to a nationwide market.  Because most customers use mobile wireless telecommunications services at and near their workplaces and homes, and in areas where they travel frequently, customers typically purchase services from providers that offer and market services where they live, work, and travel on a regular basis.  To address regional variations in demand, MNOs, including Sprint and T-Mobile, offer promotions targeted to individuals in specific geographic areas and compete on the basis of network quality in specific geographic areas.  MNOs also operate, either directly or through affiliates, retail stores in specific geographic areas to compete for customers in those areas.

42.      The Cellular Market Areas ("CMAs") that the FCC has identified and used to license mobile wireless telecommunications service providers for certain spectrum bands approximate the areas within which customers have the same competitive choices.  In addition to

a nationwide geographic market, individual CMAs in which Sprint and T-Mobile compete are relevant geographic markets under Section 7 of the Clayton Act, 15 U.S.C. § 18.

43. Sprint and T-Mobile compete head-to-head in the nation's top 50 CMAs by revenue from retail mobile wireless telecommunications subscribers (the "Top 50 CMAs"), as well as in many other areas. The Top 50 CMAs encompass about 50% of the U.S. population. Each of the Top 50 CMAs, identified in Appendix A, represents an area in which the transaction likely would substantially lessen competition for retail mobile wireless telecommunications services and each constitutes a relevant geographic market under Section 7 of the Clayton Act, 15 U.S.C. § 18. In addition, as described below, the nationwide effects of the transaction likely would substantially lessen competition in these local markets.

44. In competing for customers in the Top 50 CMAs and other CMAs, the Big Four MNOs, including Sprint and T-Mobile, run price promotions, including in local areas where they have improved the quality of their networks. Promotions may include discounts on cellular handsets or on the nationally advertised service plans to attract new customers.

45. The Big Four MNOs compete in investment in infrastructure and innovation; they have all announced plans to deploy nationwide 5G networks with initial deployments in selected geographic areas. Sprint and T-Mobile, for example, intend to initially launch 5G services in different cities. For example, Sprint has decided to initially roll out 5G service in Chicago, Atlanta, Dallas-Fort Worth, Houston, Kansas City, Los Angeles, New York City, Phoenix, and Washington, D.C. The selection of geographic areas in which to prioritize 5G deployment reflects one way in which the Big Four MNOs compete in local geographic areas.

**D.    The Merger Would Increase Concentration in the Markets for Retail Mobile Wireless Telecommunication Services**

46.    If consummated, the Merger would result in New T-Mobile having a combined share of over ███ % in the national geographic market for retail mobile wireless telecommunications services.[8]  AT&T and Verizon would have shares of about ███ % and ███ % of the national geographic market for retail mobile wireless telecommunications, respectively.

47.    Concentration in relevant markets is typically measured by the Herfindahl Hirschman Index ("HHI").[9]  Preliminary analysis shows that, if the Merger were consummated, the HHI in the national market would increase by more than ███ points to over ███ in the national market for retail mobile wireless telecommunications services.[10]  According to the USDOJ and Federal Trade Commission 2010 Horizontal Merger Guidelines (the "Horizontal Merger Guidelines"), the Merger is presumptively anticompetitive because the HHI in the national market will increase by more than 200 points and result in an HHI above 2,500.

48.    Concentration will increase to levels that render the Merger presumptively anticompetitive under the Horizontal Merger Guidelines even if the parties divest Boost Mobile, one of the brands under which Sprint sells prepaid service, as they have committed to the FCC

---

[8] For all share and HHI calculations MVNO subscribers are attributed to the MNOs that provide the network access.  This is done because, as explained above, MVNOs are dependent on MNOs for capacity.

[9] The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  The HHI takes into account the relative size distribution of the firms in a market.  It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 points when a market is controlled by a single firm.  The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

[10] All share and HHI calculations are based on data received during the course of an investigation into the Merger and may be subject to change if additional data becomes available during litigation.

and USDOJ that they will do.[11]  If Boost Mobile were divested and operated as a MVNO on the New T-Mobile network, the divestiture would not offset or limit the increase in concentration that will result from the Merger.  If Boost Mobile were to operate on one of the other MNOs – AT&T or Verizon – New T-Mobile's combined share and the increase in HHI would still render the Merger presumptively anticompetitive.

49.     The increase in concentration would be even more pronounced in many local geographic markets for mobile wireless telecommunications services.  Based on preliminary market share data, New T-Mobile would have more than ██% share of retail mobile wireless telecommunications revenues in CMA 1, which covers the New York City metropolitan area. The HHI in CMA 1 would increase by more than ████ points to nearly ████ if the Merger were consummated.  Under the Horizontal Merger Guidelines, the Merger is presumptively anticompetitive because the HHI in the CMA 1 market would increase by more than 200 points and result in an HHI above 2,500.

50.     New T-Mobile's market share would approach ██% in several large metropolitan areas in Texas such as Houston (CMA 10) and San Antonio (CMA 33) and the HHI increase would exceed ████ points. Concentration would also increase substantially in less populated and rural areas of Texas, such as Atascosa County (CMA 670) and Chambers County (CMA672).

51.     Based on preliminary market share data, New T-Mobile would have more than ██% share of retail mobile wireless telecommunications revenues in CMA 2, which covers

---

[11] *See* Proposed Final Judgment at 6-11, Dkt. No. 2-2, *United States et al. v. Deutsche Telekom AG et al.*, No.1:19-cv-2232-TJK (D.D.C. July 26, 2019) (providing for divestiture of Boost Mobile business to DISH Network Corporation).

several counties in California, including the greater Los Angeles area.[12]  The HHI in CMA 2 would increase by approximately ███ points to ███ if the Merger were consummated.  Under the Horizontal Merger Guidelines, the Merger is presumptively anticompetitive because the HHI in the CMA 2 market would increase by more than 200 points and result in an HHI above 2,500.

