**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, *et al.* | Case No. 1:19-cv-5434 (VM) (RWL) |
| *Plaintiffs*, | ECF Case |
| v. | **DEFENDANTS' PRETRIAL** |
| DEUTSCHE TELEKOM AG, *et al.* | **MEMORANDUM** |
| *Defendants*. | |

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 5

    BACKGROUND .................................................................................................. 5

    THE MERGING ENTITIES................................................................................ 7

    THE MOBILE WIRELESS COMMUNICATIONS INDUSTRY............................ 9

    THE NEW T-MOBILE NETWORK..................................................................... 12

ARGUMENT ......................................................................................................... 15

    I.    PLAINTIFFS CANNOT PROVE THAT THE MERGER IS LIKELY TO
SUBSTANTIALLY LESSEN COMPETITION IN A RELEVANT MARKET ..................... 17

        A.    Plaintiffs Are Not Entitled to Any Presumption of Illegality ........................ 17

        B.    Proper Analysis of Market Shares Does Not Support a Presumption .......................... 18

    II.  OVERWHELMING EVIDENCE WILL SHOW THAT THE MERGER  WILL NOT BE
ANTICOMPETITIVE ............................................................................................ 21

        A.    The Merger Will Increase New T-Mobile's Capacity and Lower Its Costs, Leading to
Better Quality and Lower Prices........................................................................... 21

        B.    The Merger Will Not Lead to Adverse Unilateral Effects or Coordinated Interaction
With Other Providers of Retail Mobile Wireless Services .................................... 25

    III.  ENJOINING THE MERGER WOULD DISSERVE THE PUBLIC INTEREST ............ 28

CONCLUSION...................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Caruso Mgmt. Co. Ltd. v. Int'l Council of Shopping Ctrs.*,
    --- F. Supp. 3d ---, 2019 WL 4296860 (S.D.N.Y. 2019) (Marrero, J.) .....................................19

*Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n*,
    95 F.3d 593 (7th Cir. 1996) (Easterbrook, J.) ...........................................................................23

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ....................................................................................................................28

*FCC v. WNCN Listeners Guild*,
    450 U.S. 582 (1981) ....................................................................................................................29

*Fruehauf Corp. v. FTC*,
    603 F.2d 345 (2d Cir. 1979) .......................................................................................................15

*FTC v. Arch Coal, Inc.*,
    329 F. Supp. 2d 109 (D.D.C. 2004) ..............................................................................19, 21, 28

*FTC v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ...................................................................................................18

*FTC v. Owens-Illinois, Inc.*,
    681 F. Supp. 27 (D.D.C. 1988) ..................................................................................................30

*FTC v. Tenet Health Care Corp.*,
    186 F.3d 1045 (8th Cir. 1999) ...................................................................................................23

*In re AT&T Inc. & DIRECTV*,
    30 F.C.C. Rcd. 9131 (2015) .......................................................................................................17

*State of N.Y. v. Kraft Gen. Foods, Inc.*,
    862 F. Supp. 1030 (S.D.N.Y. 1993) ..........................................................................................28

*Tenneco v. FTC*,
    689 F.2d 346 (2d Cir. 1982) .......................................................................................................15

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) ...................................................................................................18

*United States v. Archer-Daniels-Midland Co.*,
   781 F. Supp. 1400 (S.D. Iowa 1991) ....................................................................26

*United States v. AT&T, Inc.*,
   310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 2019 (D.C. Cir. 2019) ...................15, 19

*United States v. Baker Hughes, Inc.*,
   908 F.2d. 981 (D.C. Cir. 1990) ..............................................................15, 18, 21

*United States v. Country Lake Foods, Inc.*,
   754 F. Supp. 669 (D. Minn. 1990) ...........................................................................22

*United States v. General Dynamics Corp.*,
   415 U.S. 486 (1974) ...........................................................................................15

*United States v. Long Island Jewish Medical Center*,
   983 F. Supp. 121 (E.D.N.Y. 1997) ....................................................................22, 25

*United States v. Marine Bancorporation, Inc.*,
   418 U.S. 602 (1974) ...........................................................................................15

*United States v. Oracle Corp.*,
   331 F. Supp. 2d 1098 (N.D. Cal 2004) ..............................................................20, 25

*United States v. Waste Mgmt., Inc.*,
   743 F.2d 976 (2d Cir. 1984) .................................................................................26

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ...........................................................................................18

**Federal Statutes**

15 U.S.C. § 18 ....................................................................................................15

**Other Authorities**

Fed. Trade Comm'n, *Annual Competition Reports*,
   https://www.ftc.gov/policy/reports/policy-reports/annual-competition-reports ....................16

Fed. Trade Comm'n, *Cases and Proceedings*, https://www.ftc.gov/enforcement/cases-proceedings .........................................................................................................16

Fed. Trade Comm'n, *Horizontal Merger Investigation Data: Fiscal Years 1996-2011* (published January 2013), https://www.ftc.gov/sites/default/files/documents/reports/horizontal-merger-investigation-data-fiscal-years-1996-2011/130104horizontalmergerreport.pdf ..................... 16

*Memorandum Opinion and Order in the Matter of Applications of T-Mobile US, Inc. and Sprint Corporation*, WT Docket No. 18-197, FCC-19-103 (Oct. 16, 2019) ................... *passim*

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed. 2013-2018) ........................................................ 22

Press Release, U.S. Dep't of Justice, *Justice Department Settles with T-Mobile and Sprint in Their Proposed Merger by Requiring a Package of Divestitures to Dish* (July 26, 2019), https://www.justice.gov/opa/pr/justice-department-settles-t-mobile-and-sprint-their-proposed-merger-requiring-package ............................................................................. 4

Response of Plaintiff United States to Public Comments on the Proposed Final Judgment, *United States, et al. v. Deutsche Telekom AG, et al.*, No. 1:19-cv-02232-TJK (D.D.C. Nov. 6, 2019), ECF No. 42 ........................................................................................... 27

Statement of The Federal Trade Commission: AmeriSource Health Corporation/Bergen Brunswig Corporation, File No. 011-0122 (Aug. 24, 2011), https://www.ftc.gov/sites/default/files/documents/cases/2001/08/amerisourcestatement.pdf ................................................................................................................................ 17

U.S. Dep't of Justice & Fed. Trade Comm'n, *Commentary on the Horizontal Merger Guidelines* (Mar. 2006), https://justice.gov/atr/commentary-horizontal-merger-guidelines ........................................................................................................... 21, 24, 26

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (Aug. 19, 2010), https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf ........................................................................................................... *passim*

**INTRODUCTION**

The merger of T-Mobile and Sprint will bring better mobile wireless services at lower prices to all Americans.  The merger will combine the companies' highly complementary network assets and will thereby result in a massive increase in the amount of data that can be transmitted to devices like smart phones and tablets and much better network performance with faster speeds, better coverage, and more reliability, all at dramatically lower costs.  More supply and higher quality at lower cost will result in lower prices and greater value for consumers.

Armed with a vastly superior network with its massive capacity and significantly lower costs, the New T-Mobile will continue T-Mobile's successful strategy of innovative and disruptive offerings by offering a game-changing network experience, with many times faster speeds at lower prices to virtually all Americans—urban, suburban, and rural.  This, in turn, will spur competitive responses from AT&T, Verizon, and others, benefiting consumers still further and prompting a virtuous cycle of intense competition and further technological progress that would not otherwise occur.  In short, the world with the merger will be substantially better for consumers than the world without.

