# EXHIBIT A

1          (Trial resumed; in open court)
2          THE COURT:  Good morning.  Thank you.  Be seated.  Do
3    we have a witness?
4          MR. GELFAND:  Your Honor, I have two preliminary
5    housekeeping matters.  One, we're trying to schedule a
6    conference call with Magistrate Judge Lehrburger at lunchtime
7    today, and I was hoping the Court could give us an indication
8    of your expected time of breaking for lunch so we can schedule
9    it ahead of time for 15 minutes after that.
10         THE COURT:  All right.  Fair enough.  I usually break
11   for lunch anytime between 12:30 and 1:00, sort of depending
12   upon whether we're at the start of a witness or whether we want
13   to break a particular flow of testimony.  So anytime between
14   12:30 and 1:00.
15         MR. GELFAND:  Very well, your Honor.  I think we'll
16   schedule the call with Magistrate Judge Lehrburger at 1:00.
17         THE COURT:  That should be fairly safe.
18         MR. GELFAND:  Okay.  Thank you so much.
19         The second item, your Honor had given us guidance at
20   the end of the day yesterday to move into evidence all of the
21   documents, all of the exhibits we expect to use for the witness
22   before the witness begins testimony.  We had an agreement with
23   the plaintiffs that the only exhibits that would come into the
24   evidentiary record are those exhibits that are actually
25   discussed by a witness, either live or through a deposition

1    designation.

2        Our concern is that if we move a notebook full of
3    documents in before the witness testifies and the witness only
4    speaks about five of the exhibits out of 10, we would then have
5    to come back and make a request that exhibits be withdrawn from
6    the record.

7        So respectfully, your Honor, we'd like to ask that we
8    go back to the system that we were using yesterday, move the
9    exhibits in at the end of the witness, and I will commit to the
10   Court that we will not forget to do that.  We will make sure
11   that those exhibits are moved in, and even if an oversight
12   occurs, we'll be very accommodating later on if we have to go
13   back and make sure that the exhibits go into evidence.

14        THE COURT:  All right.  Fair enough.  We'll abide by
15   that.

16        MR. GELFAND:  Thank you very much, your Honor.

17        THE COURT:  All right.  Let me come back to a couple
18   of things.  In terms of time, by my timekeeper in front of me
19   here, the plaintiffs used up three hours and 20 minutes
20   yesterday and the defendants, 45.

21        Now, that means that we are short of the five hours
22   that we had allocated for yesterday.  The reason for that, as
23   you know, was technical problems of some sorts, none that you
24   could control, but it does mean that we'll have to find ways of
25   catching up, so to speak.

1  discussion at the meeting?
2  A.  I leave the agenda for the teams, but I said I want to
3  understand what is the difference between the U.S. and the
4  European market from the McKinsey perspective they offered to
5  us to pitch.  I don't think that we mandated them or had a
6  contract with them.
7  Q.  But you were personally involved, though, in the
8  discussions about the content of those workshops, right?
9  A.  Mr. Mach, what I do is I go to my team and say look, I want
10 to get smarter on the differences between the U.S. and the
11 European market, talk to a few consultants, talk to few
12 bankers, organize something.  Then I leave it for the team to
13 come back.  I don't know how far they want to tackle it.
14 Q.  Turn to Exhibit 329, please.
15          MR. PARKER:  Your Honor, we're going to object to this
16 one.  This is a McKinsey document that the witness just said he
17 hired to give us a hand and give us some advice, but that
18 doesn't make it our document.
19          MR. MACH:  So what you're seeing here, your Honor, is
20 Mr. Langheim and Mr. Stern discussing what the content of what
21 should go into the McKinsey document, and in fact what they're
22 describing as a McKinsey document the record shows is in fact a
23 document that was created by DT with some input from McKinsey.
24 That's the testimony that Mr. Ewens gave about the document.
25          And in fact, here you have Mr. Stern, who works for

1    Mr. Langheim, and Mr. Langheim setting the agenda, discussing

2    the content that should go in it, and there it is, the next

3    page.  I don't think that's a McKinsey document.

4    A.  First of all, these two gentlemens are gentlemens that do

5    not work for me.  They report to the head of strategy who

6    reports to Tim Höttges and to not me.

