## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF CONNECTICUT, DISTRICT OF COLUMBIA, STATE OF MARYLAND, STATE OF MICHIGAN, COMMONWEALTH OF VIRGINIA, STATE OF WISCONSIN, STATE OF HAWAII, COMMONWEALTH OF MASSACHUSETTS, STATE OF MINNESOTA, STATE OF OREGON, STATE OF ILLINOIS, and COMMONWEALTH OF PENNSYLVANIA,<br><br>      Plaintiffs,<br><br>  - against -<br><br>DEUTSCHE TELEKOM AG, T-MOBILE US, INC., SPRINT CORPORATION, and SOFTBANK GROUP CORP.,<br><br>      Defendants. | No.1:19-cv-5434-VM-RWL |

## STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA

| | |
|---|---|
| THOMAS M. JOHNSON, JR.<br>General Counsel | MAKAN DELRAHIM<br>Assistant Attorney General |
| ASHLEY BOIZELLE<br>Deputy General Counsel | MICHAEL F. MURRAY<br>Deputy Assistant Attorney General |
| JACOB M. LEWIS<br>Associate General Counsel | ANDREW J. ROBINSON<br>DAVID J. SHAW<br>Counsel to the Assistant Attorney General |
| MATTHEW J. DUNNE<br>Counsel<br>Federal Communications  Commission<br>Washington,  D.C. 20554 | DANIEL E. HAAR<br>KATHLEEN SIMPSON KIERNAN<br>Attorneys<br>U.S. Department of Justice<br>Antitrust Division<br>Washington,  DC 20530 |

## TABLE OF CONTENTS

INTEREST OF THE UNITED STATES .................................................................... 1

SUMMARY OF ARGUMENT ............................................................................... 1

BACKGROUND.................................................................................................. 3

    I.   Federal Government Investigations ......................................................... 3

        A.  U.S. Department of Justice Antitrust Division Investigation and Settlement ........ 3

        B.  FCC Investigation and Findings ......................................................... 7

        C.  The Divestiture in the Antitrust Division's and the FCC's Remedies ................ 10

    II.  States' Action in This Court ................................................................... 11

ARGUMENT ................................................................................................... 12

    I.   The Litigating States Must Prove Their Requested Remedy is in the
        Public Interest. ..................................................................................... 13

    II.  The Litigating States Must Prove Their Requested Relief is Necessary in the Post-
        Settlement World, in Which the United States and the FCC Already Have Obtained
        Relief. ................................................................................................. 18

    III. The Antitrust Division's and the FCC's Public Interest Determinations Are Relevant to
        the Court's Consideration of the Public Interest. ...................................... 19

        A.  The Antitrust Division's and the FCC's Conclusions Are Complementary, Not in
            Conflict. ......................................................................................... 20

        B.  The Antitrust Division and the FCC Have Agency Expertise and Nationwide
            Perspectives the Litigating States Lack. ........................................... 21

CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc., v. Puerto Rico*,
   458 U.S. 592 (1982) ..................................................................................... 14, 23

*AlliedSignal, Inc. v. B.F. Goodrich Co.*,
   183 F.3d 568 (7th Cir. 1999) ................................................................................22

*Broadcast Music v. Columbia Broadcasting System, Inc.*,
   441 U.S. 1 (1979) ..................................................................................................19

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) ..............................................................................................14

*California v. American Stores*,
   495 U.S. 271 (990) .........................................................................................13, 25

*eBay v. MercExchange, LLC*,
   547 U.S. 388 (2006) ..............................................................................................14

*Fractus, S.A. v. Samsung Electronics Co., Ltd.*,
   876 F. Supp. 2d 802 (E.D. Tex. 2012) .............................................................15, 17

*Georgia v. Pennsylvania Railroad Co.*,
   324 U.S. 439 (1945) .....................................................................................23, 24, 25

*Hecht Co. v. Bowles*,
   321 U.S. 321 (1944) ..............................................................................................14

*Minnesota v. Northern Seurities Co.*,
   194 U.S. 48 (1904) ................................................................................................13

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ..............................................................................................18

*Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*,
   754 F.2d 404 (1st Cir. 1985) .................................................................................24

*Sam Fox Publishing Co. v. United States*,
   366 U.S. 683 (1961) ..............................................................................................22

*SAS Institute, Inc. v. World Programming Ltd.*,
   874 F.3d 370 (4th Cir. 2017) ...........................................................................15, 17

*South Austin Coalition Community Council v. SBC Communications, Inc.*,
   191 F.3d 842 (7th Cir. 1999) ................................................................................19

*Town of Norwood, Mass. v. New England Power Co.*,
  202 F.3d 408 (1st Cir. 2000) ................................................................22

*United States v. Borden Co.*,
  347 U.S. 514 (1954) ...............................................................13, 24

*United States v. E.I. du Pont de Nemours & Co.*,
  366 U.S. 316 (1961) ...........................................................................13

*United States v. FCC*,
  652 F.2d 72 (D.C. Cir. 1980) ..............................................................7

*United States v. Microsoft Corp.*,
  56 F.3d 1448 (D.C. Cir. 1995) ...........................................................22

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ..........................................................................14, 18

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969) ...........................................................................14, 25

**Statutes**

15 U.S.C. § 21(a) ........................................................................................7

15 U.S.C. § 26 .....................................................................................13, 14

28 U.S.C. § 517 ..........................................................................................1

47 U.S.C. § 307 ..........................................................................................7

**Other Authorities**

3 Earl W. Kintner, *The Legislative History of the Federal Antitrust Law and Related Statutes*
  (1978) ..................................................................................................23

U.S. Department of Justice, *Antitrust Division Policy Guide to Merger Remedies* (Oct. 2004) .... 4

U.S. Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines"
  (Aug. 18, 2010) ...................................................................................20

## INTEREST OF THE UNITED STATES

The United States respectfully submits this statement pursuant to 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice to attend to the interests of the United States in any case pending in a federal court. The Department's Antitrust Division enforces the federal antitrust laws and has a strong interest in ensuring that remedies for antitrust violations promote competition and protect consumers nationwide. The Federal Communications Commission ("FCC") enforces the federal telecommunications laws and has a strong interest in ensuring that mergers transferring FCC-granted licenses, including, but not limited to, their competitive effects, are in the public interest. Both the Antitrust Division and the FCC took nationwide actions on behalf of the American people in response to the merger at the heart of this private antitrust suit, based on their factual findings and determinations that their chosen relief was in the public interest. Now, plaintiffs in this case, a minority of States, ask this court to displace those findings and decisions by imposing a nationwide permanent injunction. To secure such relief, the plaintiff States must prove it is both necessary and in the public interest, an inquiry the United States respectfully submits should take into account the Antitrust Division's and the FCC's findings and decisions and the relief they already have secured.

