

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/23/19

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF ECONOMIC JUSTICE
ANTITRUST BUREAU

December 17, 2019

**By ECF Filing & Hand Delivery**

Hon. Victor Marrero
United States District Judge
500 Pearl Street
New York, NY 10007-1312

Re:  *State of New York, et al. v. Deutsche Telekom, et al.*, 1:19-cv-05434-VM(RWL)
      Plaintiff States' Letter Motion to Admit Defendants' DT's Workshop Documents

Dear Judge Marrero,

Defendants are attempting to exclude certain documents produced by Deutsche Telekom ("DT") and/or T-Mobile (the "Workshop Documents"), on the basis that the documents purportedly contain McKinsey consultant statements that cannot be attributed to them. Exh. A (PX 339).[1] On day two of the trial, the Court preliminarily sustained an objection from the bench concerning one of the Workshop Documents during the testimony of Mr. Langheim. Exh. B (trial transcript) at 310:2-313:16; 315:3-316:3; Exh. C (PX 329).[2] At the time, the Court ruled against admissibility on the basis that "there's no indication that the client controlled the development of the content." Exh. B at 315:18-19.

Plaintiff States respectfully submit that the trial testimony of T-Mobile executive Peter Ewens would have laid the necessary foundation for these documents. Because Defendants have chosen to drop Mr. Ewens as a trial witness, Plaintiff States write instead to provide the Court with the attached documents and testimony in order to lay that foundation. The documentary record surrounding the drafting of these materials, together with deposition testimony from two of Defendants' executives, Mr. Ewens of T-Mobile and Hannes Wittig of DT, demonstrates that these documents were prepared by and completely controlled by DT, and that the contents were fully embraced by and adopted by DT, to the point that a slide from them was adapted for use in several draft iterations of a September 2018 board presentation.

---

[1] In accordance with the Court's Trial Practices VIII. regarding exhibits, Plaintiff States submit only the pages of Exhibits A C, E, and H that are relevant at trial and for this motion. Plaintiff States attest that they are familiar with the full contents of each of these documents, that they possess and will maintain a copy of each entire document until the Court's final disposition, and that the excerpts of these exhibits are authentic copies of the relevant portions of the documents.

[2] Exhibit C contains privilege redactions. Initially, DT and TMUS redacted each of these documents for privilege; after being challenged, they withdrew their privilege assertions, but did not unredact every iteration of these documents in their productions.

This evidentiary record is sufficient to lay a foundation and establish that these documents are exempted from the definition of hearsay under Rule 801.

## Background

The Workshop Documents were created in connection with two workshops held in Germany in December 2015. (See Ewens Deposition transcript, attached as Exhibit D hereto, at 47:7-16). Documents show that those workshops were scheduled by Mr. Langheim. Exh. E (PX 802), p. 3. and that Mr. Langheim hired the consulting firm McKinsey to facilitate the discussions. Exh. F (PX 796). The Workshop Documents prominently display DT's logo, and do not display McKinsey's logo. The Workshop Documents list Mr. Langheim and Mr. Ewens as participants (although Mr. Langheim disputes how much of the workshops he actually attended), and Mr. Ewens emailed John Legere on December 3, the day of the first workshop, to report that one of Langheim's ideas "is that if we can't get 4-3 consolidation the industry is headed for commoditization and DT should limit their exposure in the US." Exh. F (PX 796)

The fact that the Workshop Documents were created by DT with input from T-Mobile is apparent from evidence and testimony found elsewhere in the record. In a November 14 email before the first workshop, DT employee Steffen Stern describes at length DT's substantive preparations for and content of the meetings, before noting that McKinsey was merely "supporting on the topic." Exh. E (PX 802), p. 2. Mr. Stern then follows up in the same email chain with a November 29, 2015 email sent solely between DT and TMUS employees anticipating a conference call, to attach "a current working draft", "[i]n case we decide to jump into the workshop document for next week." *Id.,* p.1. In addition, a December 7, 2015 email sent between the dates of the two workshops between only Mr. Stern and Mr. Ewens shows Mr. Stern proposing, as next steps, that "we start to create a few slides" and "we align with you starting ca. mid of this week to jointly bring the document to a good shape for next week's workshop." Exh. G (PX 800), p. 2. The bottom line is that while McKinsey appeared to have some facilitating role for the meetings themselves, it is apparent that DT and TMO employees created, managed, and controlled the content of the Workshop Documents.

At his deposition in this matter, Mr. Ewens gave conflicting testimony, first stating that "to my recollection, those materials were prepared by McKinsey for DT," (See Ewens Deposition transcript, Exh. D, at 44:11-16) but then confirming that "[t]his was created by Deutsche Telekom," (Id. at 48:13-18), and referring to the Workshop Documents as being prepared by DT or as being DT documents another nine times.[3] Mr. Ewens further testified that Mr. Stern asked him to participate and assist in preparations for the workshop, including telephone interviews in advance of the workshop, (Id. at 46:2-47:16), and that T-Mobile "provide[d] information [reflected in the Workshop Documents] that was responsive to DT's questions that they had in advance of the first workshop." (Id. at 82:21-83:7). Mr. Ewens also attributed directly to DT the ideas and theories conveyed in these materials, e.g. "what it meant to me was a DT idea that we shouldn't follow Sprint into price wars." Id. at 97:13-20.

---

[3] See Ex. D at: (1) 58:15-23; (2) 59:1-10; (3) 59:24-60:1; (4) 61:23-62:2; (5) 64:14-18; (6) 89:10-12; (7) 89:18-21; (8) 95:22 ; and (9) 99:12-13.

LETITIA JAMES                                                    DIVISION OF ECONOMIC JUSTICE
ATTORNEY GENERAL                                                          ANTITRUST BUREAU

Finally, it is clear from other materials that DT considered the material to be DT work product.
Several draft iterations of DT board presentation documents from September 2018 contain
portions of the Workshop Materials, including an updated and substantially identical version of a
slide from one of the Workshop Documents. Compare Exh. A, PX 339 p. 16 ("Today, the US
Telco Market is More Attractive than European Portfolio Markets") with Exh. H, PX 386, p.25
("The US Telco Market Remains More Attractive than European Portfolio Markets). When
shown these slides in the 2015 and 2018 documents, Mr. Wittig testified that "it seems some of
these pages were apparently, let's say, used as frameworks in future – to structure future
discussion." See Exh. I, Wittig Deposition transcript at 135:18-133:25).

## Argument

A statement of a party opponent is by definition "not hearsay," so long as any one of five
enumerated conditions is met. Fed. R. Evid. 801(d)(2)(A)-(E). For such documents, there is no
need to invoke or satisfy Rule 803's hearsay exceptions because the document is not hearsay.
Here, Plaintiff States satisfy two separate conditions establishing that the Workshop Documents
are non-hearsay party opponent statements.

**First**, these documents were "made by the party in an individual or representative capacity"
under Rule 801(d)(2)(A). As noted above, the evidence from the discovery phase of this case
showed that the exhibit is a "DT document", made with input from DT and/or T-Mobile
personnel, that DT led the workshops at which they were presented, that they were edited and
sent by a DT executive to Mr. Ewens.

"Rule 901 provides that the requirement of authentication or identification as a condition
precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter
in question is what its proponent claims. Rule 901 does not erect a particularly high hurdle, and
that hurdle may be cleared by circumstantial evidence." *United States v. Tin Yat Chin*, 371 F.3d
31, 37 (2d Cir. 2004) (internal citations and quotation marks omitted). "[A]ll doubts at a bench
trial should be resolved in favor of admissibility." *Commerce Funding Corp. v. Comprehensive
Habilitation Servs.*, No. 01 Civ. 3796 (PKL), 2004 WL 1970144, *5 (S.D.N.Y. Sept. 32, 2004)
(citation and internal quotation omitted). Moreover, "the proponent of the evidence is not
required to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt
that the evidence is what it purports to be." *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir.
2001) (citations and quotes omitted). Where there has been a *prima facie* showing, the
opponent's evidence to the contrary goes to credibility, not admissibility. *Mendez v. Int'l Food
House Inc.*, No. 13 Civ. 2651 (JPO), 2014 WL 4276418, *1 (S.D.N.Y. Aug. 28, 2014).

**Second**, the relevant statements in the document are ones "the party manifested that it adopted or
believed to be true" under Rule 801(d)(2)(B). *Schering Corp. v. Pfizer Inc.,* 189 F.3d 218, 238-
39 (2d Cir. 1999) (noting that the Advisory Committee "recommends 'generous treatment of this
avenue to admissibility'" and holding that a survey designed and commissioned by a company
qualified under 801(d)(2)(B)). As shown by the documents and Mr. Wittig's testimony, at least
some of the Workshop Documents were used as frameworks for future discussion within DT,
including in the fall of 2018, after the merger was announced.

For these reasons, the Workshop Documents, including the last version of the slide deck (PX 339) and related materials (PX 329, 800, 802), are not objectionable hearsay, and Plaintiff States have established a foundation for their admittance.  Defendants are free to present their contrary arguments, if they choose, but only as to the weight or credibility of the evidence.  There is no basis to preclude them altogether.

Respectfully submitted,

Amber Wessels-Yen
Assistant Attorney General

The Clerk of Court is directed to enter into the public record
of this action the letter above submitted to the Court by
_Plaintiffs_.

SO ORDERED.

_12-20-19_
DATE          VICTOR MARRERO, U.S.D.J.

# DTAG – DEFINING A WINNING POSITION FOR THE US BUSINESS MODEL

Consolidated contents

17.12.2015

As per workshop discussions

**T** ··

**LIFE IS FOR SHARING.**

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

P_Ex_339

DT-LIT-00018077

Page 1

# DEFINING A WINNING POSITION FOR THE US BUSINESS MODEL



## Context

DT has 2 large portfolio elements besides Germany and UK: TMUS and DTEU

- TMUS delivered strong performance over past 2 years[1] and drives DT's growth

- EU portfolio has been struggling[2] and recovery to stable business is uncertain

In consequence, TMUS gained more importance within DT (revenues and EBITDA) while the EU portfolio has lost in relevance

However, stability of TMUS business model in long-run unsure given its sub-scale position, competitive environment, and potential market changes



## Objective

Create a deeper understanding of differences in US vs. DTEU portfolio market environment, structure and attractiveness

Identify major trends for the US that can disrupt current telco business models

Develop potential market "end-game" archetypes for the US

Outline options for TMUS to address key challenges in respective "end-game" archetypes (i.e., defining a winning position)

---

1 +20% revenue from Q2/13 to Q2/15, +34% total customers from Q2/13 to Q2/15
2 -8% revenue from Q2/13 to Q2/15
Source: DTAG

**⊤···** **LIFE IS FOR SHARING.**

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

P_Ex_339

- Strictly Confidential -   2

DT-LIT-00018078

# WORKSHOP PARTICIPANTS AT A GLANCE

## DTAG



**Thorsten Langheim**
Head of Strategy &
M&A DTAG



**Matthias Budde**
SVP Group Strategy &
Transformation DTAG



**Steffen Stern**
VP Portfolio Strategy
DTAG



**Peter Ewens**
EVP Corporate Strategy
T-Mobile US



**Roland Doll**
VP European Affairs
DTAG
(WS I only )



**Dr. Volker Stapper**
VP Competition Law
DTAG
(WS II only)

## McKinsey



**Peter Bisson**
Director
(WS I and
1st half of WS II)



**Ewan Duncan**
Director

Source: Team analysis

**LIFE IS FOR SHARING.**

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

P_Ex_339

# EXTENSIVE EXPERT INTERVIEWS CONDUCTED TO UNDERSTAND MARKET DYNAMICS

**USA**



**Endre Holen**
Macro trend perspective on US market



**Brendan Gaffey**
Macro trend perspective on US market




**Stagg Newman**
Regulatory expert (former CTO of FCC)



**Satya Rao**
Adjacencies and future business models




**Joy Chen**
Adjacencies and future business models



**Ewan Duncan**
Macro trend perspective on US market

**Europe**



**Lars Engel Nielsen**
Macro trend perspective for EU, FMC deep dive



**Martin Wrulich**
Spectrum scarcity, fixed to mobile trend

**Tomas Calleja Mediano**
Macro trend perspective on EU

**Markus Meukel**
Expert for eSIM and future business models



Source: Team analysis

**LIFE IS FOR SHARING.**

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

DT-LIT-00018082

P_Ex_339

# TODAY, THE US TELCO MARKET IS MORE ATTRACTIVE THAN EUROPEAN PORTFOLIO MARKETS

**US** VS. **DTEU Portfolio (excl. Germany and UK)**

**1 More favorable macroeconomic environment**

US
- ~42 TEUR GDP/capita 2015, growing 3% p.a. 2012-20
- 323mn population 2015, growing 1% p.a. 2012-20
- 82% urban population 2015

DTEU Portfolio
- ~17 TEUR GDP/capita 2015, growing 3% p.a. 2012-20
- 127mn population 2015, growing 0% p.a. 2012-20
- 67% urban population 2015

**2 Larger market with more attractive growth prospects**

US
- ~397bn USD telco service revenues[1] in 2015 that are stagnating (i.e., ~zero growth till 2020)
- ~197bn USD video revenues[2] in 2015, with 3.1% growth p.a. till 2012-2020
- 3.3% telco and video spend as percentage of GDP[3] 2015, declining -3% p.a. 2012-20

DTEU Portfolio
- ~37bn EUR telco service revenues[1] 2015, declining -3% p.a. 2012-20
- ~9.3bn USD video revenues[2] in 2015, with 3.0% growth p.a. till 2012-2020
- 2.1% telco and video spend as percentage of GDP[3] 2015, declining -5% p.a. 2012-20

**3 Market with limited competition and different structure**

US
- Limited fixed broadband overbuild
- No nationwide fixed broadband players
- Small role of MVNOs

DTEU Portfolio
- Fixed broadband overbuild more common
- Typically strong nationwide incumbents
- Significant MVNO market shares in Western Europe

**4 More friendly regulatory environment fostering investments[4]**

US
- Regulator with infrastructure focus
- Reliable and investment friendly spectrum awards
- Stable political environment

DTEU Portfolio
- Regulator with competition and consumer welfare focus
- Unreliable and CAPEX harming spectrum awards
- Political uncertainty in certain CEE markets

**5 Customers show higher spend for telco services**

US
- 36 EUR mobile market ARPU[5] Q2 2015
- 71 EUR fixed market ARPU[5] Q2 2015

DTEU Portfolio
- 13 EUR weighted mobile market ARPU[5] Q2 2015
- 31 EUR weighted fixed market ARPU[5] Q2 2015

*Details in appendix*
- Strictly Confidential -

1 Fixed and mobile service revenues   2 Video (excl. HR, SK, MK, ME, AL to DTEU) includes PayTV, physical home video, OTT and TV advertising   3 Revenues (video, wireline, mobile)/GDP   4 Impact of Net Neutrality policies on investment friendliness yet to be seen   5 Compared to currently ~17k USD net adjusted disposable household income for selected DTEU portfolio countries (average for HU, CZ, SK) vs. ~41k USD for US households
Source: Team Analysis, Analysis Mason, GMR, OECD

T··Mobile·

**LIFE IS FOR SHARING.**

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

P_Ex_339

DT-LIT-00018092
17

# ① NEW MOBILE ENTRANTS WILL NOT BECOME RELEVANT PLAYERS

## Trend factuals – excerpt

MVNO subscriber market share %, 2014

| USA | NL | Austria | CZ Republic | Hungary | Poland | Greece | Croatia | Romania |
|---|---|---|---|---|---|---|---|---|
| 21 | 17 | 5 | 2 | 2 | 1 | 0 | 0 | 0 |

TRACFONE   Lycamobile   ultra mobile

9 — USA

- **MVNOs currently with 9% market share[1]** in the US telco market (vs. 15%+ in selected Western European countries)
- **US MVNO agreements based on commercial terms** – all 4 mobile players will continue to engage in commercially rationale contracts



*Regulation won't support access seeker business models as the FCC values infrastructure investments over competition.*
— Expert interview

*High degree of speculation in press regarding cable MVNOs – but they will generally not be a force*
— Expert interview

*European regulation likely to continue favorable regulation for access seeker business models*
— Expert interview

*Telco is a nationwide scale game. Without regulation and telco support it is almost impossible that new mobile entrants will be able to disrupt the industry.*
— Expert interview

## "So What" for TMUS

**Trend can be disregarded to define a wining position for TMUS**

- Continuation of status quo bears no disruption potential for TMUS
- Emergence of MVNO entrants unlikely – however, if they would emerge it bears a disruption potential for TMUS

Disruption impact for TMUS

High / Low

Likelihood — Low / High

①

1 Google/iFi just starting
Source: Team Analysis, Expert interviews, OVUM

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

LIFE IS FOR SHARING.

- Strictly Confidential -

DT-LIT-00018100   25

P_Ex_339

## 9

# US ARPUS WILL REMAIN ON MUCH HIGHER LEVEL THAN IN EU PORTFOLIO COUNTRIES

### Trend factuals – excerpt

US Mobile service ARPUs,
USD/month



DTEU portfolio mobile service ARPUs[2],
EUR/month



- Underlying driver for much higher US ARPUs is operator friendly US regulation that is expected to continue and lack of price sensitivity among consumers[2]

- MVNO deals and MNO pricing will remain rationale

- Despite slight decline in ARPU – ARPUs will remain at much higher level than in DTEU portfolio countries

### "So What" for TMUS

Trend can be disregarded to define a wining position for TMUS

- Continuation of status quo bears no disruption potential for TMUS – US continues to be relatively more attractive than DTEU portfolio markets

Disruption impact
for TMUS

High

Low

Low                    High
         Likelihood

(9)

1 Expert opinion that US consumers care more about bundles and features vs. low price offers 2 Weighted average based on the service revenues per country
Source: Team Analysis

**LIFE IS FOR SHARING.**

[1] Future mobile ARPUs expected to stabilize at lower levels in DTEU portfolio countries

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

- Strictly Confidential -   33

# 10 MOBILE/MOBILE AND FMC CONSOLIDATION COULD CHANGE TELCO MARKET STRUCTURE



**LIFE IS FOR SHARING.**

## Trend factuals – excerpt

**Mobile**
- TMUS + Sprint merger regarded as natural strategic move by all experts
- However, regulator unlikely to allow emergence of 3-player mobile market
  - Antitrust policy changing slowly as no direct political influence possible, any changes only likely in mid/long-term via changes in key personnel
  - Lobbying / media campaigns could help to influence decision
- Consolidation also unlikely under new Democratic administration and only slight improvements vs. today expected under Republican government
- Dish's massive spectrum could lead to mid-term spectrum deal

**Fixed**
- Cable players under limited consolidation pressure, since they are winning broadband market share from traditional telcos
- No FMC consolidation focus due to limited geographic footprint of individual cable players (no country-wide FWC possible) and given prohibition of previous cable mergers
- Many experts eventually expect a Verizon Comcast merger
  - However, "ego issue" of several large market players hinders consolidation (e.g., VZ, Comcast do not want to give up control, Cox Comm. "not for sale")

**Video/content**
- Further consolidation of video services seen as likely (e.g. content player + telco), long term success of integrated business models needs to be proven
- Telcos will not end up as content owners and aggregation role difficult due to very fragmented content distribution rights

## "So What" for TMUS

- Trend is a relevant wild card – with clear disruption potential for TMUS
- Sprint merger as natural strategic step to obtain nationwide scale – however, regulatory approval on short-term regarded as unlikely
- Further FMC consolidation might reduce addressable market share for TMUS as mobile only player (if AT&T launches FMC offer and Verizon attempts to merge with Comcast)



Disruption impact for TMUS — Low / High

Likelihood — Low / High

10

Source: Team analysis, reports, expert interviews

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

P_Ex_339

- Strictly Confidential -    34

DT-LIT-00018109
Page 33

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

**⑪ FURTHER LONG-TAIL CONSOLIDATION TO BE EXPECTED IN THE FIXED NET MARKET**

## Trend factuals – excerpt

Manifold recent consolidation (attempts) among large cablecos[1]

- Merger between Comcast (#1) and TWC (#2) prohibited

- Charter Comm. (#3) bought TWC (#2) and Bright House (#6)

- Altice bought CableVision (#5) and Suddenlink (#9)

- Continued long-tail consolidation to be expected

  - Currently still over 400 cable providers in the US (i.e., highly fragmented market)

  - Many cable providers are nationwide subscale: 93% of the cable providers operate in one state only and only 20 providers cover more than >1mn people

*Everything below Comcast is in consolidation mode*

*– D. Goei, (CEO, Altice)*

## "So What" for TMUS

Trend can be disregarded to define a wining position for TMUS

- Continuation of status quo outside of Mobile market bears no disruption potential for TMUS



[1] Ranking based on population covered in 2014
Source: Team Analysis, broadbandmap.com

**LIFE IS FOR SHARING.**

P_Ex_339

- Strictly Confidential -   35

DT-LIT-00018110
Page 34

# ⑫ REGULATORY ENVIRONMENT REMAINS STABLE IN US AND EUROPE

## Trend expectations – excerpt

### US 〈vs.〉 DTEU

**Whole-sale**
- Still no mobile wholesale obligation, thus no new disruptive market entries (MVNOs)
- No fixed wholesale regulation expected, thus no new market entries by access seekers (e.g., ULL)

vs.
- MVNO obligations will likely remain
- Fixed access regulation might become more lax but significant improvements yet to be seen

**Consoli-dation**
- 4>3 merger not expected in the short term
- Major cable consolidation rather unlikely given TWC–Comcast prohibition
- Cross-sector consolidation will likely get approval

- 4 player mobile markets will remain key objective of EU competition policy
- No change regarding approach towards FMC consolidation

**Services regulation**
- Services regulation will remain rather lax, but potential increases in regulatory tendencies e.g. in consumer protection, net neutrality

- Current high level of regulatory intervention on telcos, application to OTTs seen as likely in the future

**Political environ-ment**
- Overall environment is stable, slight improvements possible with new Republican administration

- Overall environment mixed[1]; Regulation expected to remain more intrusive than US

*See trend 10 for further details*

## "So What" for TMUS

Stable trend, thus no disruption expected for TMUS – can be disregarded for archetype building

- Continuation of status quo bears no disruption potential for TMUS
- Monitoring of situation and active lobbying for mobile-mobile consolidation



Disruption impact for TMUS

Likelihood: Low / High
Disruption impact: Low / High

⑫

Source: Team Analysis; 1) currently difficult to assess how far investment environment can be improved.

