**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, *et al*.,

                *Plaintiffs*,

     v.

DEUTSCHE TELEKOM AG, *et al*.,

              *Defendants*.

Case No. 1:19-cv-5434-VM-RWL

**PLAINTIFFS' RESPONSE TO STATEMENT OF INTEREST
OF THE UNITED STATES**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 3

    I.    Congress Gave States an Independent Role in Enforcing the Antitrust Laws. .......... 3

    II.   The Plaintiff States Have a Unique and Comprehensive Understanding of the Public Interest at Stake in the Merger at Issue. .................................................... 6

    III.  This Court Should Not Defer to the Federal Government's Current Views on the Merger. ........................................................................................................ 9

    IV.  Enjoining the Merger Is the Only Relief That Will Protect the Public Interest. ................................................................................................................ 13

CONCLUSION.......................................................................................................... 15

i

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982) ................................................................................4

*Boardman v. Pacific Seafood Grp.,*
    822 F.3d 1011 (9th Cir. 2016) .............................................................14

*Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.,*
    441 U.S. 1 (1979) ..............................................................................4, 5

*California v. American Stores Co.,*
    495 U.S. 271 (1990) .......................................................................3, 4, 5

*California v. Federal Power Comm'n,*
    369 U.S. 482 (1962) ................................................................................5

*California v. Valero Energy Corp.,*
    No. 17-03786, 2017 U.S. Dist. LEXIS 138095 (N.D. Cal. Aug. 23, 2017) ............................6

*Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.,*
    753 F.2d 1354 (6th Cir. 1985) .............................................................15

*Consolidated Gold Fields PLC v. Minorco, S.A.,*
    871 F.2d 252 (2d Cir. 1989) ............................................................ 14-15

*Georgia v. Pennsylvania R. Co.,*
    324 U.S. 439 (1945) ............................................................................3, 4

*Hartford Fire Ins. Co. v. California,*
    509 U.S. 764 (1993) ................................................................................5

*Natural Res. Def. Council v. EPA,*
    643 F.3d 311 (D.C. Cir. 2011) .............................................................12

*New York ex rel. Schneiderman v. Actavis PLC,*
    787 F.3d 638 (2d Cir. 2015) .............................................................5, 14

*Sam Fox Publ'g Co. v. United States,*
    366 U.S. 683 (1961) ................................................................................4

*SAS Institute, Inc. v. World Programming Ltd.,*
    874 F.3d 370 (4th Cir. 2017) ...............................................................14

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943) ...............................................................................12

ii

**Cases**                                                                    **Page(s)**

*United States v. Marine Bancorporation, Inc.*,
    418 U.S. 602 (1974)........................................................................................8

*United States v. Pabst Brewing Co.*,
    384 U.S. 546 (1966)........................................................................................8

*United States v. Philadelphia Nat'l Bank*,
    374 U.S. 321 (1963)....................................................................................9, 14

**Statutes**

15 U.S.C.
    § 15a.............................................................................................................3
    § 15c.............................................................................................................3
    § 18...........................................................................................................8, 9
    § 18a.............................................................................................................4
    § 26.............................................................................................................3

**Administrative Materials**

Memorandum Opinion & Order, *In re Applications of T-Mobile US Inc., and
    Sprint Corporation*, WT Docket No. 18-197 (Nov. 5, 2019),
    https://docs.fcc.gov/public/attachments/FCC-19-103A1.pdf ......................... passim

Staff Analysis & Findings, *In re Applications of AT&T Inc. and Deutsche Telekom
    AG*, WT Docket No. 11-65 (Nov. 29, 2011), https://www.fcc.gov/proceedings-
    actions/mergers-transactions/att-and-t-mobile ..........................................................10

**Miscellaneous Authorities**

Amanda Dixon, *America's 15 Largest Banks*, Bankrate (May 30, 2019),
    https://www.bankrate.com/banking/biggest-banks-in-america/ ................................7

Antitrust Modernization Comm'n, *Report and Recommendations* (Apr. 2007),
    https://govinfo.library.unt.edu/amc/report_recommendation/amc_final_report.pdf ................5

Assistant Attorney General Makan Delrahim, Keynote Address at American Bar
    Association's Antitrust Fall Forum (Nov. 16, 2017),
    https://www.justice.gov/opa/speech/assistant-attorney-general-makan-
    delrahim-delivers-keynote-address-american-bar..........................................................11, 12

