**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK,
STATE OF CALIFORNIA,
STATE OF CONNECTICUT,
DISTRICT OF COLUMBIA,
STATE OF HAWAII,
STATE OF ILLINOIS,
STATE OF MARYLAND,
COMMONWEALTH OF MASSACHUSETTS,
STATE OF MICHIGAN,
STATE OF MINNESOTA,
STATE OF OREGON,
COMMONWEALTH OF PENNSYLVANIA,
COMMONWEALTH OF VIRGINIA, *and*
STATE OF WISCONSIN,

                              *Plaintiffs*,

                    v.

DEUTSCHE TELEKOM AG,
T-MOBILE US, INC.,
SPRINT CORPORATION, *and*
SOFTBANK GROUP CORP.,

                              *Defendants*.

Case No. 1:19-cv-5434-VM-RWL

ECF Case

**PLAINTIFF STATES' PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

**Page**

I.      SECTION 7 BARS MERGERS THAT *MAY* SUBSTANTIALLY LESSEN COMPETITION ................................................................................1

II.     RELEVANT MARKETS ............................................................................2

III.    THE MERGER IS PRESUMPTIVELY ILLEGAL ................................4

      A.    The Merger Is Presumptively Unlawful Based on Market Structure Alone............5

           1.    MVNOs' Customers Should Be Attributed to Their Partner MNOs ...........6

IV.    EVIDENCE REGARDING ANTICOMPETITIVE EFFECTS REINFORCES THE PRESUMPTION OF ILLEGALITY ...........................................8

      A.    The Merger Will Increase Coordinated Interaction ................................8

           1.    The Merger Makes Coordinated Interaction More Likely.........................9

           2.    The Relevant Market Is Vulnerable to Coordinated Interaction...............10

      B.    New T-Mobile Will Be Able To Unilaterally Raise Its Prices Post-Merger .........11

      C.    Defendants' Internal Documents Show That This Merger Is Anticompetitive........................................................13

V.     DEFENDANTS' REBUTTAL CASE ....................................................14

      A.    Defendants' Weakened Competitor Defense .........................................14

      B.    Defendants' Efficiencies Defense ..........................................................17

           1.    Defendants' Efficiencies Estimates Are Not Ordinary Course.................19

           2.    The Montana Model's Estimates Are Unverifiable and Speculative.........19

           3.    Prof. Katz Did Not Accurately Model Network Speed Efficiencies .........22

           4.    Defendants' Efficiencies Are Not Merger-Specific.................................23

      C.    Defendants' Remedies-Based Defense ..................................................25

VI.    PERMANENT INJUNCTION ...............................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Brown Shoe v. United States*,
370 U.S. 294 (1962)..................................................................................................1, 2

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)......................................................................................................1

*California v. Am. Stores Co.*,
495 U.S. 271 (1990)......................................................................................................1

*California v. Fed. Power Comm'n*,
369 U.S. 482 (1962)................................................................................................1, 30

*CBS Broad., Inc. v. EchoStar Commc'ns Corp.*,
276 F. Supp. 2d 1237 (S.D. Fla. 2003) ......................................................................28

*Chicago Bridge & Iron Co. N.V. v. FTC*,
534 F.3d 410 (5th Cir. 2008) ........................................................................................8

*Consol. Gold Fields PLC v. Minorco S.A.*,
871 F.2d 252 (2d Cir. 1989)..........................................................................................5

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006)....................................................................................................29

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972)....................................................................................................25

*FTC v. Cardinal Health, Inc.*,
12 F. Supp. 2d 34 (D.D.C. 1998) ...............................................................................26

*FTC v. CCC Holdings, Inc.*,
605 F. Supp. 2d 26 (D.D.C. 2009) ..................................................................10, 19, 27

*FTC v. Elders Grain*,
868 F.2d 901 (7th Cir. 1989) ........................................................................................1

*FTC v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) ............................................................................. *passim*

*FTC v. Penn State Hershey Med. Ctr.*,
838 F.3d 327 (3d Cir. 2016)...................................................................................17, 18

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*FTC v. ProMedica Health Sys., Inc.,*
  2011 WL 1219281 (N.D. Ohio Mar. 29, 2011) ........................................................15, 18, 26

*FTC v. Staples, Inc.,*
  190 F. Supp. 3d 100 (D.D.C. 2016) .........................................................................25, 26, 27

*FTC v. Staples, Inc.,*
  970 F. Supp. 1066 (D.D.C. 1997) ...........................................................................................12

*FTC v. Sysco Corp.,*
  113 F. Supp. 3d 1 (D.D.C. 2015) .................................................................................. *passim*

*FTC v. Tronox Ltd.,*
  332 F. Supp. 3d 187 (D.D.C. 2018) ................................................................................11, 18

*FTC v. Univ. Health, Inc.,*
  938 F.2d 1206 (11th Cir. 1991) .....................................................................................9, 13, 18

*FTC v. Warner Commc'ns Inc.,*
  742 F.2d 1156 (9th Cir. 1984) ...................................................................................................1

*FTC v. Wilh. Wilhelmsen Holding ASA,*
  341 F. Supp. 3d 27 (D.D.C. 2018) ........................................................................................18

*Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.,*
  476 F.2d 687 (2d Cir. 1973).....................................................................................................30

*Heerwagen v. Clear Channel Commc'ns,*
  435 F.3d 219 (2d Cir. 2006)......................................................................................................2

*Jim Bouton Corp. v. Wm. Wrigley Jr. Co.,*
  902 F.2d 1074 (2d Cir. 1990)..................................................................................................30

*Kaiser Alum. & Chem. Corp. v. FTC,*
  652 F.2d 1324 (7th Cir. 1981) ...............................................................................................15

*In re: LightSquared, Inc.,*
  511 B.R. 253 (S.D.N.Y. 2014)................................................................................................29

*Nat. Res. Def. Council v. EPA,*
  643 F.3d 311 (D.C. Cir. 2011) ...............................................................................................26

*New York ex rel. Schneiderman v. Actavis PLC,*
  787 F.3d 638 (2d Cir. 2015).............................................................................................29, 30

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*New York v. Actavis, PLC*,
  2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014) ........................................................30

*ProMedica Health Sys., Inc. v. FTC*,
  749 F.3d 559 (6th Cir. 2014) .................................................................5, 14, 15

*R.C. Bigelow, Inc. v. Unilever N.V.*,
  867 F.2d 102 (2d Cir. 1989)...........................................................................5

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943)......................................................................................26

*Six Western Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
  2000 WL 264295 (S.D.N.Y. Mar. 9, 2000) ...............................................2

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
  778 F.3d 775 (9th Cir. 2015) ..................................................................4, 17, 18

*Stanley Works v. FTC*,
  469 F.2d 498 (2d Cir. 1972)...............................................................1, 8, 13

*State of N.Y. v. Kraft Gen. Foods, Inc.*,
  926 F. Supp. 321 (S.D.N.Y. 1995) ..........................................................8, 12

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
  290 F. Supp. 3d 507 (E.D. Va. 2018) .............................................................15

*Teamsters Local 445 v. Bombardier Inc.*,
  546 F.3d 196 (2d Cir. 2008)..........................................................................2

*United States v. Aetna Inc.*,
  240 F. Supp. 3d 1 (D.D.C. 2017) .................................................14, 15, 25, 27

*United States v. Am. Express Co.*,
  838 F.3d 179 (2d Cir. 2016)..........................................................................3

*United States v. Anthem, Inc.*,
  236 F. Supp. 3d 171 (D.D.C. 2017) ...................................................... *passim*

*United States v. Anthem, Inc.*,
  855 F.3d 345 (D.C. Cir. 2017)...............................................................4, 17, 19

*United States v. Bazaarvoice, Inc.*,
  2014 WL 203966 (N.D. Cal. 2014) ...............................................................26

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*United States v. Conn. Nat'l Bank,*
  418 U.S. 656 (1974) .................................................................................................... 3

*United States v. Franklin Elec. Co.,*
  130 F. Supp. 2d 1025 (W.D. Wis. 2000) ................................................................. 25

*United States v. H&R Block, Inc.,*
  833 F. Supp. 2d 36 (D.D.C. 2011) ....................................................... 9, 10, 18, 26

*United States v. Marine Bancorporation Inc.,*
  418 U.S. 602 (1974) .................................................................................................... 2

*United States v. Pabst Brewing Co.,*
  384 U.S. 546 (1966) ................................................................................................. 2, 3

*United States v. Penn-Olin Chem. Co.,*
  378 U.S. 158 (1964) .................................................................................................... 1

*United States v. Phila. Nat'l Bank,*
  374 U.S. 321 (1963) .......................................................................................... *passim*

*United States v. Radio Corp. of Am.,*
  358 U.S. 334 (1959) ............................................................................................. 1, 30

*United States v. Rockford Mem'l Corp.,*
  717 F. Supp. 1251 (N.D. Ill. 1989) ...................................................................... 18

**FEDERAL STATUTES**

15 U.S.C. § 18 ............................................................................................................... 1

**FEDERAL REGULATIONS**

47 CFR § 22.909 .......................................................................................................... 3

**OTHER AUTHORITIES**

Areeda & Hovenkamp, *Antitrust Law* ................................................................ 8, 9

Dep't of Justice & FTC, Horizontal Merger Guidelines ...................................... 3

## I.   SECTION 7 BARS MERGERS THAT *MAY* SUBSTANTIALLY LESSEN COMPETITION

1.      Section 7 of the Clayton Act is a "prophylactic measure," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485 (1977), designed "to arrest incipient threats to competition," *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 170–71 (1964). Congress enacted Section 7 in response to "what was considered to be a rising tide of economic concentration in the American economy," and "sought to assure the . . . courts the power to brake this force at its outset." *Stanley Works v. FTC*, 469 F.2d 498, 503 (2d Cir. 1972).

