UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, DISTRICT OF COLUMBIA, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MISSISSIPPI, COMMONWEALTH OF VIRGINIA, and STATE OF WISCONSIN,<br><br>        Plaintiffs,<br><br>        v.<br><br>DEUTSCHE TELEKOM AG, T-MOBILE US, INC., SPRINT CORPORATION, and SOFTBANK GROUP CORP.,<br><br>        Defendants. | Case No.: 1:19-cv-05434-VM-RWL |

**BRIEF OF AMICI CURIAE NICHOLAS ECONOMIDES, JOHN KWOKA, THOMAS PHILIPPON, ROBERT SEAMANS, HAL SINGER, MARSHALL STEINBAUM, AND LAWRENCE J. WHITE IN SUPPORT OF PLAINTIFFS**

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

Fred T. Isquith
Veronica Bosco
270 Madison Avenue
New York, New York 10016
212-545-4600
isquith@whafh.com
bosco@whafh.com

*Counsel for Amici Curiae*

Lawrence J. White
Nicholas Economides
John Kwoka
Thomas Philippon
Robert Seamans
Hal Singer
Marshall Steinbaum
44 West Fourth Street, 7-65
New York, NY 10012
212-998-0880
lwhite@stern.nyu.edu

*Amici Curiae*

# TABLE OF CONTENTS

INTERESTS OF AMICI .................................................................................................................. 1

INTRODUCTION .......................................................................................................................... 2

ARGUMENT .................................................................................................................................. 3

    A.    Harms in the Wholesale Market for MVNO Access .......................................................... 3

    B.    Harms in the Retail Mobile Wireless Services, Including Postpaid and Prepaid ............ 4

    C.    There Is No Compelling Record Evidence of Marginal Cost Savings Attributable to the Merger .................................................................................................................................. 6

    D.    The Nature of the Proposed Final Judgment ..................................................................... 7

        1.    Behavioral Aspects .............................................................................................. 7

        2.    Structural Aspects ................................................................................................. 9

    E.    The Merger-Related Harms Will Not Be Adequately Addressed By The Proposed Final Judgment ..................................................................................................................... 10

        1.    If Dish Does Not Build Out a National Facilities-Based Network, Wireless Competition Will Be Forever Weakened ............................................................ 11

        2.    Even in the Unlikely Scenario Where Dish Elects to Build Out, Given the Time Required, Competition Will Be Weakened in the Intervening Years ................... 13

        3.    The Impact of the Deficient Remedy Will Be Significant Consumer Injury ....... 15

CONCLUSION ............................................................................................................................. 16

**INTERESTS OF AMICI**

As economists with significant experience in competition and regulatory matters, Nicholas Economides, John Kwoka, Thomas Philippon, Robert Seamans, Hal Singer, Marshall Steinbaum, and Lawrence J. White (the "Amici") are scholars and experts in competition, industrial organization, and the economic analysis of antitrust issues.[1] Amici have previously addressed the competitive effects flowing from the proposed merger of Sprint Corporation ("Sprint") and T-Mobile US, Inc. ("T-Mobile") (the "Merger"), as recognized by the Department of Justice's (the "DOJ") Complaint[2] and inclusive of the DOJ's proposed remedy (in the DOJ's Proposed Final Judgment) in Comments that were filed with the DOJ on October 10, 2019.[3] This brief is a summary of those Comments.

Amici have no personal interest in the outcome of this case, but they share a professional, economics-principles-based interest in seeing that this case—and the merger that is the basis for this case—has an outcome that maintains competition in the relevant markets for wireless services. Amici draw on decades of experience—in academia, in practice, and in government—studying mergers and their competitive effects.

---

[1] The Amici affiliations are as follows: Nicholas Economides, Professor of Economics, NYU Stern School of Business; John Kwoka, Neal F. Finnegan Distinguished Professor of Economics, College of Social Sciences and Humanities, Northeastern University; Thomas Philippon, Max L. Heine Professor of Finance, NYU Stern School of Business; Robert Seamans, Associate Professor of Management and Organizations, NYU Stern School of Business; Hal Singer, Managing Director at Econ One, Adjunct Professor at Georgetown McDonough School of Business; Marshall Steinbaum, Assistant Professor, Economics Department, University of Utah; and Lawrence J. White, Robert Kavesh Professor of Economics, NYU Stern School of Business.