52.    New T-Mobile would have the highest share of retail mobile wireless telecommunications revenues in ██ of the Top 50 CMAs and would have more than ██% share in at least ██ of the Top 50 CMAs.  HHIs would increase by more than 500 points in ██ of the Top 50 CMAs and would exceed 3,000 in ██ of the Top 50 CMAs.  The resulting HHI would increase by more than 200 points and would exceed 2,500 in all of the Top 50 CMAs.  Accordingly, under the Horizontal Merger Guidelines, the Merger is presumptively anticompetitive in all of the Top 50 CMAs.

53.    Concentration would also increase substantially in CMAs with fewer subscribers that include rural areas.  For example, in CMA 342 covering Imperial County, California, the combined company would have a share of nearly ██%.

54.    If the Merger were consummated, the combined Sprint and T-Mobile would have a share of over ██% of the prepaid segment of the national market for retail mobile wireless telecommunications services.

55.    The increase in concentration would be even more pronounced when looking at the prepaid segment in specific geographic areas with large low-income populations.  This includes urban areas such as New York, New York (CMA 1), Los Angeles, California (CMA 2),

---

[12] CMA 2 covers the California counties of Los Angeles, Orange, Riverside and San Bernardino.  The full name of CMA 2 is Los Angeles-Long Beach/Anaheim-Santa Ana-Garden Grove/Riverside-San Bernardino-Ontario, CA.

and Houston, Texas (CMA 10), as well as rural areas, many of which include substantial low-income populations.

## VI.   ANTICOMPETITIVE EFFECTS

### A.   The Merger Is Part of a Long-Term Plan To Increase Profits by Reducing Competition

56.     Deutsche Telekom AG has long sought consolidation among retail mobile wireless telecommunications service providers to improve profitability.  As early as 2010, Deutsche Telekom AG explained that one of its "███████" is that earning an "███████ ████████████████████████████████████ ████████████████████████████████."  A 2015 Deutsche Telekom AG slide deck explains that the "████████████████████████████████ ██████."

57.     T-Mobile was aware of, and shared, the concerns of its controlling shareholder, Deutsche Telekom AG.  For example, T-Mobile's Chief Strategy Officer wrote to CEO John Legere that Deutsche Telekom's Thorsten Langheim, who is responsible for Deutsche Telekom AG's U.S. business as well as Corporate Development, Portfolio Strategy and Group Mergers & Acquisitions activities, "████████████████████████████ ████████████████████████████████████ ███████████████████████████."  Consistent with the views of Deutsche Telekom AG, an October 2016 presentation to the T-Mobile Board of Directors stated that a "███████" for a merger with Sprint is that a "████████████████████ ████████████████████."

**B.     The Merger Would Eliminate Competition Between Sprint and T-Mobile**

58.     Sprint and T-Mobile compete head-to-head in the ordinary course of business nationally and locally against each other, as well as against AT&T and Verizon, to attract mobile wireless telecommunications services customers, including in the Top 50 CMAs identified in Appendix A.  T-Mobile monitors Sprint's pricing activities and its own pricing decisions are informed by Sprint's choices.  Sprint monitors T-Mobile's pricing activities and its own pricing decisions are informed by T-Mobile's choices.  Consequently, T-Mobile's executive vice president of corporate strategy testified that "███████████████████████████████ ████████████████████████████."

59.     Sprint and T-Mobile also compete head-to-head on network quality, pricing for cellular handsets, and add-ons offered through partnerships with companies like Netflix and Hulu.

60.     New York City has historically been an area where Sprint and T-Mobile compete fiercely.  Sprint has engaged in what T-Mobile employees referred to as "████████████████" by parking trucks with Sprint advertisements in front of T-Mobile stores in New York City.  And both companies have engaged in promotions targeted at each other in New York.  For example, after Sprint announced a campaign to attract more customers in the New York metropolitan area, T-Mobile employees wrote that "████████████████████████████████████ ████████████████████████████."

61.     Sprint continues to compete on network quality in the New York metropolitan area.  Sprint has upgraded radios and deployed small cells, which resulted in it announcing, in August 2018, that "Sprint is the most improved network in both the New York City and Long

Island markets, and now has faster average download speeds than AT&T in the Big Apple."[13]
Sprint's agreement with Altice USA, Inc. ("Altice"), pursuant to which it deployed 19,000 small cells on Altice infrastructure in less than a year, is largely responsible for the improvement in network quality.  Sprint aggressively advertised its improved network quality, including on billboards.

62.     T-Mobile and Sprint compete fiercely in many local markets, including markets in California such as those covering the cities of Los Angeles, San Francisco, Sacramento, San Diego, Bakersfield, and others.  As part of its "███████████████," T-Mobile spent millions of dollars offering ███ percent off Sprint rates in a number of markets, including those in California, and T-Mobile tracked the impact that those promotions had in drawing new customers in those markets from Sprint to T-Mobile.

63.     Sprint and T-Mobile compete head-to-head for prepaid subscribers.  T-Mobile sells prepaid services primarily through its Metro by T-Mobile ("Metro") brand.  Sprint sells prepaid services primarily through its Boost Mobile brand.  Metro and Boost Mobile are each other's closest competitors for mobile wireless telecommunications services on a prepaid basis.  Indeed, the senior vice president of sales and marketing for Sprint's Prepaid Group (which includes Boost Mobile) testified that "████████████████████████████ ███████████████."  Port-ins refer to customers switching from Metro to Boost Mobile and port-outs refer to customers switching from Boost Mobile to Metro.