The merger comes at an important time in the history of mobile wireless communications, with the transition to 5G, which is the next generation of mobile wireless technology.  Before T-Mobile and Sprint announced their merger, the other major carriers were prepared to deploy 5G in limited areas, mostly in the densest parts of a limited number of big cities.  Verizon even announced that it would surcharge customers an additional $10 over the cost of its mobile wireless service plans for the privilege of accessing 5G.  T-Mobile's vision is different:  with the capacity and speed only possible with the combined assets of T-Mobile and Sprint, it plans to deploy 5G for everyone on a nationwide network with substantially greater capabilities than T-Mobile could deploy on its own and will make this network available at no

extra charge and at a lower overall all-in price, leveraging the lower costs of the new network to attract customers from its competitors.  By accelerating the pace of 5G adoption and improving the 5G experience, New T-Mobile will spur technological innovation, as developers create new applications requiring the data speeds enabled by 5G, just as 4G propelled the rapid growth of mobile applications like Uber and Instagram that we now take for granted.

New T-Mobile's vision promises to help close the digital divide by making robust, high-speed broadband Internet access available to virtually every American on their mobile wireless devices.  Low-income customers, who often rely on mobile wireless service as their only Internet connection, and rural customers will be among the greatest beneficiaries.  New T-Mobile will also use the capacity that the merger will create to offer fixed (as distinct from mobile) in-home broadband service over its wireless network, as an alternative to a wired connection from the local cable or phone company.  Many Americans have no option for broadband access in their homes, or are dependent on their local cable monopoly, and with this merger those customers will for the first time have a new and less expensive choice.  It is therefore not surprising that cable companies have come out against this merger.

These many benefits led the Federal Communications Commission (the "FCC")—the expert agency designated by Congress to regulate the nation's wireless carriers in the public interest—and the Antitrust Division of the Department of Justice (the "DOJ")—the federal agency charged with enforcing the nation's antitrust laws—to approve the merger.  These approvals came after the FCC and DOJ conducted extensive investigations, including reviewing millions of documents and thousands of pages of submissions supported by testimony, sworn statements, and expert reports.

To ensure that the benefits of the merger are realized, the FCC and DOJ conditioned their approvals on binding commitments from New T-Mobile that it will in fact build the network that it plans to build and will do so on schedule.  To address any concern about prices, the commitments require New T-Mobile to continue to offer the same or better pricing as offered as of February 2019, for at least three years.

All of this is consistent with New T-Mobile's business plan to lower prices, improve quality, and take share.  To do anything less would be inconsistent with and damaging to the strategy and very brand identity that T-Mobile has established.  Indeed, in anticipation of the cost savings and capacity increases that the merger will bring, T-Mobile has announced that New T-Mobile will immediately offer a retail mobile wireless plan at $15 per month, half the price of its current least expensive plan.

The commitments also ensure that DISH Network ("DISH") will enter the market as a vigorous competitor in mobile wireless services.  New T-Mobile will divest Sprint's Boost business to DISH, along with customers, spectrum, towers, and retail stores.  DISH has committed to the FCC and DOJ to deploy a new network using these assets, along with the substantial spectrum it already owns, to bring even more new capacity to serve retail mobile wireless customers.  And DISH will be a competitive force from day one:  New T-Mobile will provide DISH with an unprecedented arrangement giving its customers access to the New T-Mobile network on extremely favorable wholesale terms that will allow DISH to enter as an aggressive competitor immediately while it builds out its own network.

With these commitments secured, the FCC concluded that the merger "would not substantially lessen competition, and would be in the public interest."[1]  It found that the merger

---

[1] *Memorandum Opinion and Order in the Matter of Applications of T-Mobile US, Inc. and Sprint Corporation*, WT Docket No. 18-197, FCC-19-103, ¶ 11 (Oct. 16, 2019) ("FCC Order").

would result in "New T-Mobile [having] far greater . . . network capacity than the standalone firms combined" and that the merger would "significantly increase the quality and geographic reach of [New T-Mobile's] wireless networks for the foreseeable future."[2]  The FCC further concluded that these "benefits will occur nationwide, but will be particularly significant for rural areas, where the conditions require robust broadband services deployment well beyond what [T-Mobile and Sprint] would otherwise deliver in the absence of the transaction."[3]  The DOJ similarly concluded that the merger would "expand[] output significantly by ensuring that large amounts of currently unused or underused spectrum are made available to American consumers in the form of high quality 5G networks."[4]

The remaining Plaintiffs, thirteen states and the District of Columbia,[5] ask this Court to take the unprecedented step of overturning the judgment of the FCC and the DOJ and block a merger that promises significant benefits well beyond those states' borders.  They will simplistically suggest that the merger should be blocked because it is a "4-to-3 merger."  But the required analysis cannot be short-circuited in this way, and of course on its own terms the characterization does not fit this merger, where DISH will emerge as a new competitor, and where other large sellers like TracFone with 22 million subscribers and Comcast with its own infrastructure, already compete.  Blocking the merger would not be in the public interest; it would deny the extraordinary benefits of the merger to the citizens of Plaintiffs' own states, as

---

[2] FCC Order ¶ 5.
[3] FCC Order ¶ 384.
[4] Press Release, U.S. Dep't of Justice, *Justice Department Settles with T-Mobile and Sprint in Their Proposed Merger by Requiring a Package of Divestitures to Dish* (July 26, 2019), https://www.justice.gov/opa/pr/justice-department-settles-t-mobile-and-sprint-their-proposed-merger-requiring-package (quoting Assistant Attorney General Makan Delrahim).
[5] Since this action was filed, Colorado, Mississippi, Nevada, and Texas have all dismissed their claims or announced their intention to do so.

well as the citizens of the many states that support the merger,[6] and to the national economy as a

whole.

## STATEMENT OF FACTS

On April 29, 2018, T-Mobile and Sprint announced that they had agreed to merge.

Because of the remarkable complementarity of their wireless network assets—and particularly

their respective FCC spectrum licenses—the merger will create a network of unprecedented

coverage, capacity, and speed.

### **Background**

Today's mobile wireless devices—cell phones, tablets, and other devices—can do much

more than make voice calls:  their users can access and send enormous amounts of data, enabling

video calling, streaming video on services like Netflix, and other applications that have

transformed entire industries.  To do these things, mobile wireless devices need fast,

uninterrupted, and instantaneous access to the Internet.  That access is provided by mobile

wireless networks.  These networks consist of cell sites (typically radio towers) equipped with

radios that send and receive radio signals from mobile wireless devices, backhaul facilities that

transport data to and from cell sites, and a "core network" that controls and directs traffic,

making sure that each user hears the calls and receives the data intended for them.

One of the critical requirements for a mobile wireless network is radio spectrum.  Just as

radio stations must each broadcast on different radio frequencies in order to be heard without

interference from one another, so too must mobile wireless networks exclusively operate on their

own bands of radio frequencies (or "spectrum") to avoid interference.  How much data a wireless

---

[6] To date, these fifteen states have either joined the DOJ approval process, separately resolved their concerns with the merger, or otherwise publicly supported the merger:  Arizona, Arkansas, Colorado, Florida, Kansas, Louisiana, Mississippi, Nebraska, Nevada, New Mexico, Ohio, Oklahoma, South Dakota, Texas, and Utah.

network can carry, and how fast it can carry it, is dependent in large part on the amount and type of spectrum the mobile wireless network has.

Spectrum is classified according to its frequency, and different frequencies have different physical characteristics that affect how a mobile wireless network operates.

- <u>Low-band spectrum</u> (below 1 GHz) propagates well over distances (typically approximately 18 miles, subject to topography) and penetrates into buildings well. Because of its range, low-band spectrum can be deployed relatively inexpensively as fewer towers, radios, and other infrastructure are required to cover a given area.