7           MR. MACH:  Thank you.  I didn't mean to misstate that.

8    They work for DT.

9           MR. PARKER:  So they hired somebody at McKinsey to

10   give them an opinion, give them some advice, and you have to

11   have your own people talking to them to make sure they're

12   giving you advice on something relevant.  So then McKinsey

13   comes out with its advice so he can take that into account in

14   making decisions, but that doesn't make this our document.  And

15   they certainly could have taken the deposition or called the

16   McKinsey folks and we wouldn't have this problem.

17          THE COURT:  Sustained.

18          MR. MACH:  Respectfully, your Honor, may I respond?

19          THE COURT:  You may.

20          MR. MACH:  So the courts have held that even if what

21   counsel has argued is correct and it was created by McKinsey at

22   the request of DT and was created with guidance and input as to

23   what the document should say, that that makes the document

24   qualify as a party admission.  It's what the court held in *FTC

25   V. Qualcomm*, which recognizes that multiple courts have said

|     |                                                                      |
| --- | -------------------------------------------------------------------- |
| 1   | that a consultant is a company's agent under FRE 801 such that       |
| 2   | the consultant's statements were admissible as statements of a       |
| 3   | party opponent.  When we have McKinsey and DT and, as it turns       |
| 4   | out, T-Mobile, which we will see when Mr. Ewens testifies,           |
| 5   | working together to create the document, that does qualify as a     |
| 6   | party admission under the case law.                                  |
| 7   |          MR. PARKER:  We are working with them to get their          |
| 8   | advice.  This is McKinsey's advice.  You can be working with         |
| 9   | them all day, but under the law -- I don't have a case, but it       |
| 10  | cannot be the law that just because you hire somebody and you        |
| 11  | sit down with them and you say this is what I really need, look     |
| 12  | at this and look at that, that whatever they come up with            |
| 13  | becomes your document.  I don't think that's the law, and I          |
| 14  | don't think that's fair, particularly when they have had this        |
| 15  | document for months, they could go talk to McKinsey.                 |
| 16  |          THE COURT:  Sustained.                                      |
| 17  | BY MR. MACH:                                                         |
| 18  | Q.  We'll continue, Mr. Langheim.                                    |
| 19  | A.  Sure.                                                            |
| 20  | Q.  We talked earlier --                                             |
| 21  |          MR. MACH:  I'm sorry, your Honor, I'm not interrupting      |
| 22  | you, am I?                                                           |
| 23  |          THE COURT:  No, I'm going to adjourn in three minutes       |
| 24  | in order to give you time to have a conference call with             |
| 25  | Magistrate Judge Lehrburger.                                         |

1              MR. MACH:  I am starting a substantially different
2     subject.  If you want me to continue, I will be happy to,
3     but --
4              THE COURT:  Why don't we adjourn then, 45 minutes.
5              (Luncheon recess taken)
6              (Continued on next page)

A F T E R N O O N   S E S S I O N

1:45 P.M.

THE COURT:  Before we proceed, let me just go back to the ruling the Court made on the question of that McKinsey document.  It is my practice, when these evidentiary disputes arise and the Court makes a ruling, to go back and provide a rationale for the ruling and examine whatever applicable case law may have been cited to the Court.

The reason why I adopted the ruling that I did was that my view of this issue is that under Federal Rules of Evidence 801(d)(2), a consultant's statement or report can be attributed to the client under some limited circumstances.  One is where the client actually controls the content of the entire document; and second, where the client adopts or ratifies the analysis and conclusions that are in dispute.

In this case, I did not see evidence of that.  The evidence is that the client adopted some parts, did not adopt other parts, provided some guidance; but there's no indication that the client controlled the development of the content or that it ratified the report as a whole.

In reading the *Qualcomm* case that Mr. Mach alluded to, in fact, the Ninth Circuit there clearly indicates that it ruled because Qualcomm's adoption of BCG's analysis and conclusions demonstrates that Qualcomm -- that BCG acted as Qualcomm's agent.

1          I did not see in this case that that evidentiary
2  support was there.  All right?
3          Thank you.  Proceed.
4          MR. MACH:  Thank you very much, your Honor.
5  THORSTEN LANGHEIM, resumed.
6  BY MR. MACH:
7  Q.  Welcome back, Mr. Langheim.
8          I'd like to ask you some questions about DISH.
9  A.  DISH, yes.
10 Q.  Once it was clear to DT that DISH would be the divestiture
11 buyer, you asked your team to evaluate DISH's potential to
12 build its network, right?
13 A.  Yes.
14 Q.  And you asked your team to figure out what DISH could
15 achieve in a worst-case scenario from DT's perspective, right?
16 A.  Yes.
17 Q.  And in response, your team conducted an analysis, right?
18 A.  Yeah.
19 Q.  And your team also engaged in a variety of other
20 discussions about the probability of DISH building a
21 significant wireless network in the United States; correct?
22 A.  Yes.  Correct.
23 Q.  And your team assured you repeatedly that DISH is not going
24 to build its own wireless network; correct?
25 A.  They run analysis about how much they would buy a buildout