## SUMMARY OF ARGUMENT

The United States, through the Department of Justice's Antitrust Division and the FCC, investigated the proposed merger of T-Mobile US, Inc. ("T-Mobile") and Sprint Corporation ("Sprint"). The Antitrust Division (along with a number of state Attorneys General) and the FCC concluded that consumers would benefit from the combination of T-Mobile and Sprint accompanied by the divestitures and other relief the Antitrust Division (in its proposed Final Judgment) and the FCC (in its order) secured to protect competition and promote the public interest. This outcome benefits consumers through the combination's enhanced output—the

1

increased availability of a higher quality mobile wireless network for consumers. Specifically, T-Mobile has committed to providing 5G coverage to 85% of the rural population within three years, and 90% of the rural population within six years. In addition, the relief the Antitrust Division and the FCC secured will maintain the competitive structure of the industry through a substantial divestiture of assets from T-Mobile to DISH Network Corporation ("DISH"), which has committed to building a nationwide network that will put its idle spectrum holdings into use by mobile wireless consumers for the first time. As a result, the relief the Antitrust Division (and a number of state Attorneys General) and the FCC secured means consumers in rural areas will gain new access to high quality 5G networks and consumers nationwide will continue to have four fully competitive options for their mobile wireless services.

A group of thirteen states and the District of Columbia (the "Litigating States") seek to block the merger in its entirety. In doing so, they ask this court to undo the benefits of the relief secured by the Antitrust Division (and our fellow state Attorneys General) and the FCC. The Litigating States face a high bar in their challenge. To win a permanent injunction that would block the merger, they must convince the court their request to block the merger in its entirety is in the public interest, among other obstacles. In other words, they must convince this honorable court that it is not merely acceptable, but beneficial to the public, to deprive consumers nationwide of a higher quality T-Mobile network and DISH's commitment to build a nationwide retail mobile wireless network, and to deprive consumers in rural states, which have disproportionately chosen to support the Antitrust Division's settlement rather than join in this litigation, of new access to 5G networks. Indeed, that the Litigating States' proposed remedy will affirmatively harm consumers in rural states by denying them these benefits weighs strongly against a nationwide injunction.

In determining whether to grant the Litigating States' requested injunction, this court need not choose between a nationwide injunction and a merger unimpeded by any relief. The Antitrust Division and the FCC already have secured substantial relief to address harm to competition threatened by the merger—relief directly relevant to the inquiry into whether the Litigating States' proposed injunction is necessary. Thus, the key question is whether any *additional* relief is necessary to protect competition and advance the public interest.

Finally, a nationwide injunction would block not only the transaction, but also the substantial, long-term, and procompetitive benefits for American consumers the Antitrust Division and the FCC concluded will flow from the merger and the relief each secured. Both the Antitrust Division and the FCC have significant experience and expertise in analyzing these types of transactions and do so from a nationwide perspective, and thus their conclusions that the merger as remedied is in the public interest deserve appropriate weight in this remedy inquiry by this honorable court.

## BACKGROUND

On April 29, 2018, T-Mobile and Sprint agreed to combine their businesses in an all-stock transaction valued at approximately $26 billion, with the merged firm to be owned 42% by Deutsche Telekom AG, a German corporation, and 27% by Softbank Group Corp., a Japanese corporation. Compl. ("Compl.") ¶¶ 7, 9, 11, ECF No. 1, *United States v. Deutsche Telekom AG*, 19-cv-2232 (D.D.C. July 26, 2019); Competitive Impact Statement ("CIS") at 1, ECF No. 20, *United States v. Deutsche Telekom AG*, 19-cv-2232 (D.D.C. July 30, 2019).

### I.   Federal Government Investigations

#### A.   U.S. Department of Justice Antitrust Division Investigation and Settlement

The Antitrust Division conducted a "comprehensive, fifteen-month investigation" of the

transaction. Response of Plaintiff United States to Public Comments on the Proposed Final Judgment ("RTC") at 8, ECF No. 42, *United States v. Deutsche Telekom AG*, 19-cv-2232 (D.D.C. Nov. 6, 2019). It considered the effect of the transaction on a nationwide market for retail mobile wireless service and how its impact on competition would affect consumers across the United States. *See, e.g.*, CIS at 5-7.

By the end of its investigation, the Antitrust Division determined T-Mobile's acquisition of Sprint, if not remedied, "likely would substantially lessen competition in the retail mobile wireless service market in the United States." CIS at 5. The Antitrust Division also recognized, however, that the merger, if accompanied by appropriate relief, would yield "significant efficiencies" that would benefit consumers nationwide. RTC at 33. Among other benefits, it would "enabl[e] T-Mobile to offer 5G wireless services," a more advanced technology, "more cost-effectively." *Id*. By securing relief that would require and incentivize the parties to "invest in a robust 5G network that becomes available to consumers quickly," the merger, as remedied, could help increase nationwide access to technology to "serve consumers across the country," including in rural communities and other areas that currently lack that access. *Id*. at 33-35. Thus, the merger as remedied would "expand[] American consumers' access to high quality networks." CIS at 3.

The Antitrust Division "considered a full trial on the merits challenging the merger," including whether to seek "preliminary and permanent injunctions against T-Mobile's acquisition of Sprint," but determined instead that the secured relief would benefit consumers across the country, who would reap the efficiencies generated by the merger that "would not be realized if the merger were blocked." CIS at 18; RTC at 33; *see also* U.S. Department of Justice, *Antitrust Division Policy Guide to Merger Remedies* at 4 (Oct. 2004) ("Effective remedies

preserve the efficiencies created by a merger, to the extent possible, without compromising the benefits that result from maintaining competitive markets."). Further, a settlement "would achieve all or substantially all of the relief the United States would have obtained through litigation" while "avoid[ing] the time, expense, and uncertainty of a full trial on the merits of the Complaint." CIS at 18-19. Thus, the Antitrust Division concluded that it could achieve the best of both worlds—allowing the deal (and its accompanying procompetitive benefits) to proceed, subject to a consent decree that addressed any loss of competition—and that this course served the public interest of American consumers.