- Strictly Confidential -   36
DT-LIT-00018111
Page 35

P_Ex_339

LIFE IS FOR SHARING.

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

# WRAP UP – US CONTINUES TO BE AN ATTRACTIVE MARKET DESPITE POTENTIAL WILD CARD TRENDS

**1**  US continues to have more favorable macroeconomic environment vs. DTEU portfolio countries 

**2**  US continues to be the larger market with relatively more attractive growth vs. DTEU portfolio countries 

**3** US continues to have less competitive market structure (e.g., no access seeker business model) vs. DTEU portfolio countries 

**4** US continues to have more operator friendly regulatory environment (i.e., to foster infrastructure invests[1]) vs. DTEU portfolio countries 

**5** US customers will continue to have higher spend for telco services (e.g., US mobile ARPUs will remain ~ 22 EUR higher than in DTEU portfolio countries) 

 **LIFE IS FOR SHARING.**

1 Impact of Net Neutrality policies on investment friendliness yet to be seen, EU might slightly improve.
Source: DTAG, Team Analysis

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

# CONTENTS

Workshop I

## Workshop II

- **Workshop I recap**
- Future competitive dynamics
- So what for TMUS to define a winning position
- Wrap up and next steps

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

**LIFE IS FOR SHARING.**

P_Ex_339

- Strictly Confidential -   39

DT-LIT-00018113

# US MARKET IS AND WILL CONTINUE TO BE MORE ATTRACTIVE THAN DTEU PORTFOLIO MARKETS



- **US market structure is and will be different vs. EU[1]**

  - No nationwide fixed net players



**Competition is and will remain lower than in EU**

  - Less consumer choice for fixed BB/TV




**No major shifts in regulatory policy expected**

  - US regulation more investment friendly[2] – EU might slightly improve

    - But, there won't be a full "reversion to the mean"

    - In US, large domestic players key beneficiaries



**US ARPUs will remain significantly higher than in EU**

  - Though no increase expected

    - ... and also CAPEX levels significantly higher



**Even disruptive market trends will not change the picture**

*Details in appendix*

1 EU refers to DTEU portfolio countries
Source: DTAG, Team Analysis

2 Impact of Net Neutrality policies on investment friendliness yet to be seen

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

**LIFE IS FOR SHARING.**

P_Ex_339

- Strictly Confidential - 40

# CONTENTS



**LIFE IS FOR SHARING.**

- Workshop I

**Workshop II**

- Workshop I recap

- Future competitive dynamics

- **So what for TMUS to define a winning position**

- Wrap up and next steps

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

P_Ex_339

- Strictly Confidential -   44

# TMUS TO CONTINUE ORGANIC GROWTH TILL 2018 – PLAY TOWARDS SPRINT AND (THEN) CABLE MERGER

TMUS STRATEGY SCHEMATIC OVER TIME

FOR DISCUSSION

TMUS EV, FCF, Revenues development after plan



Phase I – Continue organic growth[1]

- Will we achieve our planning?
- How long can we grow organically?
- Will competition put TMUS under pressure?
- How to become most attractive 2018+ merger target/partner?
- How to ensure that TMUS executes portfolio options before growth stops?

| 2016 | 2017 | 2018+ |
|---|---|---|
| | Election outcome | AT&T Cablecos |
| | Sprint bank-ruptcy? | FMC? going mobile? |

🕐 Event may alter market structure      🔍 Deep dive to follow

Phase II – Participate in market consolidation



🕐 4>3 merger *Sprint*

Preferred – *get Sprint to obtain necessary scale*

🕐 (Subsequent) cable merger  COMCAST  Charter  brighthouse

Preferred – *ideally after Sprint merger, else stand-alone*

🕐 Alternate mergers

Stand-alone exit option – *if none of above feasible*

🕐 Organic #3 in mobile  metroPCS  ᵀ··Mobile·  Xaltice

Last resort (might be unavoidable?!) – *if none of above feasible (sustainability questionable)*

Define strategy towards Dish – *Watch out for competitors' interest in Dish*

1 Under derived assumption that competitive dynamics will keep the market structure fairly stable
Source: Team Analysis

**LIFE IS FOR SHARING.**

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

P_Ex_339

- Strictly Confidential -    45

# PHASE II: SPRINT AND COMCAST MOST LIKELY MERGER PARTNERS – BUT THERE MIGHT ALSO BE NO ONE?

FOR DISCUSSION

| Potential TMUS end-games | Key strategic rationale(s) | Strategic or regulatory barrier(s) | Deal likelihood |
|---|---|---|---|

Low ○ / High ● Deal likelihood

**① 4>3 mobile merger** — Sprint

- Sprint on verge of bankruptcy (would love to merge)
- Clear scale gain and synergy potential for TMUS to own ~30% of mobile market (at scale with AT&T, VZ)

- Likelihood of approval will not increase substantially in case of bankruptcy (Analysts: even with Republican administration only <50% probability[1])
- Potential burdensome CFIUS process?

**② (Sub-sequent) cable merger** — COMCAST

- Move into mobile might be only natural option for Comcast to grow, as preferred Comcast moves (i.e., wire-line and content) are unlikely to get regulatory approval
- Bring video content onto mobile (i.e., linear/OTT)
- Potential move into mobile as adjacency play (e.g., eyeball increase, mobile video, cost synergies)

- Likely no significant regulatory barriers[2]
- If move into content gets regulatory approval, it will be more likely than move into mobile (see appendix)
- No nationwide fixed net – limited FMC potential
- Less likely than Comcast due to lower TMUS footprint overbuild (FMC ability) and weaker financials

**③ Alternate mergers** — Charter, brighthouse, altice

- Creation of one North American service market and synergy potentials with existing verticals
- Return to execution of core business model vs. current MVNO play (TracFone)
- Move into mobile could be an opportunistic adjacency play for Altice

- Likely no regulatory barriers
- Potentially cheaper and better acquisition candidates around the globe
- Altice currently small cable player in US (<4mn TV and broadband subs)
- Greater priority for Altice to acquire wireline
- Sprint better fit for Altice's lean turnaround playbook
- 2018+ sustainability questionable (to be investigated)

**④ Organic #3 in mobile** — T···Mobile·

- No merger optionality can be exercised (due to barriers)

Most merger optionalities with low deal likelihood – details in appendix



LIFE IS FOR SHARING.

1 Lobbying campaign needed
2 Unless Comcast becomes WiFi/MVNO entrant; FCC likely to raise concerns regarding vertical integration (i.e. mobile video); moreover, FMC M&A untested in US
Source: Team Analysis, Expert Interviews

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

P_Ex_339

- Strictly Confidential -

# PHASE I: TMUS PLAYBOOK TILL 2018

FOR DISCUSSION

Action path till eoy 2017



Continue
Uncarrier
growth

- Continue Uncarrier growth in B2C according to plan[1] or above
- Explore further growth adjacencies (e.g., B2B, IoT, M2M, mobile video)



Secure
sufficient
spectrum

- Bid in next incentive auction
- Define strategy towards Dish spectrum (i.e., what is the right acquisition price?) –
  Hypothesis: Dish currently a distraction – wait until their negotiation power is weakened
- Continue network densification as needed

Pave way for
market
consolidation

- Continue value strategy to keep 4>3 merger optionality
- Strengthen lobbying for 4>3 merger (i.e., win "right" people in D.C., media campaign)
- Don't overplay offending consolidation stakeholders (FCC, DOJ, AT&T, VZ, merger
  partners and Unions will be important in future deal-making)

Become attractive
consolidation
target for 2018+

- Show openness to consolidate
  - Signal TMUS interest in Sprint and position Sprint as difficult asset for cableco[2]
  - Signal TMUS interest in (subsequent[3]) cable merger and advertise superiority over VZ
- Invest in assets and activities that complement a cableco merger (i.e., large and
  valuable customer base, network strength, ad and mobile video capabilities)
- Consider MVNO cableco deal to establish long-term partnerships?

1 Customer, revenue, EBITDA, FCF and EV growth
Source: Team Analysis, Expert interviews

2 Especially for Comcast, Charter Group and Altice

3 After TMUS + Sprint merger if feasible

- Strictly Confidential -

LIFE IS FOR SHARING.

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

# 3 US IS A MARKET WITH FEWER COMPETITION VS. DTEU AND DIFFERENT MARKET STRUCTURE

**US**



■ *Area with at least 2 broadband providers*

■ *Area with 1 or no broadband provider*

 **VS.**   **DTEU portfolio**



**Fixed**

- No nationwide broadband players – high geographical fragmentation
- Limited FMC ability
- Limited overbuild for broadband
- Cable key broadband technology

**Mobile**

- 2 main players (i.e., from 4 nationwide operators 2 are nationwide subscale)
- MVNOs not significant in terms of market share

- Strong nationwide incumbent(s) typical
- FMC as typical value proposition
- Broadband overbuilt more common
- No dominating technology for broadband



- Incumbent and at least 2 further operators common
- MVNOs with significant market shares in Western Europe

1 According to the National Broadband Map defined as a two-way data transmission with advertised speeds of at least 768 kilobits per second (Kbps) downstream and at least 200 kbps upstream
Source: DTAG, Team Analysis, Broadband.gov

**‎T‑ ‑ ‑**

**LIFE IS FOR SHARING.**

- Strictly Confidential - 59

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

DT-LIT-00018132
Page 56

NOT EXHAUSTIVE

# 4 US MARKET WITH MORE FRIENDLY REGULATORY AND POLITICAL ENVIRONMENT (1/2)



**Overall policy objectives** 

 **US**

- US regulation aims at fostering investment
- Additional focus on consumer welfare and competition also observable

 **DTEU**

- EU regulation aims at enhancing competition and securing consumer welfare
- Kroes announcement of 2012, recommendation on costing methodologies and non-discrimination, and comments by Oettinger show willingness to improve invest climate

**Access seeker Business**

**No regulated wholesale access**
- No obligation to offer fixed wholesale access
- No obligation to offer MVNO access – MVNOs on commercial terms only

**Strict regulated wholesale access obligations enable and protect access seeker business models (e.g., ULL based like 1&1, MVNO like Drillisch, etc.)**

**Spectrum awards**

**Reliable and investment friendly spectrum awards**
- Transparent and reliable auction designs
- Spectrum ownership enables long-term invest perspective
- Spectrum awarded regionally
- Better secondary market for spectrum
- Significant spectrum allocation for mobile (e.g. 600MHz auction in 2016)

**Unreliable and investment harming spectrum awards**
- Intransparent and non-harmonized auction designs maximizing state proceeds


- No spectrum ownership - limited license durations create investment uncertainties and "extortion potential" in future auctions

 **LIFE IS FOR SHARING.**

P_Ex_339

- Strictly Confidential -  60

DT-LIT-00018133
**Page 57**

# 4 US MARKET WITH MORE FRIENDLY REGULATORY AND POLITICAL ENVIRONMENT (2/2)

 **US**

**Services regulation**



- Lax consumer protection, net neutrality allows zero-rating
  - Very relaxed consumer protection and data privacy policy
  - Net Neutrality covers fixed and mobile operators (excl. B2B)
    - Allows for zero-rating[1]
    - "Specialized services" possible and could be prioritized[2]
  - Policy driven by case law ("wait-and-see intervention")

**Market consolidation**

- Large scale in-market consolidation currently not allowed
  - Little support for 4→3 mobile consolidation
  - Large scale cable consolidation was put on hold
  - FMC/Video consolidation likely to receive clearance
  - MVNO competition not considered (e.g. TracFone)

**Political environment**

- Overall rather stable political environment
  - No sudden regulatory measures for political purposes or to close budget gaps (exception: FCC's net neutrality decision)
  - Changes in political powers do not lead to major alterations
  - Enables long-term investment perspectives

**DTEU**

- Strict consumer protection, net neutrality allows zero-rating
  - Very strict consumer protection and data privacy policy
  - Net Neutrality requirements for all operators (mobile, fixed)
    - Allows for zero-rating[1]
    - Specialized services" possible and could be prioritized[2]
  - Policy driven by coordinat. approach amongst regulators

- Significant further in-market consolidation questionable
  - 4→3 mobile consolidation becoming more difficult, unless structural remedies can be offered
  - FMC consolidation so far approved with no (GTS) / light remedies (Belgium)
  - Commission with intense focus on keeping up competition

- High political uncertainty in some CEE
  - Special taxes, excessive fees etc. (e.g. HU, ROM)
  - Nationalistic attitudes and critical towards foreign ownership
  - Investment environment largely dependent on political parties in power
  - Compliance issues in several CEE countries

1 Zero-rating as long as non-discrimination of other similar services, e.g. video; however no throttling or prioritization of services allowed, e.g. video vs. rest of traffic    2 Special services are considered as not being regular internet traffic (such as high-quality VoIP, IPTV) and can be treated differently; definition of "specialized services" not yet finalized in both regions
Source: DTAG, team analysis



**LIFE IS FOR SHARING.**

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

P_Ex_339

- Strictly Confidential -    61



# 4 REGULATORY INCENTIVES FORCED A BETTER INFRASTRUCTURE IN US THAN IN DTEU COUNTRIES



| | Cable HH coverage, % | 4G population coverage, % | Fiber[1] share HH % |
|---|---|---|---|
| 100% | | | |
| T-Mobile | 53 | 79 | 7 |
| US | 89 | 98 | 9 |

1 2014 share of broadband subs with FTTB/H technology as of total number of broadband subs
2 Household population based weighted average for DT Europe footprint (countries without Albania, Macedonia and Montenegro
Source: Digital Agenda – European Union, broadbandmap.gov, press, AT&T, TeleGeography, team analysis

**T···**

**LIFE IS FOR SHARING.**

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

P_Ex_339

- Strictly Confidential -   62

# 5  US CUSTOMERS SHOW HIGHER SPEND FOR TELCO SERVICES

**Market ARPUs 2014**
USD/month

Legend: Pay-TV[1]  Fixed[2]  Mobile[3]

Stacked bar chart (ARPU, USD/month) by country:

| Country | Total | Pay-TV[1] | Fixed[2] | Mobile[3] |
|---|---|---|---|---|
| US | 226 | 94 | 85 | 47 |
| NL | 111 | 59 | 23 | 29 |
| AU | 95 | 49 | 24 | 22 |
| GR | 83 | 39 | 31 | 13 |
| HR | 69 | 38 | 16 | 15 |
| CZ | 62 | 32 | 16 | 14 |
| SK | 60 | 26 | 17 | 17 |
| PL | 52 | 26 | 17 | 10 |
| HU | 51 | 23 | 13 | 15 |
| RO | 31 | 16 | 7 | 8 |

- US mobile ARPUs on average around 3x higher than in DTEU footprint countries
- US fixed ARPUs on average more than 2.5x higher than in DTEU footprint countries
- US Pay-TV ARPUs on average more than 4x higher than in DTEU footprint countries

1 Includes subscription and on-demand revenue via cable, satellite, IPTV and DTT (excl. TV advertising) 2 Based on Mason data 3 Based on DTAG internal estimates
Source: DTAG, Team Analysis

**⊤ ‥ ‥ ‥  LIFE IS FOR SHARING.**

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

P_Ex_339

- Strictly Confidential - 63

DT-LIT-00018136

# APPENDIX

## Workshop I

- Current DTAG position in US vs. European portfolio countries

- Today's market attractiveness of US vs. European portfolio countries

- Key trends shaping the future of the US telco market

## Workshop II

- Workshop I recap

- Future competitive dynamics

- **So what for TMUS to define a winning position**

LIFE IS FOR SHARING.

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

P_Ex_339

Strictly Confidential - 123



FOR DISCUSSION

# TMUS + SPRINT MERGER AS PREFERRED MOVE, BUT REGULATORY APPROVAL IS DIFFICULT

**1**

KEY PARAMETERS AT A GLANCE

Sprint 

Deep dive to follow

## a Strategic rationale?

- Sprint on verge of bankruptcy (would love to merge)
- Clear scale gain and synergy potential for TMUS to own ~30% of mobile market (at scale with AT&T, VZ)

## b Combined network effects?

- 188 MHz additional spectrum – 14MHz in the most attractive low band segment
- Complimentary coverage in select US regions

## c Regulatory barriers?

- Regulator will unlikely approve 4>3 mobile merger (even with Republican administration)
- Even in case of bankruptcy regulatory approval might be unlikely (Analysts: also under Republican administration potentially only <50% probability for that)

## d Key Do's and Don'ts to realize TMUS + Sprint merger

- ✅ Strengthen lobbying activities for 4>3 merger with the "right" people in Washington
- ✅ Position Sprint as difficult merger asset towards AT&T, VZ, and cablecos
- ✅ Continue value strategy (to keep optionality for 4>3 merger)
- ❌ Do not overplay offending consolidation stakeholders'
- ❌ Do not follow Sprint in price wars or irrational MVNO deals (sustain ARPUs)

## e Sprint is a target to many

  at&t
Charter  brighthouse
 verizon
 COMCAST

## f Deal likelihood

- ○ Low
- ◑ High
- **PRO:** Market structure calls for consolidation, 4>3 in the interest of all mobile players
- **CON:** Regulatory approval for 4>3 merger difficult

### "So What" for TMUS

- Preferred merger – ideally prior to subsequent cable merger
- Continue value strategy to keep optionality for 4>3 merger
- Avoid that anyone else gets them (signal Sprint as difficult target to cablecos)
- Strengthen lobbying activities for 4>3 merger with the "right" people in Washington

1 FCC, DOJ, Unions, AT&T, VZ
Source: Team Analysis, Analyst reports, Capital IQ

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

**T·· LIFE IS FOR SHARING.**



# 1C  REGULATORY APPROVAL AS KEY BARRIER FOR TMUS + SPRINT MERGER

Sprint

**Near term regulatory approval for 4>3 mobile merger seems highly unlikely ....**

... however, various levers for TMUS to lobby for 4>3 mobile-merger exist

> It's going to be hard for someone to make a persuasive case that reducing 4 firms to 3 is actually going to improve competition for the benefit of American consumers.
>
> – *William Baer, DOJ*

> We must protect competition where it exists. Our goal should be to ask how competition can best serve the public.
>
> – *Tom Wheeler, FCC*

> Were [the deal] somehow approved, there would be numerous conditions attached, such as the divestiture of spectrum/other assets and imposition of a wholesale mandate that would bleed off a portion of the financial benefits.
>
> – *UBS*

■ **Strengthen lobbying** activities for 4>3 merger with the "right" people in Washington

■ **Don't overplay offending consolidation stakeholders** (FCC, DOJ, AT&T, VZ, merger partners and Unions will be important in future deal-making)

■ **Strong commitment to provide mandatory wholesale at competitive rates** could help – additional structural remedies likely to be required

■ **Risk:** *Bears the danger to reduce ARPUs and make TMUS less attractive for further merger optionalities*

– *Strictly Confidential –*

FOR DISCUSSION

Source: Press Analysis, DT/G_Team analysis

**LIFE IS FOR SHARING.**

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

P_Ex_339

Page 121

DT-LIT-00018197 - 125

# 1C EVEN IN CASE OF SPRINT BANKRUPTCY – FCC MAY NOT ALLOW FOR 4>3 MERGER

**Sprint**

**Current Sprint situation at a glance**

**Financial distress**

- Low EBIT margins (~6% in 2014, ~2% in 2015)
- ~4.5bn USD cash burn rate expected for 2015
- Debt of 2.5bn matures in 12/2016 (currently no Source for refinancing)

**Turnaround initiative started**

- 2.5bn USD cost-cutting program started in Q2/2015
- Aggressive pricing (i.e., unlimited plan for 60 vs. 80 USD for TMUS)

**+ Outlook for the next ~12 months**

- Continued support from Softbank expected



- ...to see whether turnaround initiative shows measurable success



- ...to wait for presidential elections (even though 4>3 approval remains unlikely under Republican administration, it is worthwhile a wait)

**= 2 potential outcomes by eoy 2016**

Outcome 1 – Sprint turnaround fails and bankruptcy is unavoidable

- Likelihood of approval will not increase substantially in case of bankruptcy[1] (Analysts: even with Republican administration only <50% probability)



- If allowed – mobile players most likely purchasers (as operational synergies are larger for MNOs vs. cablecos)

Outcome 2 – Turnaround shows success and Softbank continues financing

1 The failing firm defense is rarely invoked in court or before agencies. When it is, it is perceived as rarely successful
Source: Analyst reports, Team analysis



'LIFE IS FOR SHARING.

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

P_EX_339

- Strictly Confidential -   126



TOP SECRET

# 2 PREPARE FOR COMCAST BUYING TMUS AS 2018+ OPTIONALITY

KEY PARAMETERS AT A GLANCE




**(a) Strategic rationale for Comcast?**

- Move into mobile might be only natural option to grow as preferred moves (i.e., wireline and content) are unlikely to get regulatory approval
- Several strategic advantages
  - Increase eyeballs
  - Bring video content onto mobile (i.e., linear/OTT.)
  - FMC ability in select areas (but w/o massive discounts; i.e., broadband & mobile bundle for cord cutters)
  - Realize cost and network synergies through economies of scale
  - Fits with Wi-Fi first approach



**(b) Combined network effects?**

- ~90mm people with Comcast access in the states where TMUS has >70% coverage[1]
- ~59mm TMUS customers vs. ~22mm Comcast TV & ~23mm Broadband subscribers



**(c) Regulatory barriers?**

- Likely no significant regulatory barriers[2]

---



**(d) Key Do's and Don'ts to dress TMUS for optionality?**

- Bid for spectrum & continue densification
- Increase customer base (i.e., especially younger, video affine demographics)
- Signal Sprint as difficult asset for Comcast and signal interest to merge with Comcast subsequent to potential TMUS + Sprint merger
- Don't enter into fixed (i.e., wholebuy, FMS) without thinking through what it means for Comcast merger




**(e) Alternate brides for Comcast?**

**Sprint** — If still existent and stabilized

**verizon** — Pending FCC approval (i.e., largest fixed/mobile player, vertical integration)



○ Low
● High

**(f) Deal likelihood?**

- PRO: Strategic rationale (see section a)
- CON: No wireless experience, only small growth in wireless, limited FMC ability, likely to explore alternate adjacencies if at all feasible (i.e., wireline and content)

---

TOP SECRET

**"So What" for TMUS**

Deep dive to follow

COMCAST

- **Preferred merger** – ideally after Sprint merger, else stand-alone

- **Be attractive bride** by investing in network strength and growth of subscriber base

- **Avoid Comcast + Sprint** or VZ merger (signal Sprint as difficult target)

- **Signal merger interest** with Comcast (i.e., à la "you can get a merged TMUS + Sprint")

- Strictly Confidential - 127

---

1 Percent of the population with T-Mobile wireless access in that geography
2 FCC likely to raise concerns if Comcast becomes WIFI/MVNO entrant and regarding vertical integration (i.e., mobile video)
Source: Team Analysis, Analyst reports, Capital IQ, Broadbandnow.com

LIFE IS FOR SHARING.