Department of Justice, *Horizontal Merger Guidelines* (Aug. 2010),
    https://www.justice.gov/atr/horizontal-merger-guidelines-08192010#10 ..............................11

**Miscellaneous Authorities**                                               **Page(s)**

*Global 2000: The World's 20 Largest Tech Companies In 2019*, Forbes,
    https://www.forbes.com/pictures/5cd078aa2b86450008c5ba35/2019-global-
    2000-technolo/#37be3af3a807 .........................................................................................7

H.R. Rep. No. 94-499 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2572 ........................................3

Harry First, *Delivering Remedies: The Role of the States in Antitrust Enforcement*,
    69 Geo. Wash. L. Rev. 1004 (2001) ......................................................................................5, 8

Michael J. De La Merced, *AT&T Ends $39 Billion Bid for T-Mobile*, N.Y. Times
    (Dec. 19, 2011), https://dealbook.nytimes.com/2011/12/19/att-withdraws-39-
    bid-for-t-mobile/ ......................................................................................................................10

Michael J. De La Merced, *Sprint and SoftBank End Their Pursuit of a T-Mobile
    Merger*, N.Y. Times (Aug. 5, 2014), https://dealbook.nytimes.com/2014/
    08/05/sprint-and-softbank-said-to-abandon-bid-for-t-mobile-us/ ...........................................10

Nancy Levin, *10 Largest Media Companies in the World* (Nov. 4, 2019),
    https://largest.org/technology/media-companies/ .....................................................................7

Press Release, DOJ, *Justice Department Files Antitrust Lawsuit to Block AT&T's
    Acquisition of T-Mobile* (Aug. 31, 2011), https://www.justice.gov/opa/pr/justice-
    department-files-antitrust-lawsuit-block-att-s-acquisition-t-mobile ........................................10

Stephen Calkins, *Perspectives on State and Federal Antitrust Enforcement*,
    53 Duke L.J. 673 (2003) ............................................................................................................8

U.S. Census Bureau, *Percent Urban and Rural in 2010 by State*,
    https://www.census.gov/programs-surveys/geography/guidance/geo-areas/urban-
    rural/2010-urban-rural.html ......................................................................................................6

**INTRODUCTION**

The Plaintiff States respectfully submit this response to the "Statement of Interest" filed by the federal government. *See* ECF No. 348. Plaintiffs demonstrated at trial that the proposed merger of two of the four national wireless carriers, T-Mobile and Sprint, would harm consumers nationwide by raising prices and decreasing the quality of wireless service from what they would have been without the merger. On the last day of trial, the federal government, which is not a party to this case but has been aware of it since the filing of the complaint more than six months ago, filed a "Statement of Interest" asking the Court to defer to the federal government's view that the proposed merger should be approved. No such deference is warranted.

The States have a special role in enforcing the antitrust laws on behalf of the public. The Supreme Court has made clear that neither the States nor this Court need defer to the federal government's approval of a merger. The States are independent enforcers of the antitrust laws, and it is the role of the Court—not any federal agency—to decide the lawfulness of the merger.

Contrary to the federal government's arguments, the Plaintiff States possess a broad perspective that is more than sufficient to evaluate the public interests affected by the proposed merger. The Plaintiff States represent more than 40% of the national population and a broad cross-section of interests, including almost a third of the national rural population and nearly half the national urban population. It was only after an intensive fifteen-month investigation and careful consideration of all those interests that the States concluded that the public detriments from the substantial anticompetitive effects of the proposed merger outweigh any incidental benefits of the federal government's conditions for approving the merger, including purportedly faster expansion of 5G wireless service in rural areas.

There are several other reasons why this Court should not defer to the federal government's approval of the merger. *First*, the federal agencies applied different standards from the standard this Court must apply in determining whether the proposed merger is lawful under the Clayton Act. A prosecutorial decision by the U.S. Department of Justice (DOJ) not to challenge a transaction is not a determination that the proposed merger is lawful under the Clayton Act; the same is true of a decision by the Federal Communications Commission (FCC) to approve a merger. *Second*, the federal government's approval of the merger here is inconsistent with its own past determinations rejecting similar four-to-three mergers in the wireless market, and DOJ's public statements that the kinds of remedies on which the government conditioned its merger approval here cannot effectively eliminate or mitigate the transaction's substantial anticompetitive effects. *Third*, the federal government approved the merger with what appears to be only a cursory examination of the approval conditions, without the discovery and sworn testimony related to DISH's or T-Mobile's abilities to deliver on their commitments that the Plaintiff States took in this case.