2.      "To show that a merger is unlawful, a plaintiff need only prove that its effect 'may be substantially to lessen competition.'" *Cal. v. Am. Stores Co.*, 495 U.S. 271, 284 (1990) (quoting 15 U.S.C. § 18). These words reflect Congress's "concern . . . with probabilities, not certainties." *Brown Shoe v. United States*, 370 U.S. 294, 323 (1962). Section 7 thus "does not require proof that a merger or other acquisition will cause" anticompetitive effects. *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 192 (D.D.C. 2017). Rather, "a section 7 violation is proven upon a showing of reasonable probability of anticompetitive effect." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984); *Brown Shoe*, 370 U.S. at 325. Any "doubts are to be resolved against the transaction." *FTC v. Elders Grain*, 868 F.2d 901, 906 (7th Cir. 1989).

3.      Congress has "entrusted to the courts" responsibility for Clayton Act enforcement, and that responsibility may not be "frustrated by an administrative agency." *California v. Fed. Power Comm'n*, 369 U.S. 482, 490 (1962). This Court must make its own independent determination of whether this merger should be enjoined. *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 332 & n.8, 350-51, 372 (1963) (enjoining bank merger even though Comptroller of Currency approved it); *United States v. Radio Corp. of Am.*, 358 U.S. 334, 337, 346 (1959) (antitrust suit could proceed despite prior FCC approval because "Commission action was not intended to prevent

enforcement of the antitrust laws in federal courts"); *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 2000 WL 264295, at \*23–24 (S.D.N.Y. Mar. 9, 2000) ("[USDOJ] at times countenances a higher level of anti-competitive behavior than do the courts, and, therefore, it is the responsibility of this Court to undertake its own evaluation of the merger.").

## II.   <u>RELEVANT MARKETS</u>

4.      Determining the relevant markets affected by a merger "is a necessary predicate to a finding of a violation of the Clayton Act." *Brown Shoe*, 370 U.S. at 324. A "relevant market consists of a relevant product market and a relevant geographic market." *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006), *overruled on other grounds by Teamsters Local 445 v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008).

5.      Plaintiffs have shown, and Defendants did not contest at trial, that retail mobile wireless telecommunications services is a relevant product market. Shapiro[1] 625:21–630:25.

6.      A geographic market "encompasses the geographic area to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." *Heerwagen*, 435 F.3d at 228. Where firms compete on a "regional and national basis," there may be "more than one relevant geographic market." *United States v. Marine Bancorporation Inc.*, 418 U.S. 602, 621 (1974); *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549, 551–52 (1966) (nation, state, and tri-state); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 49, 52 (D.D.C. 2015). A showing that a merger may substantially lessen competition in *any* geographic market establishes a § 7 violation. *Pabst*, 384 U.S. at 549; *Anthem*, 236 F. Supp. 3d at 179, 193, 254–59.

---

[1] All citations to trial transcripts are cited by witness testimony. All references to "native" versions of the trial exhibits are cited with "-N".

7.      As Defendants have conceded, the nation is a relevant geographic market for assessing the effects of this merger. Katz 1797:21-25; Shapiro 624:10-14, 631:18–632:1.

8.      Cellular Market Areas ("CMAs"), which correspond to the original FCC licenses areas for spectrum are also relevant geographic markets. Shapiro 624:17-22. CMAs include Metropolitan Statistical Areas ("MSAs") and Rural Statistical Areas defined by the Office of Management and Budget. 47 CFR § 22.909; Shapiro 643:1-4. The FCC and DOJ have used CMAs to assess competition in the wireless industry. PX1211 p.29; Shapiro 637:12–21.

9.      Geographic "markets need not—indeed cannot—be defined with scientific precision." *Sysco*, 113 F. Supp. 3d at 48 (quoting *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974)); *Pabst*, 384 U.S. at 549. A "rough approximation," *Conn. Nat'l Bank*, 418 U.S. at 669, or a "workable compromise" is sufficient. *Phila. Nat'l Bank*, 374 U.S. at 361.[2] In *Anthem*, for example, the court used "Core-Based Statistical Areas," "aggregations of zipcodes . . . developed by the Office of Management and Budget," to evaluate a merger. 236 F. Supp. 3d at 254.

10.     "To define the relevant market, [the Second Circuit] often applies a 'hypothetical monopolist test' ('HMT') asking whether a hypothetical monopolist acting within the proposed market would be substantially constrained from increasing prices by the ability of customers to switch to other producers." *United States v. Am. Express Co.*, 838 F.3d 179, 198 (2d Cir. 2016); Dep't of Justice & FTC, Horizontal Merger Guidelines § 4.1.1 ("HMG").

11.     Prof. Shapiro explained, and Prof. Katz did not dispute, that CMAs satisfy the HMT. Shapiro 637:23-25; Katz 1994:24–1995:2.

12.     Sprint has previously claimed that competition for wireless services can be assessed in

---

[2] Defendants incorrectly focus on the "precis[ion]" with which Plaintiffs must identify local markets. Pretrial Mem. at 19. But the cases Defendants cite simply explain that a *product market*, standing alone, is insufficient because it does not capture geographic dimensions of competition. They do not depart from the binding Supreme Court precedent cited above.

national *and* local markets. Shapiro 638:14–642:9; PX655 pp. 17, 163-64. And the evidence confirms that key aspects of competition in this industry are local. *First*, as Prof. Katz conceded, network performance and, thus, quality-adjusted prices, vary locally. Katz 1980:6–1982:2; Sole 97:3–97:19, Legere 992:1-20. Defendants believe that local network quality impacts consumers' selection between carriers, and advertise based on their networks' local characteristics. PX155; PX159–161; PX410 p. 222; PX959. *Second*, Defendants offer local promotions and compete to expand the number and quality of their retail stores. Staneff Dep. 169:5-7, 173:2–175:18, 194:25–201:20; PX1074 pp. 51, 67; PX1111 p. 14; PX911 pp. 32–34, PX949 p. 10, PX967 p. 1.

13.     T-Mobile previously asserted that competition in the wireless industry takes place locally and should be assessed in CMAs. PX1242 p.25; PX1042 p. 11. And CMAs (or MSAs, which relate to CMAs) are used as relevant local markets by Mobile Network Operators ("MNOs"). PX155 p. 3 n.2 (network claim measured in relevant MSA); PX160-161 p. 2 n.2; PX92 p. 7 (expansion in MSAs); PX908 p. 24; PX911 p. 19; PX1235 p. 30; DX7057 pp. 7, 53.

14.     Prof. Katz agrees that wireless competition "takes place at the local level" and that Defendants compete with each other within CMAs. Katz 1976:21–1977:20. But he does not identify any local market in which to assess that competition. Instead, he simply claims that *CMAs* are not informative markets, even though he has previously asserted that wireless competition *should* be evaluated in CMAs. PX1296 pp.144–46; Katz 1979:2–1982:2.

## III.     THE MERGER IS PRESUMPTIVELY ILLEGAL

15.     Courts employ a burden-shifting framework when evaluating whether a merger is barred by § 7. *E.g.*, *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017); *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 785 (9th Cir. 2015).

16.     The Supreme Court has held that the "intense congressional concern" with market concentration that pervades Section 7 "warrants dispensing . . . with elaborate proof of market

structure, market behavior, or probable anticompetitive effects" in some cases. *Phila. Nat'l Bank*, 374 U.S. at 363. "Specifically . . . a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Id.*

17.     "[U]nless defendants meet their burden of rebutting [plaintiffs'] presumption, the merger must be enjoined." *R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 107-08 (2d Cir. 1989).

### A.     The Merger Is Presumptively Unlawful Based on Market Structure Alone

18.     A merger resulting in a company with a market share of 30% or more is presumptively illegal. *Consol. Gold Fields PLC v. Minorco S.A.*, 871 F.2d 252, 260 (2d Cir. 1989).

19.     As a result of this merger, New T-Mobile will have a market share of 37.8% in the national market when measured by subscribers and 34.4% when measured by revenue. Shapiro 647:11-16; PX1258, sl. 1. New T-Mobile will also exceed the 30% threshold in dozens of CMAs within the Plaintiff States.  In some of these CMAs, New T-Mobile will have a market share of ***over 50%***, and in many it will approach this figure. Shapiro 656:20–657:4; PX1258, sl. 7-11.