[2] Department of Justice Complaint, *United States et al v. Deutsche Telekom AG, T-Mobile Us, Inc., Softbank Group Corp., and Sprint Corporation,* No. 1:19-cv-02232, at 3 (D.D.C. July 26, 2019) (the "DOJ Complaint").

[3] Nicholas Economides, John Kwoka, Thomas Philippon, Robert Seamans, Hal Singer, Marshall Steinbaum, and Lawrence J. White, Economists' Tunney Act Comments on the DOJ's Proposed Remedy in the Sprint/T-Mobile Merger Proceeding, filed with the U.S. Department of Justice, October 10, 2019; available as Exhibit 12 in https://www.justice.gov/atr/case-document/file/1215711/download.

**INTRODUCTION**

Amici believe that allowing the Merger to go forward, cannot and will not address anticompetitive harms, or restore the *ex-ante* competitive conditions in the affected antitrust product markets. First, Dish Network ("Dish") will operate on a mobile virtual network operator ("MVNO") model that the Department of Justice (the "DOJ") and the Federal Communications Commission (the "FCC") have never deemed to be a meaningful competitive constraint on facilities-based providers. Second, Dish will be reliant on post-Merger T-Mobile ("New T-Mobile") for its network and operational support for years to come—the type of ongoing entanglements between the divestiture buyer and merged company that the DOJ and the FCC find problematic because the remedy creates ongoing competitive concerns. Third, even if Dish meets its commitments to build a 5G network covering 70 percent of the population—and Amici are highly skeptical that Dish will ever build out its network—it still would not replace Sprint, which currently reaches over 90 percent of Americans.

The Merger of Sprint and T-Mobile will have unambiguous anticompetitive effects. The DOJ itself recognizes that existing competition among the four national wireless competitors has been essential in keeping "prices down" and "serv[ing] as a catalyst for innovation."[4] The DOJ emphasizes that "[p]reserving this competition is critical to ensuring that consumers will continue to have reasonable and affordable access to an essential service."[5] Because this Merger, in the DOJ's own words, "would eliminate Sprint as an independent competitor," the result is that, left to its own devices, the New T-Mobile would "compete less aggressively."[6] The DOJ

---

[4] DOJ Complaint at ¶ 2.

[5] *Id.*

[6] *Id.* ¶ 5.

concludes that "the result would be increased prices" such that American consumers "would pay billions of dollars more each year for mobile wireless service."[7]

Having conceded this, the DOJ proposes to permit this merger subject only to a complex and ultimately unworkable set of conditions on the conduct of the merged company and an entirely new outside party. Amici contend that this is not a substitute for the actions necessary to preserve competition in mobile wireless service. Allowing the Merger to move forward even with DOJ's proposed conditions would clearly reduce consumer welfare.

## ARGUMENT

### A. Harms in the Wholesale Market for MVNO Access

The merging parties offer wholesale wireless services to resellers or MVNOs. According to the DOJ Complaint, the Merger would harm competition in the wholesale market for MVNO access:

> Competition between Sprint and T-Mobile to sell mobile wireless service wholesale to MVNOs has benefited consumers by furthering innovation, including the introduction of MVNOs with some facilities-based infrastructure. The [M]erger's elimination of this competition likely would reduce future innovation.[8]

Wholesale services permit resellers to target customer segments that would otherwise be ignored or underserved by vertically integrated carriers. For example, an incumbent carrier may not be able to post two different prices for the same service—a high price for price-insensitive customers, and a low price for price-sensitive customers. Resellers allow carriers to effectively offer the same service at different price points under a different brand. MVNOs are the mechanism by which cable companies compete in wireless; with the ability to bundle wireless offerings with other products like broadband and pay television, cable companies such as

---

[7] *Id.*

[8] *Id.* ¶ 22.