---

[13] Press Release: *Sprint is Most Improved Network in the Big Apple and Faster than AT&T* (Aug. 16, 2018).

64.    Advertisements and promotions for Metro and Boost Mobile routinely target each other.  One example is the "Metro Sprint attack" television advertisement that T-Mobile launched "using a nightmare metaphor to describe what it's like to be a Sprint customer."

65.    Sprint and T-Mobile, through the Metro and Boost Mobile brands, compete head-to-head on pricing and respond to offers made by each other.  As just one example of the competition between the companies, an internal Sprint document explained that "█████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████."  T-Mobile was aware that Sprint was watching its moves.  For example, a T-Mobile document recognizes that "████████████ ████████████████████████████████████████████████████ ████████."

66.    Competition between Sprint and T-Mobile through their prepaid brands also extends to network quality, pricing for cellular handsets, and add-ons offered through partnerships with companies like Netflix and Hulu.

67.    The competition that exists between Sprint and T-Mobile through their prepaid brands will not be restored by divesting Boost Mobile.  If Boost Mobile were divested, it would then operate as a MVNO.  As a MVNO, Boost Mobile would be required to purchase network access from one of the three remaining MNOs, with that MNO controlling, indirectly, the prices Boost Mobile could charge and the quality it could offer.  Because Boost Mobile would not be able to compete on the basis of price or quality, it would not be a sufficient competitive constraint on the New T-Mobile.

68. Sprint and T-Mobile sell products and services through a network of retail stores. Both companies make decisions about store locations based on where the other company has (or does not have) stores. In many instances, Sprint and T-Mobile retail stores are located on the same block or in the same shopping center. Similarly, many Boost Mobile and Metro retail stores are located on the same block or in the same shopping center. The close proximity between the stores is another indication of the intense competition between the companies.

## C.    The Merger Would Eliminate Aggressive Competition From Sprint

69. Sprint is an aggressive competitor in the markets for retail mobile wireless telecommunications services. Sprint has closely monitored the promotions of its competitors in an effort to ensure that it is able to offer the lowest price in the market. Sprint has focused on providing value options for cost-conscious and low-income consumers. For example, in June 2018, Sprint launched a plan offering unlimited talk, text, and data for $15 per month, a substantial discount from the average prices consumers pay today for mobile wireless telecommunications services. Sprint experienced heavy demand from customers for the $15 per month unlimited offering.

70. Sprint's most recent filings with the U.S. Securities and Exchange Commission report that it has been attracting new subscribers and its revenue is growing.

71. Sprint has significant spectrum holdings, including access to approximately ██ MHz of 2.5 GHz spectrum in the top 100 CMAs.

72.     Sprint is rapidly deploying 5G service in the United States.  Marcelo Claure, Sprint's Executive Chairman and former CEO, has remarked that "Sprint's spectrum gives us an incredible advantage over the other U.S. carriers to lead the way with mobile #5G."[14]

73.     Sprint's ability to compete with AT&T, T-Mobile, and Verizon is further enhanced through the Roaming Agreement with T-Mobile, which will remain in effect even if the Merger is not consummated.  The Roaming Agreement allows Sprint users to access the T-Mobile network pursuant to the terms set forth therein.  Because the Roaming Agreement will improve the coverage and quality of the service that Sprint users receive without making additional capital expenditures, enabling Sprint to dedicate more resources to deploying 5G technology, Sprint's competitive position is further improved.

74.     The size of Sprint's customer base, along with its infrastructure, spectrum holdings, roaming agreements, and progress towards deploying 5G service give Sprint incentives to continue to offer low prices and high-speed service.

75.     The proposed Merger would eliminate Sprint, resulting in a significant loss of competition, including in the Top 50 CMAs identified in Appendix A.

**D.     An "Un-Carrier" Strategy Would Not Be Profit Maximizing for the Combined Company**

76.     T-Mobile currently pursues a "maverick" strategy and has branded itself as the "un-carrier."  T-Mobile has offered rate plans, features, and services that consumers value.  For example, T-Mobile has offered customers plans that offer unlimited data use, international roaming without additional charges, postpaid service without long-term contracts, and video and music streaming without deducting from the amount of high-speed data allotted to users on

---

[14] Tweet from Marcelo Claure (@marceloclaure), Feb. 27, 2018 at 12:38am, https://twitter.com/marceloclaure/status/968404847383982080.

unlimited plans.  T-Mobile's strategy also includes local promotions to attract customers from rivals in specific geographic areas.  The features, services, and promotions that T-Mobile has offered have benefitted all consumers of mobile wireless telecommunications services as other mobile network operators in the United States have had to compete with the offerings from T-Mobile.

77.     The combination of Sprint and T-Mobile will result in New T-Mobile having a market share greater than AT&T or Verizon and, as a result, New T-Mobile will no longer have incentives to behave as a maverick by lowering prices and/or improving quality.  By eliminating an independent competitor, the proposed transaction likely will reduce the competitive incentive for all MNOs to offer new rate plans and services that are valuable to consumers.

78.     Competition, including from T-Mobile, has resulted in carriers making greater investments in technology that lead to better service quality.  By eliminating Sprint as an independent competitor, the proposed transaction likely will reduce the competitive incentive for MNOs to invest in wireless networks to attract and retain customers.

79.     T-Mobile's CEO John Legere has explained that AT&T and Verizon have not led the industry with "un-carrier" offerings because of "███████████████████████████████████ ███████████████" which "█████████████████████████████████████████████."  If the Merger is consummated, the combined Sprint and T-Mobile would have an ██████████████ ████████████████████████████████, with a scale and market share approximately equal to AT&T and Verizon.  Thus, it will no longer be profit-maximizing for the combined company to continue pursuing the "un-carrier" strategy.