- <u>Mid-band spectrum</u> (between 1 GHz and 6 GHz) does not propagate as well (approximately 4 miles) or penetrate buildings as well as low-band spectrum, but is able to carry significantly more data.  Mid-band spectrum is therefore particularly useful in denser areas where there are more users per cell site.

- <u>High-band, or mmWave, spectrum</u> (mainly above 20 GHz) is able to handle substantially more data than mid-band, but it has severe limitations in propagation and in-building penetration, requiring a clear line-of-sight between the mobile wireless device and the cell site.

Having a variety of spectrum bands with different characteristics is important for a mobile wireless network.  Low-band provides the ability to expand coverage relatively economically, while mid-band and now high-band provide the capacity wireless networks need. Without both types of spectrum, a wireless carrier is handicapped either in terms of its ability to cover wide geographies or in terms of its ability to handle significant amounts of data traffic for a robust customer experience.

Spectrum is a scarce resource.  There is a finite amount available, and access is controlled by the FCC, which must weigh the competing interests of many different users, including radio, television, emergency broadcast, defense applications, satellite transmission, and others.  But even though spectrum is scarce, network capacity must continue to expand to meet the ever-expanding demand for data from mobile wireless communications users.  For technical reasons not in dispute, combining networks—such as the combination the merger would bring—yields multiplicative increases in capacity.  The capacity of a wireless network is determined by (1) the number of cell sites, multiplied by (2) the amount of spectrum deployed per site, multiplied by (3) the efficiency with which the deployed spectrum transmits information, which is called spectral efficiency.  For example, combining two networks of equal size so that the amount of spectrum per site and the number of cell sites double would yield a combined network with four, rather than two, times the capacity of the standalone networks.

**The Merging Entities**

T-Mobile is the third-largest mobile wireless communications service provider in the United States, although it is far smaller than AT&T and Verizon, which are the largest. T-Mobile has developed a distinct strategy and brand identity as the "Un-carrier."  Beginning in 2013, T-Mobile created and deployed a new competitive strategy:  identify and fix the things consumers dislike about their mobile phone plans—"pain points"—that had been imposed upon consumers over the years by a hidebound mobile wireless industry.  Over the last six years, this Un-carrier strategy has spurred T-Mobile to make numerous groundbreaking pro-consumer changes to its service offerings that broke industry conventions (although its competitors have since adopted many of these changes):  T-Mobile eliminated long-term contracts.  It allowed customers to upgrade their cell phones when they wanted to and not when the carrier told them they could.  It eliminated strict data limits and plans that confiscated data every month, as well as

7

high overage charges.  It eliminated astronomical international roaming charges that forced consumers to shut off their phones while traveling overseas.  T-Mobile's Un-carrier identity disrupted the market and was very successful:  its subscriber base grew from 37 million subscribers at the end of 2013 to 64 million at the end of 2018, an increase of more than 70%.

T-Mobile's Un-carrier strategy was largely enabled by its excess capacity.  Going forward, however, T-Mobile faces the potential for serious capacity constraints, which will be exacerbated by the explosion in demand for mobile data that is expected from more intensive use of existing applications like gaming and streaming video, and from new applications like mobile virtual reality that will become ever more prevalent in the 5G world.  Without adequate capacity, users will experience degraded performance such as slow access to web sites and slow download speeds that result in, among other things, video freezes and reduced video resolution.  T-Mobile will face a difficult choice:  deploy increasingly expensive capacity expansion solutions, driving up its costs, and therefore its prices; or constrain subscriber data use and deprive users of the experience they prefer.  Neither of these would be attractive or good for consumers.

Sprint is the fourth-largest mobile wireless communications provider in the United States but is declining in share.  It sells wireless services under the Sprint brand, as well as the Boost Mobile and Virgin Mobile brands, which it will divest to DISH.  Compared with Verizon, AT&T, and T-Mobile, Sprint's network faces severe coverage limitations, both in geographic reach and consistency within its footprint.  Sprint's material network deficiencies have contributed directly to customer dissatisfaction and subscriber losses.  These shrinking customer revenues have in turn made it financially challenging for Sprint to make sustained levels of competitive investments in its network, driving Sprint even further behind in network quality.  And as its network challenges push it further behind its competitors in satisfying consumer

expectations, Sprint's subscriber losses have accelerated.  This vicious cycle has continued over the last several years, with Sprint slipping from the third to fourth position, having been surpassed by T-Mobile.

Sprint's fundamental problem is that it lacks the low-band spectrum and cell site density to compete effectively.  Without sufficient low-band spectrum, Sprint's network footprint is smaller, and its coverage is limited in scope and "spotty" and inconsistent even within its footprint, meaning users often experience "dead spots" where they cannot connect to the Sprint network or can only make a low-quality connection.  The result is poor customer experiences for most customers.  And, because of expensive buildout costs, it would be uneconomic for Sprint to attempt to provide ubiquitous nationwide coverage using its 2.5 GHz mid-band spectrum (Sprint's most plentiful spectrum band).

**The Mobile Wireless Communications Industry**

Mobile wireless services are sold to retail customers by many companies, employing a variety of different business models.  As now, after the merger there will be many companies from which consumers can purchase mobile wireless communications services, including DISH as a powerful new entrant, which is guaranteed by the commitments that the DOJ and FCC secured from T-Mobile.

**Mobile Network Operators ("MNOs").**  MNOs are wireless providers that operate their own mobile wireless networks.  MNOs provide mobile wireless services directly to retail consumers using their own networks, and also sell at wholesale, through agreements with MVNOs (described below) which compete in the retail sale of mobile wireless services.  MNOs also enter into roaming agreements with other MNOs to provide expanded services to their customers where their own networks do not reach.

The four largest MNOs in the United States are AT&T, Verizon, T-Mobile, and Sprint. AT&T and Verizon are by far the largest.  AT&T and Verizon also offer landline and pay television services, which they often bundle to their customers with wireless.  Through its 2018 merger with Time Warner, AT&T also is a major provider of video content under the HBO, Turner, and Warner Bros. brands.  AT&T uses its wireless, in-home broadband, and satellite businesses to distribute this content.

U.S. Cellular and C-Spire also provide retail mobile wireless services.  These carriers, and several others, are sometimes referred to as "regional" MNOs because their network infrastructures cover only a portion of the United States.  However, these carriers offer customers nationwide coverage by entering into wholesale and/or roaming agreements with one or more other MNOs.

**Mobile Virtual Network Operators ("MVNOs").**  MVNOs are retail mobile wireless services providers, such as TracFone, that do not own their own networks.  Rather than building out their own networks, MVNOs contract with MNOs to buy network capacity, which they then sell to their own retail customers.  MVNOs can secure low wholesale prices because they can bring large volumes of traffic that they secure through independent brand strategies and retail presence, including at large retailers like Wal-Mart and Target, to the MNO's network.  Because they do not need to invest billions of dollars in building out a network, MVNOs operate profitably on lower margins.  As a result, MVNOs often offer lower retail prices than MNOs.  Following this low-price strategy, TracFone has attracted 22 million subscribers, making it the fifth-largest mobile wireless service provider in the nation.

**Cable Companies.**  Major cable companies including Comcast, Charter, and Altice also provide retail mobile wireless services.  The cable companies operate hybrid wireless systems.

10

They have MVNO agreements that allow them to offer nationwide coverage.  But they also have their own cable networks that allow them to offload traffic to proprietary WiFi hot spots and potentially to their own wireless networks.