On July 26, 2019, the Antitrust Division filed a civil antitrust complaint in D.D.C. alongside a proposed Final Judgment containing the terms of the settlement. Proposed Final Judgment, ECF No. 2-2, *United States v. Deutsche Telekom AG*, 19-cv-2232 (D.D.C. July 26, 2019) (attached as Ex. A). The proposed Final Judgment outlines a structural settlement that preserves the existence of a fourth competitor in the nationwide market for retail mobile wireless service. The settlement requires T-Mobile to divest to DISH "certain retail wireless business and network assets, and supporting assets" and "provide to DISH . . . all services, access, and assets necessary," "to facilitate DISH building and operating its own mobile wireless services network" and "to enable it to compete in the marketplace." CIS at 2. This is intended to "ensure the development of a new national facilities-based mobile wireless carrier competitor to ultimately remedy the anticompetitive harms that flow from the change in the market structure that otherwise would have occurred as a result of the merger." *Id.* at 8. Further, DISH "will bring spectrum (that it currently has no obligation to build out in this way) into service as a mobile broadband 5G service that will serve consumers across the country." *Id.*; RTC at 34-35.

The Antitrust Division reached these conclusions in its role as the enforcer of the federal

antitrust law on behalf of consumers nationwide. This required, among other things, considering the interests of differently situated consumers. Ultimately, the "proposed Final Judgment fulfills the twin goals of a merger remedy. It permits the merger to proceed, enabling rural," and other, "consumers to benefit from its promised efficiencies, while adopting remedies that will protect consumers in and bring new competition to urban areas that may have been at greater risk without this settlement." RTC at 31. *See also id.* at 51 (noting praise from the Utah and Arkansas Attorneys General that the settlement "offer[s] benefits to rural communities while maximizing output and consumer choice for all Americans"). Currently, ten states—Arkansas, Colorado, Florida, Kansas, Louisiana, Nebraska, Ohio, Oklahoma, South Dakota, and Texas—have joined the Antitrust Division's suit seeking approval of its settlement, Fifth Am. Compl., ECF No. 50, *United States v. Deutsche Telekom AG*, 19-cv-2232 (D.D.C. Nov. 27, 2019), and three more states—Arizona, New Mexico, and Utah—have publicly supported the deal.[1]

On July 30, 2019, the Antitrust Division filed its Competitive Impact Statement explaining, among other things, how the proposed Final Judgment addresses the harms alleged in the complaint. On November 6, 2019, the Antitrust Division filed its response to the public comments it received after publishing its settlement in the Federal Register, RTC at 3-4, and on November 8, 2019, it moved to enter final judgment, Motion for Entry of Final Judgment, ECF No. 44, *United States v. Deutsche Telekom AG*, 19-cv-2232 (D.D.C. Nov. 8, 2019).

Although the district court has not yet entered the proposed Final Judgment, the parties agreed they would "abide by and comply with the provisions of the proposed Final Judgment

---

[1] *See* Arizona Att'y Gen. Brnovich, "Statement on DOJ—T-Mobile/Sprint Merger Settlement," *available at* https://www.azag.gov/press-release/attorney-general-brnovich-statement-doj-t-mobilesprint-merger-settlement; Letter from New Mexico Att'y Gen. Balderas and Utah Att'y Gen. Reyes (July 10, 2018), *available at* https://attorneygeneral.utah.gov/wp-content/uploads/2018/08/Joint-AG-Letter-to-Committee-7.10.18.pdf.

pending the Judgment's entry by the Court" in a signed stipulation filed with the complaint and proposed Final Judgment. Stipulation and Order, ECF No. 2-1 at 7, *United States v. Deutsche Telekom AG*, 19-cv-2232 (D.D.C. July 26, 2019). The district court signed and entered an order approving that stipulation on July 29, 2019. Stipulation and Order, ECF No. 16, *United States v. Deutsche Telekom AG*, 19-cv-2232 (D.D.C. July 29, 2019).

B. FCC Investigation and Findings

Contemporaneously with the Antitrust Division's investigation, suit, and settlement, the FCC also investigated the merging parties, which needed the FCC's "consent to the transfer of control of the licenses, authorizations, and spectrum leases held by Sprint and its subsidiaries to T-Mobile." *In the Matter of Applications of T-Mobile US, Inc., and Sprint Corporation, et al.*, Mem. Op. and Order, Declaratory Ruling, and Order of Proposed Modification ¶ 1, WT Docket No. 18-197, FCC 10-103 (rel. Nov. 5, 2019) (attached as Ex. B). In its investigation, the FCC analyzed whether "public interest, convenience, and necessity will be served by granting these applications" for the license transfers, which included consideration of the merger's likely impact on competition. *Id.* ¶¶ 4-11; 47 U.S.C. § 307.[2]

> Commission staff [] conducted an exhaustive review of the proposed transaction, in which it: reviewed thousands of pages of pleadings; issued multiple document and information requests to the Applicants and third parties; examined the documents produced in response to these requests; studied and analyzed engineering and economic models submitted by the Applicants and other commenters; and conducted independent

---

[2] The FCC has explicit enforcement authority under Section 11 of the Clayton Act, 15 U.S.C. § 21(a): "Authority to enforce compliance with sections 13, 14, 18, and 19 of this title by the persons respectively subject thereto is vested . . . in the Federal Communications Commission where applicable to common carriers engaged in wire or radio communication or radio transmission of energy." Historically, however, the FCC has not directly enforced this provision (leaving enforcement to the Department of Justice) and instead vindicates its competition concerns through its statutory responsibility to review FCC license transfers to determine whether they are in the public interest. *See United States v. FCC*, 652 F.2d 72, 88 (D.C. Cir. 1980) ("We hold that the requirements of Section 11 of the Clayton Act and Section 309(a) of the Communications Act are satisfied when the Commission seriously considers the antitrust consequences of a proposal and weighs those consequences with other public interest factors.").

analyses of the public interest claims of the Applicants and third parties.
Ex. B ¶ 4.