P_Ex_339

DT-LIT-00018199



FOR DISCUSSION

Charter
brighthouse ◎ Time Warner Cable

# ② PREPARE FOR CHARTER GROUP MERGER AS 2018+ OPTIONALITY

KEY PARAMETERS AT A GLANCE

Deep dive to follow



### ⓐ Strategic rationale for Charter Group?

- Potential move into mobile as adjacency play
- Several strategic advantages
  - Increase eyeballs
  - Bring video content onto mobile (i.e., linear/OTT)
  - FMC ability in select areas (but w/o massive discounts; i.e., broadband & mobile bundle for cord cutters)
  - Realize cost and network synergies through economies of scale
  - Fits with Wi-Fi first approach



### ⓑ Combined network effects?

- ~80mn people with Charter Group access in the states where TMUS has a >70% coverage[1]
- ~59mn TMUS customers vs. ~17mn Charter Group TV & ~20mn Broadband subscribers



### ⓒ Regulatory barriers?

- Likely no significant regulatory barriers[2]

**T...** *(logo)*

## LIFE IS FOR SHARING.



### ⓓ Key Do's and Don'ts to dress TMUS for optionality

- ✓ Increase customer base (i.e., especially younger, video affine demographics)
- ✓ Bid for spectrum & continue densification
- ✗ Signal Sprint as difficult asset for Charter Group and show interest in (subsequent) Charter deal
- ✗ Don't enter into fixed (i.e., wholebuy, FMS) without thinking through what it means for Charter merger



### ⓔ Alternate brides for Charter group?

**Sprint** *(logo)* — If still existent and significantly stabilized

**verizon** *(logo)* — Pending FCC approval (i.e., largest fixed/mobile player, vertical integration)

### ⓕ Deal likelihood?

- **PRO:** Strategic rationale (see section a)
- **CON:** Occupied with post-merger efforts for next 1-3 years, financially torn, higher synergies with fixed players (i.e., CenturyLink, Frontier), no wireless experience, limited FMC ability


- ○ Low
- ● High

---

### "So What" for TMUS

- **Preferred merger** – if possible after Sprint merger, else stand-alone

- **Be attractive bride** by investing in network strength and growth of subscriber base

- **Avoid Charter + Sprint or VZ merger** (signal Sprint as difficult target)

- **Signal merger interest with Charter** (i.e., "you can get a merged TMUS + Sprint")

---

1 Percent of the population with T-Mobile wireless access in that geography
2 FCC likely to raise concerns if Charter Group becomes WiFi/MVNO entrant and regarding vertical integration (i.e., mobile video)
Source: Team Analysis, Analyst reports, Cashila IQ, Broadbandnow.com, Broadbandmap.gov

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

P_Ex_339

- Strictly Confidential - 128

DT-LIT-00018200

## 2D   STRONG NETWORK TOGETHER WITH SUB + FCF GROWTH KEY TO DRESS FOR CABLECOS





**Do's**

- Invest in a strong network (i.e., acquire spectrum, increase densification, engage in WiFi offloading)

- Increase customer base – focus especially on the younger, video affine demographics that consume significant amounts of mobile video

- Further strengthen P&L and balance sheet – to allow TMUS enter into merger negotiations from a position of strength

- Consider creation of mobile-only video content (i.e. short form) that could be integrated in cablecos OTT offering

- Safeguard and further expand "sexy and innovative" T-Mobile image

- Try to establish/acquire attractive mobile ad-technology that is feasible for both mobile and cable players

**VS**

**Don'ts**

- Don't decrease prices and ARPU levels too much for the sake of customer growth / as reaction to Sprint

- Don't experiment with offers that could increase churn of existing customer base

- Don't duplicate "innovative capabilities" that are already present at cablecos but lacking at TMUS

- Don't enter the wireline domain[1], i.e., own build-out, commercial whole-buy, FWS – might make cable moves more difficult and a financial benefit unlikely

1 Without having a long-term strategy that includes a consolidation plan
Source: Team Analysis, Expert interviews

**LIFE IS FOR SHARING.**

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

Charter
brighthouse

Time Warner Cable

COMCAST

FOR DISCUSSION

P_Ex_339

- Strictly Confidential - 129

DT-LIT-00018201



# ③ PREPARE FOR AMERICA MOVIL MERGER AS 2018+ OPTIONALITY

KEY PARAMETERS AT A GLANCE

**ⓐ Strategic rationale for America Movil?**

- Become full-fledged US MNO (execution of AM's core business model)
- Several strategic advantages
  - Increased eyeballs (>33mn mobile subs)
  - Creation of one North American mobile service market (US, Mexico)
  - Realization of cost synergies through economies of scale and MVNO>MNO transition



**ⓑ Combined network effects?**

- 25.7mn mobile subscribers in US via MVNO TracFone
- Merged company could have >100mn mobile subscribers by 2019[1]



**ⓒ Regulatory barriers?**

- No regulatory barriers expected (i.e., merged company would be smaller than AT&T or VZ)



**ⓓ Key Do's and Don'ts to dress TMUS for optionality?**

- ✓ Increase customer base
- ✓ Bid for spectrum & continue densification
- ✓ Signal Sprint as difficult asset for AM
- ✓ Comcast merger not feasible
- ✓ Signal merger interest to AM
- ✓ Ensure that any potential MVNO deal is long-term beneficial to TMUS
- ✗ Don't engage in price war (sustain ARPUs)

**ⓔ Alternate brides for AM?**

Sprint   If still existent and significantly stabilized

**ⓕ Deal likelihood?**

◔ Low   ● High

- PRO: Strategic rationale (see section a)
- CON: Potentially better investment opportunities in other core markets (i.e., LATAM)

---

## "So What?" for TMUS

**Potential stand-alone exit option** – if Comcast merger not feasible

**Avoid AM + Sprint merger** (signal Sprint as difficult target)

**Signal merger interest with AM** (ideally subsequent to Sprint merger)

**Be an attractive bride** (enhance network and grow subs)

---

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

1 TMUS subscriber base forecasted to be ~76mn by 2019
Source: Team Analysis, Analyst reports, Capital IQ, Broadbandnow.com

**LIFE IS FOR SHARING.**

P_Ex_339

- Strictly Confidential - 130

DT-LIT-00018202

# 3 PREPARE FOR ALTICE MERGER AS 2018+ OPTIONALITY

KEY PARAMETERS AT A GLANCE




**(a) Strategic rationale for Altice?**

- Move into mobile could be an opportunistic adjacency play for Altice (much like a PE player)



**(b) Combined network effects?**

- ~16.9mn people with Altice access in the states where TMUS has a >70% coverage[1]
- ~59mn TMUS customers vs. ~3.5mn Altice TV (of which about 2.5mn in NY) and ~4mn broadband subscribers



**(c) Regulatory barrier?**

- No regulatory barriers expected (i.e., due to wireline vs. wireless presence)



**(d) Key Do's and Don'ts to dress TMUS for optionality**

- Bid for spectrum & continue densification
- Increase customer base
- Signal Sprint turnaround as too challenging for Altice (given no wireless experience nor relevant synergies)
- Ensure that any potential MVNO deal is long-term beneficial to TMUS
- ✗ Don't engage in price war (sustain ARPUs)

**(e) Potential alternate Altice targets**

- Sprint    If still existent and stabilized

**(f) Deal likelihood?**

- **UNLIKELY**: Higher synergies with fixed players (i.e., CenturyLink, Frontier), Sprint much better fit for their lean turnaround playbook

○ Low
● High

## "So What" for TMUS

**Be attractive bride** by investing in network strength and growth of subscriber base

**Avoid Altice + Sprint merger** (signal Sprint as too challenging to turn around)

- Strictly Confidential -   131

FOR DISCUSSION

Xaltice

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER.
Case: 1:19-cv-05435-VM

LIFE IS FOR SHARING.

1 Percent of the population with T-Mobile wireless access in that geography
Source: Team Analysis, Analyst reports, Capital IQ, Broadbandnow.com

## 4 TMUS EXPECTED TO GROW ORGANICALLY TO ~76MN CUSTOMERS BY 2019

**Customer development 2012-19[1] of 4 major mobile players**



Mn

| | 2012 | 13 | 14 | 15 | 16 | 17 | 18 | 2019 |

at&t
Verizon
T‑Mobile
Sprint



CAGR
2015-19
~%

~3
~3
~5
~0

iPF predicts ~76mn
TMUS customers by
2019 (4.9% 2015-19
growth p.a., adding
~ 4.1mn customers
annually)

TMUS expected
to be a **strong 3rd**
**player by 2019**

1 TMUS based on iPF 16-19, AT&T and VZ based on overall market growth except for TMUS, Sprint assumed to be flat
Source: iPF, Team Analysis

**T····** **LIFE IS FOR SHARING.**

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

P_Ex_339

- Strictly Confidential - 132

DT-LIT-00018204

# 5 DON'T'S TO MAINTAIN 2018+ MERGER OPTIONS

FOR DISCUSSION

Key partner merger options

 **Don't enter into MVNO deal that could complicate consolidation**
(Deals should increase TMUS value)

Sprint

 **Don't trigger a price war in the US market**
(Stable ARPUs base drives attractiveness & valuation)

COMCAST

 **Don't overplay offending consolidation stakeholders**
(FCC, DOJ, AT&T, VZ, merger partners and Unions will be important in future deal-making)

Charter
Time Warner Cable
bright house

 **Don't invest in asset heavy media**, i.e., content rights or production
(Lack of scale for TMUS and unlikely return on capital)

américa móvil

 **Don't enter the wireline domain**[1], i.e., own build-out, whole-buy, FMS
(Might make cable moves more difficult + financial benefit unlikely)

altice

---

1 Without having a long-term strategy that includes a consolidation plan
Source: Team Analysis

**· · ·**
**· · ·**
**· · ·**

**LIFE IS FOR SHARING.**

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER
Case: 1:19-cv-05435-VM

P_Ex_339

- Strictly Confidential -   133

DT-LIT-00018205

JCAPSTA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
STATE OF NEW YORK, *et al.*,

               Plaintiffs,          New York, N.Y.

          v.             19 Civ. 5434(VM)

DEUTSCHE TELEKOM AG, *et al.*,

               Defendants.
------------------------------x

                                December 10, 2019
                                9:05 a.m.

Before:

                HON. VICTOR MARRERO,

                            District Judge

                    APPEARANCES

MUNGER, TOLLES & OLSON LLP
       Attorneys for Plaintiffs State of California
BY:  GLENN POMERANTZ
      KURUVILLA JOSEPH OLASA
      KYLE W. MACH

STATE OF CALIFORNIA
Department of Justice
Office of the Attorney General
       Attorneys for  State of California
BY:  PAULA L. BLIZZARD

STATE OF NEW YORK
Office of the Attorney General
       Attorneys for State of New York
BY:  ELINOR R. HOFFMANN
      BEAU W. BUFFIER

JCATSTA4                    Langheim – Direct

1    BY MR. MACH:

2    Q.   Now in early December 2015, DT also held a workshop with

3    McKinsey in DT offices in Germany, right?

4    A.   Yes.

5    Q.   And DT regularly retains outside advisers, right?

6    A.   We speak to a lot of industry sources, consignors,

7    advisers, bankers, yes.

8    Q.   And DT relies on those outside advisers in the ordinary

9    course of its business, correct?

10   A.   You listen to opinions and sometimes you agree and

11   sometimes you disagree.  You collect a lot of information on

12   the topic.

13   Q.   And the outside advisers that you rely on include companies

14   like Bayne (ph) and McKinsey, right?

15   A.   Yes, all the strategic advisers and a lot of banks.

16   Q.   And McKinsey was involved in organizing workshop in

17   December 2015, right?

18   A.   Yes.

19   Q.   And DT was also involved in organizing the workshop?

20   A.   Yes.

21   Q.   And you were personally involved in organizing that as

22   well, right?

23   A.   Giving guidance, asking the question that should have been

24   tackled at the meeting, yes.

25   Q.   Is that another way of saying that you set the agenda for

JCATSTA4                        Langheim - Direct

1    Mr. Langheim, and Mr. Langheim setting the agenda, discussing

2    the content that should go in it, and there it is, the next

3    page.  I don't think that's a McKinsey document.

4    A.    First of all, these two gentlemens are gentlemens that do

5    not work for me.  They report to the head of strategy who

6    reports to Tim Höttges and to not me.

7              MR. MACH:  Thank you.  I didn't mean to misstate that.

8    They work for DT.

9              MR. PARKER:  So they hired somebody at McKinsey to

10   give them an opinion, give them some advice, and you have to

11   have your own people talking to them to make sure they're

12   giving you advice on something relevant.  So then McKinsey

13   comes out with its advice so he can take that into account in

14   making decisions, but that doesn't make this our document.  And

15   they certainly could have taken the deposition or called the

16   McKinsey folks and we wouldn't have this problem.

17             THE COURT:  Sustained.

18             MR. MACH:  Respectfully, your Honor, may I respond?

19             THE COURT:  You may.

20             MR. MACH:  So the courts have held that even if what

21   counsel has argued is correct and it was created by McKinsey at

22   the request of DT and was created with guidance and input as to

23   what the document should say, that that makes the document

24   qualify as a party admission.  It's what the court held in *FTC*

25   *v. Qualcomm,* which recognizes that multiple courts have said

JCATSTA4                          Langheim - Direct

1              MR. MACH:  I am starting a substantially different

2    subject.  If you want me to continue, I will be happy to,

3    but --

4              THE COURT:  Why don't we adjourn then, 45 minutes.

5              (Luncheon recess taken)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JCAVSTA5                         Langheim - direct

1           I did not see in this case that that evidentiary

2    support was there.  All right?

3           Thank you.  Proceed.

4           MR. MACH:  Thank you very much, your Honor.

5    THORSTEN LANGHEIM, resumed.

6    BY MR. MACH:

7    Q.  Welcome back, Mr. Langheim.

8           I'd like to ask you some questions about DISH.

9    A.  DISH, yes.

10   Q.  Once it was clear to DT that DISH would be the divestiture

11   buyer, you asked your team to evaluate DISH's potential to

12   build its network, right?

13   A.  Yes.

14   Q.  And you asked your team to figure out what DISH could

15   achieve in a worst-case scenario from DT's perspective, right?

16   A.  Yes.

17   Q.  And in response, your team conducted an analysis, right?

18   A.  Yeah.

19   Q.  And your team also engaged in a variety of other

20   discussions about the probability of DISH building a

21   significant wireless network in the United States; correct?

22   A.  Yes.  Correct.

23   Q.  And your team assured you repeatedly that DISH is not going

24   to build its own wireless network; correct?

25   A.  They run analysis about how much they would buy a buildout

| | |
|---|---|
| **From:** | Stern, Steffen [/O=TMSX/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=S.STERN] |
| **Sent:** | 12/15/2015 4:37:25 PM |
| **To:** | Langheim, Thorsten [thorsten.langheim@telekom.de] |
| **CC:** | Budde, Matthias [matthias.budde@telekom.de] |
| **Subject:** | US Workshop 2 Doc |

Thorsten,

anbei das Dokument für den morgigen US Workshop – dieses Mal sehr kompaktes Format.

Vorab: Hannes Wittig hat darum gebeten, auch am WS teilnehmen zu dürfen. OK für Dich?

Kern-Messages und Diskussionspunkte:

Starting point (recap from WS1)
• US market is and will be more attractive than EU portfolio markets
• TMUS won't earn its cost of capital in the next years, but contributes significant growth and positive FCF to DT, resulting in increasing EV

Discussion point 1: Competitive environment
•        We do not expect major structural changes in US market in the next 2-3 years which will significantly affect TMUS
•        Highest uncertainty coming from Sprint that may go bankrupt or start acting irrationally
•        2nd highest uncertainty from potential irrational moves of AT&T

Discussion point 2: What does this mean for TMUS?
•        Based on our market analysis, we assume that TMUS will be able to deliver on its planning for the next 2-3 years (i.e. show future growth). We should discuss:
•        Will TMUS achieve planning?
•        When will growth stop?

•        What are potential long-term consolidation scenarios?
•        Sprint – preferred but feasibility?
•        (subsequent) cable merger – preferred, seems feasible, but would cableCos also be interested in it?
•        In case options above won't work out: America Movil, Altice as alternatives?
•        BUT: We also might end up without a merger!

•        Critical questions - and we should discuss these thoroughly:
•        **How to ensure that TMUS executes portfolio options before growth stops?**
•        **How to ensure that TMUS can act in consolidations from a position of strength?**

Looking forward to the discussion. Happy to align / discuss upfront if you wish to.

Best,
Steffen

CONFIDENTIAL TREATMENT REQUESTED
P Ex 329

 TRANSPERFECT

# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015, ISO 17100:2015, and ISO 18587:2017. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

File Name(s): DT-DOJ-00085478 for translation

Source Language(s):     German

Target Language(s):     English

Authorized Signature:

Name:     Maria Jose Ramos Manrique

Title:     Senior Project Manager

Date:     December 10th, 2019

Reason for signature: I approve the accuracy of this document content as written

| From: | Stern, Steffen [/O=TMSX/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=S.STERN] |
| Sent: | 12/15/2015 4:37:25 PM |
| To: | Langheim, Thorsten [thorsten.langheim@telekom.de] |
| CC: | Budde, Matthias [matthias.budde@telekom.de] |
| Subject: | US Workshop 2 Doc |

Thorsten,

Attached please find the document for tomorrow's workshop – it will be a very compact format this time.

In advance: Hannes Wittig has therefore also asked to take part in the WS. Is that OK for you?

<u>Key messages and points for discussion:</u>

Starting point (recap from WS1)
•US market is and will be more attractive than EU portfolio markets
•TMUS won't earn its cost of capital in the next years, but contributes significant growth and positive FCF to DT, resulting in increasing EV

Discussion point 1: Competitive environment
- We do <u>not</u> expect major structural changes in US market in the next 2-3 years which will significantly affect TMUS
- Highest uncertainty coming from Sprint that may go bankrupt or start acting irrationally
- 2nd highest uncertainty from potential irrational moves of AT&T

Discussion point 2: What does this mean for TMUS?
- Based on our market analysis, we assume that TMUS will be able to deliver on its planning for the next 2-3 years (i.e. show future growth). We should discuss:
- Will TMUS achieve planning?
- When will growth stop?

- What are potential long-term consolidation scenarios?
- Sprint – preferred but feasibility?
- (subsequent) cable merger – preferred, seems feasible, but would cableCos also be interested in it?
- In case options above won't work out: America Movil, Altice as alternatives?
- BUT: We also might end up without a merger!

- Critical questions - and we should discuss these thoroughly:
- How to ensure that TMUS executes portfolio options before growth stops?
- How to ensure that TMUS can act in consolidations from a position of strength?

Looking forward to the discussion. Happy to align / discuss upfront if you wish to.

Best,
Steffen

CONFIDENTIAL TREATMENT REQUESTED

# DTAG – DEFINING A WINNING POSITION FOR THE US BUSINESS MODEL

Workshop II
16.12.2015

Discussion document

**T** · ·

LIFE IS FOR SHARING.

DT-DOJ-0-0085479
Page 2

P Ex 329

CONFIDENTIAL TREATMENT REQUESTED
Case: 1:19-cv-05435-VM

# US MARKET IS AND WILL CONTINUE TO BE MORE ATTRACTIVE THAN DTEU PORTFOLIO MARKETS



**US market structure is and will be different vs. EU[1]**

- No nationwide fixed net players



**Competition is and will remain lower than in EU**

- Less consumer choice for fixed BB/TV



Redaction - Privileged

Redaction - Privileged

- In US, large domestic players key beneficiaries

US ARPUs will remain significantly higher than in EU

- Though no increase expected
- ... and also CAPEX levels significantly higher

Even disruptive market trends will not change the picture

*Details in appendix*

1 EU refers to DTEU portfolio countries
Source: DTAG, Team Analysis

  **LIFE IS FOR SHARING.**

- Strictly Confidential -   3

# TMUS TO CONTINUE ORGANIC GROWTH TILL 2018 – PLAY TOWARDS SPRINT AND (THEN) CABLE MERGER

TMUS STRATEGY SCHEMATIC OVER TIME

FOR DISCUSSION

● Event may alter market structure    ● Deep dive to follow

## Phase I – Continue organic growth[1]

- Will we achieve our planning?
- How long can we grow organically?
- Will competition put TMUS under pressure?
- How to become most attractive 2018+ merger target/partner?
- **How to ensure that TMUS executes portfolio options before growth stops?**

TMUS EV, FCF, Revenues development after plan

2016    2017    2018+

Election outcome    Sprint bank-ruptcy?    AT&T FMC?    Cablecos going mobile?

## Phase II – Participate in market consolidation

1. 4>3 merger Sprint
   **Preferred – get Sprint to obtain necessary scale**
2. (Subsequent) cable merger  COMCAST  Charter brighthouse
   **Preferred – ideally after Sprint merger, else stand-alone**
3. Alternate mergers  suddenlink altice
   **Stand-alone exit option – if none of above feasible**
4. Organic #3 in mobile  T·Mobile·
   **Last resort (might be unavoidable?!) – if none of above feasible (sustainability questionable)**

*Define strategy towards Dish –*
*Watch out for competitors' interest in Dish*



[1] Under dashed assumption that competitive dynamics will keep the market structure fairly stable
Source: Team Analysis.