In light of the anticompetitive effects that the merger will have even with the federal government's conditions, this Court should enjoin the merger. There is no adequate relief for the States other than enjoining the transaction in its entirety, and there is ample precedent for such an injunction.

**ARGUMENT**

**I.      Congress Gave States an Independent Role in Enforcing the Antitrust Laws.**

Congress gave the States an independent role in enforcing federal antitrust laws on behalf

of the public. The States may do so through injunctions of anticompetitive actions, as in this case,

*see* 15 U.S.C. § 26, or through suits for damages, *see id.* § 15c.[1] The Supreme Court has

emphasized that state enforcement of federal antitrust laws "was in no sense an afterthought; it

was an integral part of the congressional plan for protecting competition." *California v. American*

*Stores Co.*, 495 U.S. 271, 284 (1990). The purpose of giving States and private parties an

enforcement role was "'not merely to provide private relief,'" but "'to serve as well the high

purpose of enforcing the antitrust laws,'" by complementing federal enforcement. *Id.* (quoting

*Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100, 130-31 (1969)). The state

enforcement provisions also permit recovery of attorneys' fees, 15 U.S.C. §§ 15c, 26, which was

"intended to reiterate congressional encouragement" for state enforcement, H.R. Rep. No. 94-499,

at 20 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2572, 2589-90.

Congress's grant to States of independent enforcement authority is consistent with

federalism. When anticompetitive measures have injured the economy of a State, Congress

authorized the State to bring suit to protect the economic interests of its citizens. *See Georgia v.*

*Pennsylvania R. Co.*, 324 U.S. 439, 447 (1945). The States' independent enforcement role ensures

that "the State need not wait for the Federal Government to vindicate the State's interest in the

---

[1] Section 15c gives the States an exclusive cause of action to sue "as parens patriae on behalf of natural persons residing in [their] State" for treble damages for antitrust violations. Congress did not give the federal government an analogous cause of action; the federal government can sue for damages under the antitrust laws only if it is injured in its own "business or property." 15 U.S.C. § 15a.

3

removal of barriers to the participation by its residents in the free flow of interstate commerce." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 608 (1982).

The Supreme Court has made clear that States may sue to enforce the antitrust laws regardless of whether the federal government already has procured relief from the same defendants. The remedies available through the multiple enforcers of the antitrust laws "were designed to be cumulative, not mutually exclusive." *Sam Fox Publ'g Co. v. United States*, 366 U.S. 683, 689 (1961) (quotation marks omitted); *see also* 15 U.S.C. § 18a(i)(1) ("Any action taken by [the federal government] or any failure of [the federal government] to take any action under this section shall not bar any proceeding or any action with respect to such acquisition at any time under any other section of this Act or any other provision of law.").

For example, California, the plaintiff State in *American Stores*—like the Plaintiff States in this case—sued to enjoin a merger after the federal government had reached a settlement permitting the merger subject to certain relief. *See* 495 U.S. at 275-276. As in this case, California found the relief that the federal government obtained in the settlement insufficient to protect the economic interests of its citizens. *See id.* California therefore sued for further relief, and the Supreme Court recognized its right to do so. *See id.* at 283-285.[2]

A settlement, "even one entered at the behest of the Antitrust Division, does not immunize the defendant from liability." *See Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 13 (1979). The settlement does not bind any other antitrust enforcers, and it does not bind the

---

[2] Contrary to the federal government's arguments, the Supreme Court has not suggested that States must generally defer to federal-agency antitrust remedies. *See* Statement of Interest at 24-25 (citing *Georgia*, 324 U.S. 439). *Georgia* held that States must defer to certain remedies of the Interstate Commerce Commission in suits against common carriers, based on a unique provision of the Clayton Act giving the federal government exclusive authority to seek an injunction against a common carrier in matters subject to the Commission's jurisdiction. *See* 324 U.S. at 454, 461. No such provision applies in this case.

court. *See id.*; *see also American Stores*, 495 U.S. at 283-285. Clayton Act determinations are "entrusted to the court," not to any federal agency. *E.g.*, *California v. Federal Power Comm'n*, 369 U.S. 482, 490 (1962). The relief to which antitrust defendants already have agreed (*see* Statement of Interest at 19) enters into the analysis as "a fact of economic and legal life in th[e] industry." *See BMI*, 441 U.S. at 13.