20.      Mergers that result "in highly concentrated markets that involve an increase in the [Herfindahl-Hirschman Index ("HHI")] of more than 200 points" are *also* presumptively anticompetitive. HMG § 5.3; *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 568 (6th Cir. 2014); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001). "[A] post-merger market is highly-concentrated" if the post-merger "HHI is 2,500 or greater." *Anthem*, 236 F. Supp. 3d at 207; HMG § 5.3.

21.     In the national market, the merger would result in an HHI of 3,186—an increase of 679 points. Shapiro 647:17-23, 653:1-10; PX1258, sl. 1. In fact, Prof. Katz's own calculations

demonstrate that after using his preferred metric of revenue shares, assigning separate market shares to mobile virtual network operators ("MVNOs"), and accounting for the Boost divestiture, the post-merger HHI in the national market is 2,611, and the increase is 313. PX1320 p. 10; Shapiro 2276:11–2278:21.

22.     In 106 CMAs within the Plaintiff States, the HHI would increase by 200 points or more and would exceed 2,500, often dramatically so. Shapiro 653:20–656:9; PX1258, sl. 7-11.

### 1.     MVNOs' Customers Should Be Attributed to Their Partner MNOs

23.     MVNOs are companies that purchase network access from the national carriers on a wholesale basis and resell that access to their customers. Schwartz 813:8–814:1; Boubazine 539:5–13; Kalinoski Dep. 10:4–10.

24.     The FCC and DOJ have recognized that MVNOs and MNOs are not similarly situated from a competitive standpoint. Shapiro 2270:3–15 (relying on FCC report stating that "following widespread industry practices," the FCC would be "attribut[ing] the subscribers of MVNOs" to their MNO partners); PX1261, ¶ 16 (USDOJ Complaint, which declines to include MVNOs in its discussion of market shares post-merger); PX1211, ¶ 78 (FCC Order) ("As in previous transactions, we will exclude MVNOs . . . when computing initial concentration measures.").

25.     T-Mobile's CEO, John Legere, and Chief Technology Officer, Neville Ray, described T-Mobile's MVNOs' customers as *T-Mobile*'s customers at trial. Legere 912:18-25, Ray 1143:1-6. And Sprint agrees that an MVNO "is not a direct competitor" to its partner MNO. PX655 p. 372; PX585 p. 2 ("The success…of [Sprint's] MVNOs is success to Sprint.").

26.     Mr. Legere has referred to Comcast and Charter, two of the most well-known MVNOs, as "irrelevant" and "irrelevant squared." PX131 p. 9; Legere 983:11–984:7. And Defendants did not put forward any trial exhibits showing an MNO responding to a promotion by one of its MVNOs. *Cf.* Schwartz 817:16–818:1 (Comcast has seen no evidence of MNOs responding to its

offers); Miglionico  428:16-21 (Sprint provides port-in offers "to every wireless competitor out there…as long as they're not with Sprint or…an MVNO of Sprint").

27.     When calculating market shares, it is appropriate to focus on economic reality and to combine the shares of entities that are not independent competitors to each other. In *Anthem*, the court held that it was correct to combine the market shares of Anthem with the market shares of certain Blue Cross Blue Shield licensees ("Blues"). 236 F. Supp. 3d at 208, 210. The evidence showed that "Anthem and the other Blues work together to win national business," that Anthem's documents combined the market share of the Blues with its own market share, and that Anthem "receives income from the other Blues" for access to the Anthem network. *Id.* at 210.

28.     Applying this guidance, MVNOs are not independent competitors from their MNO hosts. *First*, MNOs use MVNOs as marketing partners to reach customers they would otherwise struggle to reach. PX585; PX587; PX640; PX813; Thygesen Dep. 43:11-25. *Second*, Defendants count their partner MVNOs' subscribers as their own. PX813 pp. 77, 79 (market shares of "Carriers include MVNO activity"; migrations between T-Mobile's brands and its MVNOs are "internal migrations"); PX892-N, slides 3, 13; Thygesen Dep. 15:20–25 (T-Mobile calls customers of its MVNOs T-Mobile subscribers "in the ordinary course")*;* Miglionico 428:18–21 (referring to MVNOs as "subsidiar[ies] of Sprint"); PX170, at 42 (10-K including wholesale subscribers in Sprint's subscriber count). *Third*, an MVNO's success inures to the benefit of its partner MNO. PX585. MNOs bring in substantial revenue from their MVNO partners, because MVNOs must pay for every customer they acquire. PX1031; Kalinoski Dep. 12:9–23.

29.     Consistent with the wealth of evidence showing that MVNOs are not independent competitors, Prof. Shapiro appropriately attributed the market shares of MVNOs to the MNOs that provide the underlying network access. Shapiro 658:6-11–668:15.

## IV.   EVIDENCE REGARDING ANTICOMPETITIVE EFFECTS REINFORCES THE PRESUMPTION OF ILLEGALITY

30.     Defendants have not shown that there is something unusual about this market that would render the presumption inapplicable. Rather, because of the high levels of market concentration that will result if Sprint and T-Mobile merge, this merger "is so inherently likely to lessen competition substantially" that it is presumptively unlawful and must be "enjoined in the absence of evidence clearly showing that [it] is not likely to have such anticompetitive effects." *Phila. Nat'l Bank*, 374 U.S. at 362. "[T]he whole point of [this presumption is] to simplify merger litigation by basing illegality on concentration unless the defendant c[an] show decisive factors indicating that concerns about competition [a]re unwarranted." Areeda & Hovenkamp, *Antitrust Law* § 925. "[T]he antitrust policy conclusion that there is a significant relationship between the threat of high oligopoly prices and a reduction in the number of firms in the market has significant theoretical support." *Id.*; *see also Phila. Nat'l Bank*, 374 U.S. at 363.

31.     Defendants have not shown any "decisive factors" indicating that the presumption should not apply to this market. To the contrary, the evidence reinforces the presumption that this merger will lead to the kinds of coordinated and unilateral effects that will harm consumers.  In fact, even absent the presumption, the wealth of evidence of the unilateral and coordinated effects that would result if the Proposed Merger is not enjoined (*see infra* Part IV) would satisfy Plaintiff States' obligation to make out a prima facie case. *See Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 433 (5th Cir. 2008).

### A.     The Merger Will Increase Coordinated Interaction

32.     Evidence that a merger will "enhanc[e] the likelihood of coordinated interaction by competitors" supports a finding that a merger is anticompetitive. *State of N.Y. v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 359 (S.D.N.Y. 1995); *see Anthem*, 236 F. Supp. 3d at 215.

## 1.     The Merger Makes Coordinated Interaction More Likely

33.     "Merger law rests upon the theory that, where rivals are few, firms will be able to coordinate their behavior. . . [to] achieve profits above competitive levels." *H.J. Heinz Co.*, 246 F.3d at 715; *see Stanley Works*, 469 F.2d at 507 ("[T]he greater the concentration in the market the greater is the likelihood that parallel policies of mutual advantage, not competition, will emerge."); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir. 1991). Eliminating a "particularly aggressive competitor that plays a disruptive role in the market," can increase the likelihood of coordinated interaction, particularly if that competitor had the "incentive to take the lead in price cutting." *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 79 (D.D.C. 2011).

34.     Defendants argue that this merger will not promote coordination but, rather, will allow them to better compete against their larger rivals, AT&T and Verizon.  But Defendants have not shown anything unique about the wireless industry that makes coordination unlikely.  Absent evidence that there are "'structural market barriers to collusion' that are unique to the . . . industry," a court must apply the "ordinary presumption of collusion." *H.J. Heinz Co.*, 246 F.3d at 724–25 (reversing district court's conclusion that presumption was defeated because merger would allow two smaller rivals to compete with a larger rival). As the D.C. Circuit explained, given the well-established risk of tacit collusion in concentrated markets, "[it] is a central object of merger policy to obstruct the creation or reinforcement by merger of such oligopolistic market structures in which tacit coordination can occur." *Id.*

35.     As noted *supra* ¶¶ 18, 20, this merger will significantly increase market concentration. Indeed, both Defendants and third parties view it as a "four-to-three" merger. Höttges 200:2–201:9; Legere 979:4–980:18; Ergen 1696:22–1697:10; PX370 p. 2; PX412 ▉▉▉▉.

36.     This increased concentration will reduce the carriers' incentives to compete with one another and drive prices up relative to where they would have been without the merger. Sprint's

Chief Marketing Officer has indicated the merger will allow all three remaining carriers to increase their revenue. Sole 74:2–80:16; PX566. Deutsche Telekom ("DT") has noted that a "4>3 [merger is] in the interest of all mobile players." PX 329 p. 23; PX339 p. 120. And Mr. Legere called "4 to 3" a "big prize[]" and told T-Mobile's Board that Verizon and AT&T are "slowing their competitiveness" *because* of the merger. Langheim 290:4–291:20; PX410 p. 1337, PX370 p. 2.