3

Comcast and Charter have competed aggressively on price (for example, selling wireless at a loss).[9] These innovative offerings, including prepaid plans, could be threatened if wholesale prices were to rise as a result of the Merger.

The merging parties represent the two largest companies in the wholesale market, accounting for nearly 68 percent of U.S. wholesale connections. This is no accident: relative to AT&T Inc. ("AT&T") and Verizon Communications, Inc. ("Verizon"), Sprint and T-Mobile are more willing to engage in wholesale activity because the risk of cannibalizing their retail offerings is lower, given their relatively smaller retail market shares and relatively lower margins per retail customer. Moreover, given their excess spectrum holdings, Sprint and T-Mobile would have strong incentives to continue offering wholesale service in the absence of the Merger. In the national wholesale market, the Merger would increase the Herfindahl Index ("HHI") by a staggering 2,256 points by our estimation, representing roughly the equivalent of a two-to-one merger and triggering the presumption of enhanced market power.

### B. Harms in the Retail Mobile Wireless Services, Including Postpaid and Prepaid

The DOJ Complaint defines a relevant product market as "retail mobile wireless services."[10] These include postpaid and prepaid services, and the DOJ Complaint concludes that "[t]he proposed merger would substantially lessen competition and harm consumers in the relevant market."[11] The DOJ Complaint acknowledges that U.S. wireless consumers "have benefitted from the competition T-Mobile and Sprint have brought to the mobile wireless

---

[9] In September 2019, Altice launched an extremely aggressive wireless offering—undercutting the major carriers on price—utilizing, in part, an innovative MVNO with Sprint that no other MVNO was willing to offer. *See* Press Release, Altice Mobile, the New 'Unlimited Everything' Mobile Service is Here, Sept. 5, 2019, *available at* https://alticeusa.com/news/articles/press-release/products-services/altice-mobile-new-unlimited-everything-mobileservice-here.

[10] DOJ Complaint at ¶ 14.

[11] *Id.* ¶ 16.

industry," including the introduction of unlimited data plans to retail customers in 2016.[12] Within this broader market, the DOJ recognized that an important dimension of competition between the merging parties has been in prepaid services, which has "exerted significant downward pressure on prices."[13] The DOJ Complaint notes that "competition between T-Mobile and Sprint also has led to improvements in the quality of devices and the plan features available to prepaid subscribers,"[14] including unlimited calling to Mexico. It concludes that "If the [M]erger were allowed to proceed, this competition would be lost," resulting in what economists refer to as unilateral price effects.[15] Unilateral effects arise when the customers of one merging party might have opted for the other if the former attempted to raise price. The effect of the Merger is to recapture within the combined firm those otherwise lost customers—a clear incentive for the parties to merge. Moreover, "the [M]erger would leave the market vulnerable to increased coordination among these three competitors."[16]

Prepaid wireless subscriptions are aimed at price-sensitive (or budget-constrained) customers. This is consistent with the DOJ's and the Federal Trade Commission's (the "FTC") *Horizontal Merger Guidelines* which contemplate markets in which services are targeted to certain customers as "price discrimination" markets.[17] Given that wireless customers select into prepaid and postpaid on the basis of price sensitivity, and given the merging partners focus on the prepaid segment—they collectively account for 53 percent of prepaid connections—it is natural to posit a prepaid market when studying this Merger. Indeed, the DOJ defined a market in

---

[12] *Id.* ¶ 17.

[13] *Id.* ¶ 18.

[14] *Id.* ¶ 20.

[15] *Id.* ¶ 21.

[16] *Id.*

[17] Horizontal Merger Guidelines, the DOJ and the FTC, *available* at https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf (last accessed January 9, 2020).

the DOJ Complaint in the (since abandoned) AT&T/T-Mobile merger, as "mobile wireless telecommunications services provided to enterprise and government customers," under the rationale that "[t]hese customers constitute a distinct set of customers for mobile wireless telecommunications services."[18] In the national retail prepaid market, the Sprint/T-Mobile Merger would increase HHI by at least 808 points, from 2,880 to 3,688, by our estimation. This estimate conservatively treats Dish as if it were a full-blown facilities-based horizontal competitor, as opposed to a prepaid MVNO—despite FCC and industry precedent to the contrary.[19] The clear implication is that this merger triggers a presumption of enhanced market power.