E.   **The Merger Would Reduce Competition Between all MNOs and Increase the Potential for Coordinated Effects in the Market for Retail Mobile Wireless Telecommunications Services**

80.     In addition to competing against each other, Sprint and T-Mobile also compete against AT&T and Verizon.  The Big Four MNOs compete on many dimensions, including price, network quality, network coverage, and features.  The aggressive competition between them has resulted in falling prices and improved quality.  The competition that currently takes place across those dimensions, and others, among the Big Four MNOs would be negatively impacted if the Merger were consummated.  The effects of the harm to competition on consumers will be significant because the Big Four MNOs have wireless service revenues of more than $160 billion.

81.     Market consolidation from four to three MNOs would also serve to increase the possibility of tacit collusion in the markets for retail mobile wireless telecommunications services.

82.     Pricing for retail mobile wireless telecommunications services is transparent.  The Big Four MNOs all offer detailed pricing information in stores, online, and in television, radio, print and online advertisements.

83.     Customers for retail mobile wireless telecommunications services cannot negotiate pricing or other service terms with the Big Four MNOs.

84.     The structure of the markets for retail mobile wireless telecommunications services already allows competitors to "signal" each other on pricing.  A former Sprint analyst stated that moves by ████████ and ████████ were "████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████."  Consistent with that description, T-Mobile's Senior Vice

President for Strategy and Decision Analytics said, "████████████████████████ ████████████████████████."

85.     Even with Sprint and T-Mobile pursuing competitive and disruptive strategies, price signaling has led to higher prices for consumers.  One example of this is the pricing of service plans offered to customers 55 years of age and older.  Through 2018 Verizon offered "Go Unlimited" plans for customers 55 and older at $60 per month for one line and $80 per month for two lines.  On March 9, 2018, T-Mobile announced that it would raise its monthly price from $60 for two lines to $70 for its plan offered to customers 55 years and older.  Sprint, in turn, introduced its own Unlimited 55+ plan at the higher T-Mobile price point in May 2018.

86.     If the Merger is consummated and Sprint is eliminated, the coordination and signaling that currently takes place – and which has led to price increases – will be amplified, further harming consumers.

## F.     The Merger Would Reduce Competition in the Sale of Access to MVNOs, Harming Retail Consumers

87.     To operate as a MVNO, a company must reach an agreement with a MNO so that the MVNO can resell access to the MNO's network.  Most MVNOs in the United States utilize the Sprint or T-Mobile networks.  AT&T and Verizon have agreements with some MVNOs but have historically been less interested in working with MVNOs than Sprint and T-Mobile.  The competition between Sprint and T-Mobile for business from MVNOs has led to MVNOs reaching new and innovative agreements with MNOs.  If the Merger is consummated, MVNOs will be harmed because, with the elimination of Sprint, they will have one fewer alternative from which they can acquire network access.

88.     Sprint has the reputation of being the "████████" of the Big Four MNOs to MVNOs.  Sprint is the only MNO in the United States that has been willing to grant MVNOs

"core control."  Core control gives the MVNO direct control over the customer experience.  With core control, a MVNO can, among other things, deploy spectrum it owns and enable its subscribers to transition seamlessly between the spectrum and towers controlled by the MVNO and by the MNO.  In this way, a MVNO can offer nationwide service through an agreement with a MNO but utilize its own network of cell sites to provide service in a home coverage area.  This approach gives MVNOs more control over the economics of the relationship and allows MVNOs freedom to innovate and provide subscribers with new and improved services.

89.     Sprint has a MVNO agreement with Altice through which it granted Altice core control.  Before the Merger was announced, Sprint had entered negotiations with the cable providers Comcast Corporation and Charter Communications, Inc. pursuant to which each would have been granted core control.

90.     Both T-Mobile's CEO and Chief Technology Officer have stated that T-Mobile will not provide MVNOs with core control.  Accordingly, if the Merger is consummated, MVNOs will not be able to negotiate agreements with core control from New T-Mobile.

91.     Reducing the options available to MVNOs, and the leverage that MVNOs have in negotiations, will result in MVNOs reaching less favorable agreements with MNOs.  This will reduce the quality of service that MVNOs can provide to their retail customers, reduce innovation, and increase the prices subscribers pay.

## G.     The Merger Would Create Substantial Upward Pricing Pressure

92.     If the Merger were consummated, New T-Mobile would have an incentive to raise prices.  Merger simulations estimated by economists retained by Sprint and T-Mobile indicate that, absent compensating factors, New T-Mobile would increase Sprint's current prices by more than ██% for postpaid service and nearly ██% for prepaid services.  The weighted average price increase for Sprint and T-Mobile would be over █% for postpaid and nearly ██% for prepaid.

Analyzing the impact on Sprint and T-Mobile customers, the Merger would cost Sprint and T-Mobile subscribers more than $4.5 billion annually.  That figure is a conservative estimate of the overall impact in the industry because it relies on estimates and assumptions made by economists retained by Sprint and T-Mobile and does not account for the harms to the more than 170 million customers served by AT&T or Verizon.

93.     Other countries that have allowed consolidation from four to three mobile wireless network operators have experienced price increases.  An empirical study of 25 countries conducted by Ofcom, the United Kingdom's regulator of communication services, found that "removing a disruptive player from a four player market . . . could increase prices by between 17.2% and 20.5% on average."[15]  Another study that examined information from 33 countries found that an average four-to-three merger in the mobile wireless telecommunications space leads to an "increase in the bill of end users by 16.3% when compared with a situation in which no merger had occurred."