The cable companies are the fastest-growing providers of mobile wireless telecommunications services and, with their ability to offer bundled services including wireless, home broadband and telephone, and traditional television service, have a compelling value proposition for consumers.  Comcast has added nearly 1.8 million mobile customers since launching mobile service in 2017.  As of September 2019, only a year after launching its service, Charter has almost 800,000 mobile customers.

**DISH**.  DISH will begin providing retail mobile wireless services shortly after the merger is closed.  Under the DOJ consent decree, New T-Mobile will divest to DISH Sprint's Boost and Virgin Mobile brands, with more than nine million subscribers, and will make available to DISH at least 400 retail locations and at least 20,000 cell sites.  In addition, under an MVNO agreement with T-Mobile, DISH will have access to the New T-Mobile network for seven years at unprecedented, steeply discounted wholesale rates.  Taking full advantage of these commitments, DISH will be able to compete aggressively for customers from day one.

During the time it has access to New T-Mobile's network to serve its present customers, DISH will be building its own network.  Besides the cell sites and other network elements that New T-Mobile will make available to it, DISH already has one of the deepest spectrum portfolios, including more low-band spectrum than Sprint.  With these assets, and unprecedented access to the New T-Mobile network while it builds its own network, DISH is uniquely well situated to enter the wireless industry.

Under the terms of DISH's commitments to the FCC, DISH's own network must cover at least 70% of the United States population by 2023. DISH's business plan is to build an expansive, nationwide 5G network and to serve nearly all of its customers on that network. DISH is subject to fines of up to $2.2 billion, as well as the potential forfeiture of billions of dollars' worth of spectrum, if it fails to meet its commitments.

**The New T-Mobile Network**

The New T-Mobile network will have massive capacity, breadth, and depth, owing to Sprint and T-Mobile's highly complementary spectrum portfolios and other network assets. The combination of the two companies' networks and spectrum assets will result in a superior network with significantly more capacity than the sum of the two separate networks standing alone. New T-Mobile will also have materially lower costs than either standalone company. The ability to create more supply at a lower cost means that New T-Mobile will have a powerful incentive to lower prices in order to monetize the newly created capacity, intensifying competition in the market. This is the foundation of the New T-Mobile strategy and business plan.

The power of the merger is that it will combine the highly complementary low-band T-Mobile spectrum with the mid-band Sprint spectrum. The combination of the two networks will yield a network with about twice the combined capacity of the two standalone networks, and about eight times the capacity of T-Mobile today. The merger will multiply the capacity of the two standalone networks by bringing 11,125 Sprint cell sites and 190 MHz of spectrum to the T-Mobile network. This new capacity will allow New T-Mobile to deploy more spectrally efficient 5G technology faster, multiplying yet again the total amount of available capacity. This will be accomplished while avoiding expensive network builds that would have driven up costs and prices to their customers. And, because New T-Mobile will have a broad portfolio of different

12

kinds of spectrum, it will be able to deploy each band to its highest and best use, creating yet more capacity.  For example, users that are closer to a cell site will be served efficiently by mid-band spectrum with high capacity, reserving scarce low-band spectrum for distant users or users inside buildings.

The massively-expanded capacity will enable huge increases in the quality of experience for the customers of New T-Mobile.  In addition, the merger will enable Sprint customers immediately to gain dramatically better coverage and consistency because after the merger they will use the superior New T-Mobile network.

This newfound capacity comes at an opportune time:  with the rollout of 5G, increased data demand of 5G users will further tax the networks of T-Mobile and Sprint.  By 2024, 5G users are expected to demand more than five times as much data as customers using today's mobile wireless technology (fourth generation technology known as "4G" or "LTE"), as projected by mobile wireless network infrastructure manufacturers Cisco, Ericsson, and Nokia, as well as by T-Mobile, Verizon, and AT&T.  By allowing for faster data transmission, 5G also will enable new data-intensive applications.  Just as 4G/LTE enabled applications that were unimaginable 10 years ago like streaming high definition video and real-time navigation, 5G is expected to empower innovators to develop a whole new set of applications that would not have been practical on 4G/LTE networks, such as mobile virtual and augmented reality.  These applications will all require vast amounts of data.  Moreover, because wireless carriers with legacy networks will be operating both 4G/LTE and 5G networks during the transition period, taking spectrum from 4G/LTE to deploy it for 5G will crowd the majority of users still on 4G/LTE, deteriorating their experience during the transition period.  Spectrum shortages accordingly will limit the ability of T-Mobile to deploy 5G and will slow any deployment

compared to the New T-Mobile network.  (DISH, by comparison, will not face this issue because its network will be 5G from the start, and will be able to rely on the New T-Mobile network for 4G/LTE.)

Prices will go down, not up, as a result of the merger.  The New T-Mobile network will have far lower costs than the standalone networks would have had.  By combining the spectrum and cell sites into a single denser network and eliminating redundant expenses, the merger will yield more than $40 billion in cost synergies on a net present value basis.  In a business like mobile wireless services, with low marginal costs but high fixed costs, using available capacity is the key to profitability.  Capacity is a perishable resource; left unused it cannot be stored or used later.  The combination of lower costs and more supply means that New T-Mobile's profit-maximizing strategy will be to grow volume by lowering prices to attract customers from AT&T and Verizon and other mobile wireless service providers.  AT&T, Verizon, and others will, of course, respond, leading to a virtuous cycle of higher quality networks and lower prices for all consumers of mobile wireless telecommunication services.  At the same time, DISH will enter the market with low prices and will build its own 5G network that will disrupt the marketplace further.

Anticipating all of this, and consistent with its successful and valuable Un-Carrier strategy, T-Mobile's business plan for New T-Mobile is to use the synergies and impending massive capacity to lower prices and to take share.[7]  Already, in fact, in anticipation of the massive capacity increases and lower costs that will result from the merger, T-Mobile has committed to offering a mobile wireless communications plan at $15 per month, half what its

---

[7] *See* D Ex 5277 (TMUS-DOJ-12290149), The New T-Mobile Business Plan, June 19, 2018, at 7 (explaining that New T-Mobile will "pass . . . scale benefits onto the consumer in the form of" a significant reduction in per-unit revenue and that there will be "increased competition from Cable & others").

least expensive plan costs today. It has likewise committed to the FCC to continue to offer the same or better retail mobile wireless service plans as offered as of February 2019. This will give Sprint customers an immediate dividend by enabling them to switch to cheaper T-Mobile plans if they so choose.

## ARGUMENT

Plaintiffs challenge the merger under Section 7 of the Clayton Act, which requires proof that "the effect of such acquisition may be substantially to lessen competition" "in any line of commerce . . . in any section of the country." 15 U.S.C. § 18. The "mere possibility" of harm to competition is not enough; rather, Plaintiffs must prove "that the challenged 'transaction is *likely* to lessen competition *substantially*.'" *United States v. AT&T, Inc.*, 310 F. Supp. 3d 161, 189 (D.D.C. 2018) (quoting *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 985 (D.C. Cir. 1990)) (emphasis added), *aff'd*, 916 F.3d 2019 (D.C. Cir. 2019). "There must be 'the reasonable probability' of a substantial impairment of competition to render a merger illegal under § 7." *Fruehauf Corp. v. FTC*, 603 F.2d 345, 351 (2d Cir. 1979). "[O]nly a[n] … examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger." *United States v. General Dynamics Corp.*, 415 U.S. 486, 498 (1974). A transaction does not have an anticompetitive effect unless it "is likely to hurt consumers." *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 991 n.12 (D.C. Cir. 1990). In other words, only transactions that will lead to higher prices or lower quality violate Section 7.