The FCC found that it would serve the public interest to approve the license transfers, allowing the merger to proceed and generate benefits for consumers, subject to the conditions it imposed on the parties to ameliorate the potential for competitive harm and to reinforce certain benefits of the transaction. Ex. B ¶¶ 9-11. As part of these conditions, the merging parties must "cover 97% of the U.S. population with 5G service within three years of the consummation of the transaction, and 99% within six years," and they "specifically committed to build out their new 5G network to rural communities." *Id.* ¶¶ 26-27. They also committed that this 5G network would be of high quality, providing "5G download speeds of at least 50 Mbps to almost everyone in the United States (99% of the population), and 5G download speeds of at least 100 Mbps to 90% of the U.S. population" within six years, as verified by "independently-overseen drive tests." *Id.* at ¶¶ 26, 31. The parties' commitments are legally binding through their inclusion in the FCC's determination and order, *id.* ¶¶ 387-88, and the parties would owe substantial penalties—potential reaching billions of dollars—if they fail to honor these commitments, *id.* ¶¶ 30-32.[3]

In its order, the FCC emphasized the network benefits of the transaction as "particularly important for the nation's underserved rural areas." Ex. B ¶ 7. "Rural communities will see especially large benefits from such 5G connectivity as coverage and throughput in rural areas can often lag urban development." *Id.* As the FCC noted, connectivity is a matter of health, safety, and equality in rural communities: "high-speed wireless connections are more valuable for those

---

[3] The Antitrust Division incorporated the network commitments in the FCC's order into its proposed Final Judgment, providing an additional means for enforcement of those commitments and further ensuring the parties' compliance. Ex. A at 23.

who lack quality fixed service, telehealth services are more highly demanded the further one

lives from a doctor, and distance learning is more important for those far from schools." *Id.*

The FCC also considered the potential impact of the transaction on residents of urban

areas. In response to its "concern[] about the impact of an unconditioned transaction on

consumers in densely-populated areas who are primarily concerned about cost," the FCC

"require[d], as a condition of [its] approval, that the Applicants fulfill a series of commitments to

address the potential for lost price competition" in those areas, including a divestiture of a

portion of Sprint (Boost Mobile) and a commitment "that the divested [entity] will have low-

cost wholesale networks access on terms superior to typical [mobile virtual network operators],

with the financial incentive to provide robust competition from the moment of divestiture, and

with the ability to build its own facilities over time." Ex. B ¶ 11. These commitments include a

requirement that "the pricing provisions of the wholesale arrangement" between T-Mobile and

the divested entity comply with "key principles" to ensure "competition at least as strong as"

existed prior to the merger and that the new entity "can maintain and expand its role as an

effective competitor and has all available options to continue to be effective well into the future."

*Id.* ¶¶ 202-03; *see also id.* ¶¶ 189-208.

The FCC also "carefully considered the extent to which the efficacy of the Boost

divestiture would be impeded by the buyer's initial reliance . . . on [the merged entity's]

network" due to agreements in place between the divested entity and T-Mobile. Ex. B ¶ 201; *see*

*also id.* at ¶¶ 189-208. Based on that analysis, and in light of the conditions imposed by the

FCC's order, as well as the delegated authority of the Wireless Telecommunications Bureau to

oversee and enforce those conditions, the FCC found the divested entity would be "well-

positioned to be a significant competitive force." *Id.* at ¶ 201.

In describing the Antitrust Division's settlement, which, like the FCC's order, included the Boost divestiture, the FCC's order noted that DISH "agreed to purchase the divested Boost Mobile" and "conclude[d] that significant public interest benefits would flow from DISH's deployment of 5G broadband services over its spectrum holdings, which for many years have been underutilized, and that the acquisition of Boost Mobile will help DISH achieve that deployment." Ex. B ¶ 12. Under the FCC's order, if DISH fails to meet its commitments to deploy 5G service, it "shall" make significant payments, potentially totaling in the billions of dollars. *Id.* ¶¶ 377-80; *see id.*, App. H at 255 (committing to payments of up to $2.2 billion).

Thus, because the transaction as conditioned will "result in a number of benefits," including "the deployment of a highly robust nationwide 5G network," "improving the quality of the Applicants' services for American consumers," and "substantially increased coverage and capacity (and in turn, user speeds and cost structure) compared to the standalone companies," the FCC granted its approval so long as the merging parties satisfied their commitments. Ex. B ¶¶ 5, 25-32, 236. In sum, the FCC "conclude[d] that, as conditioned, the transaction would not substantially lessen competition, and would be in the public interest." *Id.* ¶ 11.

C. The Divestiture in the Antitrust Division's and the FCC's Remedies

Both the Antitrust Division and the FCC considered central to their relief T-Mobile's divestiture of Boost Mobile, which will maintain four providers of nationwide mobile wireless service and thus preserve the competitive structure of the industry. Under the Antitrust Division's settlement, DISH will acquire Boost (and its approximately 9 million prepaid customers) and immediately enter the market. RTC at 22. This scale will enable DISH to be an effective competitor while it builds a 5G network, even without a legacy network like those of the other three nationwide mobile wireless service providers. *Id.* at 26. Within one year of the

divestiture's closure, DISH will begin offering postpaid nationwide mobile wireless service plans. Ex. A at ¶ IV.F. For up to seven years, DISH will be able to use T-Mobile's network at favorable rates to offer DISH mobile wireless service plans, "unique among [these] agreements in the industry." Ex. B ¶¶ 201, 202, 205; RTC at 2-3. Still, the Antitrust Division and the FCC structured their relief to incentivize DISH to move traffic onto its own network as soon as it can. RTC at 28-29. DISH already has extensive existing spectrum assets that it can combine with those it receives in the divestiture, uniquely positioning it to compete. Ex. B ¶ 207; CIS at 9. The new entity "will be able to use its wholesale arrangement with [the merged entity] as the jumping-off point to grow into an even stronger competitor." Ex. B ¶ 203. In sum, the relief the Antitrust Division and the FCC secured will enable DISH's effort to be disruptive competitor and will benefit consumers by preserving four nationwide mobile wireless providers, as well as combining T-Mobile's and Sprint's existing strengths. RTC at 1-3, 27-28.