**LIFE IS FOR SHARING.**

CONFIDENTIAL TREATMENT REQUESTED
Case: 1:19-cv-05435-VM

P Ex 329

- Strictly Confidential - 8

DT-DOJ-00085486
Page 9

# PHASE II: SPRINT AND COMCAST MOST LIKELY MERGER PARTNERS – BUT THERE MIGHT ALSO BE NO ONE?

FOR DISCUSSION

Deal likelihood: ● Low  ● High

| Potential TMUS end-games | Key strategic rationale(s) | Strategic or regulatory barrier(s) |
|---|---|---|

**❶ 4→3 mobile merger** — Sprint 

Key strategic rationale(s):
- Sprint on verge of bankruptcy (would love to merge)
- Clear scale gain and synergy potential for TMUS to own ~30% of mobile market (at scale with AT&T, VZ)

Strategic or regulatory barrier(s):
> Redaction – Privileged
Redaction - Privileged (Analysts; even with Republican administration only <50% probability¹)

**❷ (Subsequent) cable merger** — COMCAST 

Key strategic rationale(s):
- Move into mobile might be only natural option for Comcast to grow; Redaction - Privileged **Redaction - Privileged**
- Bring video content onto mobile (i.e., linear/OTT)

Strategic or regulatory barrier(s):
> Redaction – Privileged
- If move into content gets regulatory approval, it will be more likely than move into mobile (see appendix)
- No nationwide fixed net – limited FMC potential

Charter, brighthouse 

Key strategic rationale(s):
- Potential move into mobile as adjacency play (e.g., eyeball increase, mobile video, cost synergies)

Strategic or regulatory barrier(s):
- Less likely than Comcast due to lower TMUS footprint overbuild (FMC ability) and weaker financials

**❸ Alternate mergers** — omnicom 

Key strategic rationale(s):
- Creation of one North American service market and synergy potentials with existing verticals
- Return to execution of core business model vs. current MVNO play (TracFone)

Strategic or regulatory barrier(s):
> Redaction – Privileged
- Potentially cheaper and better acquisition candidates around the globe

altice

Key strategic rationale(s):
- Move into mobile could be an opportunistic adjacency play for Altice

Strategic or regulatory barrier(s):
- Altice currently small cable player in US (<4mn TV and broadband subs)
- Greater priority for Altice to acquire wireline
- Sprint better fit for Altice's lean turnaround playbook

**❹ Organic #3 in mobile** — T··Mobile·

Key strategic rationale(s):
- No merger optionality can be exercised (due to barriers)

Strategic or regulatory barrier(s):
- 2018+ sustainability questionable (to be investigated)

Most merger optionalities with low deal likelihood – details in appendix

**Redaction - Privileged**

Source: Team Analysis, Expert interviews

 LIFE IS FOR SHARING.

DT-DOJ-00085487
Page 10

FOR DISCUSSION

# PHASE I: TMUS PLAYBOOK TILL 2018

Action path till eoy 2017



**Continue Uncarrier growth**

- **Continue Uncarrier growth** in B2C according to plan[1] or above
- **Explore further growth adjacencies** (e.g., B2B, IoT, M2M, mobile video)



**Secure sufficient spectrum**

- Bid in next incentive auction
- **Define strategy towards Dish spectrum** (i.e., what is the right acquisition price?) – Hypothesis: Dish currently a distraction – wait until their negotiation power is weakened
- **Continue network densification** as needed



**Pave way for market consolidation**

- **Continue value strategy to keep 4>3 merger optionality**

## Redaction – Privileged



**Become attractive consolidation target for 2018+**

- **Show openness to consolidate**
  - Signal TMUS interest in Sprint and position Sprint as difficult asset for cablecos[2]
  - Signal TMUS interest in (subsequent[3]) cable merger and advertise superiority over VZ
- **Invest in assets and activities that complement a cableco merger** (i.e., large and valuable customer base, network strength, ad and mobile video capabilities)
- **Consider MVNO cableco deal** to establish long-term partnerships?



**LIFE IS FOR SHARING.**

1 Customer, revenue, EBITDA, FCF and EV growth    2 Especially for Comcast, Charter Group and Altice    3 After TMUS + Sprint merger if feasible
Source: Team Analysis, Expert interviews

- Strictly Confidential -    10

# DEFINING A WINNING POSITION FOR THE US BUSINESS MODEL



## Context

DT has 2 large portfolio elements besides Germany and UK: TMUS and DTEU

- TMUS delivered strong performance over past 2 years[1] and drives DT's growth
- EU portfolio has been struggling[2] and recovery to stable business is uncertain

In consequence, TMUS gained more importance within DT (revenues and EBITDA) while the EU portfolio has lost in relevance

However, stability of TMUS business model in long-run unsure given its sub-scale position, competitive environment, and potential market changes

## Objective

Create a deeper understanding of differences in US vs. DTEU portfolio market environment, structure and attractiveness

Identify major trends for the US that can disrupt current telco business models

Develop potential market "end-game" archetypes for the US

Outline options for TMUS to address key challenges in respective "end-game" archetypes (i.e., defining a winning position)

1 +20% revenue from Q2/13 to Q2/15, +54% total customers from Q2/13 to Q2/15
2 -8% revenue from Q2/13 to Q2/15
Source: DTAG



LIFE IS FOR SHARING.

- Strictly Confidential - 14

P Ex 329

CONFIDENTIAL TREATMENT REQUESTED
Case: 1:19-cv-05435-VM

DT-DOJ-00085492
Page 15

# RECAP WS 1 – US MARKET IS AND WILL CONTINUE TO BE MORE ATTRACTIVE THAN DTEU PORTFOLIO MARKETS

## Key findings

**US market structure is and will be different vs. EU[2]**

- No nationwide fixed net players

**Competition is and will remain lower than in EU**

- Less consumer choice for fixed BB/TV

**Redaction - Privileged**

- In US, large domestic players are key beneficiaries

**US ARPUs will remain significantly higher than in EU**

- Though no increase expected
- ...and also CAPEX levels significantly higher

**Even disruptive market trends will not change the picture**

1 Based on analyst / expert discussions    2 EU refers to DTEU portfolio countries
**Redaction - Privileged**
Source: DTAG, Team Analysis

 **LIFE IS FOR SHARING.**

## Rationale[1]

- Competitive authorities did not allow Comcast/TWC merger and split up AT&T in the past – no change in FCC ruling expected in this respect
- MVNOs on purely commercial terms & not enforced by regulator – neither change in regulation, nor irrational MVNO pricing behavior of MNOs expected

- Fixed: Limited broadband overbuild / regional monopolies and high barriers to entry
- Mobile: New WiFi-First / MVNO based players will not gain significant mobile share given unattractive financials of such business (rationale MNO behavior expected) and limited capabilities (i.e., no brand, lacking channels, handsets)

# Redaction - Privileged

- Key beneficiaries of US regulation are large US players as Sprint/TMUS suffer from scale disadvantages

- Both ARPUs and required invest ~2x higher than in EU (hence US industry ROCE level not superior)
- US customers more value focused & with higher usage - less price elastic than in EU
- US customers with significantly higher disposable income (2-3x higher than in EU)
- No detrimental pricing moves expected: lower competition, less regulation & more favorable market structure

- Convergence (FMC, mobile + TV): could emerge driven by AT&T and VZ/Comcast, but value protecting approach expected (EU seen as bad example) + lack of countrywide fixed net reduces incentive & impact eSIM / OEM taking over customers: due to lack of MNO backing no disruptive impact expected; Sprint alone not sufficient to make eSIM a success

- Strictly Confidential -    15

CONFIDENTIAL TREATMENT REQUESTED
Case: 1:19-cv-05435-VM

P Ex 329

FOR DISCUSSION



# 1. TMUS + SPRINT MERGER AS PREFERRED MOVE, BUT REGULATORY APPROVAL IS DIFFICULT

KEY PARAMETERS AT A GLANCE

**a  Strategic rationale?**

- Sprint on verge of bankruptcy (would love to merge)
- Clear scale gain and synergy potential for TMUS to own ~30% of mobile market (at scale with AT&T, VZ)

**b  Combined network effects?**

- 188 MHz additional spectrum – 14 MHz in the most attractive low band segment
- Complimentary coverage in select US regions

**c  Regulatory barriers?**

Redaction - Privileged
Redaction - Privileged (even with Republican administration)

Redaction - Privileged

Redaction - Privileged (Analysts also under Republican administration potentially only <50% probability for that)

**d  Key Do's and Don'ts to realize TMUS + Sprint merger**

Redaction - Privileged

- Position Sprint as difficult merger asset towards AT&T, VZ, and cablecos
- Continue value strategy (to keep optionality for 4>3 merger)

Redaction - Privileged

**e  Sprint is a target to many**


at&t    Charter    brighthouse    verizon    COMCAST

**f  Deal likelihood**

- PRO: Market structure calls for consolidation, 4>3 in the interest of all mobile players

Redaction - Privileged

○ Low
● High

Sprint

Deep dive to follow

**"So What" for TMUS**

- **Preferred merger** – ideally prior to subsequent cable merger
- **Continue value strategy** to keep optionality for 4>3 merger
- **Avoid that anyone else gets them** (signal Sprint as difficult target to cablecos)

Redaction - Privileged

- Strictly Confidential - 22

Source: Team Analysis, Analyst reports, Capital IQ

LIFE IS FOR SHARING.

P Ex 329

DT-DOJ-00085500
Page 23

Redaction - Privileged

FOR DISCUSSION

**Sprint**

# Redaction - Privileged

## Redaction - Privileged

> It's going to be hard for someone to make a persuasive case that reducing 4 firms to 3 is actually going to improve competition for the benefit of American consumers.
>
> — *William Baer, DOJ*

> We must protect competition where it exists. Our goal should be to ask how competition can best serve the public.
>
> — *Tom Wheeler, FCC*

> Were [the deal] somehow approved, there would be numerous conditions attached, such as the divestiture of spectrum/other assets and imposition of a wholesale mandate that would bleed off a portion of the financial benefits.
>
> — *UBS*

## Redaction - Privileged

Source: Press Analysis, DTAG, Team analysis

 **LIFE IS FOR SHARING.**

- Strictly Confidential - 23

P Ex 329

DT-DOJ-00085501
Page 24

CONFIDENTIAL TREATMENT REQUESTED
Case: 1:19-cv-05435-VM



FOR DISCUSSION

Sprint

**1c**

# Redaction - Privileged

## Current Sprint situation at a glance

**Financial distress**

- Low EBIT margins (~6% in 2014, ~2% in 2015)
- ~4.5bn USD cash burn rate expected for 2015
- Debt of 2.5bn matures in 12/2016 (currently no source for refinancing)

**Turnaround initiative started**

- 2.5bn USD cost-cutting program started in Q2/2015
- Aggressive pricing (i.e., unlimited plan for 60 vs. 80 USD for TMUS)

Redaction - Privileged

## Outlook for the next ~12 months

- Continued support from Softbank expected
- ...to see whether turnaround initiative shows measurable success

Redaction - Privileged

## 2 potential outcomes by eoy 2016

Outcome 1 – Sprint turnaround fails and bankruptcy is unavoidable

Redaction - Privileged

Outcome 2 – Turnaround shows success and Softbank continues financing

Sources: Analyst reports, Team analysis

**LIFE IS FOR SHARING.**

CONFIDENTIAL TREATMENT REQUESTED
Case: 1:19-cv-05435-VM

P Ex 329

- Strictly Confidential - 24

DT-DOJ-00085502
Page 25

FOR DISCUSSION

COMCAST

Deep dive to follow

# 2 PREPARE FOR COMCAST BUYING TMUS AS 2018+ OPTIONALITY

KEY PARAMETERS AT A GLANCE



**a Strategic rationale for Comcast?**

Move into mobile might be only natural option to grow
> Redaction – Privileged
> Redaction – Privileged

Several strategic advantages
- Increase eyeballs
- Bring video content onto mobile (i.e., linear/OTT)
- FMC ability in select areas (but w/o massive discounts; i.e., broadband & mobile bundle for cord cutters)
- Realize cost and network synergies through economies of scale
- Fits with Wi-Fi first approach

**b Combined network effects?**

- ~90mn people with Comcast access in the states where TMUS has >70% coverage[1]
- ~59mn TMUS customers vs. ~22mn Comcast TV & ~23mn Broadband subscribers

**c Regulatory barriers?**

> Redaction – Privileged

**d Key Do's and Don'ts to dress TMUS for optionality?**

- Bid for spectrum & continue densification
- Increase customer base (i.e., especially younger, video affine demographics)
- Signal Sprint as difficult asset for Comcast and signal interest to merge with Comcast subsequent to potential TMUS + Sprint merger
- Don't enter into fixed (i.e., wholebuy, FMS) without thinking through what it means for Comcast merger

**e Alternate brides for Comcast?** 

Sprint    verizon

If still existent and stabilized
Pending FCC approval (i.e., largest fixed/mobile player, vertical integration)

**f Deal likelihood?**



○ Low
● High

- PRO: Strategic rationale (see section a)
- CON: No wireless experience, only small growth in wireless, limited FMC ability, likely to explore alternate adjacencies if at all feasible (i.e., wireline and content)



## "So What" for TMUS

**Preferred merger** – ideally after Sprint merger, else stand-alone

**Be attractive bride** by investing in network strength and growth of subscriber base

**Avoid Comcast + Sprint or VZ merger** (signal Sprint as difficult target)

**Signal merger interest with Comcast** (i.e., à la "you can get a merged TMUS + Sprint")

---

1 Percent of the population with T-Mobile wireless access in that geography

> Redaction – Privileged

Source: Team Analysis, Analyst reports, CapitalIQ, Broadbandnow.com

**LIFE IS FOR SHARING.**

CONFIDENTIAL TREATMENT REQUESTED
Case: t:19-cv-06435-VM

P Ex 329

DT-DOJ-0008503
Page 26

- Strictly Confidential -   25

FOR DISCUSSION

Charter brighthouse Time Warner Cable

Deep dive to follow

# 2 PREPARE FOR CHARTER GROUP MERGER AS 2018+ OPTIONALITY

KEY PARAMETERS AT A GLANCE

**a Strategic rationale for Charter Group?**

- Potential move into mobile as adjacency play
- Several strategic advantages
  - Increase eyeballs
  - Bring video content onto mobile (i.e. linear/OTT)
  - FMC ability in select areas (but w/o massive discounts; i.e., broadband & mobile bundle for cord cutters)
  - Realize cost and network synergies through economies of scale
  - Fits with Wi-Fi first approach

**b Combined network effects?**

- ~80mn people with Charter Group access in the states where TMUS has a >70% coverage[1]
- ~59mn TMUS customers vs. ~17mn Charter Group TV & ~20mn Broadband subscribers

**c Regulatory barriers?**

Redaction - Privileged

LIFE IS FOR SHARING.

**d Key Do's and Don'ts to dress TMUS for optionality**

- ✔ Increase customer base (i.e., especially younger, video affine demographics)
- ✔ Bid for spectrum & continue densification
- ✔ Signal Sprint as difficult asset for Charter Group and show interest in (subsequent) Charter deal
- ✘ Don't enter into fixed (i.e., wholebuy, FMS) without thinking through what it means for Charter merger

**e Alternate brides for Charter group?**

Sprint — If still existent and significantly stabilized

verizon — Pending FCC approval (i.e., largest fixed/mobile player, vertical integration)

**f Deal likelihood?**

○ Low ● High

- PRO: Strategic rationale (see section a)
- CON: Occupied with post-merger efforts for next 1-3 years, financially torn, higher synergies with fixed players (i.e., CenturyLink, Frontier), no wireless experience, limited FMC ability

## "So What" for TMUS

**Preferred merger** – if possible after Sprint merger, else stand-alone

**Be attractive bride** by investing in network strength and growth of subscriber base

**Avoid Charter + Sprint or VZ merger** (signal Sprint as difficult target)

**Signal merger interest with Charter** (i.e., à la "you can get a merged TMUS + Sprint")

1 Percent of the population with T-Mobile wireless access in that geography
Source: Team Analyses, Analyst reports, Capital IQ, Broadbandnow.com, Broadbandmap.gov
Redaction - Privileged

- Strictly Confidential - 26

DT-DOJ-00085504
Page 27

P Ex 329

CONFIDENTIAL TREATMENT REQUESTED
Case: 1:19-cv-05435-VM





FOR DISCUSSION

COMCAST

Charter   Time Warner Cable
Bright House Networks

# 2 STRONG NETWORK TOGETHER WITH SUB + FCF GROWTH KEY TO DRESS FOR CABLECOS

## Do's

> **Invest in a strong network** (i.e., acquire spectrum, increase densification, engage in WiFi offloading)

> **Increase customer base** – focus especially on the younger, video affine demographics that consume significant amounts of mobile video

> **Further strengthen P&L and balance sheet** – to allow TMUS enter into merger negotiations from a position of strength

> **Consider creation of mobile-only video content** (i.e. short form) that could be integrated in cablecos OTT offering

> **Safeguard and further expand "sexy and innovative" T-Mobile image**

> **Try to establish/acquire attractive mobile ad-technology** that is feasible for both mobile and cable players

**VS**

## Don'ts

ⓧ **Don't decrease prices and ARPU levels too much** for the sake of customer growth / as reaction to Sprint

ⓧ **Don't experiment with offers that could increase churn** of existing customer base

ⓧ **Don't duplicate "innovative capabilities"** that are already present at cablecos but lacking at TMUS

ⓧ **Don't enter the wireline domain**[1], i.e., own build-out, commercial whole-buy, FMS – might make cable moves more difficult and a financial benefit unlikely



**LIFE IS FOR SHARING.**



[1] Without having a long-term strategy that includes a consolidation plan
Source: Team Analysis, Expert Interviews

P Ex 329

- Strictly Confidential - 27

CONFIDENTIAL TREATMENT REQUESTED
Case: 1:19-cv-05435-VM

DT-DOJ-00085505
Page 28

FOR DISCUSSION

américa móvil

**3**

# PREPARE FOR AMERICA MOVIL MERGER AS 2018+ OPTIONALITY

KEY PARAMETERS AT A GLANCE



**a) Strategic rationale for America Movil?**

- Become full-fletched US MNO (execution of AM's core business model)
- Several strategic advantages
  - Increased eyeballs (>83mn mobile subs)
  - Creation of one North American mobile service market (US, Mexico)
  - Realization of cost synergies through economies of scale and MVNO>MNO transition



**b) Combined network effects?**

- 25.7mn mobile subscribers in US via MVNO TracFone
- Merged company could have >100mn mobile subscribers by 2019[†]

**c) Regulatory barriers?**

Redaction - Privileged

**d) Key Do's and Don'ts to dress TMUS for optionality?**

- ⊙ Increase customer base
- ⊙ Bid for spectrum & continue densification
- ⊙ Signal Sprint as difficult asset for AM
- ⊙ Signal merger interest to AM
- ⊙ Ensure that any potential MVNO deal is long-term beneficial to TMUS
- ⊗ Don't engage in price war (sustain ARPUs)



**e) Alternate brides for AM?**

Sprint ⚠ If still existent and significantly stabilized



**f) Deal likelihood?**

- PRO: Strategic rationale (see section a)
- CON: Potentially better investment opportunities in other core markets (i.e. LATAM)

○ Low
● High

**"So What" for TMUS**

- **Potential stand-alone exit option – if** Comcast merger not feasible

- **Avoid AM + Sprint merger** (signal Sprint as difficult target)

- **Signal merger interest with AM** (ideally subsequent to Sprint merger)

- Be an attractive bride (enhance network and grow subs)

- Strictly Confidential - 28

DT-DOJ-00085506
Page 29

† TMUS subscriber base forecasted to be ~76mn by 2019
Source: Team Analysis, Analyst reports, Capital IQ, Broadbandnow.com



LIFE IS FOR SHARING.