It is a natural consequence of Congress's scheme of multiple antitrust enforcers that, at times, different enforcers will reach different conclusions about competitive effects. "No single antitrust enforcement agency always gets it right."[3] With multiple, independent enforcers of the antitrust laws—all with differing knowledge and experience—each enforcer may pursue its understanding of what is necessary to protect competition. If there is a conflict between the enforcers' views, each of the enforcers may attempt to persuade a court that its understanding is correct. But it is the court—not any federal agency, or any other enforcer—that has the final say.

Moreover, while the federal government touts its antitrust experience, the Plaintiff States also have extensive antitrust experience and expertise. The States have investigated and litigated hundreds of antitrust cases, often involving mergers.[4] And the Plaintiff States here include several of the States that have been most active in antitrust enforcement, regularly "scor[ing] major successes both in litigated cases and in settlement."[5]

---

[3] Harry First, *Delivering Remedies: The Role of the States in Antitrust Enforcement*, 69 Geo. Wash. L. Rev. 1004, 1038 (2001).

[4] *See, e.g.*, Antitrust Modernization Comm'n, *Report and Recommendations* 190-191 (Apr. 2007) (internet) (summary of available data on States' antitrust enforcement actions from 1990 to 2006); First, *supra* note 3, at 1015-18 & tbls. 1-5 (summary of New York Attorney General's antitrust enforcement).

For authorities available on the internet, full URLs appear in the Table of Authorities.

[5] First, *supra* note 3, at 1025; *see also, e.g.*, *Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993); *American Stores*, 495 U.S. 271; *New York ex rel. Schneiderman v. Actavis PLC*, 787

## II.     The Plaintiff States Have a Unique and Comprehensive Understanding of the Public Interest at Stake in the Merger at Issue.

The Plaintiff States filed this action after a thorough investigation lasting over fifteen months. This investigation included sworn testimony from nearly fifty witnesses, review of millions of company and third-party documents, and extensive economic analyses of the industry and the competitive effects of the merger. After DOJ and the FCC approved the merger subject to certain conditions, the States also thoroughly investigated those conditions and expanded the evidentiary record in discovery in this litigation. Based on this extensive evidentiary record and careful consideration of the interests of their 133 million citizens, the States determined that their citizens would be harmed by the substantial anticompetitive harms of the proposed merger, and that DOJ and the FCC's conditions were unlikely to remedy those harms.[6]

The federal government rightly recognizes "[t]he Litigating States' strong interest in this merger case." Statement of Interest at 25. The federal government's contention that the Plaintiff States lack a national perspective (*id.* at 15) is wrong. The Plaintiff States comprise a broad cross-section of the nation. They include States in the Northeast, the Midwest, the South, and the West—and they contain 43% of the national population. The population of the Plaintiff States is almost twice as large as the population of the States that have joined the DOJ settlement approving the merger.[7]

---

F.3d 638 (2d Cir. 2015); *California v. Valero Energy Corp.*, No. 17-03786, 2017 U.S. Dist. LEXIS 138095 (N.D. Cal. Aug. 23, 2017).

[6] Unless otherwise noted, all data discussed in this section is taken from the Excel spreadsheet cited in the Statement of Interest (at 16). *See* U.S. Census Bureau, *Percent Urban and Rural in 2010 by State* (internet).

[7] The following States have joined the DOJ settlement: Arkansas, Colorado, Florida, Kansas, Louisiana, Nebraska, Ohio, Oklahoma, South Dakota, and Texas.

Contrary to the federal government's suggestion (*id.* at 16), the Plaintiff States contain large rural populations in addition to dense urban centers. The Plaintiff States are home to some 19 million rural Americans—nearly a third of the national rural population. Indeed, the total rural population in the Plaintiff States is more than 30% larger than the rural population in the States that joined the DOJ settlement.

Only after considering the interests of their many residents—including both rural and urban residents—did the Plaintiff States conclude that the overarching anticompetitive effects of the proposed merger outweigh any incidental benefits of the merging parties' commitment to purportedly faster 5G expansion in rural areas if the merger is approved. The Plaintiff States are also mindful of the potential role of 5G technology in fostering innovation in U.S. high-tech industries. The Plaintiff States—including California and New York—are home to many of America's leading technology and media firms and to businesses that provide services to those firms. Eight of the ten largest technology companies,[8] all eight of the eight largest media companies,[9] and eight of the ten largest banks[10] in the United States are based in Plaintiff States. However, as the evidence

---

[8] *See Global 2000: The World's 20 Largest Tech Companies In 2019*, Forbes (internet) (1. Apple (California); 3. Alphabet (California); 4. Intel (California); 5. IBM (New York); 6. Facebook (California); 7. Cisco Systems (California); 8. Oracle (California); 9. Broadcom (California)).