37.     Sprint led the charge in introducing low-cost unlimited plans, was the first to introduce cell-phone leasing, and has an established strategy of being the low-price leader, such that its elimination will increase the likelihood of coordinated effects. PX170 pp. 33–34; PX111 p. 44; PX525 p. 4; PX535; Sole 25:4–26:8, 30:5-20, 36:15–42:18; Shapiro 680:10–681:19.

38.     While T-Mobile has historically also been an aggressive competitor, New T-Mobile will match the scale of Verizon and AT&T, and the economic incentives that previously encouraged it to act as a maverick will change. Shapiro 678:11–679:15; 681:20–683:7. As T-Mobile's former Chief Marketing Officer explained, larger carriers have less upside from cutting prices and more to lose. Sherrard Dep. 68:13–69:24, 72:17–73:22. And, though T-Mobile has argued that New T-Mobile's greater scale and lower network costs will incentivize it to lower its prices, Verizon and AT&T today have more scale and lower network costs than T-Mobile, and *higher* prices. Sievert 1135:23–1137:10. Mike Sievert, T-Mobile's incoming CEO, has a duty to maximize New T-Mobile's profits for shareholders and will raise prices if it would be profitable for T-Mobile in the long run. Sievert 1094:20-23, 1098:5-11.

     **2.     The Relevant Market Is Vulnerable to Coordinated Interaction**

39.     Other market conditions, in addition to high concentration, can also be a "recipe for price coordination." *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 60 (D.D.C. 2009); *see also H&R Block*, 833 F. Supp. 2d at 78.

40.     The market for retail telecommunications is characterized by high barriers to entry, inelastic demand, minimal consumer purchasing power and price transparency—all conditions that make it vulnerable to coordinated interaction. Shapiro 672:24–675:12, 703:18–704:19.

41.     Prices in this market are highly transparent. PX184; PX175; Staneff Dep. 53:23–55:3; PX924 pp.8, 36; PX1021 pp.28–31; PX554; PX514; Sole 31:15–32:4; Shapiro 675:6–676:5.

42.     Defendants have not shown that the market for retail mobile wireless services lacks high barriers to entry. Indeed, Prof. Katz conceded as much. Katz 1816:2–3; *see also* Shapiro 703:21–704:10 (noting that "no new nationwide carriers have [entered] for years").[3]

43.     Indications that market participants "have already shown an awareness that implicit coordination would be beneficial" can also support a finding that a market is susceptible to coordination. *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 209 (D.D.C. 2018); *see* HMG § 7.2 (prior attempts to coordinate "suggest that successful collusion was difficult pre-merger but not so difficult as to deter attempts, and a merger may . . . make success more likely").

44.     Defendants have repeatedly attempted to "signal"—or interpret perceived signals from— other MNOs regarding their competitive intentions. These "signals" are meant to facilitate coordinated interactions amongst the MNOs, and convey MNOs' awareness of the market's susceptibility to coordination. PX410 p. 13; PX459; PX647 pp. 1-2; PX777; PX856; PX1318; Langheim 278:22–279:10; Shapiro 676:9-24; Roettgering Dep. 44:20–47:22.

### B.     New T-Mobile Will Be Able To Unilaterally Raise Its Prices Post-Merger

45.     Unilateral anticompetitive effects can occur when a merger's elimination of a competitor allows the remaining firm to charge higher prices or provide lower quality because it no longer

---

[3] These high barriers to entry have prevented cable companies like Comcast and Charter from acquiring significant market share. Schwartz 816:16–817:15. The cable companies do not expect this to change. Schwartz 871:18– 872:19. Nor did Defendants in the months preceding the merger and the concomitant investigation and litigation. PX410 p. 856 ("TMUS has no concern or doesn't see impact on post-paid phone business from Cable MVNO").

faces the risk that consumers will defect to the eliminated rival. *See* HMG § 6.1. Unilateral effects "may alone constitute a substantial lessening of competition." *Anthem*, 236 F. Supp. 3d at 216; *see Kraft Gen. Foods, Inc.*, 926 F. Supp. at 359.

46.     The risk of unilateral effects is magnified when the merging firms are "close competitors," even if they are not each other's "closest competitor." *Anthem*, 236 F. Supp. 3d at 216; HMG § 6.1. The danger that a merger will result in unilateral effects—and permit the combined company "to increase prices or otherwise maintain prices at an anti-competitive level"—is particularly acute when the merger would "eliminate significant head-to-head competition between the two lowest cost and lowest priced firms." *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1082 (D.D.C. 1997).

47.     Generally speaking, Sprint and T-Mobile offer lower prices than Verizon and AT&T. Höttges 168:21–169:25; Sole 46:8–47:11

48.     Qualitative evidence shows that Defendants are close competitors. DT Board Member Thorsten Langheim agrees that Sprint and T-Mobile "compete[] rigorously head to head." Langheim 275:10-13. T-Mobile carefully monitors Sprint's competitive moves. Langheim 275:20–280:5, 287:17-288:12; PX410 pp. 8, 156-57, 1227; PX8112 p.14; PX913; PX977; PX837; Legere 994:24–998:5. It moved up the launch of its unlimited plan to beat Sprint. Sievert 1110:16–1113:4; PX898; PX535 p.1. And it has planned or provided offers directed at Sprint customers or local markets where Sprint is performing well. PX888; PX907; PX908 pp. 2, 6; PX914; PX967; PX554; PX890 p. 3; Legere 997:23–999:16. Sprint also competes aggressively with T-Mobile. PX514; PX525 p.4; PX527 p.11; Sole 24:19–26:8, 62:10–64:24; PX770. This competition extends to Defendants' prepaid brands. Rittgers 127:11–129:3; PX461; PX559; PX504 p.2; PX507; PX916; McLaughlin Dep. 217:17-25.

49.     However, T-Mobile has downplayed its competition with Sprint in its public statements for strategic reasons. PX301; Legere 998:8–1002:16; PX890 p. 3; PX1001 p.1; Sievert 1113:18–25; PX339 p. 120; PX301; Sherrard Dep. 140:22–143:14. Sprint is aware of this tactic. PX554.

50.     Using a variety of sources of industry switching data, Prof. Shapiro quantified the extent of head-to-head competition between T-Mobile and Sprint and found that the two companies are very close competitors: Approximately 40% of the customers who switch away from T-Mobile switch to Sprint, and around 50% of the customers who switch away from Sprint switch to T-Mobile. Shapiro 693:19–695:24, 696:21-24.

51.     Based upon this quantification, Prof. Shapiro calculated that, even after the Boost divestiture, the elimination of direct competition between Sprint and T-Mobile will result in significant upward pricing pressure on New T-Mobile. Shapiro 698:15–702:22; PX1320, sl. 19. Prof. Shapiro's calculations are affected only minimally by incorporating certain adjustments proposed by Prof. Katz. PX1320, slide 19; Shapiro 2292:14–2293:19.

### C.     Defendants' Internal Documents Show That This Merger Is Anticompetitive

52.     Though unnecessary for a plaintiff to prevail, evidence that a merger is *intended* to reduce competition also supports a finding that the merger is anticompetitive. *See H.J. Heinz Co.*, 246 F.3d at 717; *Univ. Health, Inc*., 938 F.2d at 1220 n.27; *Stanley Works*, 469 F.2d at 504.

53.     The evidence shows that DT—T-Mobile's controlling shareholder—has precisely those kinds of anticompetitive motives. Since at least 2010, DT and T-Mobile have been interested in pursuing a merger with Sprint, and Defendants have repeatedly engaged in merger negotiations. Höttges 187:18-25; Claure 1320:13-22, PX332, PX339 p. 120. Throughout this nine-year span, DT's reasons for pursuing a merger with Sprint have not materially changed. Höttges 188:4-7. These motives include what DT describes as the "'Rule of 3'—potential to reduce price competition." PX1034 p. 8; Höttges 197:6–198:9; Höttges Dep. 101:16-24; Ewens Dep. 20:11–

21:22. Indeed, Mr. Langheim expressed the view that "if [T-Mobile] can't get 4-3 consolidation the industry is headed for commoditization"—that is, that because wireless services would become more of a commodity, prices would fall—"and DT should limit their exposure in the US." PX796, Ewens Dep. 73:7–77:2. And DT's head of M&A has emphasized that one of the potential benefits of a merger between Sprint and T-Mobile would be "market repair." PX382.

54.     DT also supports the merger because it will ensure that "cable c[annot] buy Sprint and use it against T-Mobile." PX303 p. 2; Langheim 348:6-11; PX343; PX339 p. 120.

## V.     **DEFENDANTS' REBUTTAL CASE**

55.     Defendants raise three defenses: (1) a weakened competitor defense, (2) an efficiencies defense, and (3) a remedies-based defense. Defendants fail to carry their burden each.

56.     In considering Defendants' arguments, this Court should accord little weight to evidence that "could arguably be subject to manipulation" or that may simply be an effort to "improve [a] litigation position." *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 79–80 (D.D.C. 2017).