      C.    **There Is No Compelling Record Evidence of Marginal Cost Savings Attributable to the Merger**

There is no compelling evidence that the Merger would reduce the *marginal costs* of New T-Mobile.[20] Even if one were to credit T-Mobile's economists' claims of enhanced 5G deployment in otherwise unprofitable-to-deploy neighborhoods—prior to the Merger proposal, Sprint and T-Mobile separately announced plans to deploy 5G services nationwide[21]—these largely rural households are distinct from those urban and suburban households that likely will incur a price increase on 4G services resulting from the Merger. An economically significant and

---

[18] Department of Justice Complaint, U.S. et al v. AT&T, Inc. T-Mobile USA and Deutsche Telekom AG, Case:1:11-cv-01560 (D.D.C. Aug. 31, 2011) at ¶13.

[19] *See, e.g.,* Federal Communications Commission, 20th Wireless Competition Report, dated Sept. 26, 2017, n.99, *available at* https://www.fcc.gov/document/fcc-releases-20th-wireless-competition-report-0 ("Following widespread industry practices, the Commission generally attributes the subscribers of MVNOs to their host facilities-based service providers, including when it calculates market concentration metrics.").

[20] Marginal or incremental costs are the costs associated with making the last unit of production. Because fixed costs do not inform a firm's (marginal) pricing analysis in the short run, changes in fixed costs are not given the same consideration in efficiencies analysis as are changes in marginal costs.

[21] *See*, *e.g.*, R. Cheng, *Sprint: We're in a Unique Position to Deliver Broader 5G*, CNET, Feb. 28 2018 at 3:54 AM PST, https://www.cnet.cim/news/sprint-were-in-unique-positiom-to-deliver-broader-5g-now-mwc-2018/; T-Mobile Newsroom, *T-Mobile Building Out 5G in 30 Cities This Year…and That's Just the Start*, Feb. 26, 2018, https://www.t-mobile.com/news/mwc-2018-5g.

pervasive merger-related injury to one party should not be treated as being offset by a purported gain to a separate party.

### D. The Nature of the Proposed Final Judgment

To supposedly combat any anticompetitive effects of the Merger, the DOJ has come up with a final judgment (the "Proposed Final Judgment") that allows the Merger to go forward. The Proposed Final Judgment establishes a number of affirmative obligations on the parties, obligations that lock the parties into a long-term relationship with Dish. Despite this fact, the DOJ Antitrust Division has described this Proposed Final Judgment as "structural" in nature, undoubtedly because structural remedies are viewed as more likely to be successful in remedying a merger's harm than are rules governing the behavior of a merged company. However, this remedy is hardly "structural." It strays far from the known workable model of divestiture, which involves identifying an overlapping operation or product of two merging companies, requiring divestiture of one of them, and then—if done well—counting on competition to produce roughly the same market outcome as before. In the classic model case, no further oversight, monitoring, or intervention is necessary.

In reality the structural elements of this Proposed Final Judgment are modest, problematic in several respects, and dwarfed by behavioral provisions that are known—and acknowledged by the DOJ itself[22]—to be far less likely to be successful in preserving competition.

#### 1. Behavioral Aspects

The Proposed Final Judgment contains several critical behavioral components. It imposes on the merging parties an obligation to permit Dish to operate as a reseller on New T-Mobile's

---

[22] Makin Delrahim, *It Takes Two: Modernizing the Merger Review Process, Remarks of the Assistant Attorney General for Antitrust*, 2018 Global Antitrust Enforcement Symposium, Washington, DC, Sept. 25, 2018, https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-remarks-2018-global-antitrust.