## H.     Significant Barriers to Entry

94.     No company has announced plans to enter the markets for mobile wireless telecommunications services.  Entry by a new provider would be difficult, time consuming, and expensive.  Because most subscribers demand nationwide coverage, no new entrant can be a serious competitor unless and until it can offer nationwide service.  Thus, to replace the competition that would be lost from the elimination of Sprint and T-Mobile as independent competitors, a new entrant would need to, among other things, acquire spectrum nationwide and build a nationwide network before it could meaningfully compete for customers.  A prospective

---

[15] United Kingdom Office of Communications, A Cross-Country Econometric Analysis of the Effect of Disruptive Firms on Mobile Pricing, at 2 (March 15, 2016), available at https://www.ofcom.org.uk/__data/assets/pdf_file/0019/74107/research_document.pdf.

new entrant would not be able to meaningfully compete until it had invested tens of billions of

dollars in building a network, which could take more than five years to do.  Therefore, entry in

response to a small but significant price increase for mobile wireless telecommunications

services would not be likely, timely, and sufficient to thwart the competitive harm resulting from

the Merger.

## I.    Claimed Efficiencies Are Not Cognizable and Do Not Outweigh Anticompetitive Effects

95.     Defendants cannot demonstrate cognizable efficiencies sufficient to counteract the

anticompetitive effects of the Merger as such efficiencies do not exist.  Analysis of the Merger

by Sprint and T-Mobile shows that, absent efficiencies, the Merger will result in immediate and

permanent harm to competition and consumers.

96.     The efficiencies proffered by Sprint and T-Mobile are speculative, non-verifiable,

and not merger specific.  The claimed efficiencies are based on speculation and assumptions

about what the company might achieve years in the future using new and untested technologies

and, thus, cannot be verified.

97.     The efficiencies that Defendants have asserted will result from combining the

Sprint and T-Mobile networks are derived from a model that was developed at the request of

T-Mobile's antitrust counsel and in consultation with outside consulting economists.  Because

the model was not complete until months after the transaction was announced, T-Mobile's

executives and Board of Directors did not rely on that model when deciding to enter into the

Merger.  The model has not been used to make any investment decisions.  The model is

unreliable, based on flawed inputs and assumptions, and speculative.

98.     If the events described by the parties as "efficiencies" do occur, they will not be

merger specific.  For example, the Merger is not necessary for the deployment of 5G service in

the United States.  Sprint and T-Mobile are separately working to deploy the equipment

necessary for 5G service.  Sprint has already launched mobile 5G service in multiple markets.

Sprint and T-Mobile will soon offer 5G service in multiple markets, regardless of whether the

Merger is completed.  Sprint's webpage boasts that "Sprint is building a blazing-fast, high-

capacity mobile network that will enable the next wave of wireless innovation.  Sprint mobile 5G

is going to create incredible new connections to people and things, services and opportunities

that will allow our customers to live a better life."[16]  T-Mobile announced in January 2019 that it

had "achieved the world's first 5G data call and video call on 600 MHz spectrum," and CEO

John Legere explained that:  "This is huge! Unlike the other guys, @TMobile is using low-band,

mid-band and mmW to create a true nationwide #5G network that ACTUALLY WORKS when

you cross the street!"[17]

## VII.   DEFENDANTS' PROPOSED REMEDIES

### A.   Proposed Commitments to the FCC Are Insufficient To Protect Competition

99.      Restoring competition is the key to any effective antitrust remedy.  Defendants

bear the burden of showing that their proposed remedies—including the commitments they have

proposed to the FCC, their proposed settlement with USDOJ, and their agreements with DISH—

resolve the competitive problems created by the Merger.

100.    The proposed commitments that Sprint and T-Mobile made to the FCC do not

ameliorate the harms to competition, and the resulting harms to consumers, that will result if the

Merger is completed.

---

[16] Sprint 5G Overview (May 11, 2019), https://newsroom.sprint.com/sprint-5g-overview-1.htm.

[17] Tweet from John Legere (@JohnLegere), Jan. 7, 2019 at 6:01am, https://twitter.com/ johnlegere/status/1082276159646121984.

101.    The proposed commitments related to network build out, including the proposed commitments related to deploying 5G technology, deploying 5G technology in rural areas, and providing in-home broadband service, do not eliminate the competition concerns that arise from the Merger for reasons discussed elsewhere in this Amended Complaint.  The proposed commitments do not provide verifiable, merger-specific benefits to retail mobile wireless telecommunications subscribers when compared to the probable state of competition without the Merger, including the progress the Big Four MNOs, including Sprint and T-Mobile, have already made on deploying 5G technology.  The proposed commitments with respect to in-home broadband service are irrelevant because (i) T-Mobile already has plans to offer, as a standalone entity, in-home broadband service and (ii) in-home broadband service, whether offered by New T-Mobile, T-Mobile, or Sprint, constitutes a distinct service, offered to customers in select areas, that is priced on the basis of existing in-home broadband service and is, therefore, not in the market for retail mobile wireless telecommunications services.

102.    The proposed commitment to divest Boost Mobile does not restore competition lost by the Merger because, among other things, Boost Mobile would operate as a MVNO.  As a MVNO, Boost Mobile must purchase network access from T-Mobile and would be dependent on the New T-Mobile for the foreseeable future.  Accordingly, the proposed divestiture of Boost Mobile would not prevent or ameliorate the harm to competition and consumers that the Merger will cause.