The Court's task is to examine the likely state of the world with the merger and compare it to the likely state of the world without the merger. *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 623-26 (1974); *Tenneco, Inc. v. FTC*, 689 F.2d 346, 351-52 (2d Cir. 1982); *see also* U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger*

*Guidelines* § 1 (Aug. 19, 2010) ("Most merger analysis is necessarily predictive, requiring an assessment of what will likely happen if a merger proceeds as compared to what will likely happen if it does not."). Here, the merger will result in a world in which the combined assets of Sprint and T-Mobile create a dramatically better network than either could achieve on its own, unlocking huge increases in cheap capacity that will allow the new company to compete more aggressively. In addition, under the watchful eyes of the FCC and DOJ, the merger will enable DISH to put its own plentiful spectrum assets to use, further increasing industry capacity, and become a disruptive competitor backed by its own network and privileged wholesale access to the New T-Mobile's leading 5G network. By contrast, without the merger, Sprint and T-Mobile will continue to face competitive challenges and escalating costs, and DISH will remain a sidelined player in wireless (at best), allowing the market leaders AT&T and Verizon to retain dominant positions and face less competition. The merger will therefore enhance competition.

Plaintiffs ask the Court to ignore these marketplace realities and block the merger because of a simplistic, and factually incorrect, assertion that this is a "4-to-3 merger." Of course, the merger is only a "4-to-3" if one were to ignore the divestiture to DISH mandated by the FCC and DOJ and the numerous other retail sellers like the MVNOs and cable companies. In any event, there is no rule of law that "4-to-3" mergers are *per se* illegal, and the antitrust agencies have approved many such transactions, often without any remedies at all.[8] For

---

[8] An FTC study reports that, in mergers involving 4-to-3 industrial markets subject to in-depth investigations over a sixteen-year period (fiscal years 1996-2011), the FTC closed its investigation into 34 4-to-3 industrial markets without any enforcement action. *See* Fed. Trade Comm'n, *Horizontal Merger Investigation Data: Fiscal Years 1996-2011* (published January 2013), https://www.ftc.gov/sites/default/files/documents/reports/horizontal-merger-investigation-data-fiscal-years-1996-2011/130104horizontalmergerreport.pdf (excluding following market categories as non-industrial markets: Grocery, Oil, Chemical, Pharmaceutical, and Hospital). Based on a review of publicly-available information from the FTC's website, during the same time period the FTC approved mergers involving another 39 4-to-3 industrial markets with some form of remedy. *See* Fed. Trade Comm'n, *Annual Competition Reports*, https://www.ftc.gov/policy/reports/policy-reports/annual-competition-reports; Fed. Trade Comm'n, *Cases and Proceedings*, https://www.ftc.gov/enforcement/cases-proceedings.

example, in analogous circumstances, the FTC approved the merger of Amerisource Health Corporation and Bergen Brunswig Corporation, the third- and fourth-ranked competitors in a market with economies of scale, after determining "the proposed transaction likely will give the merged firm sufficient scale so that it can become cost-competitive with the two leading firms and can invest in value-added services desired by customers."[9]

## I.   PLAINTIFFS CANNOT PROVE THAT THE MERGER IS LIKELY TO SUBSTANTIALLY LESSEN COMPETITION IN A RELEVANT MARKET

### A.   Plaintiffs Are Not Entitled to Any Presumption of Illegality

Plaintiffs are not entitled to a "presumption" of anticompetitive effects.  Before addressing Plaintiffs' failure to demonstrate that concentration statistics warrant a "presumption," it is worth noting that it would certainly be incongruous to apply a presumption where, as here, both the FCC and DOJ approved the merger after a comprehensive review that included the consideration of millions of pages of documents and detailed economic and engineering analysis.[10]  The FCC's analysis in particular makes clear that market concentration statistics alone fail to capture this merger's effect on competition in the nationwide market (or in local areas), and the FCC accordingly concluded that "the transaction would not substantially lessen competition, and would be in the public interest" with the proposed remedies.[11]  The FCC has statutory authority to "examine the competitive impacts of proposed communications mergers and transactions involving transfers of Commission licenses," *In re AT&T Inc. & DIRECTV*, 30 F.C.C. Rcd. 9131, 9140 (2015), and it has in fact done so here.  As the Supreme Court has observed, "[t]he regulatory framework" in the telecommunications field may, as here,

---

[9] Statement of The Federal Trade Commission: AmeriSource Health Corporation/Bergen Brunswig Corporation, File No. 011-0122 (Aug. 24, 2001), at 2, https://www.ftc.gov/sites/default/files/documents/cases/2001/08/amerisourcestatement.pdf.
[10] FCC Order, ¶ 4.
[11] FCC Order, ¶ 11.

make it "less plausible that the antitrust laws contemplate . . . additional scrutiny." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 412 (2004).

### B.     Proper Analysis of Market Shares Does Not Support a Presumption

In any event, even when market "share" statistics are considered, Plaintiffs are not entitled to any presumption of illegality.  Plaintiffs have the burden of proving that the merger will result in "undue concentration in the [relevant] market." *Baker Hughes Inc.*, 908 F.2d at 982.  "Market concentration, or the lack thereof, is often measured by the Herfindahl-Hirschman Index (HHI)," which is calculated by summing the squares of the market shares of the market participants. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 & n.9 (D.C. Cir. 2001).

Plaintiffs allege that the relevant product market is retail mobile wireless services.  Third Amended Complaint ("Complaint"), ¶¶ 28-33.  Defendants will accept that definition for present purposes.  The parties agree that the United States is a relevant geographic market.

Plaintiffs allege that they are entitled to a presumption that the merger will have anticompetitive effects based on an HHI calculation because, according to their calculations, "the HHI in the national market [for retail mobile wireless services] will increase by more than 200 points and result in an HHI above 2,500."  Complaint ¶ 47.  That is incorrect.  In making this calculation, Plaintiffs have improperly excluded a number of substantial competitors from their math, most importantly the MVNOs and cable companies like Comcast and Charter.  When those providers are included, as they must be as a matter of law, the post-merger HHI does not exceed the threshold of 2,500.

The MVNOs' and cable companies' shares must be included in the HHI calculation as a matter of law.  In determining market shares for purposes of assessing concentration, the relevant market must include all "sellers . . . who have actual or potential ability to deprive each other of significant levels of business." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369,

1374 (9th Cir. 1989); *see also Horizontal Merger Guidelines*, § 5.1 ("All firms that currently

earn revenues in the relevant market are considered market participants . . . .  Firms not currently

earning revenues in the relevant market, but that have committed to entering the market in the

near future, are also considered market participants.").

Plaintiffs ask the Court to ignore this blackletter law and assign the retail subscribers of

MVNOs and cable companies to the MNOs from which they obtain supply.  Not surprisingly,

Plaintiffs' gerrymandering makes the market for retail mobile wireless services appear far more

concentrated than it actually is.  Indeed, only through that flawed and legally incorrect scheme

are Plaintiffs able to manufacture a national HHI that is above 2,500.  When all of the firms

providing retail mobile wireless services are included, the resulting post-merger HHI is less than

2,300.  This is well below the 2,500 threshold.

Plaintiffs' artificial exclusion of cable companies and MVNOs from the competitive set

"def[ies] reality" and must be rejected.  *See United States v. AT&T*, 310 F. Supp. 3d at 176 n.6.

"To ignore those industry trends . . . would be to ignore the Supreme Court's direction to

examine this case with an eye toward the 'structure, history, and probable future' of this fast-

changing industry."  *Id.* (quoting *General Dynamics*, 415 U.S. at 498).