## II.  States' Action in This Court

During the Antitrust Division's and the FCC's investigations of the transaction, a number of states conducted their own investigations. On June 11, 2019, before the Antitrust Division or the FCC had completed their reviews, the Litigating States filed the underlying complaint in this case, arguing that "[i]f the merger between Sprint and T-Mobile were consummated, it likely would substantially lessen competition" in violation of Section 7 of the Clayton Act. Compl. ¶ 103, ECF No. 2, *N.Y. v. Deutsche Telekom AG*, No. 19-5434 (S.D.N.Y. June 11, 2019). After the Antitrust Division filed its proposed Final Judgment, the Litigating States amended their complaint to allege that the settlement "does not ameliorate the harms to competition, and the resulting harms to consumers, that will result if the Merger is completed." Third Amended Compl. ¶ 107, ECF No. 214, *N.Y. v. Deutsche Telekom AG*, No. 19-5434 (S.D.N.Y. Sept. 18,

11

2019). Despite the extensive relief the Antitrust Division and the FCC secured and their conclusions that this relief addressed the competitive harms of the transaction for consumers nationwide while preserving numerous benefits to consumers, the Litigating States continued to seek a nationwide injunction blocking the proposed merger. *Id.* ¶ 111.

In contrast, as discussed above, ten states have joined the Antitrust Division's suit seeking approval of its settlement, and three more states have publicly supported the deal. Meanwhile, four states left the Litigating States group after reaching separate settlements with the parties.[4] (Two of these, Colorado and Texas, joined the Antitrust Division's suit.) The remaining twenty-two states have neither objected in the Tunney Act proceeding nor joined the Litigating States' suit.

## ARGUMENT

In seeking a nationwide injunction, the Litigating States ask this court to disregard the findings and decisions of the Antitrust Division (and certain state Attorneys General) and the FCC to impose on the nation as a whole the preferred remedy of a minority of states. The Litigating States face a high bar in seeking this relief: suing as private parties, they must prove affirmatively that such relief is in the public interest. The Antitrust Division (and a number of state Attorneys General) and the FCC already have secured relief they determined would address the merger's potential anticompetitive effects and yield substantial benefits to consumers. Thus, here, the Litigating States must prove that a permanent nationwide injunction is necessary even though it will negate the relief already secured, and in the interest of the public even though it

---

[4] Letter from Mississippi, ECF No. 223, *N.Y. v. Deutsche Telekom AG*, No. 19-5434 (S.D.N.Y. Oct. 9, 2019); Letter from Colorado, ECF No. 226, *N.Y. v. Deutsche Telekom AG*, No. 19-5434 (S.D.N.Y. Oct. 23, 2019); Letter from Nevada, ECF No. 286, *N.Y. v. Deutsche Telekom AG*, No. 19-5434 (S.D.N.Y. Nov. 26, 2019); Letter from Texas, ECF No. 293, *N.Y. v. Deutsche Telekom AG*, No. 19-5434 (S.D.N.Y. Nov. 26, 2019).

will prevent consumers from benefiting from that relief and the underlying merger.

**I.     The Litigating States Must Prove Their Requested Remedy is in the Public Interest.**

The Litigating States bring their suit under Section 16 of the Clayton Act, 15 U.S.C. § 26. As Section 16 plaintiffs seeking a nationwide injunction, they face a more difficult test than the Antitrust Division would have faced had it sought to bar the parties' merger. *Cal. v. Am. Stores*, 495 U.S. 271, 295-96 (1990).

Unlike the Litigating States, the Antitrust Division enforces the federal antitrust laws on behalf of the American people, and has expansive authority to do so "according to some uniform plan, operative throughout the entire country." *Minn. v. N. Sec. Co.*, 194 U.S. 48, 70-71 (1904) (noting that the Sherman Act limited "proceedings in equity to prevent and restrain such violations of the anti-trust act as cause injury to the general public . . . to those instituted in the name of the United States"); *see also United States v. Borden Co.*, 347 U.S. 514, 518 (1954) (noting that the Clayton Act charges the United States "with the duty of instituting equity proceedings to prevent and restrain violation of certain of the antitrust laws"). Thus, when the Antitrust Division brings an antitrust suit seeking injunctive relief as a remedy, "the proof of the violation of law may itself establish sufficient public injury to warrant relief," *Am. Stores*, 496 U.S. at 296, and when the United States establishes a violation of the law, "all doubts as to the remedy are to be resolved in its favor," *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961). In contrast, circumstances that would justify an injunction in a suit brought by the Antitrust Division under Section 15 of the Clayton Act might not justify an injunction in a suit brought by plaintiffs—like the Litigating States—under Section 16. *Am. Stores*, 495 U.S. at 295-96 (that "a district court has the power to order divestiture in appropriate cases brought under § 16 of the Clayton Act does not, of course, mean that such power should be exercised in

every situation in which the Government would be entitled to such relief under § 15").

A Section 16 plaintiff must establish "threatened loss or damage by a violation" that is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Alfred L. Snapp & Son, Inc., v. Puerto Rico*, 458 U.S. 592, 607 (1982) (states do not have standing to bring *parens patriae* suits based on the individual interests of their residents or commercial entities). In particular, as the Litigating States concede, they must satisfy a four-factor test, including the question of whether their desired injunction is in the "public interest":

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also* Plaintiff States' Pretrial Mem. ("Pretrial Mem."), ECF No. 295 at 27, *N.Y. v. Deutsche Telekom AG*, No. 19-5434 (S.D.N.Y. Nov. 16, 2019). Additionally, courts considering such requests for injunctive relief follow "the rules governing such proceedings" in "courts of equity." 15 U.S.C. § 26.

The public interest element of the four-factor test the Litigating States must pass reflects the traditional understanding that "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). "Its availability should be 'conditioned by the necessities of the public interest which Congress has sought to protect.'" *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 131 (1969) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 330 (1944)).

In considering the public interest, courts examine the proposed remedy's impact on innocent third parties. "Direct effects on innocent third parties have frequently grounded courts' denials of injunctions. This is especially so where the public interests weighing in favor of an injunction rely on broad, abstract rule of law concerns." *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 388 (4th Cir. 2017). In *SAS Institute*, the Fourth Circuit weighed "concrete harms to [] existing customers" who "would have to expend significant time and money" against the plaintiff's breach of contract claim, noting that while its interests were "certainly legitimate, the award of compensatory and punitive damages in this case already serves them well. Were we to hold that these broad principles were sufficient to defeat more concrete harms to innocent third parties, the public interest factor would weigh in favor of an injunction in nearly every case." *Id.*

Similarly, in *Fractus, S.A. v. Samsung Electronics Co., Ltd.*, the Eastern District of Texas held that a plaintiff seeking an injunction failed the public interest test; while granting the injunction would have "significantly disrupt[ed] third-party businesses" and "detrimentally affect[ed] the retail sellers of Samsung phones, as well as their customers," the plaintiff did not "identif[y] a specific public interest that would be served by entry of its requested injunction," other than "maintaining a strong patent system." 876 F. Supp. 2d 802, 854 (E.D. Tex. 2012).