CONFIDENTIAL TREATMENT REQUESTED
Case: 1:19-cv-05435-VM

P Ex 329

FOR DISCUSSION



# 3 PREPARE FOR ALTICE MERGER AS 2018+ OPTIONALITY

KEY PARAMETERS AT A GLANCE

 **(a) Strategic rationale for Altice?**
- Move into mobile could be an opportunistic adjacency play for Altice (much like a PE player)

  **(b) Combined network effects?**
- ~16.9mn people with Altice access in the states where TMUS has a >70% coverage[1]
- ~59mn TMUS customers vs. ~3.5mn Altice TV (of which about 2.6mn in NY) and ~4mn broadband subscribers

 **(c) Regulatory barrier?**

**Redaction - Privileged**

▶ **(d) Key Do's and Don'ts to dress TMUS for optionality**
- ✅ Bid for spectrum & continue densification
- ✅ Increase customer base
- ❌ Signal Sprint turnaround as too challenging for Altice (given no wireless experience nor relevant synergies)
- ✅ Ensure that any potential MVNO deal is long-term beneficial to TMUS
- ❌ Don't engage in price war (sustain ARPUs)

 **(e) Potential alternate Altice targets**

Sprint   If still existent and stabilized

**(f) Deal likelihood?**
- UNLIKELY : Higher synergies with fixed players (i.e., Centurylink, Frontier), Sprint much better fit for their lean turnaround playbook

○ Low
● High

## "So What" for TMUS

**Be attractive bride** by investing in network strength and growth of subscriber base

**Avoid Altice + Sprint merger** (signal Sprint as too challenging to turn around)

[1] Percent of the population with T-Mobile wireless access in that geography
Sources: Team Analysis, Analyst reports, Capital IQ, Broadbandnow.com

**LIFE IS FOR SHARING.**

CONFIDENTIAL TREATMENT REQUESTED
Case: 1:19-cv-05435-VM

P Ex 329

- Strictly Confidential -   29

DT-DOJ-00085507
Page 30

altice

# 5 DON'TS TO MAINTAIN 2018+ MERGER OPTIONS

FOR DISCUSSION

Key partner/ merger options

 Sprint

 COMCAST

 Charter brighthouse

 américa móvil

altice

 **Don't enter into MVNO deal that could complicate consolidation**
(Deals should increase TMUS value)

 **Don't trigger a price war in the US market**
(Stable ARPUs base drives attractiveness & valuation)

 **Redaction - Privileged**

 **Don't invest in asset heavy media, i.e., content rights or production**
(Lack of scale for TMUS and unlikely return on capital)

 **Don't enter the wireline domain[1], i.e., own build-out, whole-buy, FMS**
(Might make cable moves more difficult + financial benefit unlikely)

[1] Without having a long-term strategy that includes a consolidation plan
Source: Team Analysis

**LIFE IS FOR SHARING.**

CONFIDENTIAL TREATMENT REQUESTED
Case: 1:19-cv-05435-VM

P Ex 329

- Strictly Confidential -   32

DT-DOJ-00085510
Page 33

Page 1

1                UNITED STATES DISTRICT COURT
2                SOUTHERN DISTRICT OF NEW YORK

3    _____

     STATE OF NEW YORK, STATE OF        )
4    CALIFORNIA, STATE OF COLORADO,     )
     STATE OF CONNECTICUT, DISTRICT     )
5    OF COLUMBIA, STATE OF              )
     MARYLAND, STATE OF MICHIGAN,       )   1:19-cv-05434 (VM)
6    STATE OF MISSISSIPPI,              )
     COMMONWEALTH OF VIRGINIA, and      )
7    STATE OF WISCONSIN,                )
                                        )
8                     Plaintiffs,       )
                                        )
9         -against-                     )
                                        )
10   DEUTSCH TELECOM AG, T-MOBILE       )
     US, INC., SPRINT CORPORATION       )
11   and SOFTBANK GROUP CORP.,          )
                                        )
12                    Defendants.       )

13   _____

14        VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

15                        PETER EWENS

16                    HIGHLY CONFIDENTIAL

17   _____

18                        9:04 A.M.
19                   SEPTEMBER 12, 2019
20             925 FOURTH AVENUE, SUITE 2900
21                   SEATTLE, WASHINGTON
22
23
24
25   REPORTED BY: CARLA R. WALLAT, CRR, RPR, CCR 2578

Page 42

1 takes place, DISH will only be able to provide service
2 to its own customers initially by sharing the T-Mobile
3 network, right?
4     MS. LEVIN:  Objection.
5     A.  DISH is not sharing in a network sharing
6 arrangement with T-Mobile.  DISH has a
7 infrastructure-based MVNO with T-Mobile.
8     Q.  (BY MR. MACH)  But in terms of providing
9 service to its customers, DISH will not have its own
10 network, correct?
11     A.  DISH initially will not have its own network,
12 but is committed to build a network.
13     Q.  Right.  That's a fair clarification.
14 Initially DISH will not have its own network, correct?
15     A.  That's correct.
16     Q.  So it must rely on T-Mobile's network to serve
17 its customers, correct?
18     A.  That's correct.
19     Q.  Okay.  So T-Mobile -- strike that.
20       So DISH will not have a basis for network
21 differentiation with T-Mobile, right?
22     MS. LEVIN:  Objection.
23     A.  DISH will be using T-Mobile's network
24 initially.  That's absolutely right.  But over time,
25 they will build their own network and they will have an

Page 43

1 opportunity to combine, uniquely combine those networks
2 and offer differentiated services.
3     Q.  (BY MR. MACH)  And the agreement that you have
4 with DISH, it places a specific limit on how much of
5 T-Mobile's network DISH can use to serve its own
6 customers, right?
7     MS. LEVIN:  Objection.
8     A.  The -- the agreement with DISH actually allows
9 DISH unlimited access to the T-Mobile network for the
10 first three years.  Thereafter, there are limits on
11 Dish's ability to use the network, but the whole
12 strategy is for DISH to begin to -- to build their own
13 network and begin to migrate traffic to their own
14 facilities.
15     Q.  (BY MR. MACH)  Let's shift gears a little bit.
16 In December 2015, you took part in a series of
17 discussion workshop -- workshops with DT, correct?
18     A.  Yes, I did.
19     Q.  And those workshops included participants from
20 T-Mobile, DT and also McKinsey, correct?
21     A.  Yes, they did.
22     Q.  You've worked with McKinsey a number of times
23 at T-Mobile, right?
24     A.  Yes, I have.
25     Q.  And the team from McKinsey that you worked

Page 44

1 with in those workshops included people you really
2 trust, right?
3     MS. LEVIN:  Objection.
4     A.  At least one of the persons I knew well and I
5 respected.
6     Q.  (BY MR. MACH)  And you really trusted him,
7 right?
8     A.  That's correct.
9     Q.  And who was that person?
10     A.  Peter Bisson.
11     Q.  And you personally assisted DT employees in
12 the preparation of the materials for those discussion
13 workshops in December 2015, right?
14     A.  No, I did not.  Those materials were
15 prepared -- to my recollection, those materials were
16 prepared by McKinsey for DT.
17     Q.  Well, my question, sir, was not whether you
18 prepared the materials, but whether you personally
19 assisted the DT employees in the preparation of the
20 materials.  Did you do that?
21     A.  No, I did not.  I don't recall.  I think I was
22 sent the documents pretty much near the end in advance
23 of the workshops.
24     MR. MACH:  Introduce a document that
25 will be Ewens Exhibit 58.

Page 45

1       (Deposition Exhibit 58 was marked for
2         identification.)
3     MR. MACH:  I'm sorry, I can't reach it.
4     MS. LEVIN:  That's all right.
5     Q.  (BY MR. MACH)  Sir, do you recognize what's
6 been marked as Ewens Exhibit 58 as an email thread
7 between you and Mr. Stern of DT in November of 2015?
8     MS. LEVIN:  Objection.
9     A.  I'm sorry, can you repeat the question?
10     Q.  (BY MR. MACH)  Sure.  I'll -- I'll strike the
11 question and ask it again.
12       Do you recognize Ewens Exhibit 58 as an email
13 thread between you and Mr. Stern, among others, in --
14 in November of 2015?
15     A.  Yes, I do.
16     Q.  And is this something you would have created
17 in the ordinary course of your business?
18     A.  Yes.
19     Q.  Okay.  And this thread discusses preparations
20 for the workshops you participated in with DT in
21 December 2015, right?
22     A.  That's correct.
23     Q.  And Mr. Stern at the time was the VP of
24 portfolio strategy for DT, correct?
25     A.  I don't remember his title, but that sounds

12 (Pages 42 - 45)

Page 46

1 plausible.
2    Q. And in this email thread, Mr. Stern wrote
3 asking for your assistance in preparing materials for
4 the workshops, right?
5      MS. LEVIN: Objection.
6    A. Can I look at the email?
7    Q. (BY MR. MACH) Absolutely.
8    A. Yeah, in this email, Mr. Stern requests
9 materials that we -- from the U.S. and he also requests
10 time for an interview to learn more about a series of
11 questions.
12    Q. An interview with you?
13    A. I believe the interview was with Sarah Bond.
14    Q. And the top email in the thread on the page
15 that ends 99484 has Mr. Stern saying "Looking forward
16 to the call tomorrow."
17    Do you see that, sir?
18    A. Yes.
19    Q. And did you hold a call with Mr. Stern about
20 the workshops as suggested in this thread?
21    A. Yes, I believe we did.
22    Q. And what did you discuss with Mr. Stern on
23 that call?
24    A. I don't recall all the questions we discussed.
25 This -- there looks to be a question outline in this

Page 47

1 email.
2    Q. Do you remember any of the questions you
3 discussed?
4    A. I do not.
5    Q. You then participated in the first workshop --
6 strike that. Let's take a step back.
7    Does this refresh your recollection that you
8 personally assisted DT employees in the preparation of
9 the materials for the December 2015 discussion
10 workshops in Germany?
11      MS. LEVIN: Objection.
12    A. What we did is we provided information to them
13 and we participated in I believe at least one call
14 where they had asked us questions, but we did not have
15 a hand in preparing the documents for the workshop at
16 all.
17    Q. (BY MR. MACH) Got it.
18    You provided input to DT and they wrote the
19 documents. Is that fair?
20    A. Yes, we provided information and tried to be
21 responsive to questions, but we did not have a hand in
22 preparing the documents at all.
23    Q. Thank you.
24    You then participated in the first workshop
25 session in Germany on December 3rd, 2015, right?

Page 48

1    A. Yes, I did.
2    Q. Okay. I'm going to ask the court reporter to
3 please mark Exhibit 59.
4      (Deposition Exhibit 59 was marked for
5      identification.)
6    Q. (BY MR. MACH) Do you have Exhibit 59 in front
7 of you, sir?
8    A. Yes, I do.
9    Q. And do you recognize Exhibit 59 as the slide
10 deck that was used in the first workshop -- workshop
11 session in Germany in 2015?
12    A. Yes, I do.
13    Q. And that's something that was created in the
14 normal course of your business, right?
15      MS. LEVIN: Objection.
16    A. This was created by Deutsche Telekom. And I
17 don't know whether it was created in their normal
18 course of business or not.
19    Q. (BY MR. MACH) Fair enough.
20    Would you please turn to me -- with me to the
21 slide that's marked 4, it's Bates Number ending
22 00999374.
23    This slide lays out the objectives for the
24 first meeting, correct -- strike that. Sorry.
25    This slide lays out the objectives for the two

Page 49

1 workshops, right, sir?
2    A. Yes, that's what this slide appears to do.
3    Q. And the next page shows the participants for
4 the first meeting, right?
5    A. These were the participants that were invited,
6 but I don't believe everybody was there.
7    Q. So who wasn't there?
8    A. I don't recall, but the meeting was much, much
9 smaller. This is a long list of participants and --
10 well, these are the experts at the meeting. I don't
11 recall all the people who were there, but we -- you
12 know, Thorsten, for example, wasn't in the whole
13 meeting. We may have had one or two other people, but
14 this wasn't -- this wasn't the exact set of
15 participants.
16    Q. So I'm looking at slide 5. Are you looking at
17 slide 5?
18    A. Yes.
19    Q. Okay. And it shows six individuals, including
20 you, Mr. Stern, Mr. Langheim.
21    A. Yes.
22    Q. And Mr. Langheim was present for at least some
23 of the meetings, correct?
24    A. There were two workshops. Mr. Langheim was
25 present for part of at least one of the meetings, but I

13 (Pages 46 - 49)

Page 58

1   Q. Well, it has proven true since 2015 that new
2   mobile entrants have not become relevant players in
3   your marketplace, hasn't it?
4        MS. LEVIN: Objection.
5   A. Actually, I disagree with that. I believe
6   cable companies have entered and they've become
7   relevant mobile players. So I don't actually agree
8   that your statement is true.
9   Q. (BY MR. MACH) So in 2015 when these
10  predictions were laid -- strike that. Excuse me.
11       Since 2015 when these predictions were laid
12  out, your predictions about how the market would evolve
13  have proven wrong?
14       MS. LEVIN: Objection.
15  Q. (BY MR. MACH) Is that what you're saying?
16       MS. LEVIN: Objection. It
17  mischaracterizes the testimony.
18  A. These are not my -- these are not my
19  predictions of how the U.S. market would evolve. As I
20  told you before, this is a DT prepared document and
21  some things I might agree with and other things I
22  don't. But these are not my predictions of how the
23  U.S. market would evolve.
24  Q. (BY MR. MACH) Today or in 2015?
25  A. In 2015.

Page 59

1   Q. Okay. So you're saying that in 2015, you
2   thought that this document was incorrect about trend
3   Number 1?
4   A. In 2015, I don't have a particular view, and I
5   can't tell you which statement in 2015 I agreed with
6   or -- or I didn't agree with. What I can tell you is
7   these are DT's predictions, or appear to be DT's
8   predictions as encapsulated in this document, and I
9   probably agreed with some of them but didn't
10  necessarily agree with all of them.
11  Q. Understood. Thank you.
12       Turn with me, please, to slide 24. I'm just
13  hoping you can help me understand this. In the middle
14  of the slide it says "U.S. MVNO agreements based on
15  commercial terms. All four mobile players will
16  continue to engage in commercially rationale
17  contracts."
18       Do you see that?
19  A. Yes, I do.
20  Q. Okay. What does that mean?
21       MS. LEVIN: Again, Mr. Ewens, if you
22  want to look at the whole slide, you're welcome to do
23  that.
24  A. Yeah, I don't know exactly what this means.
25  Again, this is a DT document and this is a DT

Page 60

1   statement.
2   Q. (BY MR. MACH) Well, what's the connection
3   between commercially rationale contracts and the
4   ability of a new entrant to compete?
5        MS. LEVIN: Objection.
6   A. I don't know what you mean by "commercially,"
7   and I know -- I don't know what this document means by
8   "commercially rationale contract."
9   Q. (BY MR. MACH) Okay. And in the right-hand
10  side of -- side of that slide there's a box and it says
11  "'So what' for TMUS."
12       Do you see that, sir?
13  A. Yes.
14  Q. That's T-Mobile US, right?
15  A. That's correct.
16  Q. Okay. And the conclusion was "Emergence of
17  MVNO entrants unlikely," correct?
18  A. That's what the document says.
19  Q. Well, was that the view that DT expressed to
20  you in 2015?
21  A. I don't recall. I don't recall discussing
22  this specific page. What the document says is
23  "Emergence of MVNO entrants unlikely," but I don't
24  recall that specific discussion from the workshop.
25  Q. A few more questions about this document.

Page 61

1   Slide 33, please. And slide 33 discusses industry
2   consolidation, right?
3   A. Yes.
4   Q. Including the potential merger of T-Mobile and
5   Sprint, correct?
6   A. That's what the document says.
7   Q. And regarding the T-Mobile Sprint merger, the
8   slide says: "Regulatory approval on short-term regarded
9   as unlikely."
10       Do you see that, sir?
11       MS. LEVIN: I'm sorry, could you direct
12  us to that?
13  A. I'm sorry, can you point that -- to that --
14  point me to that.
15  Q. (BY MR. MACH) That is a totally reasonable
16  question. In the box on the right-hand side of the
17  slide, the first bullet says: "Sprint merger as
18  natural strategic step to obtain nationwide scale -
19  however, regulatory approval on short-term regarded as
20  unlikely."
21       Do you see that, sir?
22  A. I do.
23  Q. So why was regulatory approval of the T-Mobile
24  and Sprint merger regarded as unlikely in 2015?
25       MS. LEVIN: Objection.

16 (Pages 58 - 61)

Page 62

1    A. As I say, this is not my document, this is
2  DT's document. And I don't know where they developed
3  those points of view, but it is not necessarily my
4  point of view at the time.
5    Q. (BY MR. MACH) Well, did -- did you agree with
6  that point of view in 2015?
7    A. I don't recall whether I agreed with that
8  point of view or not.
9    Q. And did DT express to you any reason why
10  regulatory approval might be unlikely?
11    A. No, I don't recall.
12    Q. Now --
13      MS. LEVIN: I'm sorry, was that question
14  about 2000- -- strike that. I withdraw my question.
15    Q. (BY MR. MACH) If we go to the left-hand side
16  of slide 33, the last bullet in the Mobile category
17  there, it says "Dish's massive spectrum could leave --
18  lead to mid-term spectrum deal."
19    Do you see that?
20    A. Yes, I do.
21    Q. What does that mean?
22      MS. LEVIN: Objection.
23    A. Well, I presume that means that there was at
24  least a possibility to discuss purchasing spectrum from
25  DISH.

Page 63

1    Q. (BY MR. MACH) When it says "mid-term
2  spectrum," can you help me understand what the phrase
3  "mid-term spectrum" means? Mid -- I'm sorry, excuse
4  me. Could you help me understand what "mid-term" means
5  in that bullet?
6    A. I don't know what DT specifically had in mind,
7  but I would presume that would mean over the course of
8  a handful of years.
9    Q. In that same Mobile category, it says
10  "Regulator unlikely to allow emergence of three-player
11  mobile market."
12    Do you see that?
13    A. I'm sorry, where?
14    Q. It's the second bullet in the Mobile category
15  on the left-hand side of the slide.
16    A. Yes, I do.
17    Q. And there when it's talking about the
18  emergence of a three-player mobile market, that's
19  talking about the results of a potential merger between
20  T-Mobile and Sprint, correct?
21      MS. LEVIN: Objection.
22    A. I don't know exactly what it's referring to,
23  but that seems -- seems what it's referring to in the
24  document.
25    Q. (BY MR. MACH) And the three players referred

Page 64

1  to there would be T-Mobile, AT&T and Verizon, correct?
2    A. Yeah, I think the -- the only issue is that
3  would be three -- maybe it should say three -- three --
4  three network owners, but -- but yes.
5    Q. Let's go to the next slide, please. Slide 35.
6      MS. LEVIN: 34 or 35?
7      MR. MACH: 35. That's helpful.
8    Q. (BY MR. MACH) And in the upper left-hand
9  corner of the slide, it says "Still no mobile wholesale
10  obligation, thus no new disruptive market entires
11  (MVNOs)."
12    Do you see that, sir?
13    A. Yes, I do.
14    Q. What does that mean?
15      MS. LEVIN: Objection.
16    A. Again, this is DT's document. So you'd -- you
17  know, you'd have to ask them exactly what they meant by
18  that.
19    Q. (BY MR. MACH) Well, what did it mean to you
20  when you had the document in the meeting with DT in
21  2015?
22    A. Well, firstly I don't know that we discussed
23  this page specifically. But I do -- one difference
24  between the U.S. and Europe is in Europe you have
25  mandated and prescribed wholesale rates for MVNOs. Or

Page 65

1  you did at the time.
2    Q. In -- in which market?
3    A. I don't recall, but at least in some markets
4  in Europe.
5    Q. Yeah. My point is not the U.S. market, right?
6    A. That's correct.
7    Q. So do you understand this to be saying unless
8  there is that type of wholesale obligation in the
9  United States, there will not be disruptive MVNO market
10  entries?
11      MS. LEVIN: Objection.
12    A. I don't -- as I say, I don't know what DT
13  meant. What I can tell you is there are MVNOs in the
14  U.S. market that are disruptive. Altice just entered
15  the market with a very disruptive price point. Comcast
16  under the Xfinity mobile brand is an MVNO. And up
17  until Altice entered, they had the lowest priced
18  unlimited single line post paid plan.
19    Q. (BY MR. MACH) Let's go to slide 40, please,
20  and we're almost done with this long document.
21      MS. LEVIN: And might we take a break
22  after we're done?
23      MR. MACH: Absolutely.
24    Q. (BY MR. MACH) Are you with me on slide 40,
25  sir?

17 (Pages 62 - 65)

Page 82

1 means, but one possibility is that if we were able to
2 combine with DISH and utilize all that spectrum, it
3 would provide us with dramatically more capacity, and
4 so we would need to evaluate that as a potential
5 option.
6       Q. Does -- does looking at Ewens Exhibit 62
7 refresh your recollection that you insisted -- you
8 assisted in the preparation of materials for the second
9 workshop in Germany?
10      A. We didn't prepare the materials for the second
11 workshop in Germany.  We may have been responsive to
12 DT's questions, but those materials were prepared by
13 DT.
14      Q. That's fair, and I -- I'm -- I just want to --
15 want to hone in on the distinction that you're making.
16          Mr. Stern prepared the materials for the
17 meeting; is that correct?
18          MS. LEVIN:  Objection.
19      A. I don't know who prepared the meetings [sic]
20 for that.
21      Q. (BY MR. MACH)  Okay.  In any case, you
22 provided information to Mr. Stern that DT could use to
23 prepare the materials for the meeting; is that
24 accurate?
25          MS. LEVIN:  Objection.

Page 83

1      A. I don't recall whether we provided information
2 for the second workshop, but as we discussed, we did
3 provide information that was responsive to DT's
4 questions that they had in advance of the first
5 workshop.  I don't know what other information was
6 provided or not provided between the first workshop and
7 the second workshop.
8      Q. (BY MR. MACH)  Thank you, sir.
9          You thought that the slide deck that was
10 prepared for the second workshop was a good document,
11 right?
12          MS. LEVIN:  Objection.
13      A. What the email says is "I think doc okay."
14          And what I meant by that was I think that the
15 document would probably serve to tee up some of the
16 major topics.  I did not provide a detailed or do a
17 detailed review of the document, and I certainly didn't
18 have time to engage -- I was very busy at the time and
19 I didn't have time to engage in a word-by-word review
20 of the document or to get into a battle with DT about
21 the document.  It was ultimately their document and I
22 thought for the purposes of at least starting the
23 discussion, the document was okay.
24      Q. (BY MR. MACH)  So I appreciate the
25 explanation, sir, but my question is did you believe

Page 84

1 that the slide deck used in the second session,
2 workshop session was a good document?
3      A. I said the email says I think the document is
4 okay.  I don't know what you mean by a good deck.
5      Q. Well, I'll introduce an exhibit.
6          MR. MACH:  I'll ask the court reporter
7 to please mark this as Ewens Exhibit 63.
8          (Deposition Exhibit 63 was marked for
9             identification.)
10          MR. MACH:  And I'm going to
11 simultaneously introduce what will be Ewens Exhibit 64.
12          (Deposition Exhibit 64 was marked for
13             identification.)
14      Q. (BY MR. MACH)  Do you have Exhibits 63 and 64
15 in front of you, sir?
16      A. I do.
17          MS. LEVIN:  Which is which, sir?
18          MR. MACH:  I will clarify that.
19          MS. LEVIN:  Thank you.
20          MR. MACH:  Oh, you mean in front of you.
21 So Exhibit 63 is the document that's also marked
22 Ewens CID Exhibit 42.  And Exhibit 64 is the document
23 labeled TMUS-LIT-00198721.
24          MS. LEVIN:  Thank you.
25      Q. (BY MR. MACH)  Now, let's start with

Page 85

1 Exhibit 63.  Do you recognize this as an email exchange
2 between you and Mr. Stern attaching a PowerPoint
3 presentation in December of 2015?
4      A. Yes, I do.
5      Q. And Exhibit 63 is something that would have
6 been created in the ordinary course of your business,
7 correct, sir?
8          MS. LEVIN:  Objection.
9      A. The email would have been created in the
10 ordinary course.  If Exhibit 63 includes this document,
11 we didn't -- didn't create that in our ordinary course.
12      Q. (BY MR. MACH)  Thank you for the
13 clarification.
14          So the email would have been something you
15 would have created in your ordinary course, but
16 receiving materials like the attachment that you
17 received from Deutsche Telekom was a relatively common
18 occurrence for you in your position at DT; is that
19 true?
20          MS. LEVIN:  Objection.
21      A. I can't say one way or another.  I mean, we
22 had a very specific agreement that I would participate
23 in the workshop and that they would send me the
24 document ahead of time.
25          MR. MACH:  So a little bit of

22 (Pages 82 - 85)

Page 86

1 housekeeping. The PowerPoint presentation that's
2 attached to Exhibit 63 is redacted. Exhibit 64 is an
3 unredacted version of a PowerPoint that I understand to
4 be the same document as the one that is attached to
5 Exhibit 63. And I just would ask counsel to verify
6 that they have the same understanding, that those
7 documents -- those PowerPoint decks, the one attached
8 to 63 and the one that is 64, are the same.
9        MS. LEVIN: Yes, we have the same
10 understanding.
11       MR. MACH: Thank you.
12    Q. (BY MR. MACH) You don't have any reason to
13 doubt that, do you, sir?
14    A. I do not.
15    Q. Okay. So let's take a look at the front of
16 Exhibit 63. You received the slide deck that is
17 Exhibit 64 from Mr. Stern, right, sir?
18    A. Yes, that's correct.
19    Q. And you told Mr. Stern "good document," right?
20    A. That's correct.
21    Q. Okay.
22    A. But again, what I really wanted to -- the
23 focus here was not on a page-by-page review, but
24 basically do we have a document that could serve as a
25 jumping off point for a workshop discussion.