[9] Nancy Levin, *10 Largest Media Companies in the World* (Nov. 4, 2019) (internet) (1. Alphabet (California); 2. Walt Disney (California); 3. Comcast (Pennsylvania); 4. 21st Century Fox (New York); 5. Facebook (California); 6. Viacom (New York); 7. CBS (New York); 8. News Corp (New York)).

[10] *See* Amanda Dixon, *America's 15 Largest Banks*, Bankrate (May 30, 2019) (internet) (1. JPMorgan Chase (New York); 3. Citigroup (New York); 4. Wells Fargo (California); 5. Goldman Sachs (New York); 6. Morgan Stanley (New York); 7. U.S. Bancorp (Minnesota); 9. PNC (Pennsylvania); 10. Capital One (Virginia)).

at trial demonstrated, rapid 5G expansion is likely nationwide even without the merger conditions.[11]

Moreover, unlike the federal government, the Plaintiff States have a unique awareness of local as well as national interests. That perspective is particularly important in merger cases like this one, where the proposed merger's effects may differ in different local markets. Under the Clayton Act, where firms proposing to merge compete on "a local, regional, and national basis," there is "more than one relevant geographic market." *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 621 (1974). If the merger may substantially lessen competition in *any* such market, the merger violates the Clayton Act. *See United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966); *see also* 15 U.S.C. § 18 (prohibiting mergers that may substantially lessen competition "in any section of the country"). In this case, certain markets represented by the Plaintiff States would face particularly acute harm from the merger at issue, such as the New York City and Los Angeles metropolitan areas, where post-merger T-Mobile's share of subscribers would exceed 50%, and rural Imperial County, California, where post-merger T-Mobile's market share would be 63%.[12] The Plaintiff States are especially well positioned to understand and protect the interests of consumers in those markets.[13]

---

[11] *See* Trial Tr. at 368:12-14 (Langheim) (T-Mobile will build out 5G network even if merger does not go through); *see also id.* at 80:22-83:16 (Solé); PX131; PX648, at 7-8.

[12] *See, e.g.*, Tr. 656:24-657:4 (Shapiro); PX1258, at 7, 10.

[13] *See, e.g.*, Stephen Calkins, *Perspectives on State and Federal Antitrust Enforcement*, 53 Duke L.J. 673, 679 (2003) (recognizing local knowledge as an advantage of States in antitrust enforcement); First, *supra* note 3, at 1005 (same).

III.   **This Court Should Not Defer to the Federal Government's Current Views on the Merger.**

Although the federal government asks this Court to defer to its approval of the merger at issue, courts must independently evaluate on the merits any challenges to the merger by other enforcers of the antitrust laws, like the Plaintiff States here. See *supra* at 3-5.

There are a number of reasons that this Court should not defer to the federal government's current views in this case.

*First*, the federal agencies applied standards in approving the merger that are different from the standards this Court must apply in deciding this case. Both DOJ and the FCC are free to make settlement and enforcement decisions based on considerations beyond the requirements of the Clayton Act. Moreover, the FCC applies a wholly different standard in approving mergers from the Clayton Act standard this Court must apply here. The FCC's review is not "limited to[] traditional antitrust principles."[14] By contrast, this Court must find unlawful any merger that may substantially lessen competition, irrespective of other considerations. *See* 15 U.S.C. § 18. "[A] merger the effect of which 'may be substantially to lessen competition' is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 371 (1963).

*Second*, the federal government's approval of the merger here is inconsistent with the federal government's own past determinations and statements. In 2011, DOJ sued to block another proposed merger that would have reduced the number of national wireless providers from four to three—in that case, a proposal to merge T-Mobile and AT&T. DOJ explained that it was suing

---

[14] Memorandum Opinion & Order (FCC Memorandum Order) ¶¶ 39-40, *In re Applications of T-Mobile US Inc., and Sprint Corporation*, WT Docket No. 18-197 (Nov. 5, 2019) (internet); *see also* Statement of Interest at 20-21.