57.     Defendants' actions make clear why courts discount potentially self-serving testimony. Mr. Langheim, on behalf of DT, submitted a declaration in support of the 2011 AT&T/T-Mobile merger averring that the transaction would benefit T-Mobile's customers and U.S. consumers, even though he in fact believed the merger would hurt competition.  Langheim 299:12–300:16.

### A.     **Defendants' Weakened Competitor Defense**

58.     Defendants' first rebuttal argument is that Sprint is so weak that it will not be a meaningful competitor in the future and, therefore, that eliminating Sprint as a competitor will not substantially lessen competition.[4] This defense—often termed the "weakened competitor" or "flailing firm" defense—has been dubbed the "Hail-Mary pass of presumptively doomed

---

[4] Plaintiff States do not understand Defendants to be asserting a failing firm defense.

mergers," *ProMedica*, 749 F.3d at 572, and is "probably the weakest ground of all for justifying a merger," *Kaiser Alum. & Chem. Corp. v. FTC*, 652 F.2d 1324, 1338–41 (7th Cir. 1981).

59.     To prevail on a weakened competitor defense, Defendants must show that: (1) Sprint's market share will decline so dramatically that it would undermine Plaintiff States' prima facie case, and (2) the purported weakness giving rise to this decline cannot be resolved by any means other than the merger. *ProMedica*, 749 F.3d at 572; *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 290 F. Supp. 3d 507, 515–16 (E.D. Va. 2018) (requiring an "imminent, steep plummet" in market share to prevail); *Aetna Inc.*, 240 F. Supp. 3d at 92; *FTC v. ProMedica Health Sys., Inc.*, 2011 WL 1219281, at *58 (N.D. Ohio Mar. 29, 2011).

60.     Likely due to the stringency of these requirements, defendants sometimes try to avoid calling arguments about a merging entity's weakness what they truly are: a flailing firm defense. Instead, these defendants argue that evidence related to the merging entity's weakness is simply relevant to the competitive-effects analysis. But courts have rejected efforts to make an end-run around the high bar the weakened competitor defense imposes. *See, e.g.*, *Steves & Sons, Inc.*, 290 F. Supp. 3d at 510–11, 513, 517.

61.     Sprint's market share has been stable the past few years, and will remain so for at least the next several years. Shapiro 650:2–652:20; PX1258 sl. 3–4.

62.     Over the past four fiscal years, Sprint's revenue and subscriber totals have also remained stable, with some increases.[5] At the same time, Sprint's EBITDA has increased by 29.4%, and its EBIT has increased three-fold. PX1315 p. 2; Solomon 2004:23–2005:24, 2007:16-24.

63.     Sprint executives have recently and repeatedly assured investors of the company's

---

[5] While Sprint reported that wireless service revenue declined during the past two quarters, Sprint has told investors that the declines were due to one-off events that are unlikely to recur (an accounting change and an adjustment based on an error Sprint made with respect to government subsidies). PX115 p. 5; PX214 p. 5; Solomon 2015:7–2017:23. Absent these idiosyncrasies, Sprint's wireless service revenue would have remained stable. *Id.*

stability. PX104; PX632; PX1256; Claure 1327:23–1328:19, 1330:8–1331:24, 1332:14-23;

Solomon 2011:18–2012:10. In 2018, Sprint even touted the "best profitability in company

history" after securing "its highest annual operating income" ever. PX109 p. 1.

64.     These positive results have occurred despite Sprint's acknowledgement that the pendency

of the merger has made it "harder to compete." PX123 p. 8; *see also* PX170 p. 15; Solomon

2012:20–2015:3. Sprint has also limited and altered its spending on network improvements due

to the merger. Davies Dep. 94:22–96:4; PX1202; Bluhm 497:9–498:6.

65.     These positive results also belie Sprint's self-serving predictions about its future. Sprint is

financially stable. *See supra* ¶¶ 62–63. And it has a considered strategy to prioritize 48 markets

(covering approximately 70% of the U.S. population) for 5G expansion, while also improving its

network in the remaining markets. Combes 1424:25–1425:15; PX1202 pp.12–17. Under this

plan, Sprint would continue to be a national carrier, covering 93% of the U.S. population.

66.     Sprint's current situation compares quite favorably to T-Mobile's in 2011. T-Mobile was

hemorrhaging customers and had high churn and an inferior network. PX394, PX1263; Legere

905:5-20, 941:18–942:25; Langheim 292:1–295:10. Sprint, by contrast, has held steady at over

50 million total subscribers for years, and it possesses an extremely valuable trove of mid-band

spectrum that Sprint has told another judge in this Court will allow it to "leap-frog" its

competitors as it deploys 5G. PX648 ¶¶ 24–25; PX1315 p. 2.

67.     Just as T-Mobile overcame the challenges it faced in 2011, Sprint can overcome the

challenges it is currently facing. Indeed, Sprint has developed a plan to spend approximately $5

billion a year over five years to improve its network,[6] PX425 p. 12; Bluhm 456:7-16, 458:4–

---

[6] Sprint spent the first $5 billion in 2018, and has already observed significant network improvements. PX436-N, pp.
2, 17; Bluhm 467:19–472:1. There is a lag between network investment and improved customer perception, such
that one would not yet expect to see a substantial improvement in the public's perception of Sprint's network based
on this expenditure. PX437-N, pp. 74–75; Bluhm 444:16–446:9, 460:19–461:8.

460:2; Combes 1407:25–1408:25; Solomon 2024:14-16, and its adjusted operating cash flow, as forecasted in its Board-approved plan of record, will be more than sufficient to fund this level of investment, Solomon 2020:11-18, 2026:17-22. Should Sprint require additional funds, it has $10.9 billion of near-term sources of debt available, as well as cash on its balance sheet and additional borrowing capacity. PX1315 p. 8; Solomon 2031:7–2032:21, 2064:21-22, 2065:19–2066:2. Softbank's Founder and CEO Masayoshi Son has stated that he is willing to pay back all Sprint's bonds. PX469; Claure 1318:18–1319:12. With the right leadership and a commitment to innovation, Sprint can follow T-Mobile's precedent and strengthen its competitive position.

68.     Sprint also has a number of strategic alternatives to a merger with T-Mobile, including a merger or MVNO arrangement with a cable company. PX196 p. 5; Claure 1342:23–1343:2; PX220 p. 14. In 2018 Sprint also contemplated a merger with DISH, proposing that the merged company could sell spectrum for financing while still deploying the country's best 5G network. PX252; Claure 1343:22–1344:12; Cullen 1770:6–1771:14, 1775:19-22.

### B.     Defendants' Efficiencies Defense

69.     Defendants' efficiencies defense rests on the claim that the merged firm will have a superior network, with greater capacity and lower costs, than the standalone firms could achieve. Defendants purported to quantify these cost efficiencies by developing a model that projects dramatically lower marginal congestion relief costs for the merged firm compared with the standalone firms by 2024. Scott Morton 2188:20–2189:10.

70.     "The Supreme Court has never expressly approved an efficiencies defense to a § 7 claim," and circuit courts that have entertained this defense have made clear that it is highly disfavored. *St. Alphonsus*, 778 F.3d at 788–89, 790 ("We remain skeptical about the efficiencies defense"); *accord FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 348 (3d Cir. 2016); *Anthem*, 855 F.3d at 353; *see also* Plaintiffs' Pretrial Mem. at 18-19. No court has held that the

benefits generated by a merger are sufficient to overcome a presumption of illegality. *See Anthem*, 236 F. Supp. 3d at 236–37.

71.    Defendants must show that any alleged efficiencies are "sufficient to overcome the presumption of anticompetitive harm." *Sysco Corp.*, 113 F. Supp. 3d at 86; *see also Penn State Hershey Med. Ctr.*, 838 F.3d at 350. Where, as here, "the potential adverse competitive effect of a merger is likely to be particularly substantial, extraordinarily great cognizable efficiencies would be necessary." HMG § 10; *St. Alphonsus*, 778 F.3d at 790. Efficiencies outside the relevant market are irrelevant to this inquiry. *See* Plaintiffs' Pretrial Mem. at 4–5 n.2, 18-19.

72.    Defendants bear the burden of showing that: (1) the claimed efficiencies are "verifiable, not merely speculative," *St. Alphonsus*, 778 F.3d at 791; (2) the efficiencies are "merger-specific. . . which is to say that the efficiencies cannot readily be achieved without the concomitant loss of a competitor," *id.* at 790-91; *see also H.J. Heinz Co.*, 246 F.3d at 721–22; and (3) the claimed efficiencies will benefit customers, *Univ. Health, Inc.*, 938 F.2d at 1222.

73.    For alleged efficiencies to be deemed verifiable, "the court must undertake a rigorous analysis of the kinds of efficiencies being urged by the parties in order to ensure that those 'efficiencies' represent more than mere speculation and promises about post-merger behavior." *H.J. Heinz Co.*, 246 F.3d at 721. This rigorous analysis requires that efficiencies be "reasonably verifiable by an independent party"; the testimony of "experienced executives" alone will not suffice. *H&R Block*, 833 F. Supp. 2d at 89, 91; *see also Tronox Ltd.*, 332 F. Supp. 3d at 215-17; *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 73 (D.D.C. 2018).