wireless network for the entire seven-year term of the Proposed Final Judgment.[23] In setting out various provisions seeking to make this arrangement work, it discloses by implication the enormous difficulties that arise in having one company assist its direct competitor. The Proposed Final Judgment details a host of obligations that T-Mobile must observe in carrying out the resale agreement, including traffic non-discrimination, device non-discrimination, and obligations to provide operational support and support handover mobility.[24] The Proposed Final Judgment requires T-Mobile and Sprint to provide certain "transition services" to Dish for a period up to three years, including billing, customer care, SIM card procurement, device positioning, and "all other services [previously] used by the Prepaid Assets."[25] The New T-Mobile is also required to extend existing MVNO agreements to resellers.[26] In the wholesale market, until Dish builds its own network, the number of network operators is indisputably reduced from four to three. In this market, the Proposed Final Judgment has only a behavioral remedy in which competition is supposedly preserved by the parties extending existing MVNO agreements. But as previously described, an MVNO agreement is acknowledged by the DOJ and the FTC (as well as by many others) to result in less than a full competitor because its provisions, like behavioral remedies, require the merged company to act against its own interests.

Moreover, Dish is required to "offer retail mobile wireless services, including offering nationwide postpaid retail mobile wireless service,"[27] reflecting the concern that Dish may ultimately have little incentive to expand beyond prepaid service. Dish also must "comply with

---

[23] Proposed Final Judgment at Section VI.A.

[24] *Id.* at VI.B.

[25] *Id.* at IV.A.4.

[26] *Id.* at VII.A.

[27] *Id.* at IV.F.

8

the June 14, 2023, network build commitments made to the FCC."[28] The Proposed Final Judgment stipulates that Dish must provide wireless service using cell sites and retail stores as they are "decommissioned" and determined to be redundant by the merged firm. If Dish's own network does not serve 70 percent of the country by 2023, it will face penalties up to $2.2 billion. To the DOJ, these detailed operational instructions may have seemed necessary for the remedy to be effective, but just as surely, they will prove insufficient for all the reasons that behavioral remedies—especially when critical and long-term—have proven unlikely to succeed.

2. **Structural Aspects**

The Proposed Final Judgment is claimed to be structural in nature, whereas any arguable structural features are extremely limited. The sole certain divestiture consists of Sprint's prepaid business, but that business consists of subscribers, which are to be divested to Dish, and an opportunity to contract with Sprint's current employees in that business. These are not hard and sunk assets whose transfer clearly confers on the recipient a going viable production process. It is essentially a handoff of a business operation which could evaporate overnight if either customers or employees decide not to switch to the new and untested Dish brand and management.

Dish also has the option to purchase Sprint's 800-megahertz spectrum licenses, as well as decommissioned cell sites and retail locations. In terms of acquired personnel, the Proposed Final Judgment "includes a complicated process by which Sprint will identify all employees of its existing prepaid operations so that Dish can vet, interview, and negotiate with those employees for continued employment with Dish's follow-on service."[29] The option to purchase spectrum is intended to expand Dish's own 800 MHz spectrum holdings and thereby permit it to

---

[28] *Id.* at VII.A.

[29] *See* John Kwoka, Masquerading as Merger Control: The U.S. Department of Justice Settlement with Sprint and T-Mobile, AAI Working Paper 2019.

build out an entirely new 5G network. The Proposed Final Judgment penalizes Dish for failing to acquire Sprint's spectrum, unless it demonstrates that it can provide such service strictly with its own, currently unused 800 MHz spectrum.

It is clear that the Proposed Final Judgment has all the crucial elements of a conduct or behavioral remedy. It involves the parties in an on-going relationship over critical aspects of the business. It depends on the DOJ's ability to oversee and judge those relationships for a period of seven or more years. The extreme dependency of Dish on the good graces of New T-Mobile creates abundant opportunities for the merged firm to engage in strategic pricing, slowdown of provision, alteration of terms or quality of the assets and services, and so forth. The Proposed Final Judgment, in short, has all the hallmarks of a detailed, regulatory, and interventionist remedy of the sort previously and properly criticized by the DOJ, which is now inexplicably offering up this proposal to an anticompetitive Merger.