103.    The proposed commitment that New T-Mobile will offer the same or better rate plans for three years after the Merger, does not address the harms to competition that would result from the Merger.  Consumer prices for mobile wireless telecommunications services have decreased over time.  Thus, a promise not to raise prices, when those prices would be falling in a

competitive market, does not address the harm to competition that will result.  Nor does it prevent T-Mobile from raising prices after the commitment ends.  Additionally, Sprint and T-Mobile offer promotions to compete for customers, including lower prices on cellular handsets and introductory offers for new customers.  The proposed commitment to offer the same or better rate plans for three years after the Merger ignores that Sprint and T-Mobile compete through promotions and fails to address the harm that will result from the reduction of those promotional activities.

104.    The proposed commitments related to Sprint's agreement with Altice do not address the harms that will result from the Merger.  The proposed commitments provide no specificity regarding any of the terms that will be offered to Altice or any other MVNOs that desire the flexibility of a similar agreement.  Although Altice has "core control" through its agreement with Sprint, T-Mobile has clearly stated that it will not allow MVNOs like Altice to exercise core control in the future.

105.    The "voluntary contributions" that the parties have proposed to pay to the U.S. Treasury in the event that New T-Mobile fails to meet the proposed commitments do not address the harms to competition that will result from the Merger, or create sufficient financial incentives for New T-Mobile to comply with the proposed commitments if it is not otherwise economically rational for it to do so.

**B.    The Proposed DISH Settlement Is Insufficient To Protect Competition**

106.    The Proposed DISH Settlement was finalized by USDOJ less than three weeks before the filing of the Second Amended Complaint, and Plaintiff States will continue to evaluate the settlement as discovery progresses.

107.    The Proposed DISH Settlement does not ameliorate the harms to competition, and the resulting harms to consumers, that will result if the Merger is completed.

108.    In conjunction with the Proposed DISH Settlement, DISH has made commitments to USDOJ and the FCC, including commitments to build network infrastructure and offer certain services.  These commitments similarly do not ameliorate the harms to competition, and the resulting harms to consumers, that will result if the Merger is completed.

## VIII.   VIOLATION ALLEGED

109.    If the Merger between Sprint and T-Mobile were consummated, it likely would substantially lessen competition in interstate trade and commerce across the nation for mobile wireless telecommunications services, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

110.    Unless enjoined, the Merger likely will have the following effects in retail mobile wireless telecommunications services across the nation, among others:

a.    Actual and potential competition between Sprint and T-Mobile will be eliminated;

b.    Competition in retail mobile wireless telecommunications will be lessened substantially;

c.    Prices for retail mobile wireless telecommunications services are likely to be higher than they otherwise would be;

d.    The quality and quantity of mobile wireless telecommunications services are likely to be less than they otherwise would; and

e.    Innovation will likely be reduced.

## IX.    REQUESTED RELIEF

111.    Plaintiff States request that:

a.    The proposed Merger between T-Mobile and Sprint be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

b.      Defendants be permanently enjoined from and restrained from carrying

out the Merger;

c.      Plaintiff States be awarded fees and the costs of this action; and

d.      Plaintiff States have such other relief as the Court may deem just and

proper.

Dated this 18th day of September, 2019.

Respectfully submitted,

FOR PLAINTIFF STATE OF
NEW YORK:

LETITIA JAMES
Attorney General

CHRISTOPHER D'ANGELO
Chief Deputy Attorney General,
Economic Justice Division
(pro hac vice forthcoming)

_____
Beau Buffier
Beau.Buffier@ag.ny.gov
Elinor R. Hoffmann
Elinor.Hoffmann@ag.ny.gov
Morgan J. Feder
Morgan.Feder@ag.ny.gov
Michael Jo
Michael.Jo@ag.ny.gov
Jeremy R. Kasha
Jeremy.Kasha@ag.ny.gov
Beatriz Marques
Beatriz.Marques@ag.ny.gov
Amber Wessels-Yen
Amber.Wessels-Yen@ag.ny.gov
James Yoon
James.Yoon@ag.ny.gov
New York State Office of the
Attorney General
28 Liberty Street
New York, NY 10005
Tel:  (212) 416-8262

*Attorneys for Plaintiff State of New York*

FOR PLAINTIFF STATE OF
CALIFORNIA:

XAVIER BECERRA
Attorney General

KATHLEEN FOOTE
Senior Assistant Attorney General

MICHAEL JORGENSON
Supervising Deputy Attorney General

_____
Paula L. Blizzard
Paula.Blizzard@doj.ca.gov
Adam Miller
Adam.Miller@doj.ca.gov
Nicole Gordon
Nicole.Gordon@doj.ca.gov
California Office of the Attorney General
455 Golden Gate Avenue Suite 11000
San Francisco, CA 94102
Tel:  (415) 510-4400

MUNGER, TOLLES & OLSON LLP

_____
Glenn D. Pomerantz
Glenn.Pomerantz@mto.com
Kyle W. Mach
Kyle.Mach@mto.com
Kuruvilla J. Olasa
Kuruvilla.Olasa@mto.com
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel:  (213) 683-9100

*Attorneys for Plaintiff State of California ex rel. Xavier Becerra*

FOR PLAINTIFF STATE OF COLORADO:

Natalie Hanlon Leh
Chief Deputy Attorney General


Devin Laiho
Senior Assistant Attorney General
Colorado Department of Law
Devin.Laiho@coag.gov

1300 Broadway, Seventh Floor
Denver, Colorado 80203
Tel:  720-508-6000

*Attorneys for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF CONNECTICUT

WILLIAM TONG
ATTORNEY GENERAL

Michael E. Cole
Assistant Attorney General
55 Elm Street
Hartford, CT  06106
Phone:  860-808-5040
Fax:  860-808-5391
Michael.Cole@ct.gov