Plaintiffs cannot rescue their math by resorting to "local" markets, which would require

Plaintiffs to prove that their proposed local markets encompass the "precise geographic

boundaries of effective competition."  *Caruso Mgmt. Co. Ltd. v. Int'l Council of Shopping Ctrs.*,

--- F. Supp. 3d ---, 2019 WL 4296860, at *6 (S.D.N.Y. 2019) (Marrero, J.); *see also FTC v. Arch

Coal, Inc.*, 329 F. Supp. 2d 109, 119 (D.D.C. 2004) ("[T]he relevant geographic market

identifies the geographic area in which the defendant competes in marketing its products or

service.").  Plaintiffs hypothesize these proposed local markets by reference to Cellular Market

Areas ("CMAs"), a geographic area defined by the FCC for the purpose of granting cellular licenses, not for purposes of competitive analysis.[12]  But Plaintiffs cannot show, and there is no basis to conclude, that CMAs are relevant geographic markets.  Retail mobile wireless providers provide national calling and data service, compete nationally, set national prices, and determine network quality and characteristics nationally.  Indeed, the allegations in Plaintiffs' Complaint concede the nationwide nature of competition and undermine any claim of local markets.  Among other things, Plaintiffs allege that MNOs "utilize networks that cover the vast majority of the U.S. population, advertise nationally, have nationally recognized brands, and offer pricing, plans, and devices that are generally available nationwide."  Complaint ¶ 40.

Ultimately, the undisputed fact that prices are set on a national basis dooms any assertion of local markets.  If there were in fact local markets, and if Plaintiffs were correct that increases in concentration lead to anticompetitive price increases, consumers in CMAs with higher concentration should face higher prices than consumers in CMAs with lower concentration.  *See United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1120 (N.D. Cal. 2004) ("[I]t might be inappropriate to focus on a single city in analyzing the effects of a merger between sellers who compete on a much larger scale.").  This is not the case.  CMAs are therefore not relevant antitrust geographic markets and have no relevance to the antitrust analysis of the merger.

---

[12] Complaint, ¶ 42 (alleging that "individual CMAs in which Sprint and T-Mobile compete are relevant geographic markets under Section 7 of the Clayton Act").

## II.   OVERWHELMING EVIDENCE WILL SHOW THAT THE MERGER WILL NOT BE ANTICOMPETITIVE

### A.  The Merger Will Increase New T-Mobile's Capacity and Lower Its Costs, Leading to Better Quality and Lower Prices

A merger is not anticompetitive if the merger will create a more formidable competitor that will increase overall competition in the relevant market.  That is because "a primary benefit of mergers to the economy is their potential to generate significant efficiencies and thus enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, enhanced service, or new products."  *Horizontal Merger Guidelines*, § 10.[13]  In particular, "merger-generated efficiencies may enhance competition by permitting two ineffective competitors to form a more effective competitor, *e.g.*, by combining complementary assets."  *Id.*  Thus, evidence of efficiencies "is relevant to the competitive effects analysis of the market required to determine whether the proposed transaction will substantially lessen competition."  *Arch Coal*, 329 F. Supp. 2d at 151.

Here, the evidence will demonstrate that the lower-cost and higher-quality network resulting from this merger will create strong financial incentives for New T-Mobile to continue to compete aggressively through low pricing and high quality services to take customers from AT&T, Verizon, Comcast, Charter, TracFone, and others.  Consequently, Plaintiffs will not be

---

[13] Plaintiffs seem to take the position that efficiencies are not "sufficient to rescue an otherwise illegal merger." ECF No. 57 at 3 n.4 (quoting *FTC v. ProMedica Health Sys., Inc.*, No. 3:11 CV 47, 2011 WL 1219281, at *57 (N.D. Ohio Mar. 29, 2011)).  Plaintiffs' framing of efficiencies assumes away the central question that the Court must decide: "whether [the] transaction is likely to lessen competition substantially" and, therefore, is illegal under Section 7 of the Clayton Act. *See Baker Hughes*, 908 F.2d at 991.  Defendants are not invoking efficiencies as an affirmative defense to argue that the Court should permit an "otherwise illegal" merger.  To the contrary, *Baker Hughes* explains that it is "hornbook law" that the "prospect of efficiencies" is a factor that "can rebut a prima facie case."  908 F.2d at 985.  Defendants are not aware of a court declining to consider the relevance of merger efficiencies to the post-merger company's incentives, which is all that Defendants ask of this Court here.  *Accord* U.S. Dep't of Justice & Fed. Trade Commission, *Commentary on the Horizontal Merger Guidelines*, § 4 (Mar. 2006) (explaining that the DOJ and FTC "integrate efficiencies into their assessments of competitive effects").

able to meet their burden of demonstrating that the merger is likely to enable New T-Mobile to raise prices or reduce services either unilaterally or through coordination.

Courts and commentators have repeatedly recognized that a transaction that increases capacity and lowers costs does not violate the antitrust laws. For example, in *United States v. Country Lake Foods, Inc.*, 754 F. Supp. 669, 674 (D. Minn. 1990), the court denied a request to enjoin the merger of two smaller dairy processors in the Minneapolis area because the merger would "increase [] capacity substantially" and "result in lower plant and transportation costs and other savings" allowing the merged entity "to become a lower-cost producer capable of effective competition with the market leader." Similarly, in *United States v. Long Island Jewish Medical Center*, the court denied a request to enjoin the merger of two hospitals because "the proposed merger will result in significant efficiencies in the form of annual operating savings in expenses in the sum of approximately 25 to 30 million dollars per year," which would "ultimately result in benefits to the consumers." 983 F. Supp. 121, 148-49 (E.D.N.Y. 1997).[14]

That is what will happen here. The very business rationale for the merger is based on achieving huge increases in capacity that will enable New T-Mobile to compete more aggressively. Consequently, Plaintiffs cannot and do not seriously dispute that combining the parties' complementary assets will yield a more capable (higher capacity and higher quality) network than the two networks that would exist in the absence of the merger. Sprint's mid-band spectrum will provide significant capacity and allow New T-Mobile to more efficiently deploy its low-band spectrum to serve users at greater distances and provide better in-building penetration. The evidence will show that higher capacity in the mobile wireless sector has and will continue to result in lower prices and greater speed for users of the network. In concrete

---

[14] *See generally* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 404 (4th ed. 2013-2018) ("Large amounts of excess capacity encourage price cutting.").

terms, the $40 billion in cost synergies will materially reduce the cost of service, as is reflected in T-Mobile's contemporaneous business documents.

Mergers that increase capacity and lower costs, and thereby create strong financial incentives to reduce prices and improve services, do not violate Section 7 of the Clayton Act. *See FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1054-55 (8th Cir. 1999) (explaining that in analysis of "the competitive effects of the merger" the district court should have considered evidence that the merger of two smaller hospitals would create "a hospital that is larger and more efficient" than the standalone hospitals and that "will provide better medical care than either of those hospitals could separately"). This is because the touchstone of any meritorious antitrust claim, including one under Section 7 of the Clayton Act, is proof that the challenged merger would decrease, not increase, output. *See, e.g., Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) (Easterbrook, J.) ("The core question in antitrust is output. Unless a contract reduces output . . . there is no antitrust problem.").

The Court will hear from T-Mobile's network engineers, who have quantified these capacity increases using the same methods employed in the ordinary course of business. These engineers will testify that New T-Mobile will be able to offer about twice the amount of total capacity than the *sum* of the standalone networks by 2024, and three times the 5G capacity.