Here, unlike the Antitrust Division and the FCC, the Litigating States represent only a select portion of the United States, as illustrated in the following map (which does not include Puerto Rico or other U.S. territories).



Notably, of the thirteen Litigating States and the District of Columbia, only *two* rank in the top twenty-five U.S. states by percentage of rural population as measured by the U.S. Census Bureau—Wisconsin, ranking 19th with 29.9% of its population living in rural areas, and Minnesota, ranking 25th with 26.7%—while more than half of the top fifteen U.S. states by percentage of urban population are part of the Litigating States (the District of Columbia, with 100% urban population; California, with 95%; Massachusetts, with 92%; Hawaii, with 91.1%; Illinois, with 89%; Connecticut, with 88%; New York, with 87.9%; and Maryland, with 87.2%).[5] By contrast, half of the states that have joined the Antitrust Division's suit rank in the top half of states by percentage of rural population: Arkansas, ranking 6th with 43.5%; South Dakota, ranking 7th with 43.4%; Oklahoma, ranking 16th with 33.8%; Nebraska, ranking 23rd with 26.9%; and Louisiana, ranking 24th with 26.8%. *Id.*

The Litigating States' lack of a nationwide interest is of special concern here because the challenged merger would combine two nationwide cellular networks that serve customers in

---

[5] Data from Excel spreadsheet, "Percentage Urban and Rural in 2010 by State," U.S. Census Bureau, *available at* https://www.census.gov/programs-surveys/geography/guidance/geo-areas/urban-rural/2010-urban-rural.html.

every state. The transaction and the relief the Antitrust Division and the FCC secured are particularly important for the nation's rural residents, who currently lack access to many of the benefits mobile wireless service brings to urban areas; the FCC determined that for these Americans, "the transaction would markedly increase their ability to access robust 5G services at all, or to have more choice in which provider they purchase 5G services from." Ex. B ¶¶ 7, 172; *see also* RTC at 31 (noting that the proposed Final Judgment would "enabl[e] rural consumers to benefit from its promised efficiencies").

In their commitments to the FCC, the merging parties "pledged to cover 85% of the United States rural population with 5G service within three years of the consummation of the transaction, and 90% within six years." Ex. B ¶ 27. (The Antitrust Division incorporated these network build commitments into its own settlement. Ex. A at 23.) The FCC concluded that "[e]xpanding 5G access to all Americans will also enhance the benefits of 5G innovation for the overall United States economy and will support American technological leadership." Ex. B ¶ 8. For example, the Commission found, 5G "holds the potential to create three million new jobs in our country and $500 billion in GDP growth." *Id.* ¶ 3. The FCC also determined that the parties' "rural coverage claims are verifiable and creditable and constitute a significant public interest benefit." Ex. B ¶ 257. "By bringing new connectivity and expanded competition to underserved rural areas, the proposed transaction will ensure that 5G helps to close, rather than widen, the digital divide." *Id.* ¶ 269. The Litigating States' requested relief would eliminate these substantial commitments and their resulting benefits to consumers. These are exactly the kind of "[d]irect effects on innocent third parties" that deserve strong consideration when weighing whether the Litigating States' requested relief is in the public interest. *See SAS Institute*, 874 F.3d at 288; *Fractus*, 876 F. Supp. 2d at 854.

II.     **The Litigating States Must Prove Their Requested Relief is Necessary in the Post-Settlement World, in Which the United States and the FCC Already Have Obtained Relief.**

A court in equity will not grant an injunction unless such relief is necessary. "An injunction is a drastic and extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). "If a less drastic remedy . . . [is] sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted." *Id.* at 165-66. *See also Romero-Barcelo*, 456 U.S. at 312 ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies.").

Determining whether such extraordinary relief is necessary requires examining the world as it is. If existing conditions remedy the harms plaintiffs seek to redress, such extraordinary injunctive relief is unnecessary, and thus inappropriate. Both the Antitrust Division and the FCC secured significant relief to address the potential harms of the merger, RTC at 31; Ex. B ¶¶ 9-11—relief requiring the parties to verify their 5G commitments through independent monitoring and testing, Ex. B ¶¶ 26, 31, enforceable through penalties including, but not limited to, the significant monetary fines (potentially totaling billions) set forth in the FCC's order, *id.* ¶¶ 30-32, 358-80. Indeed, the robust penalties and rigorous verification requirements set forth in the FCC's order make clear the FCC's determination and ability to ensure that the new T-Mobile and DISH satisfy their 5G buildout commitments. In evaluating whether the Litigating States satisfy the equitable considerations for injunctive relief, therefore, this court is not choosing between blocking the merger or permitting it to proceed unremedied, but rather asking whether a nationwide injunction is necessary even with the substantial remedies already secured.

The Supreme Court addressed a similar situation in *Broadcast Music v. Columbia*

*Broadcasting System, Inc.*, 441 U.S. 1, 13 (1979). That case called on the Court to decide whether to apply the *per se* rule or the rule of reason to a private antitrust claim that challenged conduct already covered by an Antitrust Division consent decree. As the Court stressed, "it cannot be ignored that the Federal Executive and Judiciary have carefully scrutinized [a business] and [its] challenged conduct, have imposed restrictions on various of [its] practices, and, by the terms of the decree, stand ready to provide further consideration, supervision, and perhaps invalidation of asserted anticompetitive practices." *Id.* at 13.

As the Supreme Court noted in *BMI*, while the court "is not bound by the Antitrust Division's actions, the decree is a fact of economic and legal life in this industry, and [courts] should not [] ignore[] it completely in analyzing the practice." 441 U.S. at 13. As one appellate court explained more recently, "[c]ourts often wait for agencies, even when the agencies' views are not legally conclusive—not only because the agencies may have something helpful to say, but also because what the agencies *do* may shape the litigation." *S. Austin Coal. Cmty. Council v. SBC Commc'ns, Inc.*, 191 F.3d 842, 844 (7th Cir. 1999) (upholding dismissal without prejudice of private challenge, under Section 16, to telecommunications merger to allow FCC to review).