Page 87

1        MR. MACH: I'll move to strike that as
2 nonresponsive. You don't need to worry about that,
3 sir.
4    Q. (BY MR. MACH) Okay. If you would, please,
5 turn with me to Exhibit 64, we will work with that, and
6 I think you can set 63 aside for now just to keep
7 things organized.
8        This was the slide deck that was used for
9 session 2 of your meetings in Germany in 2015, correct?
10    A. Yeah. Again, this was a slide deck that was
11 furnished at the beginning of the meeting, but I don't
12 have a specific recollection of how much of this
13 workshop we actually followed the deck or whether we
14 had a different, you know, or related discussion.
15    Q. Well, when you sat down for workshop 2 with DT
16 in December of 2015, you had this slide deck in front
17 of you, correct?
18    A. We did at the beginning of the workshop.
19    Q. So let's turn first to slide 6. Are you with
20 me, sir?
21    A. I am.
22    Q. And there are three MNO competitors listed on
23 this slide, right, sir?
24    A. Can you define "MNO"?
25    Q. Well, I'll strike that the question so we

Page 88

1 don't get sidetracked here.
2        Here you list AT&T, Verizon and Sprint, right,
3 among others?
4        MS. LEVIN: Objection.
5    A. Correct.
6    Q. (BY MR. MACH) And this slide deck --
7    A. I should -- just -- I should clarify that. I
8 don't list them; DT lists them.
9    Q. That's a fair clarification. Thank you, sir.
10       And this slide discusses competitive dynamics
11 over the next two to three years, correct?
12    A. Yes, that's what I read the slide to discuss.
13    Q. Okay. And going back to your previous note --
14 I'll strike that.
15       Now, let's look at AT&T. The prediction that
16 you received from DT was that AT&T would not engage in
17 price reductions, right?
18    A. What this -- this slide says "No price
19 reductions and unlikely to initiate FMC race (if
20 somehow unavoidable)."
21       That's what's written on the slide.
22    Q. And in the box below that, DT conveyed to you
23 that Verizon had the incentive to keep the market as is
24 and be the last one to reduce prices, right?
25    A. I'm sorry, what the slide says is "Incentive

Page 89

1 to keep market as is - last one to reduce prices (given
2 customer base and premium position) or join FMC (given
3 wireless focus)."
4    Q. And -- and whereas DT conveyed that Sprint was
5 likely to continue to engage in aggressive pricing,
6 correct?
7    A. I don't know what you mean by "DT conveyed."
8 What the slide says is "Focus on turnaround to avoid
9 bankruptcy (aggressive pricing to continue)."
10    Q. Well, the slide was prepared by DT and sent to
11 you, right?
12    A. That's correct.
13    Q. And then at the top, in gray lettering, it
14 said "Potential pressure for price reduction if Sprint
15 recovers."
16       Do you see that?
17    A. Yes.
18    Q. What does that mean?
19       MS. LEVIN: Objection.
20    A. I don't know what this means. This -- again,
21 this is DT's document; this is not my document.
22    Q. (BY MR. MACH) Well, to be clear, I'm not
23 asking what DT meant, I'm asking what -- what it meant
24 to you when you received the document?
25    A. I mean, presumably it means that this

23 (Pages 86 - 89)

Page 94

1    Q. Okay. And in evaluating the Sprint deal, DT
2  conveyed to you that four-to -- four-to-three
3  consolidation was in the interest of all mobile
4  players. Do you recall that?
5        MS. LEVIN: Objection.
6    A. I don't recall the specific conversation that
7  was relayed to me.
8    Q. (BY MR. MACH) Would you turn with me to
9  slide 22, please.
10      Do you see where it says "Deal likelihood"?
11   A. Can I take a minute to read the slide?
12   Q. Of course, yes.
13   A. Yes, I see that.
14   Q. Okay. And what did you understand DT to
15 conveying to you when it -- they said, "Market
16 structure calls for consolidation, four to three in the
17 interest of all mobile players"?
18   A. I don't understand what they meant. And
19 again, I can't say that we -- I don't recall going
20 through this slide specifically. I don't know what
21 "market structure calls for consolidation" means.
22   Q. Well, Mr. Langheim had expressed to you that
23 he thought it important to take the market from four to
24 three, right?
25   A. I think if you go back to the previous emails,

Page 95

1  Mr. Langheim had expressed to me the idea that four --
2  going -- for the market from four to three might be an
3  option, you know, if -- if you thought that
4  commoditization was such that you wouldn't be able to
5  earn a return on capital. I think Mr. Langheim
6  conveyed to me that he thought four to three might be
7  an option.
8    Q. So do you understand how consolidation from
9  four players to three could be in the interest of all
10 mobile players?
11   A. It's not -- I don't necessarily agree that
12 four to three is in the interest of all mobile players.
13 Four-to-three consolidation has to be evaluated
14 separately for each market and for each mobile player.
15   Q. Well, I appreciate that. My question is a
16 little bit different. And that is, did you understand
17 DT's rationale for the statement that four to three was
18 in the interest of all mobile players?
19       MS. LEVIN: Objection.
20   A. I'm not sure I really fully understood DT's
21 rationale, but this -- this is what the document says
22 and this is DT's document. But the rationale and the
23 conclusion about why that's in the interest of all
24 mobile players, I think is -- you know, I think -- I
25 don't fully understand what DT means by that.

Page 96

1    Q. (BY MR. MACH) Can you, as you sit here today,
2  can you think of any ways in which four-to-three
3  consolidation could be in the interest of all mobile
4  players?
5        MS. LEVIN: Objection.
6    A. Look, I think -- as I say, the outcome of
7  four-to-three consolidation depends dramatically on the
8  market and the competitive positions of all the
9  players. So it's certainly a possible outcome, but
10 it's by no -- by no means a -- an ordained outcome or
11 necessary outcome.
12   Q. (BY MR. MACH) It's hard to predict the
13 outcome, would you agree with that?
14   A. I'd say predicting the outcome depends on
15 having a lot more knowledge about the market, the
16 market structure, competitive dynamics. There are
17 many, many factors that go into the resulting
18 competitive positions of players.
19   Q. Now, slightly above that on the same slide it
20 says "Key do's and don'ts to realize TMUS plus Sprint
21 merger."
22      Do you see that?
23   A. Yes.
24   Q. Did you discuss these key do's and don'ts with
25 DT?

Page 97

1    A. I don't recall.
2    Q. It says "Do not overplay offending
3  consolidation stakeholders."
4      Do you see that?
5    A. Yes.
6    Q. What did that mean to you, sir?
7    A. I don't know. It's not even a grammatically
8  correct English sentence.
9    Q. It then says "Do not follow Sprint in price
10 wars or irrational MVNO deals (sustain ARPUs)."
11      Do you see that?
12   A. Yes.
13   Q. What does that mean to you when you received
14 this deck?
15   A. I think what it meant to me was a DT idea that
16 we shouldn't follow Sprint into price wars, but as a
17 general matter, DT doesn't actually set our pricing, we
18 set our pricing independently. We set our pricing
19 based on what we believe we need to compete and gain
20 share.
21   Q. At the top of that list it says, as a do and
22 don't, it says "Strengthen lobbying activities for
23 four-to-three merger with the right people in
24 Washington."
25      Do you see that, sir?

25 (Pages 94 - 97)

Page 98

1    A. Yes, I do.
2    Q. What did that mean to you?
3    A. I don't know what that means to me. I don't
4  have any -- any connection with any lobbying
5  activities. I don't really have any knowledge of that
6  topic.
7    Q. Well, did Sprint -- strike that.
8       Did T-Mobile strengthen its lobbying
9  activities for a four-to-three merger to increase the
10 probability of approval of its merger with Sprint?
11      MS. LEVIN: Objection.
12   A. I don't know. I'm not involved in those
13 topics at all.
14      MR. MACH: What's the basis for the
15 objection, Counsel?
16      MS. LEVIN: I'm just curious about
17 the -- the ambiguity around what lobbying activities
18 means and how you would lobby about a four-to-three
19 merger.
20      MR. MACH: Okay.
21   Q. (BY MR. MACH) Just going back really quickly
22 to where it says "Do not overplay offending
23 consolidation stakeholders," I know we asked about that
24 already.
25      Would you take a look at the footnote that's

Page 99

1  attached to that and read that for me to yourself.
2       Where it says "consolidation stakeholders,"
3  the footnote reads --
4    A. Yes.
5    Q. FCC, DOJ, unions, AT&T, Verizon. That's what
6  that means, right?
7    A. That's what the footnote says.
8    Q. Okay. So why was it important to avoid
9  offending AT&T and Verizon if you wanted to merge with
10 Sprint?
11      MS. LEVIN: Objection.
12   A. I have no idea. This is DT's -- as I said
13 before, this is DT's document. I don't actually even
14 know what this says. It's not a correct English
15 translation or translation in English. So I don't
16 really know.
17   Q. (BY MR. MACH) Based on the materials, it
18 looks like T-Mobile regularly looks for M&A
19 opportunities. Is that a fair statement?
20      MS. LEVIN: Objection.
21   A. I would -- I would say we look at M&A
22 opportunities from time to time.
23   Q. (BY MR. MACH) And that includes opportunities
24 to be the buyer, but also includes the possibility that
25 T-Mobile could be acquired, right?

Page 100

1    A. Can you repeat the question?
2    Q. Why don't I break it up so it's not such a
3  confusing question: I'll withdraw it.
4       You regularly evaluate opportunities to be the
5  buyer in M&A -- for M&A opportunities. Is that fair?
6    A. Yes, I think that's fair.
7    Q. And you also evaluate opportunities where you
8  might be acquired in an M&A transaction. Is that fair?
9    A. Do you mean the acquisition of T-Mobile as a
10 whole or specific assets from T-Mobile?
11   Q. Both.
12   A. Well, as a general matter, at T-Mobile US, we
13 don't particularly engage in looking at opportunities
14 to sell the whole company. That's really DT's
15 province.
16   Q. Fair enough.
17      In your view, might you need to combine with a
18 company -- strike that.
19      In your view, is it possible that you need to
20 combine with another company in order to be successful
21 in the marketplace?
22      MS. LEVIN: Objection.
23   A. Look, as a general matter when we look at M&A,
24 we look at the specifics of each M&A opportunity, and
25 we don't generalize and say we -- you know, we have to

Page 101

1  look at each and every opportunity separately and
2  figure out how those opportunities might contribute to
3  our success.
4    Q. (BY MR. MACH) Right. My question is it's
5  entirely possible that T-Mobile would conclude that it
6  has an M&A opportunity and it needs to take that
7  opportunity in order to be successful in the
8  marketplace, right?
9    A. I think it's entirely possible that T-Mobile
10 could conclude that taking an M&A opportunity would
11 allow it to be more successful in the marketplace than
12 not taking that opportunity.
13   Q. Thank you, sir.
14      And is it important from a competitive
15 perspective for T-Mobile to have flexibility to engage
16 in that type of M&A activity if the opportunity arises?
17      MS. LEVIN: Objection.
18   A. Can you refine your question or can you
19 rephrase your question?
20   Q. (BY MR. MACH) Yeah. Is it important for
21 T-Mobile to have flexibility to engage in M&A
22 opportunities if the need arises?
23   A. I think it's important for us to continue to
24 evaluate M&A opportunities. If M&A opportunities are
25 above $75 million, then we absolutely need to partner

26 (Pages 98 - 101)

| | |
|---|---|
| **From:** | Ewens, Peter </O=WESTERN WIRELESS CORP/OU=PCS/CN=USER ACCOUNTS/CN=FINANCE/CN=WANEWPORT/CN=PEWENS> |
| **To:** | Bond, Sarah; Sridharan, Balaji |
| **Sent:** | 11/29/2015 3:43:59 PM |
| **Subject:** | FW: AW: Workshop |
| **Attachments:** | US.business.model_WS1_v57.pdf |

fyi

**From:** "Stern, Steffen"
**Date:** Sunday, November 29, 2015 at 1:49 PM
**To:** Peter Ewens
**Cc:** "Budde, Matthias", "Wehrmann, Arne", "Wiese, Philip"
**Subject:** AW: Workshop

Dear Peter,

Looking forward to the call tomorrow. In case we decide to jump into the workshop document for next week Thursday, please find attached a current working draft. Final document to be sent out in the next days. Please keep this document confidential.

Best regards,
Steffen

**Von:** Ewens, Peter
**Gesendet:** Freitag, 20. November 2015 22:00
**An:** Stern, Steffen
**Cc:** Banker, Joan "Joanie"
**Betreff:** Re: AW: AW: Workshop

Steffen - I will have Sarah on my team send the video materials. I am out next week. Let's shoot for Nov 30. Copying my assistant Joanie

Sent from my T-Mobile iPhone

On Nov 20, 2015, at 12:41 PM, Stern, Steffen <S.Stern@telekom.de> wrote:

Dear Peter,

Sorry for the late reply. Please find below a few explanatory points on in the questions which came up during our analysis. We could discuss them either next week or early in the week thereafter - I understand that you will be on vacation next week (lucky you :)). Just let us know what would work best for you or someone from your team. Any day will do if the call takes place between 7 and 11pm CET (i.e. 10am - 2pm Seattle time)

One further question: We learnt from McKinsey that an US McK team has prepared an analysis on the US TV market / TMUS options in this context. Would you be able to share this analysis?

Thanks and best regards,
Steffen

**Spectrum scarcity:**

- How serious do you see the spectrum scarcity in the light of potential future offloading?
- What are the economics of more spectrum vs. building more cells – at what point / price does spectrum become

Confidential Treatment Requested
P Ex 802

less attractive than investing in denser networks?

- Do you see other ways to deal with spectrum scarcity than investing at spectrum auctions (e.g. increasing network densification, technological solutions, etc...)?

**Backhauling ability/offloading:**

- How important are backhauling capabilities for operators considering the increasing network densification?
- How is the backhaul market structured? Is it easy to get more (dense) backhaul in light of 5G and small cells (considering the lack of TMUS fixed footprint)?
- Role of mobile offloading to fixed broadband for TMUS
- Rationale behind the recently introduced LTE micro cell & how will this develop given increasing popularity of data caps in fixed offers
- What is your view on 5G and the impact of 5G on the telco players?

**Digital adjacencies:**

- Do you see any opportunities/threads from digital adjacencies for TMUS (e.g. IoT, B2B M2M, etc...)?
- What is your view on the (rather fragmented) content rights landscape in the US? Will this change in the future and how will this affect telcos and TMUS?

**eSIM:**

- What is your perspective on the upcoming introduction of eSIM by major device manufacturers in terms of disruptiveness? What is the motivation of handset manufacturers?
- What would be a strategy to avoid being forced into the role of a telco "commodity provider"?


```
-----Ursprüngliche Nachricht-----
Von: Ewens, Peter
Gesendet: Montag, 16. November 2015 17:22
An: Stern, Steffen
Betreff: Re: AW: Workshop
```

Steffen - I did catch up with Thorsten in Barcelona. We can get on the phone - just let us know when. Would be great to just send a few lines on the questions in advance so we can be a bit prepared.

Sent from my T-Mobile iPhone

> On Nov 14, 2015, at 12:00 PM, Stern, Steffen <S.Stern@telekom.de> wrote:
>
> Dear Peter,
>
> As requested, we are re-scheduling the workshop. Most likely, the new date will be Dec 3rd. Our assistant should already be in touch with your assistant to fix the date.
>
> I am not aware how far you have been briefed by Thorsten - we are working on the following:
>
> In the Dec 3rd workshop, we are comparing the market attractiveness US vs. EU. Specifically:
> - Current market structure, economic and regulatory environment
> - Market trends / potential changes in Telco market and future market scenarios  (with particular focus on US, including fixed net, Cable, TV/content)
>
> In a 2nd workshop later in Dec, we will then focus on the option space for TMUS ("what does it need to be successful in the US market, and how to get there").
>
> McKinsey is supporting on the topic. By the way, the McK team is also working on questions regarding "mobile video" - the US seems to be more advanced compared to EU, and recent moves of VZ and AT&T show that both companies are placing bets on this trend.

Confidential Treatment Requested
P Ex 802

> 
> One last question - since our last call a few weeks ago, a few more questions came up that we would like to better understand. Would you or someone from your team be available for a short follow-up call, ideally late next week or the week after (if holidays allow)? So far, it's about spectrum scarcity (how serious is it?), mobile backhauling ability in light of future network densification needs, and the ability of offloading to Fixed Broadband connections.
> 
> Looking forward to the discussion!
> 
> Best regards,
> Steffen
> 
> 
> -----Ursprüngliche Nachricht-----
> Von: Budde, Matthias
> Gesendet: Mittwoch, 11. November 2015 18:41
> An: Langheim, Thorsten; Ewens, Peter
> Cc: Richard, Lilli; Stern, Steffen
> Betreff: AW: Workshop
> 
> Peter,
> 
> let me see what we can arrange - we get back to you asap.
> 
> Thx
> Matthias
> 
> 
> 
> -----Ursprüngliche Nachricht-----
> Von: Langheim, Thorsten
> Gesendet: Mittwoch, 11. November 2015 18:39
> An: Budde, Matthias
> Betreff: Fw: Workshop
> 
> 
> Thorsten Langheim
> 0170-330 1110
> ----------------------------------------
> Sent from my T-Mobile BlackBerry
> 
> 
> ----- Original Message -----
> From: Ewens, Peter
> Sent: Wednesday, November 11, 2015 06:38 PM
> To: Langheim, Thorsten
> Subject: Workshop
> 
> Thorsten - I see you scheduled a workshop for Nov 24. I am on holidays that week - thanksgiving week and holidays for my daughter.
> 
> Any chance of moving this to following week?
> 
> Sent from my T-Mobile iPhone

Confidential Treatment Requested
P Ex 802

Discussion document

# DTAG – DEFINING A WINNING POSITION FOR THE US BUSINESS MODEL

Workshop I
03.12.2015

Working draft

**LIFE IS FOR SHARING.**

T ·  ·

TMUS-DOJ-00999487
Page 4

Confidential Treatment Requested
P Ex 802

# DEFINING A WINNING POSITION FOR THE US BUSINESS MODEL



## Context

DT has 2 large portfolio elements besides Germany and UK: TMUS and DTEU

- **TMUS delivered strong performance** over past 2 years[1] and drives DT's growth
- **EU portfolio has been struggling**[2] and recovery to stable business is uncertain

In consequence, **TMUS gained more importance within DT** (revenues and EBITDA) while the EU portfolio has lost in relevance

However, **stability of TMUS business model in long-run unsure given its sub-scale position**, competitive environment, and potential market changes

## Objective

Create a **deeper understanding of differences in US vs. DTEU portfolio market** environment, structure and attractiveness

Identify **major trends for the US** that can disrupt current telco business models

Develop potential market **"end-game" scenarios** for the US

Outline **options for TMUS to address key challenges** in respective "end-game" scenarios (i.e., defining a winning position)

1 +20% revenue from Q2/13 to Q2/15, +34% total customers  from Q2/13 to Q2/15
2 -8% revenue from Q2/13 to Q2/15
Source: DTAG



**LIFE IS FOR SHARING.**

Confidential Treatment Requested
P Ex 802

2

TMUS-DOJ-00999488
Page 5

# WORKSHOP I – PARTICIPANTS AT A GLANCE

## DTAG



**Thorsten Langheim**
Head of Strategy &
M&A DTAG



**Peter Ewens**
EVP Corporate Strategy
T-Mobile US



**Matthias Budde**
SVP Group Strategy &
Transformation DTAG

**Steffen Stern**
VP Portfolio Strategy
DTAG

## McKinsey



**Peter Bisson**
Macro trend
perspective on
US market

*In person*

**Ewan Duncan**
Macro trend
perspective on
US market

*VC*

**Brendan Gaffey**
Macro trend
perspective on
US market

*TBC*

Source: Team Analysis

**LIFE IS FOR SHARING.**

5

Confidential Treatment Requested
P Ex 802

TMUS-DOJ-00999491
Page 8

# EXTENSIVE EXPERT INTERVIEWS CONDUCTED TO UNDERSTAND MARKET DYNAMICS



USA



**Endre Holen**
Macro trend perspective on US market



**Brendan Gaffey**
Macro trend perspective on US market



**Stagg Newman**
Regulatory expert (former CTO of FCC)



**Satya Rao**
Adjacencies and future business models



**Joy Chen**
Adjacencies and future business models



**Ewan Duncan**
Macro trend perspective on US market

Europe



**Martin Wrulich**
Spectrum scarcity, fixed to mobile trend

**Lars Engel Nielsen**
Macro trend perspective for EU, FMC deep dive

**Tomas Calleja Mediano**
Macro trend perspective on EU

**Markus Meukel**
Expert for eSIM and future business models

Source: Team Analysis

 **LIFE IS FOR SHARING.**

Confidential Treatment Requested
P Ex 802

TMUS-DOJ-00999492
Page 9

Case: 1:19-cv-05435-VM

# TODAY, THE US TELCO MARKET IS MORE ATTRACTIVE THAN EUROPEAN PORTFOLIO MARKETS

|  | US |  **VS.** DTEU Portfolio |
|---|---|---|
| **(1)** More favorable macroeconomic environment | • ~42 TEUR GDP/capita 2015, growing 3% p.a. 2012-20<br>• 323mn population 2015, growing 1% p.a. 2012-20<br>• 82% urban population 2015 | • ~17 TEUR GDP/capita 2015, growing 3% p.a. 2012-20<br>• 127mn population 2015, growing 0% p.a. 2012-20<br>• 67% urban population 2015, growing 0.3% p.a. 2012-20 |
| **(2)** Larger market with more attractive growth prospects | • ~583bn USD telco revenues 2015, increasing 1% p.a. 2012-20<br>• 3.3% spend of GDP 2015, declining -3% p.a. 2012-20 | • ~49bn EUR telco revenues 2015, declining -1% p.a. 2012-20<br>• 2.1% spend of GDP 2015, declining -5% p.a. 2012-20 |
| **(3)** Market with limited competition and different structure | • Limited fixed broadband overbuild<br>• No nationwide fixed broadband players<br>• Small role of MVNOs | • Fixed broadband overbuild more common<br>• Typically strong nationwide incumbents<br>• Significant MVNO market shares in Western Europe |
| **(4)** More friendly regulatory environment fostering investments | • Regulator with infrastructure focus<br>• Reliable and investment friendly spectrum awards<br>• Stable political environment | • Regulator with competition and consumer welfare focus<br>• Unreliable and CAPEX harming spectrum awards<br>• Political uncertainty in CEE markets |
| **(5)** Customers show higher spend for telco services | • 36 EUR mobile market ARPU Q2 2015<br>• 71 EUR fixed market ARPU Q2 2015 | • 13 EUR weighted mobile market ARPU Q2 2015<br>• 31 EUR weighted fixed market ARPU Q2 2015 |