because "[c]onsumers across the country, including those in rural areas and those with lower incomes, benefit from competition among the nation's wireless carriers, particularly the four remaining national carriers."[15] The FCC likewise concluded that a four-to-three merger in the wireless market would not be in the public interest.[16] T-Mobile and AT&T thereafter abandoned the proposed merger.[17] Then, in 2014, DOJ and the FCC made clear to T-Mobile and Sprint that they intended to block as anticompetitive a merger that the companies were proposing at that time, leading the companies to quickly abandon that proposed deal.[18]

Nevertheless, earlier this year, DOJ and a three-to-two majority of the FCC commissioners approved the merger of T-Mobile and Sprint, subject to conditions they understood would be necessary to justify the merger. Among these conditions was a commitment to sell certain assets to DISH Network Corporation and allow DISH to pay for access to T-Mobile's network for several years, in hopes that DISH could become a new national wireless competitor.[19] However, there are serious flaws in the DISH remedy that DOJ is relying on to replace the competition that DOJ has expressly agreed will be lost as a result of the merger.[20] For instance, only a small fraction of the

---

[15] Press Release, DOJ, *Justice Department Files Antitrust Lawsuit to Block AT&T's Acquisition of T-Mobile* (Aug. 31, 2011) (internet) (quotation marks omitted).

[16] Staff Analysis & Findings ¶¶ 5, 266, *In re Applications of AT&T Inc. and Deutsche Telekom AG*, WT Docket No. 11-65 (Nov. 29, 2011) (internet).

[17] Michael J. De La Merced, *AT&T Ends $39 Billion Bid for T-Mobile*, N.Y. Times (Dec. 19, 2011) (internet).

[18] Michael J. De La Merced, *Sprint and SoftBank End Their Pursuit of a T-Mobile Merger*, N.Y. Times (Aug. 5. 2014) (internet).

[19] *See, e.g.*, [Proposed] Final Judgment, at 6-18, *United States v. Deutsche Telekom AG*, No. 1:19-cv-2232 (D.D.C. July 26, 2019) (DOJ Proposed Judgment); FCC Memorandum Order, ¶¶ 33-37.

[20] *See, e.g.*, Complaint ¶ 16, *United States v. Deutsche Telekom AG*, No. 1:19-cv-2232 (D.D.C. July 26, 2019), ECF No. 1 (merger "would substantially lessen competition and harm consumers"); *id.* ¶ 5 (merger would result in "increased prices and less attractive service offerings for American consumers" that will cost consumers "billions of dollars more each year"); *id.* ¶ 24

merged company's assets will be sold to DISH; DISH has no experience in the wireless market and a history of broken promises; and DISH will be dependent on the new T-Mobile's network and will lack the scale needed for long-term success as a national wireless provider.[21]

Other conditions of the merger approval included pledges that the merged company would meet certain targets for access to 5G wireless service over a number of years.[22] But T-Mobile and Sprint already have been competing aggressively to expand 5G service (see *supra* at 7-8 & note 11) and DOJ's own merger guidelines make clear that, in deciding whether to approve a merger, DOJ should credit only merger-specific efficiencies: that is, efficiencies that would not exist in the absence of the merger.[23]

Moreover, as DOJ's Assistant Attorney General for the Antitrust Division emphasized early in his tenure, adding behavioral remedies like these to a merger approval is rarely a successful approach to protecting competition. Remedies requiring regulation of future conduct are difficult to enforce, and sunset provisions ensure that the remedies are no more than a "band-aid" that "at best only delays the merged firm's exercise of market power."[24] More fundamentally, it is very difficult to design remedies that effectively counteract known anticompetitive effects. DOJ's antitrust chief previously stated that he does not "think [he's] smart enough" to design remedies

---

("[a]ny efficiencies generated by this merger are unlikely to be sufficient to offset the likely anticompetitive effects . . . unless additional relief is granted").

[21] These flaws are discussed in greater detail in Plaintiffs' Proposed Findings of Facts and Conclusions of Law pt. V-C.

[22] *See, e.g.*, DOJ Proposed Judgment, at 12, 23; FCC Memorandum Order, ¶¶ 26-29.

[23] DOJ, *Horizontal Merger Guidelines* (Aug. 2010) (internet).

[24] Assistant Attorney General Makan Delrahim, Keynote Address at American Bar Association's Antitrust Fall Forum (Nov. 16, 2017) (internet).

"that distort competitive incentives just enough to undo the damage done by a merger, for years to come."[25] It is unclear what has changed.

*Third*, while recognizing the merger's undisputed anticompetitive effects, the federal government agreed to the merger based on conditions it had not thoroughly investigated and with incomplete information.