74.    Courts view projections of efficiencies created "outside of the usual business planning process" with great skepticism. HMG § 10; *see ProMedica Health Sys., Inc.*, 2011 WL 1219281, at *40; *United States v. Rockford Mem'l Corp.*, 717 F. Supp. 1251, 1289 (N.D. Ill. 1989).

75.     Less weight is given to efficiencies that are remote in time, "because they are...more difficult to predict." HMG § 10; *see also CCC Holdings*. 605 F. Supp. 2d at 76; *Anthem*, 855 F.3d at 358 (efficiencies too speculative when renegotiations would take 3-5 years to complete).

### 1.     Defendants' Efficiencies Estimates Are Not Ordinary Course

76.     In early 2018, T-Mobile did not have a capacity/congestion planning model for 5G that it used in the ordinary course of its business. Scott Morton 2203:6-17; Kapoor 1314–1513:25; PX75 pp. 2-3 & n.3; PX81 pp. 2-3. Instead, Prof. Katz made his efficiencies calculations using the "Montana" congestion planning model, which was created at counsel's direction over the course of six months *after* Defendants' Boards had already evaluated and approved the merger in April 2018. Kapoor 1514:12–1518:3; Ray Dep. 107:3-10; Kapoor Dep. 65:19–66:8; PX81.

77.     To build the Montana model, T-Mobile—under the direction of outside counsel— substantially modified its existing 4G congestion planning tool for litigation purposes, adding a 5G module, a Sprint standalone scenario, and a New T-Mobile scenario. Scott Morton 2188:10-13; Kapoor 1512:13-1514:11; PX81. Sprint does not use a congestion-based network planning model in the ordinary course of its business at all, making the Montana model a particularly unreliable means of measuring its marginal costs. Kapoor 1481:6-17; Scott Morton 2204:14-20.

78.     Because this model was created outside the usual business planning process, the Court should view Defendants' efficiencies estimates with great skepticism.

### 2.     The Montana Model's Estimates Are Unverifiable and Speculative

79.     The Montana model recommends congestion solutions through 2024 based on data from 2018, but the ordinary course model (onto which T-Mobile grafted the 5G, New T-Mobile and Sprint standalone modules) is used to make capacity deployment plans only up to 18 months in advance. Moreover, in the ordinary course, T-Mobile semiannually updates the data inputs on which congestion calculations are based. Kapoor 1522:11–1531:2; Scott Morton 2202:19–

2203:5; PX1214.

80.     The static nature of the Montana model renders Defendants' projections of efficiencies through 2024 speculative and unreliable. Scott Morton 2187:23–2188:4. *First,* because its input data is static for five years, the Montana model has no "memory" of and cannot accurately account for the capacity effects of solutions implemented in prior years.  For example, to address congestion in year 2, the model will simply recommend the year 1 solutions again, and then layer on additional solutions to address demand increases in year 2.   This flaw will necessarily exaggerate T-Mobile's costs. Kolodzy 2119:7–2121:5; Kapoor Dep. 165:3-8; PX1314, slide 20. *Second*, as the Montana model's projections get further out in time, the extent to which they are based on an inaccurate representation of the physical network increases, rendering the model's results more and more unreliable. Kolodzy 2117:19–2121:5; PX1314 p. 20.

81.     The Montana model fails to account for the fact that the integration of Sprint and T-Mobile's network may be delayed, even though Defendants have acknowledged this possibility, and notwithstanding the fact that T-Mobile's last major acquisition is currently failing to meet its goals. Höttges 222:13-25; Combes Dep. 193:9–194:11; Ewens Dep. 196–199; PX300 p. 3.

82.     The Montana model artificially increases the costs, and constrains the performance, of standalone Sprint and T-Mobile by assuming that neither firm will acquire any new spectrum during the five years it models. Katz 1950:11-1952:5; Ray Dep. 79:6-10; Scott Morton 2191:8–2192:22, 2195:1-10. This assumption provides a significant advantage to the combined firm in Prof. Katz's calculation of efficiencies—spectrum valued at approximately $26 billion—without accounting for the possibility of any spectrum acquisitions by standalone Sprint or T-Mobile. Scott Morton 2246:5-22. Indeed Prof. Katz conceded that New T-Mobile's "additional" spectrum is the principal advantage it has over standalone T-Mobile. Katz 1947:7-20. But, this

assumption is unrealistic and inconsistent with historical business practices; Sprint and T-Mobile have obtained spectrum every year for the past seven years and intend to continue to do so. Kolodzy 2102:9–2103:6; Combes 1413:6-8; Sievert 1124:20–1125:2; PX1121; PX1314, slide 13. And the FCC plans to auction hundreds of megahertz of desirable mid-band spectrum later this year, including CBRS and C-band spectrum. Kolodzy 2092:3–2095:25; 2100:13–2101:1.1

83.     The Montana model also ignores advances in technology that would increase the efficiency of Defendants' use of their existing spectrum, thereby increasing the costs associated with standalone Sprint and T-Mobile. For example, the Montana model ignores a technology called DSS that would more efficiently transition spectrum between 4G and 5G. Kolodzy 2104:11–2108:24; PX1314, slides 14-17; Scott Morton 2234:17–2235:2; Kapoor Dep. 106:24–108:14. This static view of technology is yet another reason the Montana model's projections are unreliable. Scott Morton 2191:11-21; Kolodzy 2103:7–2104:10; Bluhm 487:7-18.

84.     Prof. Katz admits that his calculations for standalone T-Mobile and Sprint require accurate models of T-Mobile and Sprint's future behavior, and that business plans inform that behavior. Katz 1962:15–1963:12. But T-Mobile has not yet determined its standalone plan if the merger is enjoined and does not know if that plan will meet "some or all of the objectives that [Defendants are] trying to meet with the Sprint merger." Höttges 231:11-14; Langheim 350:12-22. Moreover, since Sprint provided its data to T-Mobile, Sprint has been developing alternative plans for its standalone future, which rely on different spectrum and technology than the network plans and data used in the Montana model. These differences would impact the Montana model's results. Kapoor Dep.198:12-199:4, 199:16-24; Kolodzy 2122:19-2124:12.

85.     The "congestion threshold"—the calculated speed below which the model triggers congestion solutions—that T-Mobile modeled for 5G is significantly and unreasonably larger

than the threshold that T-Mobile used for 4G. The 5G congestion threshold T-Mobile selected is based on the speeds necessary to stream 4K video, a screen resolution that is a tiny percentage of phones used on T-Mobile's network, and is unlikely to be visibly superior to existing resolutions. Kapoor 1538:8–1542:1; DX 5060 p. 17; Ray Dep. 40:20–44:16; Kolodzy 2111:5–2113:14. This choice of congestion threshold artificially inflates the costs estimated by the model. Kolodzy 2113:15–2114:25; PX1314 p. 29. This inflation of costs is exacerbated by the questionable way the model handles leakage of 5G onto LTE-only sites.  Kolodzy 2115:10-12216:22.

86.     Once Prof. Katz's model is adjusted to accommodate more realistic predictions regarding standalone T-Mobile and Sprint—like the acquisition of spectrum—Defendants' projected efficiencies decrease dramatically. Scott Morton 2192:21–2193:16, 2200:11-20; Kolodzy 2088:13–2091:20, 2106:6–2107:1; PX1314 pp 3–57. Defendants' projected efficiencies are therefore speculative and unverifiable.

87.     Prof. Katz has no opinion on the merger's competitive effects if his numbers are incorrect.  Katz 1925:3-23.

### 3.     Prof. Katz Did Not Accurately Model Network Speed Efficiencies

88.     Prof. Katz relied on this flawed Montana model to calculate the efficiencies consumers might experience as a result of improved network speed. Scott Morton 2205:2–2206:10.

89.     Prof. Katz's attempt to value any merger-specific increases in speed is speculative as his calculation is based on an article studying dramatically slower speeds (15 megabits per second) in a much different environment than those standalone Sprint and T-Mobile will offer in 2024. Scott Morton 2205:2–2214:8. This distinction is important: Prof. Katz's analysis assumes that consumers derive tremendous quantifiable benefits beyond those that will already occur from the 5G networks that will be built by standalone T-Mobile and Sprint. *Id*. But mobile wireless customers value speed only insofar as it enhances their user experience. *Id*. For example, once a

customer has the speed necessary to watch a video on his phone without interference, additional speed loses practical impact, and thus value. *Id*. Prof. Katz's work does not properly model this.

90.     The possibility that future products, services or technologies will rely on greater speeds and bring quantifiable consumer value is too speculative to justify an anticompetitive merger. Scott Morton 2214:12–2216:2; 2216:19–2217:14. Such possible future technologies would need to be merger-specific in order to be credited as efficiencies. *Id*. at 2216:9-18.