### E. The Merger-Related Harms Will Not Be Adequately Addressed By The Proposed Final Judgment

Based on experience there is good reason to doubt that Dish will ever deploy its own facilities-based network. What is clear, however, is that the Merger reduces the number of facilities-based carriers from four to three, and the loss to postpaid customers is immediate, obvious, and long-term. Any price-disciplining effect that Sprint previously imposed on T-Mobile's postpaid offerings (and vice versa) is forever lost, and wholesale competition is forever diminished. The only harm potentially attenuated via the Merger is the harm to prepaid customers, and even that is partial and uncertain; because Dish will operate as an MVNO, where its business partner is a rival, the remedy will not fully offset the loss of a facilities-based provider of prepaid services. Even in the unlikely scenario where Dish elects to build out, given the significant time and investment required, competition will be weakened in the intervening

years. Because prepaid customers, by definition, do not have long-term contracts (they pay month-to-month), they are particularly susceptible to seeing any benefits from competition disappear to the extent *other* prepaid providers—primarily offering service via MVNOs—experience the effects of less competition in wholesale.

### 1. If Dish Does Not Build Out a National Facilities-Based Network, Wireless Competition Will Be Forever Weakened

The supposed rationale for approving the Merger appears to be Dish's actually building out its own national facilities-based network. Amici urge a careful assessment of the prospects for this happening. In predicting what a firm might do in the future when subject to a remedy, one good source of such information is the firm's past behavior in analogous settings. Dish has repeatedly failed to meet prior FCC build-out requirements on its existing spectrum. This conduct goes back to as early as 2012 with the company's acquisitions of DBSD and TerreStar. Dish's existing 700 megahertz and AWS-4 spectrum licenses come with an FCC requirement to construct a wireless network by March 2020. Dish has missed a number of interim construction deadlines on that front. Indeed, in the FCC's review of the pending Merger, in March 2019 a T-Mobile attorney wrote that "Dish has a track record of price increases for its services, speculative warehousing of spectrum and failing to meet FCC-imposed deadlines to construct the facilities required."[30] The filing goes on to note "Dish stands out for its efforts to game the regulatory system by proffering a modernized version of last century's two-way paging as a substitute for meeting its obligations to start building a real 5G network."[31]

---

[30] *See* Letter from Nancy Victory to Marlene Dortch, In Re Notification of Written *Ex Parte* Presentation Applications of T-Mobile US, Inc. and Sprint Corporation for Consent to Transfer Control of Licenses and Authorizations, WT Dkt. No. 18-197, Mar. 11, 2019, at note 3, *available at* https://bit.ly/2kVbOrI, *last visited* Jan. 13, 2020/

[31] *Id.*

11

Moreover, because of Dish's importance in securing the settlement, it likely extracted a favorable resale arrangement. If the DOJ wanted to wean Dish from the resale agreement, the term would have been shorter than seven years and the access terms would have deteriorated over time. The financial markets would likely penalize Dish for making any infrastructure investments. Any Dish investment in towers and other facilities likely would not add value to the most likely buyers of the spectrum—namely, New T-Mobile, AT&T or Verizon. A similar episode occurred in Germany. There, a reseller named Drillisch served the role of "fixing" a four-to-three merger of E-Plus and Telefonica, by taking on a retail obligation.[32] Drillisch saw its stock hammered when it started to invest in spectrum to build out its own network.[33]

The risk to Dish if it fails to build a national facilities-based network is a modest $2.2 billion financial penalty, which is small compared to Dish's estimated $10 billion in buildout costs.[34] The penalty is also small relative to what some think its spectrum holdings could fetch if sold outright. It bears noting that the $2.2 billion fine is the maximum, which implies that it could be lower, as Dish could challenge the fine in court as, for example, inappropriate due to unforeseen obstacles to the build-out. Because the license forfeitures would have occurred with respect to Dish's original buildout requirements, they are not incremental to Dish's marginal calculus now. If Dish has the "natural" incentive to build out anyway, it is not clear why

---

[32] *See, e.g.,* Michael Filtz, *Telefonica Deutschland closes €8.6bn acquisition of E-Plus*, ZDNET, Oct. 2, 2014, 01:17 PDT, *available at* https://www.zdnet.com/article/telefonica-deutschland-closes-eur8-6bn-acquisition-of-e-plus/ ("For the deal to pass muster, the regulator found, Telefonica had to agree to initially sell off 20 percent of the combined network capacity to Drillisch, a mobile virtual network operator.").