*Attorneys for Plaintiff State of Connecticut*

FOR PLAINTIFF DISTRICT OF COLUMBIA:

KARL A. RACINE
Attorney General

ROBYN R. BENDER
Deputy Attorney General
Public Advocacy Division


Catherine A. Jackson
Chief, Public Integrity Section


Arthur T. Durst
Assistant Attorney General
Office of the Attorney General for the District of
Columbia
441 Fourth Street, N.W., Suite 630-S
Washington, DC 20001
Tel:  (202) 442-9853
arthur.durst@dc.gov

*Attorneys for Plaintiff District of Columbia*

FOR PLAINTIFF STATE OF HAWAI'I

CLARE E. CONNORS
ATTORNEY GENERAL


_____
Bryan C. Yee
Rodney I. Kimura
Deputy Attorneys General
Department of the Attorney General
425 Queen Street
Honolulu, Hawai'i  96813
Phone:  808-586-1180
Fax:  808-586-1205
Rodney.i.kimura@hawaii.gov

*Attorneys for Plaintiff State of Hawai'i*

FOR PLAINTIFF STATE OF ILLINOIS:

KWAME RAOUL
Attorney General


Blake L. Harrop
Chief, Antitrust Bureau
bharrop@atg.state.il.us
Elizabeth L. Maxeiner
emaxeiner@atg.state.il.us
Assistant Attorney General
Joseph B. Chervin
Assistant Attorney General
jchervin@atg.state.il.us
Office of the Illinois Attorney General
100 W. Randolph St.
Chicago, IL  60601
Tel:  312-814-3000

*Attorneys for Plaintiff State of Illinois*

FOR PLAINTIFF STATE OF MARYLAND:

BRIAN E. FROSH
Attorney General

JOHN R. TENNIS
Chief, Antitrust Division
Assistant Attorney General

_____
John R. Tennis
jtennis@oag.state.md.us

Gary Honick
ghonick@oag.state.md.us
Maryland Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, Maryland  21202
Tel:  (410) 576-6470

*Attorneys for Plaintiff State of Maryland*

FOR PLAINTIFF COMMONWEALTH
OF MASSACHUSETTS

MAURA HEALEY
ATTORNEY GENERAL


_____

William T. Matlack (MA BBO No. 552109)
Assistant Attorney General
Chief, Antitrust Division
William.Matlack@mass.gov
Michael B. MacKenzie (MA BBO No. 683305)
Assistant Attorney General
Deputy Chief, Antitrust Division
Michael.Mackenzie@mass.gov
Matthew B. Frank (MA BBO No. 698482)
Assistant Attorney General
Antitrust Division
Matthew.Frank@mass.gov
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200


*Attorneys for Plaintiff Commonwealth of
Massachusetts*

FOR PLAINTIFF STATE OF MICHIGAN:

DANA NESSEL
Attorney General

WISAM E. NAOUM
Assistant Attorney General


Wisam E. Naoum
NaoumW1@michigan.gov
Michigan Department of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
Tel:  (517) 335-7632

*Attorneys for Plaintiff State of Michigan*

FOR PLAINTIFF STATE OF MINNESOTA:

KEITH ELLISON
Attorney General

JAMES W. CANADAY
Deputy Attorney General

Justin Moor
Assistant Attorney General
justin.moor@ag.state.mn.us
Office of the Minnesota Attorney General
Suite 1400
445 Minnesota Street
St. Paul, MN 55101
Tel:  (651) 296-9663

*Attorneys for Plaintiff State of Minnesota*

FOR PLAINTIFF STATE OF MISSISSIPPI:

JIM HOOD
Attorney General

CRYSTAL UTLEY SECOY
Special Assistant Attorney General

_____

Crystal Utley Secoy
cutle@ago.state.ms.us
Mississippi Attorney General's Office
Post Office Box 22947
Jackson, Mississippi 39225
Telephone: 601-359-4213

*Attorney for Plaintiff State of Mississippi*

FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General

ERNEST FIGUEROA
Consumer Advocate

Lucas J. Tucker (NV Bar No. 10252)
Senior Deputy Attorney General
LTucker@ag.nv.gov
Marie W.L. Martin (NV Bar No. 7808)
Senior Deputy Attorney General
MMartin@ag.nv.gov
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel:  (775) 684-1100

*Attorneys for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF OREGON:

ELLEN F. ROSENBLUM
Attorney General

Tim Nord
Special Counsel
**Tim.D.Nord@doj.state.or.us**
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
Tel: (503) 934-4400


*Attorney for Plaintiff State of Oregon*

FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA

JOSH SHAPIRO
Attorney General

James A. Donahue, III
Executive Deputy Attorney General
Public Protection Division


Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section
twertz@attorneygeneral.gov

Joseph S. Betsko
Senior Deputy Attorney General
Antitrust Section
jbetsko@attorneygeneral.gov

Pennsylvania Office of the Attorney General
14th Floor Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530

*Attorneys for Plaintiff Commonwealth of
Pennsylvania*

FOR PLAINTIFF STATE OF TEXAS

KEN PAXTON
Attorney General

_____
Kim VanWinkle
kim.vanwinkle@oag.texas.gov
Bret Fulkerson
bret.fulkerson@oag.texas.gov
Trevor E. D. Young
trevor.young@oag.texas.gov
State of Texas, Office of the Attorney General
300 W. 15th Street
Austin, Texas 78701
Tel: (512) 933-1266

*Attorneys for Plaintiff State of Texas*

FOR PLAINTIFF COMMONWEALTH OF VIRGINIA:

MARK R. HERRING
Attorney General

SAMUEL T. TOWELL
Deputy Attorney General
Civil Litigation Division

Tyler T. Henry
Assistant Attorney General
THenry@oag.state.va.us
Sarah Oxenham Allen
Senior Assistant Attorney General
and Unit Manager
SOAllen@oag.state.va.us
Antitrust Unit
Virginia Office of the Attorney General
202 N. 9th Street
Richmond, Virginia 23219
Tel:  804-692-0485

*Attorneys for Plaintiff Commonwealth of
Virginia*

FOR PLAINTIFF STATE OF WISCONSIN

JOSHUA L. KAUL
ATTORNEY GENERAL


_____
GWENDOLYN J. COOLEY
Assistant Attorney General for Antitrust
State Bar #1053856
Attorneys for the State of Wisconsin

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 261-5810
(608) 266-2250 (Fax)
cooleygj@doj.state.wi.us

**APPENDIX A**

**Top 50 CMA Markets for Retail Mobile Wireless Telecommunications Services[18]**

| CMA No. | CMA Name | T-Mobile & Sprint Share | Increase in HHI | HHI Post-Merger |
|---|---|---|---|---|
| 2 | Los Angeles-Long Beach/Anaheim-Santa Ana-Garden Grove/Riverside-San Bernardino-Ontario, CA | ▮ | ▮ | ▮ |
| 1 | New York, NY-NJ/Nassau-Suffolk, NY/Newark, Jersey City and Paterson-Clifton-Passaic, NJ | ▮ | ▮ | ▮ |
| 9 | Dallas-Fort Worth, TX | ▮ | ▮ | ▮ |
| 3 | Chicago, IL | ▮ | ▮ | ▮ |
| 10 | Houston, TX | ▮ | ▮ | ▮ |
| 8 | Washington, DC-MD-VA | ▮ | ▮ | ▮ |
| 17 | Atlanta, GA | ▮ | ▮ | ▮ |
| 12 | Miami-Fort Lauderdale-Hollywood, FL | ▮ | ▮ | ▮ |
| 4 | Philadelphia, PA | ▮ | ▮ | ▮ |
| 7 | San Francisco-Oakland, CA | ▮ | ▮ | ▮ |
| 6 | Boston-Lowell-Brockton-Lawrence-Haverhill, MA-NH | ▮ | ▮ | ▮ |
| 5 | Detroit/Ann Arbor, MI | ▮ | ▮ | ▮ |
| 26 | Phoenix, AZ | ▮ | ▮ | ▮ |
| 18 | San Diego, CA | ▮ | ▮ | ▮ |
| 15 | Minneapolis-St. Paul, MN-WI | ▮ | ▮ | ▮ |
| 19 | Denver-Boulder, CO | ▮ | ▮ | ▮ |
| 20 | Seattle-Everett, WA | ▮ | ▮ | ▮ |
| 14 | Baltimore, MD | ▮ | ▮ | ▮ |
| 22 | Tampa-St. Petersburg, FL | ▮ | ▮ | ▮ |
| 11 | St. Louis, MO-IL | ▮ | ▮ | ▮ |
| 33 | San Antonio, TX | ▮ | ▮ | ▮ |
| 93 | Las Vegas, NV | ▮ | ▮ | ▮ |
| 60 | Orlando, FL | ▮ | ▮ | ▮ |
| 30 | Portland, OR-WA | ▮ | ▮ | ▮ |
| 35 | Sacramento, CA | ▮ | ▮ | ▮ |
| 75 | Austin, TX | ▮ | ▮ | ▮ |
| 27 | San Jose, CA | ▮ | ▮ | ▮ |
| 24 | Kansas City, MO-KS | ▮ | ▮ | ▮ |
| 91 | San Juan-Caguas, PR | ▮ | ▮ | ▮ |

---

[18] All share and HHI calculations are based on data received during the course of an investigation into the Merger and may be subject to change if additional data becomes available during litigation.

| CMA No. | CMA Name | T-Mobile & Sprint Share | Increase in HHI | HHI Post-Merger |
|---|---|---|---|---|
| 28 | Indianapolis, IN | ■ | ■ | ■ |
| 13 | Pittsburgh, PA | ■ | ■ | ■ |
| 46 | Nashville-Davidson, TN | ■ | ■ | ■ |
| 16 | Cleveland, OH | ■ | ■ | ■ |
| 31 | Columbus, OH | ■ | ■ | ■ |
| 51 | Jacksonville, FL | ■ | ■ | ■ |
| 23 | Cincinnati, OH-KY-IN | ■ | ■ | ■ |
| 39 | Salt Lake City-Ogden, UT | ■ | ■ | ■ |
| 61 | Charlotte-Gastonia, NC | ■ | ■ | ■ |
| 72 | West Palm Beach-Boca Raton, FL | ■ | ■ | ■ |
| 71 | Raleigh-Durham, NC | ■ | ■ | ■ |
| 21 | Milwaukee, WI | ■ | ■ | ■ |
| 45 | Oklahoma City, OK | ■ | ■ | ■ |
| 36 | Memphis, TN-AR-MS | ■ | ■ | ■ |
| 29 | New Orleans, LA | ■ | ■ | ■ |
| 47 | Greensboro-Winston-Salem-High Point, NC | ■ | ■ | ■ |
| 43 | Norfolk-Virginia Beach-Portsmouth, VA/NC | ■ | ■ | ■ |
| 32 | Hartford-New Britain-Bristol, CT | ■ | ■ | ■ |
| 37 | Louisville, KY-IN | ■ | ■ | ■ |
| 41 | Birmingham, AL | ■ | ■ | ■ |
| 59 | Richmond, VA | ■ | ■ | ■ |