This fact alone ought to establish that the merger will be procompetitive. As far as Defendants are aware, no plaintiff has ever successfully challenged a transaction that would double the capacity of the sum of the standalone companies. Indeed, as noted above, the paradigmatic example of a procompetitive transaction is where "two ineffective competitors [merge] to form a more effective competitor, *e.g.*, by combining complementary assets." *Horizontal Merger Guidelines*, § 10.

Because New T-Mobile will realize significant cost savings, prices will be lower than without the merger, a reality reflected in T-Mobile's contemporaneous business plans and confirmed by basic economic principles. By the end of 2024, New T-Mobile will realize cost savings of several billion dollars per year.[15] These lower costs will make each additional subscriber more profitable for New T-Mobile than it would have been absent the merger, and, consequently, New T-Mobile will have the strong financial incentive to lower prices to attract more customers. This will further T-Mobile's Un-carrier brand identity and its business plan to "supercharge" its "proven pro-consumer strategy that is fundamentally built around more value and higher consumer satisfaction," leading New T-Mobile to aggressively take share from industry leaders.[16] As basic economic principles dictate, all else equal, a firm with lower costs will find it profitable to charge a lower price. *See, e.g.*, *Horizontal Merger Guidelines*, § 10 ("[I]ncremental cost reductions may reduce or reverse any increases in the merged firm's incentive to elevate price.").[17] To do otherwise would be ruinous and anathema to the Un-carrier brand strategy that it has worked so hard and invested so much to create.

Finally, there can be no serious question that New T-Mobile will build this new network. The very thesis of this merger was to combine complementary assets to achieve massive synergies and create a network with massive capacity. It is New T-Mobile's business plan and T-Mobile has made legally-enforceable commitments to the FCC and DOJ to do so. Once the network is built, New T-Mobile will have every incentive to attract customers to it. The savings that New T-Mobile will realize will be passed through to its customers as a core feature of New

---

[15] *See* D Ex 5277 (TMUS-DOJ-12290149), The New T-Mobile Business Plan, June 19, 2019, at 26.

[16] *See id.* at 4 (explaining the "New T-Mobile Vision"); *id.* at 7 (discussing expected post-merger share growth).

[17] *See also Commentary on the Horizontal Merger Guidelines*, § 4 ("Economic analysis teaches that price reductions are expected when efficiencies reduce the merged firm's marginal costs, *i.e.*, costs associated with producing one additional unit of each of its products.").

T-Mobile's plan to win customers from AT&T, Verizon and others.  *See, e.g.*, *Long Island Jewish Med. Ctr.*, 983 F. Supp. at 149 (finding that "the 'efficiencies' gained in this merger will ultimately result in benefits to the consumers" due in part to an "agreement with the Attorney General of the State of New York" to "pass on to the community cost savings that will be achieved").  T-Mobile has also made binding commitments not to raise its prices for the next three years, which eliminates any concern—implausible as it is—that T-Mobile would risk destroying its Un-carrier brand identity and raise prices ahead of realizing the cost savings of its new network.

> **B.     The Merger Will Not Lead to Adverse Unilateral Effects or Coordinated Interaction With Other Providers of Retail Mobile Wireless Services**

Plaintiffs have alleged that there are two ways that the merger will lead to anticompetitive effects: (1) by allowing the merged firm to profitably raise prices as a result of the elimination of competition between the two merged firms (unilateral effects); or (2) by increasing the ability of the remaining firms to engage in coordination on price or some other aspect of competition (coordinated effects).  *See Oracle*, 331 F. Supp. 2d at 1112.  Plaintiffs will fail to establish either.

In terms of unilateral effects, there will be no evidence that New T-Mobile will raise prices or decrease quality on its own.  First, New T-Mobile will immediately lower certain prices and the entire premise of the merger—the very reason that T-Mobile is investing so much to acquire Sprint—is to increase quality quickly.  This makes sense because New T-Mobile will have strong incentives to pass on its reduced costs to its customers in the form of lower prices, and no incentive to raise them.  *See Horizontal Merger Guidelines*, § 10 ("In a unilateral effects context, incremental cost reductions may reduce or reverse any increases in the merged firm's incentive to elevate price.").  Otherwise, the capacity it has built will remain unused and, like any other transitory thing, will perish.

Similarly, Plaintiffs cannot prove that the merger will create a risk of detrimental "coordinated interaction" with the myriad other providers of mobile wireless services. Quite the opposite, New T-Mobile will have network a vastly superior to what could be offered by either of the standalone companies and, by approximately doubling wireless network capacity, it will have significantly lower costs. With its higher capacity, better quality and lower-cost network, New T-Mobile will maximize its profits not by coordinating with its many competitors, but by doubling down on its Un-carrier strategy to expand (rather than restrict) sales by continuing to disrupt the market by taking customers from AT&T, Verizon, TracFone, Comcast, Charter, and others. This will instigate a virtuous cycle of better service and lower prices. Asymmetries in capacity utilization by market players are powerful disincentives to coordination, particularly in industries such as mobile wireless services where fixed costs are high and the costs to serve additional customers are low. *See, e.g.*, *United States v. Archer-Daniels-Midland Co.*, 781 F. Supp. 1400, 1423 (S.D. Iowa 1991) ("The high ratio of fixed to variable production costs creates strong economic incentives to produce at close to full capacity. This economic incentive to maintain full production, combined with seasonal excess capacity, works against the likelihood of any collusive price raising scheme which would require output restrictions.").[18]  It would defy economic sense to conclude that New T-Mobile would spend tens of billions of dollar to build its new network, generate substantial additional capacity, and then not monetize it by trying to keep prices high by somehow "coordinating" to sell less capacity rather than more.

The entry of DISH further undermines any speculation about post-merger potential coordinated interaction. *See United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 981 (2d Cir.

---

[18] *See also Commentary on the Horizontal Merger Guidelines*, § 4 (explaining that "some mergers that appreciably reduce the uniformity of costs across competitors may disrupt existing coordination or otherwise make coordination less likely" because "[a]s a lower-cost producer, the merged firm may find it profitable to reduce prices notwithstanding its rivals' likely reactions").

1984) (allowing transaction to proceed and explaining that "market share does not accurately reflect market power" where "new firms would quickly enter market and undercut" the merged firm).  The FCC confirmed this, concluding that DISH will have a "significant incentive to expand or grow in response to any coordinated price increases by the larger firms in the market."[19]  And the DOJ informed the United States District Court for the District of Columbia in the Tunney Act proceeding that, in its judgment, the DISH divestiture "decrease[s] the likelihood of anticompetitive coordinated effects that may arise out of the merger."[20]

Moreover, key features of the retail mobile wireless services market make coordination impracticable.  Mobile wireless service providers have very different business models and market approaches.  The participants have different pricing plans and different strategies.  The MNOs also have different network investment strategies that cannot easily be monitored by rivals.  In addition, both AT&T and Verizon have wired telecommunications businesses and provide in-home broadband and video programming distribution through their respective U-Verse and FiOS brands, which they bundle with mobile wireless service for a single price.  AT&T is also a provider of satellite television services through DirecTV and creates content and programming as a result of its 2018 acquisition of Time Warner, which AT&T can bundle as streaming services with its mobile wireless services, while at the same time using its mobile wireless network as a means of distribution of its video content.  T-Mobile, in contrast, has no meaningful presence in video and essentially no presence in in-home broadband today.  The cable companies are focused on converting their traditional pay television customers to wireless

---

[19] FCC Order, ¶ 188.