Thus, as with the agency actions in *BMI* and *South Austin*, the substantial relief the Antitrust Division (and a number of state Attorneys General) and the FCC already have secured is centrally relevant to this court's determination of the likely future competitive effects of the merger and the necessity of additional relief. Further, to the extent this Court views any additional relief as necessary to remedy the merger's anticompetitive effects, the existing relief provides this Court a framework on which it could build, rather than a structure to tear down.

## III. The Antitrust Division's and the FCC's Public Interest Determinations Are Relevant to the Court's Consideration of the Public Interest.

Just as the existence of the remedies secured by the Antitrust Division and the FCC are

important factors in this court's equitable relief analysis, so too are the conclusions of both agencies that the remedies they secured are in the public's interest. Giving weight to these determinations is all the more justified here, where granting the Litigating States' request for a nationwide injunction would directly conflict with the Antitrust Division's proposed Final Judgment and the FCC's order, effectively displacing these remedies and preventing the merger's significant procompetitive efficiencies from flowing to consumers.

     A.   <u>The Antitrust Division's and the FCC's Conclusions Are Complementary, Not in Conflict.</u>

     As an initial point, the Litigating States are wrong to portray the Antitrust Division and the FCC as in conflict over the merger: while the Litigating States claim the Antitrust Division "did not accept the FCC's remedies as sufficient" because the Antitrust Division concluded the merger likely would harm competition, Pretrial Mem. at 6-7, this mischaracterizes the agencies' separate, but complementary, statutory mandates and review processes.

     The FCC reviews the likely effect of the transaction as conditioned by the parties' commitments in making its public-interest determination (including, but not limited to, a competition analysis). Ex. B ¶¶ 4-11. The Antitrust Division first analyzes the impact on competition of the proposed merger before the imposition of any potential conditions, *see, e.g.*, *Horizontal Merger Guidelines* at 1, and then works to craft relief that would address those harms. Thus, that the Antitrust Division reached its own conclusion about the merger's effect on competition does not indicate the two agencies had materially different views of the merger. It simply reflects differences in the two agencies' statutory mandates and review processes. The Antitrust Division concluded that the merger, unremedied, would harm competition, and it secured relief to remedy that harm; the FCC concluded that the merger, remedied, would not harm competition. These two conclusions do not conflict—they agree.

20

That the Antitrust Division and the FCC reached complementary, rather than identical, results should not be surprising. They conduct separate investigations with separate statutory mandates and policy requirements. The Antitrust Division focuses solely on the merger's likely effects on competition. "The FCC's review," although it includes a competition analysis, also "takes into account public interest concerns broader than strict antitrust issues, including spectrum aggregation, universal service, localism, and diversity." Frequently Asked Questions About Transactions, Fed. Communications Commission, *available at* https://www.fcc.gov/reports-research/guides/mergers-frequently-asked-questions (July 10, 2014).

The Antitrust Division and the FCC have worked side-by-side on numerous past matters in which they secured similar but not identical remedies after reaching the same broad conclusion about a merger. *See* Press Release, Department of Justice, "Justice Department Allows Comcast-NBCU Joint Venture to Proceed with Conditions" (Jan. 18, 2011), *available at* https://www.justice.gov/opa/pr/justice-department-allows-comcast-nbcu-joint-venture-proceed-conditions; Press Release, Department of Justice, "Justice Department Allows Charter's Acquisition of Time Warner Cable and Bright House Networks to Proceed with Conditions" (Apr. 25, 2016), *available at* https://www.justice.gov/opa/pr/justice-department-allows-charter-s-acquisition-time-warner-cable-and-bright-house-networks. The Antitrust Division and the FCC similarly coordinated their processes here.

B.   <u>The Antitrust Division and the FCC Have Agency Expertise and Nationwide Perspectives the Litigating States Lack.</u>

Both the Antitrust Division and the FCC had the ability to pursue a nationwide injunction to block the merger, but after an extensive review and analysis, instead chose to secure other relief. After studying the merger for fifteen months on the basis of its antitrust expertise and from

the perspective of the nation as a whole, the Antitrust Division reached a settlement that provided "substantial long-term benefits for American consumers" by allowing consumers to benefit from the transaction's efficiencies while protecting them from its harms. RTC at 2. Similarly, the FCC conducted a thorough and lengthy investigation, informed by its expertise regarding competition among providers of various telecommunications services and its nationwide perspective, and "concluded that the proposed transaction, as modified by the FCC's own set of conditions, would be in the public interest." RTC at 1.

The Litigating States err in urging this court not to give weight to these conclusions. Pretrial Mem. at 7-8.[6] As the Supreme Court noted, "sound policy would strongly lead us to decline appellants' invitation to assess the wisdom of the Government's judgment in negotiating and accepting [an antitrust] consent decree." *Sam Fox Pub. Co. v. United States*, 366 U.S. 683, 689 (1961). Courts take seriously the expertise of agencies like the Antitrust Division and the FCC. *Town of Norwood, Mass. v. New England Power Co.*, 202 F.3d 408, 423 (1st Cir. 2000) (in analyzing an antitrust claim brought by a Massachusetts town, the court recognized that "[a] different reason for doubt as to the antitrust claim is that FERC itself found, after a regulatory analysis, that the sale would not enhance market power"). The same rationale underlies courts' hesitance to "assume the role of Attorney General" in a Tunney Act review of an Antitrust Division settlement. *United States v. Microsoft Corp.*, 56 F.3d 1448, 1462 (D.C. Cir. 1995).