Source: Team Analysis, McKinsey iConsumer service

 **LIFE IS FOR SHARING.**

Confidential Treatment Requested<br>P Ex 802

TMUS-DOJ-00999503<br>Page 20

Case: 1:19-cv-05435-VM

PREPARED ONLY AS A BACKUP IF NEEDED
NOT EXHAUSTIVE

## 3 US IS A MARKET WITH LIMITED COMPETITION AND DIFFERENT MARKET STRUCTURE

**US**



▓ Area with at least 2 broadband providers   ■ Area with 1 or no broadband provider

**VS**

**European portfolio**





**Fixed**
- No nationwide broadband players – high geographical fragmentation
- Limited FMC ability
- Limited overbuild for broadband
- Cable key broadband technology

- Strong nationwide incumbent(s) typical
- FMC as typical value proposition
- Broadband overbuilt more common
- No dominating technology for broadband

**Mobile**
- 2 main players (i.e., from 4 nationwide operators 2 are subscale)
- MVNOs not significant in terms of market share

- Incumbent and at least 2 further operators common
- MVNOs with significant market shares in Western Europe

1 According to the National Broadband Map defined as a two-way data transmission with advertised speeds of at least 768 kilobits per second (kbps) downstream and at least 200 kbps upstream
Source: DTAG, Team Analysis, Broadband.gov



**LIFE IS FOR SHARING.**

21

Confidential Treatment Requested
P Ex 802

HIGHLY CONFIDENTIAL OUTSIDE COUNSEL & IN HOUSE COUNSEL ONLY AND CONTAINS DEFERRED OR PENDING RECORDS EXCERPT

# ④ US MARKET WITH MORE FRIENDLY REGULATORY AND POLITICAL ENVIRONMENT (1/2)

**US**

**DTEU**

## Overall policy objectives

US regulation aims at fostering investment

EU regulation aims at enhancing competition and securing consumer welfare

## Access seeker Business



**No regulated wholesale access**

- No obligation to offer fixed wholesale access
- No obligation to offer MVNO access – MVNOs on commercial terms only

**Strict regulated wholesale access obligations** enable and protect access seeker business models (e.g., ULL based like 1&1, MVNO like Drillisch, etc.)

## Spectrum awards



**Reliable and investment friendly spectrum awards**

- Transparent and reliable auction designs
- Spectrum ownership enables long-term invest perspective
- Spectrum awarded regionally

**Unreliable and investment harming spectrum awards**

- Intransparent and non-harmonized auction designs maximizing state proceeds
- No spectrum ownership - limited license durations create investment uncertainties and "extortion potential" in future auctions

Source: DTAG, Team Analysis

  **· LIFE IS FOR SHARING.**

Confidential Treatment Requested
P Ex 802

TMUS-DOJ-00999508
Page 25

Case: 1:19-cv-05435-VM

PREPARED ONLY FOR OUTSIDE COUNSEL'S EYES
EXCERPT

# 4  US MARKET WITH MORE FRIENDLY REGULATORY AND POLITICAL ENVIRONMENT (2/2)

| | US | DTEU |
|---|---|---|
| **Services regulation**  | **Lax consumer protection, net neutrality allows zero-rating**<br>• Very relaxed consumer protection and data privacy policy<br>• Net Neutrality covers fixed and mobile operators (excl. B2B)<br>  • Allows for zero-rating[1]<br>  • "Specialized services" possible and could be prioritized[2]<br>• Policy driven by case law ("wait-and-see intervention") | **Strict consumer protection, net neutrality allows zero-rating**<br>• Very strict consumer protection and data privacy policy<br>• Net Neutrality requirements for all operators (mobile, fixed)<br>  • Allows for zero-rating[1]<br>  • Specialized services" possible and could be prioritized[2]<br>• Policy driven by coordinat. approach amongst regulators |
| **Market consolidation**  | **Large scale in-market consolidation currently not allowed**<br>• 4>3 mobile consolidation currently not allowed<br>• Large scale cable consolidation was put on hold<br>• FMC/Video consolidation likely to receive clearance | **Significant further in-market consolidation unlikely**<br>• EU Commission more skeptical towards 4>3 mobile consolidation<br>• Even FMC consolidation under scrutiny in some markets<br>• Commission with intense focus on keeping up competition |
| **Political environment** | **Overall stable political environment**<br>• No sudden regulatory measures for political purposes or to close budget gaps<br>• Changes in political powers do not lead to major alterations<br>• Enables long-term investment perspectives | **Very high political uncertainty in CEE**<br>• Special taxes, excessive fees etc. (e.g. HU, ROM)<br>• Nationalistic attitudes and critical towards foreign ownership<br>• Investment environment largely dependent on political parties in power<br>• Compliance issues in several CEE countries |



**LIFE IS FOR SHARING.**

[1] Zero-rating as long as non-discrimination of other similar services, e.g. video; however no throttling or prioritization of services allowed, e.g. video vs. rest of traffic   [2] Special services are considered as not being regular internet traffic (such as high-quality VoIP, IPTV) and can be treated differently; definition of "specialized services" not yet finalized in both regions
Source: DTAG, Team Analysis

23

Confidential Treatment Requested
P Ex 802

Case: 1:19-cv-05434-VM

TMUS-DOJ-00999509
Page 26



# 5  US CUSTOMERS SHOW HIGHER SPEND FOR TELCO SERVICES

**Market ARPUs 2014**
USD/month

Legend:
- Pay-TV[1]
- Fixed[2]
- Mobile[3]

- US mobile ARPUs on average around 3x higher than in DTEU footprint countries

- US fixed ARPUs on average more than 2.5x higher than in DTEU footprint countries

- US Pay-TV ARPUs on average more than 4x higher than in DTEU footprint countries

Chart data (Market ARPUs 2014, USD/month):

| | US | NL | AU | GR | HR | CZ | SK | PL | HU | RO |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 226 | 111 | 95 | 83 | 69 | 62 | 60 | 52 | 51 | 31 |
| Pay-TV | 85 | 23 | 24 | 31 | 16 | 16 | 17 | 17 | 13 | 7 |
| Mobile | 47 | 29 | 22 | 13 | 15 | 14 | 17 | 10 | 15 | 8 |

1 Includes subscription and on-demand revenue via cable, satellite, IPTV and DTT (excl. TV advertising) 2 Based on Mason data 3 Based on DTAG internal estimates
Source: DTAG, Team Analysis

**LIFE IS FOR SHARING.**

25

TMUS-DOJ-00999511
Page 28

Confidential Treatment Requested
P Ex 802

Case: 1:19-cv-05435-VM

PREPED ONLY FOR BACKUP PURPOSES

① **NEW MOBILE ENTRANTS WILL NOT BECOME RELEVANT PLAYERS**

## Trend factuals – excerpt

**MVNO subscriber market share**
%, 2014

TRACFONE  RedPocket MOBILE  Project Fi



| USA | NL | Austria | CZ Republic | Hungary | Poland | Greece | Croatia | Romania |
|-----|-----|---------|-------------|---------|--------|--------|---------|---------|
| 21 / 9 | 17 | | 5 | 2 | 2 | 1 | 0 | 0 |

MVNOs currently with 9% market share in the US telco market (vs. 15%+ in selected Western European countries)

US MVNO agreements based on commercial terms – all 4 mobile players will continue to engage in commercially rationale contracts

💬 *Telco is a scale game. Without regulatory and telco support it is almost impossible that new mobile entrants will be able to disrupt the industry.*
— *Expert interview*

💬 *Regulation won't support access seeker business models as the FCC values infrastructure investments over competition.*
— *Expert interview*

🔴 *European regulation likely to continue favorable regulation for access seeker business models*

T··· *Regulation likely to continue favorable regulation for access seeker business models*

**LIFE IS FOR SHARING.**

Source: Team Analysis, Expert Interviews, OVUM

### "So What" for TMUS

Trend can be disregarded to define a wining position for TMUS

- Continuation of status quo bears no disruption potential for TMUS
- Emergence of MVNO entrants unlikely – however, if they would emerge it bears a disruption potential for TMUS



33

TMUS-DOJ-00999519
Page 36

Confidential Treatment Requested
P Ex 802

Case: 1:19-cv-05435-VM

PREPARED IN ANTICIPATION OF LITIGATION
PRIVILEGED & CONFIDENTIAL – FOR DISCUSSION ONLY (SUBJECT TO REVISION)

# ⑨ US ARPUS WILL REMAIN ON MUCH HIGHER LEVEL THAN IN EU PORTFOLIO COUNTRIES

## Trend factuals – excerpt

**US Mobile service ARPUs,**
USD/month

48  49  47  45  44  43  42  42  41
12  13  14  15  16  17  18  19  20

—2% p.a.—

- Underlying driver for much higher US ARPUs is operator friendly US regulation that is expected to continue

**DTEU portfolio mobile service ARPUs,**
EUR/month

17  16  14  14  13  14  13  13  13  12  12  12  12
2011  12  13  14  15  16  17  18  19  2020

—4% p.a.—

- Despite slight decline in ARPUs – ARPUs will remain at much higher level than in DTEU portfolio countries

*Future mobile ARPUs expected to stabilize at lower levels in DTEU portfolio countries*

## "So What" for TMUS

Trend can be disregarded to define a wining position for TMUS

- Continuation of status quo bears no disruption potential for TMUS – US continues to be relatively more attractive than DTEU portfolio markets



41

1 Weighted average based on the service revenues per country
Source: Team Analysis

**· · ·  ᛐ··  LIFE IS FOR SHARING.**

Confidential Treatment Requested
P Ex 802

TMUS-DOJ-00999527
Page 44

# ⑩ MOBILE/MOBILE AND FMC CONSOLIDATION COULD CHANGE TELCO MARKET STRUCTURE

## Trend factuals – excerpt

**Mobile**
- TMUS + Sprint merger regarded as natural strategic move by all experts
- However, regulator unlikely to allow emergence of 3-player mobile market
  - Antitrust policy changing slowly as no direct political influence possible, any changes only likely in mid/long-term via changes in key personnel
- Consolidation also unlikely under new Democratic administration and only slight improvements vs. today expected under Republican government
- Dish's massive spectrum could lead to mid-term spectrum deal

**Fixed**
- Cable players under limited consolidation pressure, since they are winning broadband market share from traditional telcos
- No FMC consolidation focus due to limited geographic footprint of cable players (no country wide FMC possible) and given prohibition of previous cable mergers
- Many experts eventually expect a Verizon Comcast merger
- However, "ego issue" of several large market players hinders consolidation (e.g. VZ, Comcast do not want to give up control, Cox Comm. "not for sale")

**Video/ content**
- Further consolidation of video services seen as likely (e.g. content player + telco), long term success of integrated business models needs to be proven
- Telcos will not end up as content owners and aggregation role difficult due to very fragmented content distribution rights

Source: Team analysis, reports, expert interviews

**LIFE IS FOR SHARING.**

## "So What" for TMUS



- Trend is a scenario relevant wild card – with clear disruption potential for TMUS
- Sprint merger as natural strategic step to obtain scale – however, regulatory approval regarded as unlikely
- Further FMC consolidation might reduce addressable market share for TMUS as mobile only player (if AT&T launches FMC offer and Verizon attempts to merge with Comcast)

42

Confidential Treatment Requested
P Ex 802

TMUS-DOJ-00999528
Page 45

**PRIVILEGED AND CONFIDENTIAL PREPARED ONLY FOR INTERNAL PURPOSES**

# (11) FURTHER LONG-TAIL CONSOLIDATION TO BE EXPECTED IN THE FIXED NET MARKET

## Trend factuals – excerpt

**Manifold recent consolidation (attempts) among large cablecos[1]**

**COMCAST**
**Time Warner Cable** — Merger between Comcast (#1) and TWC (#2) prohibited

**Charter**
**Time Warner Cable**
**bright house** — Charter Comm. (#3) bought TWC (#2) and Bright House (#6)

**Altice**
**Suddenlink**
**CABLEVISION** — Altice bought CableVision (#5) and Suddenlink (#9)

[1] Ranking based on population covered in 2014
Source: Team Analysis, broadbandmap.com

---

- Continued long-tail consolidation to be expected

  - **Currently still over 400 cable providers in the US** (i.e., highly fragmented market)

  - **Many cable providers are subscale:** 93% of the cable providers operate in one state only and only 20 providers cover more than >1 mn people

> 💬 *Everything below Comcast is in consolidation mode*
>
> – D. Goei, (CEO, Altice)

---

## "So What" for TMUS

Trend can be disregarded to define a winning position for TMUS

- Continuation of status quo outside of Mobile market bears no disruption potential for TMUS



(Chart axes: Disruption Impact for TMUS — Low to High (vertical); Likelihood — Low to High (horizontal); marker "11" positioned low likelihood, low disruption)

43

---

**LIFE IS FOR SHARING.**

Confidential Treatment Requested
P Ex. 802

TMUS-DOJ-00999529
Page 46

PRE-READ ONLY / BACKUP HINTS

(12) **REGULATORY ENVIRONMENT REMAINS STABLE IN US AND EUROPE**

## Trend expectations – excerpt

|  | **US** | **DTEU** |
|---|---|---|
| Whole-sale | • Still no mobile wholesale obligation, thus no new disruptive market entries (MVNOs)<br>• No fixed wholesale regulation expected, thus no new market entries by access seekers (e.g., ULL) | • MVNO obligations will likely remain<br>• Fixed access regulation might become more lax but significant improvements yet to be seen |
| Consoli-dation | • 4>3 merger not expected in the short term<br>• Major cable consolidation rather unlikely given TWC-Comcast prohibition<br>• Cross-sector consolidation will likely get approval | • 4 player mobile markets will remain key objective of EU competition policy<br>• FMC consolidation will become more difficult |
| Services regulation | • Services regulation will remain rather lax, but potential increases in regulatory tendencies e.g. in consumer protection, net neutrality | • Current high level of regulatory intervention on telcos, application to OTTs seen as likely in the future |
| Political environ-ment | • Overall environment is stable, slight improvements possible with new Republican administration | • Overall environment mixed and no major improvements in stability or investment-friendliness likely |

*See trend 10 for further details*

Source: Team Analysis

**· · ·** **T · ·**   **LIFE IS FOR SHARING.**

---

## "So What" for TMUS

Stable trend, thus no disruption expected for TMUS – can be disregarded for scenario building

■ Continuation of status quo bears no disruption potential for TMUS

■ Monitoring of situation and active lobbying for mobile-mobile consolidation



44

# WRAP UP – US CONTINUES TO BE AN ATTRACTIVE MARKET DESPITE POTENTIAL WILD CARD TRENDS

**1** US continues to have more favorable macroeconomic environment vs. DTEU portfolio countries 

**2** US continues to be the larger market with relatively more attractive growth vs. DTEU portfolio countries 

**3** US continues to have less competitive market structure (e.g., no access seeker business model) vs. DTEU portfolio countries 

**4** US continues to have more operator friendly regulatory environment (i.e., to foster infrastructure invests) vs. DTEU portfolio countries 

**5** US customers will continue to have higher spend for telco services (e.g., US mobile ARPUs will remain ~ 22 EUR higher than in DTEU portfolio countries) 

Source: DTAG, Team Analysis

 **LIFE IS FOR SHARING.**

45

Confidential Treatment Requested
P Ex 802

TMUS-DOJ-00999531
Page 48

| From: | Ewens, Peter </o=Western Wireless Corp/ou=PCS/cn=User Accounts/cn=Finance /cn=WANewport/cn=PEwens> |
| To: | Legere, John |
| Sent: | 12/3/2015 1:29:47 PM |
| Subject: | FW: Thorsten |

John – as I mentioned below, Thorsten has hired McKinsey to give him independent perspective on US vs rest of Europe outside Germany. US is now much bigger portion of DT market cap than rest of Europe.

On the one hand, US market seems intrinsically more attractive in terms of growth, propensity to spend, ARPU's etc, on the other he is always concerned that US industry structure is broken and we could be headed down a path of commoditization that will make it even harder to improve returns on capital. Workshop today included me and a long-time partner in NY from McKinsey, who I really trust.

We spent some time on structure, but more time on industry conduct -- VZ's incentives, potential for Sprint to be irrational, and AT&T's seeming lack of stomach for the consumer wireless battle. As usual Thorsten sees ghosts in many places, but I think we collectively made progress on the idea that the industry is not about to melt down anytime soon – either from Sprint's behavior, Comcast entry in wireless, AT&T or VZ fighting back, Apple and other OEMs driving commoditization through eSIM, etc. I think it's important to stick with Thorsten on these topics because one of his ideas is that if we can't get 4-3 consolidation the industry is headed for commoditization and DT should limit their exposure in the US. Of course, they could do that by selling down – which would be ok with us, we just don't want the constraints on their exposure to come in the form of stricter capital limitations.

Peter

**From:** Peter Ewens
**Date:** Sunday, November 22, 2015 at 5:27 PM
**To:** John Legere
**Subject:** Thorsten

John – I spent some time with Thorsten when we were in Barcelona

He is very much thinking about what we need to be successful over a five year period. They are coming to grips with the idea that there may be no near-medium M&A solution and that it might actually be really good to own us for a while. A key element is getting comfortable that we can be successful as an independent wireless company without wireline – something they are not seeing in Europe. He has retained McKinsey (his idea, not mine) to do a couple of workshops in December to look at future US industry scenarios – first one is Dec 3. I will attend both.

Also, I will be on vacation this coming Tuesday and won't dial into SLT.

Peter

Confidential Treatment Requested
P Ex 796

| From: | Ewens, Peter </O=WESTERN WIRELESS CORP/OU=PCS/CN=USER ACCOUNTS/CN=FINANCE/CN=WANEWPORT/CN=PEWENS> |
| To: | Stern, Steffen |
| CC: | Roettgering, Mark |
| Sent: | 12/10/2015 8:29:02 PM |
| Subject: | Re: AW: AW: Workshop |

Steffen – I think doc ok. Perhaps we can chat for a few minutes on Monday – 7:30am my time, 4:30pm your time?

Mark Roettgering leads our Pricing group.

Mark – Steffen works for Thorsten Langheim in DT Strategy and may have a few questions on how we think about pricing and our process. In particular, I think questions about how to avoid the kind of deep price battles DT has seen in Europe are likely top of mind.

Peter

**From:** "Stern, Steffen"
**Date:** Thursday, December 10, 2015 at 5:50 AM
**To:** Peter Ewens
**Subject:** AW: AW: Workshop

Peter,

pls find attached a first draft version of the workshop document. As you can see, we are now going with a very slim deck. We will add a few backup pages for the "end game" options – to come asap.

Please let me know if you have any comments / changes / additions. Happy to jump on a call to discuss.

Best,
Steffen

PS: Is there a contact person in TMUS you could recommend for an exchange on TMUS' pricing strategy? (see email below)

**Von:** Ewens, Peter
**Gesendet:** Montag, 7. Dezember 2015 18:16
**An:** Stern, Steffen
**Betreff:** Re: AW: Workshop

Steffen – I think the plan is fine. As you learned, the slides are helpful but what Thorsten really wants is the discussion.

Just a couple notes:

- The strategy options are all about timeframe. In the 10-year timeframe we are unlikely to be an independent company with our current ownership configuration, but I think it's very important to establish that while competition will get incrementally harder each year as we capture the easiest switchers, there is unlike to be a big structural change to industry profit pools in the next 2-3 years – for all the reasons we discussed. Therefore the "no regrets" organic strategy is to continue smart growth for as long as possible. We can discuss more when we talk.
- TMUS+TWC – I think you mean TMUS+New Charter. Charter is in a three way merger with TWC and Brighthouse, likely to close mid-2016
- It's also possible, although harder, for a joint bid for TMUS by Comcast and New Charter

- TMUS+Dish may not be a 10-year end game, but it extends our runway several years with an unbeatable spectrum position – so we have to include it as an option

**From:** "Stern, Steffen"
**Date:** Monday, December 7, 2015 at 8:55 AM
**To:** Peter Ewens
**Subject:** AW: Workshop

Peter,

for the upcoming workshop on Dec. 16th, we wanted to keep the slide material rather slim (as a learning from workshop 1 ;)). Focus is on 3 key agenda points:

1) Workshop 1 recap: Market attractiveness US vs. EU, and TMUS challenge
2) Future competitive dynamics US
3) TMUS options

Detailed agenda with first hypotheses on messages below.

In terms of next steps, I would propose the following:
- we start to create a few slides to have a basis for a structured discussion
- we align with you starting ca. mid of this week to jointly bring the document to a good shape for next week's workshop
- Intensity of iterations as needed

Would that work for you?

One additional request: In the workshop, you mentioned TMUS' outstanding pricing analytics & skills. A team in Group Strategy is currently working on pricing questions and would love to get in touch with one of your experts. Can you recommend a contact for us?