DOJ conducted an initial investigation of the proposed merger in cooperation with the Plaintiff States, and concluded that the merger "would substantially lessen competition and harm consumers."[26] Yet DOJ then agreed to the merger subject to certain conditions, without the benefit of formal discovery on whether, when, and under what circumstances the merging companies and DISH might fulfill those conditions. Similarly, the FCC recognized that the merger would likely lead to significant price increases, and it approved the merger only subject to conditions.[27] The FCC has not, however, approved conditions related to DISH or license transfers as called for by the DOJ settlement; some of those conditions remain pending and some have not even been formally proposed.[28] Moreover, the FCC has not undertaken the sort of extensive investigation of the likelihood that the merging companies and DISH will fulfill the merger-approval conditions that the Plaintiff States have undertaken.[29]

---

[25] Delrahim Keynote Address, *supra* note 24.

[26] Complaint, *supra* note 20, ¶ 16.

[27] *See* FCC Memorandum Order ¶¶ 9, 11, 163.

[28] *See, e.g.*, FCC Memorandum Order n.15 & 395. Because these terms are contingent on future FCC approval, this Court cannot assume that they will become valid conditions and owes no deference to the federal government's views as to those forms of relief. *See, e.g.*, *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943); *Natural Res. Def. Council v. EPA*, 643 F.3d 311, 321 (D.C. Cir. 2011).

[29] According to one of the dissenting commissioners, the majority also agreed to the merger before the agency staff had distributed its legal, engineering, or economic analysis of the transaction—and before DOJ had completed its own review, departing from the FCC's

The Plaintiff States conducted a far deeper investigation of the proposed merger remedies in this litigation, including extensive document discovery, sworn testimony, and expert economic analyses. That investigation uncovered several critical pieces of evidence supporting the Plaintiff States' contention that there is considerable risk that the merging parties and DISH will not fulfill the many promises they have made, which serve as the basis for the DOJ and FCC approvals. For example, both T-Mobile and Sprint have expressed doubt that DISH will become a serious competitor in the national wireless market.[30] In addition, the Plaintiff States' investigation uncovered other information that was not available to DOJ or the FCC that altered the competitive balance in this matter and factored into the States' assessment that the merger is anticompetitive and should be blocked. For example, the Plaintiff States procured additional documents from Deutsche Telekom, the controlling shareholder of both current T-Mobile and the potential new T-Mobile; deposed three Deutsche Telekom executives; and examined two of those executives at trial, including CEO Timotheus Höttges, who acknowledged under oath that reducing price competition was one of the reasons for the T-Mobile-Sprint merger.[31]

## IV.    Enjoining the Merger Is the Only Relief That Will Protect the Public Interest.

Plaintiffs demonstrated at trial that the merger at issue would have dramatic anticompetitive effects, and that those effects would not be offset by the federal government's

---

longstanding practice of coordinating with DOJ on merger approvals. FCC Memorandum Order at 279-280 (Statement of Commissioner Rosenworcel).

[30] *See, e.g.*, Trial Tr. at 1346:4-1348:22 (Claure) (DISH will not become meaningful competitor, but will build only what is necessary to be "out of trouble with the FCC"); PX346; PX347; PX375; PX401; PX402; PX403.

[31] *See* Trial Tr. at 188:4-7 (Höttges) (reasons for merger with Sprint same since before 2011); Höttges Dep. at 101:16-24 (potential to reduce price competition was one of the reasons for merger with Sprint in 2011).

merger-approval conditions. Those facts require that the merger be enjoined under the Clayton Act. *See, e.g.*, *Philadelphia Nat'l Bank*, 374 U.S. at 363 (anticompetitive merger "must be enjoined").

The federal government misplaces its reliance on cases from outside the antitrust context to suggest that the Plaintiff States must prove something more than likely anticompetitive effects in order to show that an injunction is in the public interest, and therefore justified. *See* Statement of Interest at 14-15. State enforcement of the antitrust laws on behalf of the public will always satisfy the public-interest prong of the injunction analysis, so long as the State has shown a threat to competition. *See, e.g.*, *Actavis PLC*, 787 F.3d at 662 (state action to enforce antitrust laws "is presumed to be in the public interest"); *see also Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) ("It is competition that [antitrust] statutes recognize as vital to the public interest." (ellipses and emphasis omitted)).[32]