### 4.     Defendants' Efficiencies Are Not Merger-Specific

91.     Efficiencies are not cognizable if some or all of the benefits could be achieved via "alternatives that are practical in the business situation faced by the merging firms" and that would not harm competition. HMG § 10.

92.     Prof. Katz's analysis of merger specificity did not address "potential options that might bring similar benefits that don't involve a transaction of some form between T-Mobile and Sprint," as Defendants must to establish an efficiencies defense. Katz 1973:5-8, 1972:24–1973:4.

93.     Sprint has a variety of means of achieving consumer-enhancing improvements to its standalone performance. It has the opportunity to "leapfrog" its competition as a standalone firm. PX648, ¶¶ 24–25. And it has considered the possibility of a merger with Comcast, Charter or DISH in the past. *See supra* ¶ 66. Prof. Katz did not consider such transactions. Katz 1973:9-13.

94.     Mr. Legere admitted that alternative transactions could bring T-Mobile equivalent benefits to the Sprint merger. For example, Mr. Legere has never thought that a merger between T-Mobile and Sprint "[would be] superior to" a merger between T-Mobile and DISH. Legere 956:21–957:3. And that transaction would result in a "deep nationwide spectrum position," much like the Sprint merger. Legere 951:14–956:6; *see* Höttges 226:9–227:6; PX334. Mr. Legere believed in 2017 that it would be "easy" to buy DISH. PX378. Alternatively, T-Mobile could lease spectrum from DISH, providing it with the "principal advantage" of the Sprint merger,

without the anticompetitive effects. Cullen 1766:1–1767:19; Legere 963:2-18; Katz 1947:7-20.

95.     If the merger with Sprint is not consummated, DT's employees acknowledge that T-Mobile has a strong stand-alone future. DT will continue to invest in the company, and T-Mobile will be able to acquire new spectrum and towers, and continue to offer attractive products to customers. Legere 958:19–961:1; Langheim Dep. 246:18–247:3.[7]

96.     T-Mobile and Sprint do not need to merge in order to compete with AT&T and Verizon. Today, more than 130 million customers choose T-Mobile and Sprint's offerings instead of Verizon or AT&T. Legere 912:23–25 (84M); Claure 1336:13–14 (50M). Indeed, T-Mobile announced in late 2017, when its merger negotiations with Sprint had reached an impasse, that it did not need to merge with Sprint to compete vigorously with Verizon and AT&T. T-Mobile's Chief Financial Officer, told investors that as T-Mobile continued to "scale and evolve…we believe AT&T and Verizon will shrink. We'll come up and there will be an equilibrium." PX92 p. 13. T-Mobile also engaged in strategic planning sessions in which it laid out several plans for T-Mobile's future, including a scenario in which T-Mobile would become the largest wireless player in the U.S. Legere Dep. 176:9–180:8; PX1045 at 76. And while T-Mobile witnesses claim that New T-Mobile will be better able to compete against Verizon and AT&T, Mr. Sievert admitted that those two companies have already "been forced to respond over and over to what [T-Mobile has] done." Sievert 1136:22–1137:5.

97.     Finally, while Defendants claim that some of the merger's efficiencies are attributable to spectrum constraints that Sprint and T-Mobile will face if they remain standalone companies, similar claims have been made—and proven wrong—in the past. Katz 1943:10–1947:1; Kapoor

---

[7] In 2017, once a merger with Sprint no longer seemed possible, T-Mobile and DT repeatedly expressed their enthusiasm for T-Mobile's standalone future. Sievert 1114:7–1121:1; PX325; PX1067.

Dep. 156:21–157:22; PX211 p. 44, PX332 p. 4. And T-Mobile believes it has "multiple paths to extend capacity," that are not dependent on this merger. Langheim Dep. 259:24–262:3; PX760.

### C.   Defendants' Remedies-Based Defense

98.   Defendants' final defense is that their agreements with the FCC and USDOJ resolve any anticompetitive effects the merger would otherwise have. To evaluate this defense, the Court must assess whether these remedies will "replace the competition lost by the merger." *Aetna Inc.*, 240 F. Supp. 3d at 60; *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972).

99.   *Defendants* bear the burden of showing that the proposed remedies will restore competition to pre-merger levels. *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 137 n.15 (D.D.C. 2016); *see also Sysco*, 113 F. Supp. 3d at 72; *Aetna Inc.*, 240 F. Supp. 3d at 60; *United States v. Franklin Elec. Co.*, 130 F. Supp. 2d 1025, 1033 (W.D. Wis. 2000).

100.   **FCC Commitments:** To secure FCC approval, Defendants committed to: (1) divest Boost Mobile; (2) freeze rate-plan prices for three years; and (3) build a nationwide 5G network on a prescribed schedule; including a slightly quicker rollout in some rural markets. PX1211, ¶¶ 25–32. Unsurprisingly, given that the FCC's focus is not competition, these commitments do not "negate" the merger's anticompetitive effects. *Staples, Inc.*, 190 F. Supp. 3d at 137 n.15. *First*, Boost as a standalone brand with 9 million customers is insufficient to replace Sprint, a company that has been a robust competitor for decades. *Second*, a commitment to freeze prices means little in a market where "[f]ierce competition . . . has led to falling prices" for years. *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 65 (D.D.C. 1998). *Third*, Sprint and T-Mobile are *already* selling 5G service in markets throughout the country and have comprehensive standalone plans to compete as 5G leaders. Sole 80:22–83:16; PX648 pp.7–8; Langheim 368:12–14; PX131. In any event, improved coverage in certain markets cannot justify an increase in market concentration nationwide, or the anticompetitive effects that concentration generates. *See*

*Phila. Nat'l Bank*, 374 U.S. at 370.

101.    **DISH Deal:** USDOJ reviewed the transaction as originally proposed—and as modified

by Defendants' FCC commitments—and concluded that it was an anticompetitive 4-to-3 merger

that would result in "increased prices and less attractive service offerings for American

consumers." PX1213, ¶ 5. But USDOJ opted to approve the transaction after facilitating a deal

("the DISH deal") between Defendants and DISH, a satellite TV provider, that was primarily

intended to allow DISH to enter the market as a fourth retail wireless competitor.[8] PX5363;

PX254 p.179.

102.    In evaluating whether the DISH deal is an adequate remedy, this Court must ask whether

DISH's entrance into the market will be "timely, likely, and sufficient in its magnitude, character

and scope to deter or counteract the competitive effects of concern." HMG § 9.

103.    The relevant time frame for assessing "timeliness" is "two to three years." *Staples, Inc.*,

190 F. Supp. 3d at 133; *United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *70 n.19 (N.D.

Cal. 2014); *H&R Block*, 833 F. Supp. 2d at 73 n.28; *ProMedica Health Sys.*, 2011 WL 1219281,

at *31. This Court must ask whether, "in the near term," DISH will be able to "step into

[Sprint's] shoes" and "maintain . . . the pre-merger level of competition." *Sysco*, 113 F. Supp. 3d

at 73.

104.    Courts have rejected arguments that a new competitor is likely or sufficient to resolve the

competitive risks of a merger where the new competitor is projected to be significantly smaller

than the acquired firm. *See, e.g.*, *Sysco Corp.*, 113 F. Supp. 3d at 73. Courts have also found

relevant a new entrant's lack of relevant expertise or brand recognition, disadvantages a new

---

[8] Certain key aspects of the remedy negotiated by USDOJ, and the extensions to DISH's build-out deadlines, are
dependent on further action by the FCC. Ergen 1709:2–1712:13; PX1211 n.15 & ¶ 395. The timeline for FCC action
is uncertain, as is its ultimate conclusion. Until the FCC acts, this Court cannot predict what its decision will be. *See
Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 321 (D.C. Cir. 2011); *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943).

entrant may face with respect to distribution and personnel, and whether there have been high barriers to entry in the relevant market historically.[9] *See, e.g.*, *Staples, Inc.*, 190 F. Supp. 3d at 134; *Sysco Corp.*, 113 F. Supp. 3d at 76–77; *Aetna Inc.*, 240 F. Supp. 3d at 64–65, 72–73.

105.    Finally, remedies involving a new entrant must provide for an "*independent* competitor." *Sysco*, 113 F. Supp. 3d at 77. A "continuing relationship[]" between a defendant and a new entrant "can be a problem." *Id.*; *Aetna Inc.*, 240 F. Supp. 3d at 60; *CCC Holdings*, 605 F. Supp. 2d at 49.

106.    DISH's entrance into the market will not be timely, likely, or sufficient to replace the competitive significance of Sprint and, thus, to mitigate the anticompetitive effects of the merger. Scott Morton 2179:25–2180:6, 2221:13–14; *see also* Shapiro 703:21–704:10, 711:16–712:10.

107.    DISH is a satellite TV provider with no experience in the retail mobile wireless industry, no retail wireless subscribers, no retail wireless network, no retail wireless stores, no brand associated with retail wireless services, and no towers capable of communicating with handsets. Ergen 1566:7:1568:9; Cullen Dep. 31:22–32:6, 32:19–34:4, 35:17-19, 35:22.