[33] *See Market unimpressed as billionaire throws hat into Germany's 5G ring*, DW.com*, available at* https://bit.ly/2kI5Kmv ("Investors were skeptical about the move. TecDax-listed Drillisch and United Internet shares fell after the announcement by 7.7 percent and 2.8 percent, respectively, on concerns they would give up their current profitable business as a virtual mobile network operator (MVNO) and have to borrow heavily to secure a license and build network infrastructure. Since the announcement of interest in the auction in last summer, Drillisch has lost 43 percent of its value.").

[34] *See* Drew Fitzgerald, *A TV Maverick Is Going All-In on a New Wireless Bet*, Wall St. J., July 27, 2019, *available at* https://on.wsj.com/2ZjITws.

financial penalties are even necessary. If Dish reaches only 50 percent of nationwide population by June 2023, it will have to make a voluntary, tax-deductible contribution of $580 million. In that case, Dish gets a two-year extension until June 2025 to hit the buildout criteria for license renewal, which are 70 percent population coverage in each license area for AWS-4, H block, and the Lower 700 MHz E Block, and 75 percent of population for 600 MHz.

With respect to resellers, given that Sprint was a well-documented innovator in the wholesale market, T-Mobile's extending existing MVNO agreements will not fully restore competition in wholesale. Sprint's MVNO with Altice USA was the first and only MVNO agreement with so-called "core control" provisions, giving Altice control over various features such as subscriber identity module ("SIM"), roaming and network partners, customer care, and billing.[35] It is true that New T-Mobile would be constrained from raising wholesale rates to existing MVNO partners. However, absent the merger, wholesale competition between Sprint and T-Mobile might well have driven down the wholesale rates to MVNOs. Now that competition is eliminated, the existing MVNOs, who are only guaranteed to be held whole by the Proposed Final Judgment, would be worse off relative to the but-for world with no Merger. Moreover, holding the terms of existing agreements in place does not mean that New T-Mobile has to enter into new agreements with MVNOs, such as cable operators; it simply preserves existing prices for existing MVNO partners.

### 2. Even in the Unlikely Scenario Where Dish Elects to Build Out, Given the Time Required, Competition Will Be Weakened in the Intervening Years

Under the Proposed Final Judgment, Dish has until June 2023 to construct a network covering 70 percent of the population. That leaves four years in which Dish does not operate its

---

[35] Responses of Altice USA, Inc. to the Federal Communication Commission's October 4, 2018 Information and Document Request, Jan. 28, 2019, *available at* https://bit.ly/2m71dua.

13

own network, and so the transaction is essentially a four-to-three merger. This is because of the widespread recognition that MVNOs do not actually constrain the postpaid pricing of incumbent operators; thus, postpaid competition will be diminished in the interim even if Dish ultimately deploys its own network. Dish will certainly not be able to constrain New T-Mobile's selling power in the wholesale market in the intervening years. Moreover, because the coverage requirement is denominated in terms of population, not geography, it is clear that certain parts of the country will lose out. Thus, it possible, for example, to cover 50 percent of the population by just targeting 15 percent of the most urban areas in the U.S. Even if Dish hits that 70 percent goal, the resulting network likely will not fully replace Sprint's ubiquitous nationwide network, leaving nearly 100 million Americans with one fewer facilities-based carrier.[36]

T-Mobile's CEO, John Legere, acknowledged on an investor call right after the settlement was announced that Dish would not affect New T-Mobile's profitability: "It's important to point out that the target synergies, the profitability and long-term cash generation have not changed for the New T-Mobile."[37] If New T-Mobile really just helped provision a disruptive number four carrier, then the new carrier would rapidly take market share away from the incumbents: otherwise, it would not justify a $10 billion network investment. It is difficult to square Mr. Legere's comments with what the DOJ's settlement promises. Expecting that Dish will bring "disruptive" competition is implausible. The parties would never willingly and knowingly create such a competitor. This statement would seem to reflect DOJ's anxiety about approving the Merger that eliminates such a firm, and the claim should be firmly rejected.