[20] Response of Plaintiff United States to Public Comments on the Proposed Final Judgment at 13, *United States, et al. v. Deutsche Telekom AG, et al.*, No. 1:19-cv-02232-TJK (D.D.C. Nov. 6, 2019), ECF No. 42; *see also Horizontal Merger Guidelines*, § 7.2 (explaining that coordinated effects are unlikely to deter competitive response from a firm "with a small market share that can quickly and dramatically expand" and "has little stake in the status quo").

customers before they "cut the cord."  These varied and inconsistent agendas make reaching a coordinated outcome satisfactory to all of these different players implausible.

Given these disparities, coordinated interaction is not likely.  *See Arch Coal*, 329 F. Supp. 2d at 144-46 (concluding merger would not lead to tacit coordination in part because different providers offered products with different qualities at different prices and the market did not lend itself to ready detection and punishment of deviations from coordination).

## III.    ENJOINING THE MERGER WOULD DISSERVE THE PUBLIC INTEREST

No court has ever enjoined a national merger that, like the one before this Court, has been approved by the relevant expert federal regulator (here, the FCC) and the Antitrust Division of the Department of Justice.  This is not a case where the Plaintiff states seek to solve a distinctly local issue in an otherwise unobjectionable national merger.  Rather, here a minority of states and the District of Columbia seek to prevent a nationwide merger in its entirety, denying all mobile wireless users in all states the benefits of the merger.

States suing as *parens patriae* are "considered ... private part[ies] when seeking an injunction pursuant to the Clayton Act," and so they do "not benefit from the presumption of irreparable harm enjoyed by the FTC or the Department of Justice when those agencies sue to stop a merger."  *State of N.Y. v. Kraft Gen. Foods, Inc.*, 862 F. Supp. 1030, 1033 (S.D.N.Y. 1993).  To the contrary, they are afforded no special deference or relaxation of the standards for an injunction applicable to any other private litigant.

Under the applicable standard, like any plaintiff seeking a permanent injunction, these Plaintiffs must demonstrate that the balance of hardships tips in their favor, that a remedy in equity is warranted, and "that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Plaintiffs cannot show—as they must—that enjoining the merger and denying consumers the benefits of the merger would serve the public interest.  In assessing this critical factor, the Court should give substantial weight to the FCC's determination that the merger "will result in significant public interest benefits, including encouraging the rapid deployment of a new 5G mobile wireless network, and improving the quality of [wireless] services for American consumers."[21]  With respect to national telecommunications policy, the Supreme Court has "repeatedly emphasized that the Commission's judgment regarding how the public interest is best served is entitled to substantial judicial deference."  *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 596 (1981).  Here, the FCC concluded after an extensive investigation that "[b]uilding leading 5G networks is of critical importance for our nation,"[22] and that the merger's "network benefits . . . are particularly important for the nation's underserved rural areas,"[23] many of which currently receive service from only one or two providers.[24]  The FCC further concluded that with New T-Mobile's significant expansion of network capacity and improvement of service quality beyond what either standalone entity could achieve, the merger would enhance competition "into the new 5G wireless world, strengthening incentives for market participants to innovate."[25]  These competitive benefits follow both from making New T-Mobile a stronger competitor to Verizon and AT&T and from establishing DISH as a fourth facilities-based competitor for 5G.[26]

Moreover, the public interest benefits of the merger will extend beyond mobile wireless, as New T-Mobile will have sufficient network capacity not just to serve wireless customers, but

---

[21] FCC Order ¶ 5.

[22] *Id.* ¶ 3.

[23] *Id.* ¶ 7.

[24] *Id.* ¶ 268.

[25] *Id.* ¶ 10.

[26] *Id.* ¶¶ 11-12.

to begin serving in-home broadband customers as well.[27]  The FCC explained that it "has previously and consistently recognized the value to consumers of fixed services with the capabilities of the broadband service promised by the Applicants' in-home broadband commitments," and that the benefits to broadband consumers "would likely be significant," "enabl[ing] millions of homes to receive lower-cost or higher-quality service than they would otherwise enjoy."[28]  The FCC also emphasized that "underserved homes in rural areas" will be among the beneficiaries.[29]

Because here an injunction would impose hardships on both the parties and American consumers, neither of which could enjoy the economic benefits that the New T-Mobile's network will provide, the balance of hardships plainly favors T-Mobile, Sprint, and their customers, and all consumers.  *See FTC v. Owens-Illinois, Inc.*, 681 F. Supp. 27, 52-53 (D.D.C. 1988) (denying an injunction where it "would 'spell the doom' of the merger,'" its economic benefits, and its pro-competitive effects).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs cannot meet their burden of showing that the merger will substantially decrease competition, nor can they show that an injunction against the merger would be in the public interest.  At the conclusion of the trial, Defendants will accordingly ask the Court to enter judgment in their favor and deny Plaintiffs' request for relief in its entirety.

---

[27] D Ex 5277 (TMUS-DOJ-12290149), The New T-Mobile Business Plan, June 19, 2018, at 21 (indicating that New T-Mobile will offer a "home broadband replacement product delivering industry-leading value to consumers").
[28] FCC Order ¶¶ 282-83.
[29] *Id.* ¶ 282.

Dated: November 26, 2019

Respectfully submitted,

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

George S. Cary (*pro hac vice*)
David I. Gelfand (*pro hac vice*)
Mark W. Nelson (*pro hac vice*)
gcary@cgsh.com
dgelfand@cgsh.com
mnelson@cgsh.com
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone:  (202) 974-1500
Facsimile:  (202) 974-1999

*Counsel for Defendant T-Mobile US, Inc.*

WILMER CUTLER PICKERING
HALE AND DORR LLP

Hallie B. Levin
hallie.levin@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone:  (212) 295-6710
Facsimile:  (212) 230-8888

*Counsel for Defendant T-Mobile US, Inc.*

WILSON SONSINI GOODRICH & ROSATI

_____

Joshua H. Soven (*pro hac vice*)
jsoven@wsgr.com
Wilson Sonsini Goodrich & Rosati
1700 K Street, NW 5th Floor
Washington, DC 20006-3817
Telephone:  (202) 973-8827
Facsimile:  (202) 973-8899

*Counsel for Defendant Deutsche Telekom AG*

GIBSON, DUNN & CRUTCHER LLP

Richard G. Parker (*pro hac vice*)
rparker@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  (202) 955-8503
Facsimile:  (202) 530-9518

*Counsel for Defendant Deutsche Telekom AG*

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP

_____

Steven C. Sunshine
Julia K. York (*pro hac vice*)
steve.sunshine@skadden.com
julia.york@skadden.com
1440 New York Avenue NW
Washington, D.C. 20005
Tel.: (202) 371-7000
Fax:  (202) 393-5760

Karen Hoffman Lent
karen.lent@skadden.com
4 Times Square
New York, NY 10036
Tel.: (212) 735-3000
Fax: (212) 735-2000

*Counsel for Defendant Sprint Corp.*

MORRISON & FOERSTER LLP

Grant J. Esposito
David J. Fioccola
gesposito@mofo.com
dfioccola@mofo.com
250 West 55th Street
New York, NY 10019
Tel.: (212) 468-8000
Fax: (212) 468-7900

David L. Meyer (*pro hac vice*)
Brad S. Lui (*pro hac vice*)
dmeyer@mofo.com
blui@mofo.com
2000 Pennsylvania Avenue, NW, Suite 6000
Washington, D.C. 20006-1888
Tel.: (202) 887-1500
Fax: (202) 887-0763

*Counsel for Defendants SoftBank Group Corp.*
*and Sprint Corporation*