Further, both agencies bring a nationwide perspective to their analysis of the transaction that the Litigating States lack. In empowering the United States to enforce the antitrust laws on

---

[6] The Litigating States also are wrong to characterize the Antitrust Division's decision as one "not to challenge" the merger. Pretrial Mem. at 8. The Antitrust Division filed a complaint challenging the merger as unlawful, *see* Compl., and negotiated a settlement with the merging parties that resolved that challenge. That mistaken description also renders inapt their citation to *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568 (7th Cir. 1999), which involved a decision not to challenge a merger, not a decision to remedy a merger, as is the case here.

behalf of the American people, Congress noted the importance of this uniform, nationwide perspective. When, during floor consideration of the Clayton Act, Senator Reed offered an amendment that would have permitted the attorney general of any state to "bring suit in the name of the United States to enforce any of the antitrust laws," Senators opposed to the idea worried it could introduce "great danger of having a diversity of conclusions" or "prevent the carrying out of any uniform policy in the enforcement of the antitrust law." 51 Cong. Rec. S14,476-77 (daily ed. Aug. 31, 1914), *reprinted in* 3 Earl W. Kintner, *The Legislative History of the Federal Antitrust Law and Related Statutes* 2288-9 (1978) ("Kintner"); 51 Cong. Rec. S14,518 (daily ed. Sept. 1, 1914), *reprinted in* Kintner at 2303. Thus, the Senate rejected the proposed amendment. 51 Cong. Red. S14,526 (daily ed. Sept. 1, 1914), *reprinted in* Kintner at 2323.

As Congress recognized, state government bodies do not hold the same policy concerns as federal government bodies. In representing the rights and interests of their residents, they do not consider the rights and interests of the nation as a whole. In particular, they do not possess the expansive view of federal enforcers who regularly oversee antitrust investigations and make remedy recommendations on a national scale. They have neither the authority nor the responsibility to act on behalf of the nation, and while their concerns are not invalid, they are bound by state borders.

Unlike the Antitrust Division, which enforces the federal antitrust laws on behalf of the American people, states and other plaintiffs suing under Section 16 of the Clayton Act do not represent the nation as a whole. As the Supreme Court determined, when a state seeks equitable relief to vindicate its citizens' interests under the antitrust laws, it asserts a limited, "quasi-sovereign" interest as *parens patriae* for those citizens. *Ga. v. Pa. R. Co.*, 324 U.S. 439, 447 (1945); *see also Snapp*, 458 U.S. at 607 (a state in this position has a "quasi-sovereign interest in

23

the health and well-being—both physical and economic—of its residents in general.").[7]

This "quasi-sovereign" role does not permit states to override the sovereign interests of the United States. "The private-injunction action . . . supplements Government enforcement of the antitrust laws; but it is the Attorney General and the United States district attorneys who are primarily charged by Congress with the duty of protecting the public interest under these laws." *Borden*, 347 U.S. at 518. "Congress intended private antitrust suits both to provide a remedy to injured parties when the government fails to act or is not able to provide an adequate remedy, and to enlist the business public as private attorneys general to aid the government in 'achieving the broad social object of the statute." *Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 415 (1st Cir. 1985). "Congress did not intend that the efforts of a private litigant should supersede the duties of the Department of Justice in policing an industry." *Borden*, 347 U.S. at 519.

*Georgia* illustrates this dynamic. In that case, which recognized the states' "quasi-sovereign" interest, the Supreme Court was careful to point out that the state of Georgia's suit to enjoin a rate-fixing agreement among railroads would *not* interfere with any federal regulatory proceeding. *Georgia*, 324 U.S. at 447, 460. In particular, in finding that the equitable factors justifying relief under Section 16 were "sufficiently satisfied," the Court reasoned that Georgia sought "to dissolve an illegal combination," "relief [that] cannot be obtained from the [Interstate Commerce] Commission for it has no supervisory authority over the combination." *Id*. Indeed, the Court stressed, "[w]e are not asked to enjoin what the Commission might later approve or condone. We are not asked to trench on the domain of the Commission; nor need any decree which may be ultimately entered in this cause have that effect." *Id*. at 461.

---

[7] This "quasi-sovereign" interest does not privilege states relative to private parties with respect to the rigorous standards facing any plaintiff bringing a Section 16 suit, as discussed in Section I.

Here, the Litigating States *are* asking this court "to trench on the domain" of the Antitrust Division and the FCC, which *do* have "supervisory authority over the combination." *Georgia*, 324 U.S. at 460-61. Neither Congress nor the Supreme Court approved of such expansive action.

The Litigating States' strong interest in this merger does not justify their attempt to substitute their judgment for the nationwide perspective of the United States. The United States does not intend to discourage private party plaintiffs—whether states, businesses, or individuals—from spending their time and effort assisting the federal government in antitrust enforcement. The Clayton Act "was enacted 'not merely to provide private relief, but to serve as well the high purpose of enforcing the antitrust laws.'" *Am. Stores*, 495 U.S. at 284 (quoting *Zenith*, 395 U.S. at 130-31). At the same time, states cannot and should not displace the federal government's role as the nation's federal antitrust enforcer. When a group of states attempts to do so by seeking relief that quite arguably may benefit certain citizens while harming others, such a remedy is not in the public interest, and, respectfully, should not satisfy this court's test for injunctive relief.

## CONCLUSION

The Antitrust Division and the FCC are responsible for enforcing federal laws protecting competition in telecommunications markets and ensuring that their remedies protect competition and consumers from harm on a nationwide scale. Given that mandate, the public determinations and decisions of these federal agencies, including their choices of remedy, are relevant to a court considering the appropriate remedy in a private federal antitrust suit. We respectfully ask that the court give due weight and consideration to the judgments of the Antitrust Division and the FCC before the court deems any additional relief necessary and in the public interest.

Respectfully submitted,

THOMAS M. JOHNSON, JR.
General Counsel

ASHLEY BOIZELLE
Deputy General Counsel

JACOB M. LEWIS
Associate General Counsel

MATTHEW J. DUNNE
Counsel
Federal Communications  Commission
Washington,  D.C. 20554

December 20, 2019

MAKAN DELRAHIM
Assistant Attorney General

MICHAEL F. MURRAY
Deputy Assistant Attorney General

ANDREW J. ROBINSON
DAVID J. SHAW
Counsel to the Assistant Attorney General

DANIEL E. HAAR
KATHLEEN SIMPSON KIERNAN
Attorneys

/s/ Kathleen Simpson  Kiernan
KATHLEEN SIMPSON KIERNAN
U.S. Department of Justice
Antitrust Division
950 Pennsylvania  Avenue, NW
Washington,  DC 20530

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of December, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent a notification of such filing to all counsel of record in this matter.

/s/ Kathleen Simpson Kiernan
KATHLEEN SIMPSON KIERNAN
U.S. Department of Justice
Antitrust Division
950 Pennsylvania Avenue NW
Washington, DC 20530