Best regards,
Steffen

----


**Workshop I recap (45mins)**
\*\*\* slide 1: US market is and will be more attractive than DTEU portfolio markets
    (Summary of market structure and trend discussion from WS 1)
\*\*\* slide 2: TMUS not in a sustainable position to win in US (ROCE < WACC)
    (Showing ROCE vs. WACC in US for 2014 and 2019E, FCF profile, scale issue)
\*\*\* slide 3: *Hypothesis tbc -* Capital market values subscriber growth and tapping into new growth areas (e.g., advertising/video)
    (Mapping of valuation/market cap for key telco players over time with major moves - e.g., AT&T buying DTV, VZ buying AOL)

**Competitive dynamics (1h)**
\*\*\* slide 4: Several distinct player moves can shape US telco market going forward
    (Outline of potential moves for AT&T, VZ, Sprint, Comcast, TWC group)
\*\*\* slide 5: Select player moves will likely go hand in hand - most moves will further weaken TMUS position (if we do not react)
    (clustering of competitive player dynamics according to joint occurrence, implication for TMUS position if we do not react)

**TMUS options to define a winning position (1h)**
\*\*\* slide 6: X options emerge for TMUS in light of competitive dynamics
    (outline/clear definition of option space for TMUS)
\*\*\* slide 7: Y options  recommended for further investigation

Confidential Treatment Requested
P Ex 800

(Qualitative evaluation of options according to (i) strategic viability, (ii) increasing ROCE, (iii) increasing capital market valuation)
*** slide 8-13: One pager deep dives for options that are recommended for further investigation (potentially backup in actual WS)
*** slide 14: At a glance summary of key questions that need to be answered for further option evaluation
*** slide 15: Preliminary outline of short and mid-term TMUS measures to (i) increase optionality (ii) prepare for specific market developments
   (timing of options and outline where we want to be market shaper vs. follower)


**Wrap up and alignment on potential next steps (15mins)**


---

In terms of long-term market consolidations that TMUS could participate in, I currently see:
-   TMUS + Sprint
-   TMUS + Comcast
-   TMUS + TWC

Dish comes as an "add-on optionality" to add spectrum and TV customers, but not an structural end-game consolidation move as such.


**Von:** Stern, Steffen
**Gesendet:** Montag, 7. Dezember 2015 08:56
**An:** Ewens, Peter
**Betreff:** AW: Workshop

Hi Peter. Thank you for your participation in last week's workshop. Please find attached the final doc.

I will approach you later today regarding how to best tackle Workshop 2 which will come up on Dec. 16th.

Challenge will be to provide Thorsten with a clear "so what" even though there is a significant amount of influencing factors in the market which are hard to predict...

Best Steffen


**Von:** Ewens, Peter
**Gesendet:** Samstag, 5. Dezember 2015 00:15
**An:** Stern, Steffen
**Betreff:** Workshop

Steffen – thanks for all your preparation for the workshop. Can you send an electronic copy of the final doc?

thanks

Case: 1:19-cv-05435-VM

P_EX_386

Page 1

# DEUTSCHE TELEKOM SUPERVISORY BOARD MEETING

VIENNA, SEPTEMBER 5TH, 2018

DRAFT 3

ERLEBEN, WAS VERBINDET.

# CONTENT

**01** WE ARE LIVING IN A NICE HOUSE, BUT IN A BAD NEIGHBOURHOOD....

**02** LITTLE CREDIT FOR BEING THE BEST POSITIONED OPERATOR IN EUROPE

**03** DT NOT A "ONE TRICK" COMPANY

**04** FMC IS POWERFUL – BUT RELEVANCE AND ABILITY TO PLAY DIFFERS ACROSS MARKETS

**05** QUO VADIS PORTFOLIO: CONSISTENT CAPITAL ALLOCATION

**06** FOCUS TOPICS 2018/19

ERLEBEN, WAS VERBINDET.



P_EX_386

# DT OUTPERFORMED PEERS IN AN INCREASINGLY DIFFICULT TELCO MARKET ENVIRONMENT



Case 1:19-cv-05434-VM-RWL   Document 351   Filed 12/23/19   Page 101 of 112

# THESE LAST MONTHS DT HAS DECLINED IN VALUE, BUT STRUGGLED LESS THAN MOST EU PEERS

**Market cap performance** (Aug '17 – Aug '18 in local currency)



Source: CapitalIQ, market caps dated 30.08.2017 vs. 10.08.2018; Charter by Goldman Sachs; 1) MDU (incl. Altice);
2) Altice 2018 PF combining both EU and US Equity Value —— Source: DT M&A comps

**ERLEBEN, WAS VERBINDET.**

Key trends impacting DT:
- Global Telco sector
- EU Telco sector
- DT issues

Strictly confidential

P_Ex_386

Page 8

Case: 1:19-cv-05435-VM

# THE EU TELCO SECTOR TURNING POINT WAS 2015

🌐 Global Telco sector

**Investors' hopes until 2015:**

- EU single market and regulatory reform hopes
- Market consolidation fantasies
- Appropriate and certain returns on investment



- Market growth (increasing smartphone/4G penetration)
- Value accretive M&A (TMUS/Metro, AT&T/Leap)
- Cable broadband and video growth

**What investors got:**

Market cap: indexed to 100 per 01.01.2010

EU Peak



+266%

+116pp

-70pp



+6%

**EU Telcos lost €115bn in value since peak**

Source: CapitalIQ, Morgan Stanley, EU/Telcos include Deutsche Telekom, BT (group, telefonica, Orange, Telecom Italia, Vodafone US Telcos include T-Mobile, Sprint, AT&T, Verizon, Charter, Altice USA, Comcast

**ERLEBEN, WAS VERBINDET:**

Strictly confidential –

9

# A TOXIC STORY HAS LED TO CONTINUOUS EU TELCO SECTOR DE-RATING



● EU Telco sector

## EU Telco pressure points...

### Adverse Regulation

- Blocked in-market deals
- Infra freeriding (UI, Sky, VFUK)
- Wholesale obligations (AT, CZ)

- Enforced 4th player market entry (NL, IT, BE, DE?)
- FMC play killed (UK)
- Net neutrality limitations (US vs EU)

### Investment Overhang

- FTTH
- 5G
- → Public pressure on uneconomic buildouts

### Lack of Scale

- Fragmented markets; inferior scale economics vs. US
- No cross-border consolidation/politics

### Decelerating Growth
Year-on-Year NTM EBITDA Growth (%)

4.4%  2015
1.9%  2018

## ... fueling sector de-rating

EU Telcos[2]: EV / NTM EBITDA (x)



7.4x

1x de-rating

6.4x

8.0
7.5
7.0
6.5
6.0
5.5

2015   2016   2017   2018   (Jan)

Source: Capital IQ as of 06-Aug-2018; Broker research.
Notes: 1. Average growth rate as per broker projections in respective years; 2. Deutsche Telekom. Telefónica Deutschland and Telecom Italia (weighted by sales initiative at operating level). Vodafone. Proximus, KPN, Orange and Swisscom; European telcos included DT, Telefónica, Orange, BT and Vodafone.



ERLEBEN, WAS VERBINDET.

Streng vertraulich

P_EX_386

Page 10

10

Case: 1:19-cv-05435-VM

# REGULATION IS AT THE CENTER OF TELCO VALUE CREATION – EVAPORATING €14BN OF DT MARKET CAP

 EU Telco sector

Regulatory intervention in market consolidation

- Failed mobile consolidation

   withdrawn

  prohibited

 withdrawn

- Approved, but subject to significant remedies

  approved, subject to establishment of 4th MNO

- Increased pressure on incumbents – DT value impacted

  - Regulatory measures impacting DT value:
    - Mobile and Fixed Termination Rates
    - Roaming retail and wholesale price regulation
    - Regulatory induced fixed line losses
    - Regulatory induced mobile market share losses



FCF impact
**€ 1bn**  ⟹  Market cap impact
**€ 14bn**

(EC valuation pending)

- Strictly confidential -

Page 11

ERLEBEN, WAS VERBINDET.





Case 1:19-cv-05435-VM-RWL Document 351 Filed 12/23/19 Page 105 of 112

# THE US TELCO MARKET REMAINS MORE ATTRACTIVE THAN EUROPEAN PORTFOLIO MARKETS

## US market more attractive

| | | US | Europe |
|---|---|---|---|
| More favorable macroeconomic environment [1] | GDP capita | ~€51k | ~€19k[3] |
| Customers show higher spend for Telco services [2] | Mobile ARPU | €36 | €11 |
| Larger market with more attractive growth prospects [2] | Mobile Revenue | €47bn | €6bn |





**More friendly regulatory environment fostering investments**

- ✓ Infrastructure focus
- ✓ High reliability

- ✗ Competition and consumer focus
- ✗ High uncertainty





**Market with limited competition and different structure**

- ✓ No nationwide fixed / no overbuild
- ✓ No/weak MVNOs

- ✗ Nationwide incumbents with overbuild
- ✗ Strong MVNOs






1) Year 2017; 2) Q1 2018 market (TowerIRa) and ARPU; 3) DT Footprint GDP per capita calculated based on aggregation of GDP figures for DT EU subsidiaries (CZ, GR, SK, CRO, PL, HU, AT, MK, NL, ME, and HR), weighted on respective aggregated population. Source: DTAG, Statista, Analyst Mason.

ERLEBEN, WAS VERBINDET.

Streng vertraulich –



# TMUS SHOWS ORGANIC PERFORMANCE AMID M&A DISTRACTIONS OVER THE LAST 12 MONTHS

**Outperforming on Net Adds with record low Churn**

Branded Postpaid Net Adds (x1000)

817    Q2-17

1,017    Q2-18    +24%

Branded Postpaid Churn

1.10 %    Q2-17

0.95 %    Q2-18    -0.15 pp

**Sustained revenue growth**

Branded Postpaid Revenue (in $ bn)

4.8    Q2-17

5.2    Q2-18    +7%

TMUS target share price (in $)[1]

$72    Aug 17

$78    Aug 18    +9%

Source: Company public filings –
1) 0-18 month target price

ERLEBEN, WAS VERBINDET.

– Strictly confidential –

# PATIENCE – OFF OVER THE LAST 4 YEARS – SMART DEAL STRUCTURE PROVIDES CONTROL

## TMUS significantly improved its relative position to Sprint

Market cap: TMUS vs. Sprint (in $ bn)



Legend: TMUS / Sprint

- Jul-14 — Sprint rumors: $26 bn / $32 bn
- Nov-17 — Discussions terminated: $49 bn / $27 bn
- Apr-18 — Pre-leak: $52 bn / $21 bn

Relative position improved by $37bn

## Creative deal structure enables DT to control New TMUS

VOTING
- T··Mobile 42%
- SoftBank 27%
- Free Float 31%
- 69%

New TMUS (OpCo)

Shareholder ownership
- T··Mobile 67%
- Sprint 33%

Source: CapitalIQ per 09.04.2018 and 15.07.2014; 1) Total branded customers Q2 2014 vs. Q1 2018; Sprint Q1 2018 figures excludes Lifeline subscribers

ERLESEN, WAS VERBINDET

Streng vertraulich

P_EX_386

Case: 1:19-cv-05435-VM

Page 27

27

# SIGNIFICANT VALUE UPSIDE AHEAD – IN DEAL AND NO-DEAL SCENARIOS

No deal / standalone scenario provides valuation floor for TMUS above current share price



Market cap ($ bn)

**DEAL**

$66/share[1]

Up to +37%

Up to $90/share

| TMUS (pre-leak) | Sprint (pre-leak) | Synergy NPV | Total New TMUS |
|---|---|---|---|
| 52 | 21 | Up to 43 | Up to 116 |

**UP TO ~ $24 PER TMUS SHARE ACCRETION**

**NO DEAL SCENARIO**

FCF Growth[2] (in $ bn)

$66/share[1]
7.3x EBITDA

+11%

$73/share
7.5x EBITDA[3]

| 2018E | 2023E |
|---|---|
| 3.4 | 7.1 |

$70bn share buybacks

**~$1-12 PER TMUS SHARE ACCRETION[5]**

**BUT INVESTORS CURRENTLY WAIT FOR A DECISION → SHARE PRICE MOVING SIDEWAYS**

Notes:
1) As of 10.08.2018
2) Based on TMUS projections on a standalone basis using 2018 FCF guidance provided by TMUS management
3) Illustrative forward AV/Cash EBITDA multiple assumption in-line with current 7.0x – 8.0x range
4) Announced $9.0bn share buyback program + $1.5bn share buyback already occurred; an additional $0.5bn expected in Q4 18 (timing ahead of deal)
5) Reflects premium of discounted equity value per share by (low – 8.0x AV/Cash EBITDA multiple; above current TMUS price of $60.00) per share as at 31.08.2018,
   discounted equity value based on 2020E FV multiple AV/Cash EBITDA discounted at 8.0% cost of equity)

ERLEBEN, WAS VERBINDET.
– Streng vertraulich –

# THE DEAL STRUCTURALLY IMPROVES TMUS MARKET POSITION ALSO FOR FUTURE M&A

**Reduced the gap with AT&T and Verizon**

Aug-17 vs. Aug-18 Market cap (in $ bn)

| | | | | | | |
|---|---|---|---|---|---|---|
| at&t | 231 / 234 | | | | | |
| verizon | 196 / 217 | | | | | |
| Sprint T·· | 123 | | | | | |
| T·· | 53 / 55 | | | | | |
| Sprint | 33 / 25 | | | | | |
| d·sh | 27 / 16 | | | | | |

Including $43bn synergy upside

**Position vs Cable improved given value decline**

## CABLE PLAYERS COME INTO REACH – BUT QUESTION IF AND WHEN NEEDED?

| | Aug-17 | Aug-18 |
|---|---|---|
| COMCAST | 192 | 161 |
| Sprint T·· | 123 | 121 |
| Charter [1] | 71 | |
| altice | 23 | 13 |

Source: CapitalIQ per 30.08.2017 and 30.08.2018.
1) Charter values by Goldman Sachs, calculated based on fully diluted shares

ERLEBEN, WAS VERBINDET.

P_EX_386

Page 29

29

Strictly confidential

# EXECUTIVE SUMMARY

**1) WE ARE LIVING IN A NICE HOUSE, BUT IN A BAD NEIGHBOURHOOD....**

- DT share price outperformed its EU peers over last years and remains largest EU Telco
- Global Telco shares hit by increasingly difficult market environment characterised by low growth, high leverage and increasing regulatory concerns
- EU Telco de-rated since 2015 peak driven by "toxic" sector trends, in particular higher regulatory uncertainty
- DT is facing specific issues, notably high investments, indirect cost challenge, "Schwarzer Peter" risk in fibre, and T-Systems FCF drag
- Weak sector trends and DT issues result in DT ex-USA ("Plump") devaluation

**2) TODAY WE GET LITTLE CREDIT FOR BEING THE BEST POSITIONED OPERATOR IN EUROPE OUTINVESTING PEERS**

- DT portfolio superior to peers (well balanced with unique US assets and no EM exposure, out-investing peers, with all assets growing)
- We have been doing the right things (FMC deals, out-investing peers with sustainable growth in reach at DE and EU)
- However, DT valuation still in line with peers as investors not paying for DT's superior portfolio and outlook, yet
- Given weak Telco environment, strong execution with tangible results now required to convince markets to improve DT share price beyond current level

**3) DT NOT A "ONE TRICK" COMPANY – THUS AS A HEDGE AGAINST EU REGULATION AND PRESSURE TO BUILD OUT FIBRE EVEN IF UNECONOMICAL**

- US market remains more attractive than European portfolio markets offering strong organic growth opportunities
- Plan A (deal with $43bn synergies) and Plan B (standalone with share buyback) offer material US upside, but the market waits for regulatory outcome before putting money to work

**4) FMC IS POWERFUL – BUT RELEVANCE AND ABILITY TO PLAY DIFFERS ACROSS MARKETS**

- FMC is powerful, but it manifests itself very differently across the world
- The regulatory position is a key factor for FMC to play out and we allocate capital accordingly

**5) QUO VADIS PORTFOLIO: CONSISTENT CAPITAL ALLOCATION – "PREDICTING THE UNPREDICTABLE"**

- We have delivered on our promises last year (M&A in US, AT, NL and FMC deals in CEE, further development of Towers, NL and DTCP)
- BT remains challenged and may need to consider NatCo strategy
- MNO NetCo spin-offs / Activists break-up play – The EU Telco late? No quick "one size fits all" answer for all markets and assets

**6) WHAT KEEPS US BUSY IN 2018/19**

- We stick to our M&A playbook – EU leading Telco (M&A reflecting sector risk requires patience)
- Remain focused on closing US and NL deals
- Stay ahead of the curve on sector trends like NetCo spin-offs and be prepared for Activism

ERLEBEN, WAS VERBINDET.

P_Ex_386

– Strictly confidential –

Page 1

1
2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3
    Case No.: 1:19-cv-05434 (VM)
4
5   - - - - - - - - - - - - - - - x
                                   )
6   STATE OF NEW YORK, STATE OF     )
    CALIFORNIA, STATE OF COLORADO,  )
7   STATE OF CONNECTICUT, STATE OF  )
    COLUMBIA, STATE OF MARYLAND,    )
8   STATE OF MICHIGAN, STATE OF     )
    MISSISSIPPI, COMMONWEALTH OF    )
9   VIRGINIA, and STATE OF WISCONSIN )
                        Plaintiffs, )
10                                  )
    -against-                       )
11                                  )
    DEUTSCHE TELEKOM AG, T-MOBILE US )
12  INC., SPRINT CORPORATION and    )
    SOFTBANK GROUP CORP.,           )
13                      Defendants. )
    - - - - - - - - - - - - - - - x
14
15              Friday, October 18, 2019
                9:40:a.m.
16
17
18
19              VIDEO DEPOSITION OF HANNES WITTIG,
    taken by Plaintiff State of New York, held at
20  Gibson, Dunn & Crutcher LLP, Telephone House
    2-4, Temple Avenue, London EC4Y, United Kingdom
21  reported by Chanelle Malliff, Realtime Court
    Reporter of the United Kingdom and Europe.
22
23
24
25

Page 134

HANNES WITTIG

1
2 of that.
3 BY MS. WESSELS-YEN:
4    Q.   Is that what you did when you were an analyst?
5        MR. SOVEN: Objection.
6    A.   This is -- I think my bank wanted me to do that
7 sometimes, so they can create business, but I didn't do it.
8 I described -- as an analyst I was truthful and my
9 motivation was not to -- he is a specialist. It's
10 different. Specialists are on the sales side of the
11 business.
12 BY MS. WESSELS-YEN:
13    Q.   Let's go back and look at tab G for one -- oh, I'm
14 sorry, I'm referencing tab G. Let's look at Exhibit 10 for
15 a second please. You can tell it's getting to the middle of
16 the afternoon.
17    A.   Going back to my friends at McKinsey.
18    Q.   Well, I had a follow-up question about that
19 document actually. I think you testified earlier you
20 thought that McKinsey had put the document together.
21    A.   That's my understanding, yeah.
22    Q.   What's that understanding based on?
23    A.   Well it was characterized at the time as a
24 McKinsey workshop. I remember this. McKinsey participated
25 in this workshop. They wouldn't participate in a workshop

Page 135

HANNES WITTIG

1
2 that they are not hosting. So my understanding was that
3 it's a McKinsey-led presentation. And there are many
4 participants of McKinsey on that list of people, so I think
5 what I can see in front of me confirms my impression.
6 I need to check again. For instance in that e-mail I say
7 "McKinsey summary" at the end. That's Exhibit 11 anyway.
8 But it's just what I remember.
9    Q.   Were you in any way involved with creating that
10 document?
11    A.   No.
12    Q.   Were you involved with reviewing that document?
13    A.   No.
14    Q.   Is it possible that some of your DT colleagues
15 could have created that document?
16        MR. SOVEN: Objection to form.
17    A.   I don't know.
18 BY MS. WESSELS-YEN:
19    Q.   Is it possible that some of them could have
20 reviewed the document and made changes to it?
21        MR. SOVEN: Objection to form.
22    A.   A McKinsey presentation usually asks for input
23 from the company and then presents it as a view of McKinsey.
24 That's what consultants do. I was a McKinsey consultant
25 myself. That's what they do.

Page 136

HANNES WITTIG

1
2 BY MS. WESSELS-YEN:
3    Q.   Is it possible that some of DT's colleagues could
4 have added information to the document as well?
5        MR. SOVEN: Objection to form.
6    A.   Generically possible. I think there are pages
7 where DTAG is mentioned as a source, and there are many
8 pages where DTAG is not mentioned as one of the sources. So
9 I guess we should go by that. Because if it's this explicit
10 mentioning of DTAG, and there is also other pages that do
11 not mention it. And from what I can see it's -- but anyway,
12 I don't know simply.
13 BY MS. WESSELS-YEN:
14.    Q.   DT has incorporated some of the material from this
15 workshop PowerPoint into its own presentations to its board;
16 correct?
17        MR. SOVEN: Objection to form.
18    A.   I think some former seem to have been referenced
19 in future research or presentations, that's correct, from
20 what I can see, but I was not involved in that, neither in
21 this presentation nor in other presentations I used any of
22 this material. I personally never used any of this
23 material.
24 BY MS. WESSELS-YEN:
25    Q.   But if you put the page 17 of the workshop

Page 137

HANNES WITTIG

1
2 PowerPoint next to page 25 of the board presentation they're
3 substantially similar, aren't they?
4        MR. SOVEN: Objection to form.
5    A.   I see what you are seeing and, as I said just now,
6 it's possible that some of these pages were -- or it seems
7 some of these pages were apparently, let's say, used as
8 frameworks in future -- to structure future discussion. But
9 that's all we can say. And I can't -- I didn't do it, so
10 I don't know. But they look similar.
11 BY MS. WESSELS-YEN:
12    Q.   Let's mark a new document.
13        (Exhibit 14 marked for identification.)
14        This is Wittig Exhibit 14, an e-mail chain with
15 the beginning Bates number DT-DOJ-00031121 through 00031126.
16        If you would please take a moment to review the
17 e-mails, as well as the, at least the final page of the
18 JPMorgan discussion, please, Mr. Wittig?
19    A.   Okay. There's obviously a lot in there so ...
20    Q.   Yes. Let's look first at the JPMorgan discussion
21 and this is an e-mail from January 4, 2017 with a JPMorgan
22 newsletter. If you could look at the final bullet point in
23 that e-mail, the one that says:
24        "If Sprint and T-Mobile merge, a much better MVNO
25 rate could be the price of cable support for the deal."

35 (Pages 134 - 137)