The federal government's objection to a *nationwide* injunction is a red herring here. That objection implies that relief can be provided to the Plaintiff States on a more local basis. But if the States are entitled to relief from the merger at issue here on the ground that it is anticompetitive, the only meaningful relief is to enjoin the merger. There is no serious option of providing relief on a less-than-nationwide basis. And there is ample precedent for providing state or private parties with the "nationwide" relief of blocking a merger. *See, e.g.*, *Consolidated Gold Fields PLC v.*

---

[32] The non-antitrust cases on which the federal government relies also are distinguishable on their facts. For instance, in *SAS Institute, Inc. v. World Programming Ltd.*, 874 F.3d 370 (4th Cir. 2017), the Fourth Circuit found "concrete harms to innocent third parties" weighing against an injunction only where those "concrete harms" consisted of non-party customers "hav[ing] to expend significant time and money to replace their existing . . . systems" if an injunction were entered. *See id.* at 388. Here, an injunction would incur no such concrete harms, because it would merely preserve the status quo. An injunction would not require third parties to take any actions or incur any expenses, and the harms the federal government posits are in any event speculative and contrary to the evidence at trial. See *supra* at 7-8 & note 11.

14

*Minorco, S.A.*, 871 F.2d 252 (2d Cir. 1989) (affirming preliminary injunction of merger); *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.,* 753 F.2d 1354 (6th Cir. 1985) (same).

## CONCLUSION

For all the foregoing reasons, this Court should not defer to the federal government's approval of the merger at issue in this case, but should decide this case on its merits, and enjoin the merger as anticompetitive.

Dated this 8th day of January, 2020.

Respectfully submitted,

| | |
|---|---|
| FOR PLAINTIFF STATE OF NEW YORK: | FOR PLAINTIFF STATE OF CALIFORNIA: |
| LETITIA JAMES<br>Attorney General | XAVIER BECERRA<br>Attorney General |
| /s/ Barbara D. Underwood<br>BARBARA D. UNDERWOOD<br>Solicitor General | KATHLEEN FOOTE<br>Senior Assistant Attorney General |
| CHRISTOPHER D'ANGELO<br>Chief Deputy Attorney General,<br>Economic Justice Division<br>(pro hac vice forthcoming) | MICHAEL JORGENSON<br>Supervising Deputy Attorney General |
| ANISHA S. DASGUPTA<br>Deputy Solicitor General<br>PHILIP J. LEVITZ<br>Assistant Solicitor General<br>(admission pending) | /s/ Paula L. Blizzard<br>Paula L. Blizzard<br>Paula.Blizzard@doj.ca.gov<br>Adam Miller<br>Adam.Miller@doj.ca.gov<br>Nicole Gordon<br>Nicole.Gordon@doj.ca.gov<br>Michael Battaglia<br>Michael.Battaglia@doj.ca.gov<br>Brian Wang |
| Beau Buffier<br>Beau.Buffier@ag.ny.gov<br>Elinor R. Hoffmann<br>Elinor.Hoffmann@ag.ny.gov<br>Morgan J. Feder<br>Morgan.Feder@ag.ny.gov<br>Michael Jo<br>Michael.Jo@ag.ny.gov<br>Jeremy R. Kasha<br>Jeremy.Kasha@ag.ny.gov<br>Beatriz Marques<br>Beatriz.Marques@ag.ny.gov<br>Amber Wessels-Yen<br>Amber.Wessels-Yen@ag.ny.gov<br>James Yoon<br>James.Yoon@ag.ny.gov<br>New York Office of the Attorney General<br>28 Liberty Street<br>New York, NY 10005<br>Tel:  (212) 416-8262 | Brian.Wang@doj.ca.gov<br>California Office of the Attorney General<br>455 Golden Gate Avenue Suite 11000<br>San Francisco, CA 94102<br>Tel:  (415) 510-4400<br><br>MUNGER, TOLLES & OLSON LLP<br><br>/s/ Glenn D. Pomerantz<br>Glenn D. Pomerantz<br>Glenn.Pomerantz@mto.com<br>Kyle W. Mach<br>Kyle.Mach@mto.com<br>Kuruvilla J. Olasa<br>Kuruvilla.Olasa@mto.com<br>350 S. Grand Avenue, 50th Floor<br>Los Angeles, CA 90071<br>Tel:  (213) 683-9100 |
| *Attorneys for Plaintiff State of New York* | *Attorneys for Plaintiff State of California ex rel. Xavier Becerra* |