108.    According to DISH's own projections, in two to three years, the company will still pale in comparison to Sprint. DX7199. Today, Sprint has about 45 million subscribers, and its network covers 93% of the population. Shapiro 703:21–704:10. In two years, DISH projects that it will have ███████████████████████████████. DX7199 p. 6. DISH's FCC commitments, moreover, require DISH's network to cover just 20% of the population by mid-2022. DX7202. ███████████████████████████████████████████

---

[9] DISH EVP of Corporate Development Thomas Cullen testified that the wireless industry's high barriers to entry would likely keep DISH from ever entering the retail market absent the DISH deal. Cullen 1762:21–1763:13. And Mr. Ergen testified that DISH originally opposed the merger because it believed that a transition from four market participants to three would prevent any potential competitor—DISH included—from entering the market. Ergen 1584:21–1585:18, 1741:14–1742:15; *see* Blum Dep. 42:22–44:12; PX73; PX74; PX82; PX13–PX26; PX259.

███████████████████████████████████████████████████████.

DX7199 p. 6. By 2023, DISH has committed simply to cover 70% of the population with its network. DX7202.

109.    DISH has offered no concrete explanation as to how it arrived at the subscriber and revenue numbers in its models. Although DISH justified its numbers by referencing negotiations with potential partners, Ergen 1652:7–18, none of those deals has been finalized, and DISH lacks any firm financing commitments. Cullen 1768:19–1769:2; Ergen 1628:9–14, 1668:7–24.

110.    DISH will be dependent on numerous third parties (tower companies, handset manufacturers, tech companies, etc.) to succeed. Cullen 1754:17–1755:8, 1756:22–1757:20, 1759:8–17, 1761:6–15; Ergen 1578:17–1579:13. If any of these companies falls behind schedule, those delays could disrupt DISH's deployment. *See id.*; PX97.

111.    Although DISH told the FCC in 2012 that it planned to enter the retail wireless market, now—more than seven years later—DISH still has not built a mobile broadband network for consumers. PX37 (2012 Letter); Ergen 1728:17–1729:10.

112.    DISH has repeatedly failed to meet FCC-imposed deadlines, even when it has faced harsh consequences for doing so. Ergen 1681:18–21; PX1303; PX1305; PX1177. DISH has also found ways to subvert and make an "end-run[]" around certain FCC regulatory regimes, including its decision to "abuse" the FCC's designated entity program. PX1306; *see* PX1308–PX1310.

113.    At least two federal courts have found that testimony offered by DISH Chairman Charles Ergen, was untruthful or not credible. *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 276 F. Supp. 2d 1237, 1244 (S.D. Fla. 2003), *overruled on other grounds by* 450 F.3d 505 (11th Cir. 2006); *In re: LightSquared, Inc.*, 511 B.R. 253, 319 (S.D.N.Y. 2014).

114.    Defendants have expressed skepticism about whether DISH seriously intends to build a

nationwide network. PX346; PX347; PX375; PX401; PX402; PX403; Claure 1346:4-1348:22.

115.     For at least the next seven years, DISH will be reliant on New T-Mobile to provide

mobile wireless service to some, if not all, of its customers. DX5363, pt. VI; DX7207; Ergen

1715:15–24. DISH will also rely on New T-Mobile to provide transition services. *Id.* In

exchange, DISH will pay some portion of its revenue to New T-Mobile. *Id.*; Ergen 1717:2–7. For

these reasons, DISH will not be an *independent* competitor. Ergen 1719:4–1722:2; Shapiro

714:9–715:1; Scott Morton 2222:2–2223:6. Even as DISH and New T-Mobile are contractually

obligated to work together to provide wireless service to DISH's customers, DISH and New T-

Mobile will be competing against one another for customers. *Id.* This scenario will give rise to an

inherent conflict of interest. *Id.*

116.     In sum, there is considerable reason for this Court to doubt whether DISH will build the

promised network; and, even if it does, DISH's most optimistic projections still fall well short of

being timely, likely, or sufficient to replace the lost competition that Sprint has long provided.

**VI.     <u>PERMANENT INJUNCTION</u>**

117.     Courts consider four factors in deciding whether to issue a permanent injunction: (1)

"irreparable injury"; (2) inadequacy of remedies at law; (3) "the balance of hardships"; and (4)

whether "the public interest would not be disserved by a permanent injunction." *eBay Inc. v.*

*MercExchange, LLC*, 547 U.S. 388, 391 (2006). The first two are satisfied if a merger "threatens

to reduce competition" and will cause ongoing economic harm to consumers. *New York ex rel.*

*Schneiderman v. Actavis PLC*, 787 F.3d 638, 660–62 (2d Cir. 2015).

118.     This merger threatens to reduce competition and cause ongoing economic harm to

consumers in the form of higher quality-adjusted prices relative to where prices would be absent

the merger. The upward pricing pressure caused by the loss of head-to-head competition between

Sprint and T-Mobile would cause $4.6 billion in consumer harm if New T-Mobile passes on only

*half* of this pressure to consumers. Shapiro 698:15–702:22; PX1320, slide 19. And if, as a result of coordinated interaction, Verizon, AT&T, and New T-Mobile hold prices steady for a single year, it would cost consumers approximately $8.7 billion. Shapiro 668:23–675:12, 684:1-25.

119.    Defendants' pre-trial brief did not identify any hardships faced by Defendants from issuance of an injunction, and the fact that an injunction would require Defendants to continue to "compete with other firms in the market is what the antitrust laws require, not a cognizable harm." *New York v. Actavis, PLC*, 2014 WL 7015198, at *45 (S.D.N.Y. Dec. 11, 2014). By contrast, denying an injunction would cause billions of dollars of harm to consumers.

120.    In considering the public interest, the Court's analysis must be tethered to the purposes of the Clayton Act. *See* Plaintiffs' Pretrial Mem. at 27–29. An injunction that curbs an antitrust violation is consistent with the public interest. *See Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687, 699 (2d Cir. 1973) ("[D]oubts as to whether an injunction . . . is necessary to safeguard the public interest" against an antitrust violation "should be resolved in favor of granting the injunction," regardless of whether the plaintiff is the government or a "private attorney general."). This reflects the well-established proposition that a "reduction in competition must be considered against the public interest." *Jim Bouton Corp. v. Wm. Wrigley Jr. Co.*, 902 F.2d 1074, 1080 (2d Cir. 1990); *Actavis,* 787 F.3d at 662.

121.    A federal agency's determination that a merger is in the "public interest" is not controlling. *Radio Corp. of Am.*, 358 U.S. at 337, 346 (prior FCC approval under a public interest standard not controlling); *Fed. Power Comm'n*, 369 U.S. at 485–86, 490; *Phil. Nat. Bank*, 374 U.S. at 332 & n.8, 350-52.

Dated this 8th day of January, 2020.
Respectfully submitted,

FOR PLAINTIFF STATE OF
NEW YORK

LETITIA JAMES
Attorney General

CHRISTOPHER D'ANGELO
Chief Deputy Attorney General,
Economic Justice Division
(*pro hac vice* forthcoming)

Beau Buffier
Beau.Buffier@ag.ny.gov
Elinor R. Hoffmann
Elinor.Hoffmann@ag.ny.gov
Morgan J. Feder
Morgan.Feder@ag.ny.gov
Michael Jo
Michael.Jo@ag.ny.gov
Jeremy R. Kasha
Jeremy.Kasha@ag.ny.gov
Beatriz Marques
Beatriz.Marques@ag.ny.gov
Amber Wessels-Yen
Amber.Wessels-Yen@ag.ny.gov
James Yoon
James.Yoon@ag.ny.gov
New York State Office of the       Attorney
General
28 Liberty Street
New York, NY 10005
Tel:  (212) 416-8262

*Attorneys for Plaintiff State of New York*

FOR PLAINTIFF STATE OF CALIFORNIA

XAVIER BECERRA
Attorney General

KATHLEEN FOOTE
Senior Assistant Attorney General

MICHAEL JORGENSON
Supervising Deputy Attorney General

Paula L. Blizzard
Paula.Blizzard@doj.ca.gov
Adam Miller
Adam.Miller@doj.ca.gov
Nicole Gordon
Nicole.Gordon@doj.ca.gov
Michael Battaglia
Michael.Battaglia@doj.ca.gov
Brian Wang
Brian.Wang@doj.ca.gov
California Office of the Attorney General
455 Golden Gate Avenue Suite 11000
San Francisco, CA 94102
Tel:  (415) 510-4400

MUNGER, TOLLES & OLSON LLP

Glenn D. Pomerantz
Glenn.Pomerantz@mto.com
Kyle W. Mach
Kyle.Mach@mto.com
Kuruvilla J. Olasa
Kuruvilla.Olasa@mto.com
Sarah G. Boyce
Sarah.Boyce@mto.com
Lauren E. Ross
Lauren.Ross@mto.com
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel:  (213) 683-9100

*Attorneys for Plaintiff State of California ex rel. Xavier Becerra*