---

[36] *See, e.g.*, Jon Brodkin, *DOJ's plan to make Dish the fourth major carrier has a fatal flaw*, Aug. 27, 2019, *available at* https://bit.ly/2kqbzVs.

[37] T-Mobile US, Inc. (TMUS) CEO John Legere on Q2 2019 Results - Earnings Call Transcript, Seeking Alpha, July 29, 2019, *available at* https://bit.ly/2m38U4o.

### 3. The Impact of the Deficient Remedy Will Be Significant Consumer Injury

At the closing of this Merger, and with this Proposed Final Judgment, there will in fact be only three facilities-based national wireless competitors, and the DOJ's own concerns about competition will be realized. Dish will acquire and seek to maintain a small prepaid business with roughly 8.7 million customers, or about 2.5 percent of all U.S. wireless subscribers and less than one sixth of Sprint's 54.3 million subscriber base. Dish will operate on an MVNO model that the DOJ and the Federal Communications Commission (FCC) have never deemed to be a meaningful competitive constraint on facilities-based providers.[38] Dish will be reliant on New T-Mobile for its network and operational support for years to come—the type of ongoing entanglements between the divestiture buyer and merged company that the DOJ and the FCC find problematic because the remedy creates ongoing competitive concerns. Indeed, the DOJ itself recognizes that going from four to three wireless providers will harm consumers through higher prices, lower quality and less choice.[39]

There will also be consumer harm in the long term. In 2023, in the unlikely event that Dish meets its commitments to build a 5G network covering 70 percent of the population, it still would not replace Sprint, which currently reaches over 90 percent of Americans. Accordingly, the Merger would leave over 90 million Americans (or 30 percent of the U.S. population), primarily in smaller communities and rural areas, still paying those higher prices and without any assurance of restored competition. Dish, however, is not likely to ever be able to replace Sprint even for that 70 percent of the population. Dish would be starting from scratch with significant

---

[38] *See* FCC 20th Wireless Competition Report, ¶33 n.99, Sept. 17, 2017, *available at* https://www.fcc.gov/document/fcc-releases-20th-wireless-competition-report-0 ("Following widespread industry practices, the Commission generally attributes the subscribers of MVNOs to their host facilities-based service providers, including when it calculates market concentration metrics.").

[39] DOJ Complaint ¶ 30.

debt, no network infrastructure or wireless experience, in a business that the DOJ itself characterizes as having "high barriers to entry."[40] It would be attempting what no company has ever done before—to build and operate a nationwide wireless network, at a cost of at least $10 billion, from scratch, and in a short number of years. This significant undertaking exceeds what Dish has promised regulators before, but failed to deliver time and again. The DOJ's aspiration to create a new competitor in these circumstances is fraught with risk that will surely doom it to failure.

## CONCLUSION

By eliminating Sprint as an independent competitor, the Sprint/T-Mobile Merger, even in the presence of the Proposed Final Judgment, would predictably inflict serious antitrust injury on consumers and competition. This is clearly the case in the short and medium terms, with only the unlikely prospect of restoring competition several years from now as the supposed benefit of the merger. The uncertainty of the latter, together with the certainty of harm until then, is more than sufficient reason to reject this merger.

Dated: January 13, 2020
      New York, New York

Respectfully submitted,

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

/s/ Fred T. Isquith

Fred T. Isquith
Veronica Bosco
270 Madison Avenue
New York, New York 10016
212-545-4600
isquith@whafh.com

---

[40] *Id.* ¶ 23.

bosco@whafh.com

*Counsel for Amici Curiae*

Lawrence J. White
Nicholas Economides
John Kwoka
Thomas Philippon
Robert Seamans
Hal Singer
Marshall Steinbaum
44 West Fourth Street, 7-65
New York, NY 10012
212-998-0880
lwhite@stern.nyu.edu

*Amici Curiae*